# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**



| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| APPLE, INC., | ) Civil Action No. |
| HACHETTE BOOK GROUP, INC., | ) |
| HARPERCOLLINS PUBLISHERS L.L.C., | ) |
| VERLAGSGRUPPE GEORG VON | ) |
| HOLTZBRINCK GMBH, | ) |
| HOLTZBRINCK PUBLISHERS, LLC | ) |
| d/b/a MACMILLAN, | ) |
| THE PENGUIN GROUP, | ) |
| A DIVISION OF PEARSON PLC, | ) |
| PENGUIN GROUP (USA), INC., and | ) |
| SIMON & SCHUSTER, INC., | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

The United States of America, acting under the direction of the Attorney General of the

United States, brings this civil antitrust action against Defendants Apple, Inc. ("Apple");

Hachette Book Group, Inc. ("Hachette"); HarperCollins Publishers L.L.C. ("HarperCollins");

Verlagsgruppe Georg von Holtzbrinck GmbH and Holtzbrinck Publishers, LLC d/b/a Macmillan

(collectively, "Macmillan"); The Penguin Group, a division of Pearson plc and Penguin Group

(USA), Inc. (collectively, "Penguin"); and Simon & Schuster, Inc. ("Simon & Schuster";

collectively with Hachette, HarperCollins, Macmillan, and Penguin, "Publisher Defendants") to

obtain equitable relief to prevent and remedy violations of Section 1 of the Sherman Act, 15

U.S.C. § 1.

Plaintiff alleges:

## I. INTRODUCTION

1. Technology has brought revolutionary change to the business of publishing and selling books, including the dramatic explosion in sales of "e-books"—that is, books sold to consumers in electronic form and read on a variety of electronic devices, including dedicated e-readers (such as the Kindle or the Nook), multipurpose tablets, smartphones and personal computers. Consumers reap a variety of benefits from e-books, including 24-hour access to product with near-instant delivery, easier portability and storage, and adjustable font size. E-books also are considerably cheaper to produce and distribute than physical (or "print") books.

2. E-book sales have been increasing rapidly ever since Amazon released its first Kindle device in November of 2007. In developing and then mass marketing its Kindle e-reader and associated e-book content, Amazon substantially increased the retail market for e-books. One of Amazon's most successful marketing strategies was to lower substantially the price of newly released and bestselling e-books to $9.99.

3. Publishers saw the rise in e-books, and particularly Amazon's price discounting, as a substantial challenge to their traditional business model. The Publisher Defendants feared that lower retail prices for e-books might lead eventually to lower wholesale prices for e-books, lower prices for print books, or other consequences the publishers hoped to avoid. Each Publisher Defendant desired higher retail e-book prices across the industry before "$9.99" became an entrenched consumer expectation. By the end of 2009, however, the Publisher Defendants had concluded that unilateral efforts to move Amazon away from its practice of offering low retail prices would not work, and they thereafter conspired to raise retail e-book prices and to otherwise limit competition in the sale of e-books. To effectuate their conspiracy,

2

the Publisher Defendants teamed up with Defendant Apple, which shared the same goal of restraining retail price competition in the sale of e-books.

4.    The Defendants' conspiracy to limit e-book price competition came together as the Publisher Defendants were jointly devising schemes to limit Amazon's ability to discount e-books and Defendant Apple was preparing to launch its electronic tablet, the iPad, and considering whether it should sell e-books that could be read on the new device.  Apple had long believed it would be able to "trounce Amazon by opening up [its] own ebook store," but the intense price competition that prevailed among e-book retailers in late 2009 had driven the retail price of popular e-books to $9.99 and had reduced retailer margins on e-books to levels that Apple found unattractive.  As a result of discussions with the Publisher Defendants, Apple learned that the Publisher Defendants shared a common objective with Apple to limit e-book retail price competition, and that the Publisher Defendants also desired to have popular e-book retail prices stabilize at levels significantly higher than $9.99.  Together, Apple and the Publisher Defendants reached an agreement whereby retail price competition would cease (which all the conspirators desired), retail e-book prices would increase significantly (which the Publisher Defendants desired), and Apple would be guaranteed a 30 percent "commission" on each e-book it sold (which Apple desired).

5.    To accomplish the goal of raising e-book prices and otherwise limiting retail competition for e-books, Apple and the Publisher Defendants jointly agreed to alter the business model governing the relationship between publishers and retailers.  Prior to the conspiracy, both print books and e-books were sold under the longstanding "wholesale model."  Under this model, publishers sold books to retailers, and retailers, as the owners of the books, had the freedom to establish retail prices.  Defendants were determined to end the robust retail price competition in

3

e-books that prevailed, to the benefit of consumers, under the wholesale model. They therefore

agreed jointly to replace the wholesale model for selling e-books with an "agency model."

Under the agency model, publishers would take control of retail pricing by appointing retailers as

"agents" who would have no power to alter the retail prices set by the publishers. As a result, the

publishers could end price competition among retailers and raise the prices consumers pay for e-

books through the adoption of identical pricing tiers. This change in business model would not

have occurred without the conspiracy among the Defendants.

6.      Apple facilitated the Publisher Defendants' collective effort to end retail price

competition by coordinating their transition to an agency model across all retailers. Apple

clearly understood that its participation in this scheme would result in higher prices to

consumers. As Apple CEO Steve Jobs described his company's strategy for negotiating with the

Publisher Defendants, "We'll go to [an] agency model, where you set the price, and we get our

30%, and yes, the customer pays a little more, but that's what you want anyway." Apple was

perfectly willing to help the Publisher Defendants obtain their objective of higher prices for

consumers by ending Amazon's "$9.99" price program as long as Apple was guaranteed its 30

percent margin and could avoid retail price competition from Amazon.

7.      The plan – what Apple proudly described as an "aikido move" – worked. Over

three days in January 2010, each Publisher Defendant entered into a functionally identical

agency contract with Apple that would go into effect simultaneously in April 2010 and "chang[e]

the industry permanently." These "Apple Agency Agreements" conferred on the Publisher

Defendants the power to set Apple's retail prices for e-books, while granting Apple the assurance

that the Publisher Defendants would raise retail e-book prices at all other e-book outlets, too.

Instead of $9.99, electronic versions of bestsellers and newly released titles would be priced

4

according to a set of price tiers contained in each of the Apple Agency Agreements that determined de facto retail e-book prices as a function of the title's hardcover list price. All bestselling and newly released titles bearing a hardcover list price between $25.01 and $35.00, for example, would be priced at $12.99, $14.99, or $16.99, with the retail e-book price increasing in relation to the hardcover list price.

8.     After executing the Apple Agency Agreements, the Publisher Defendants all then quickly acted to complete the scheme by imposing agency agreements on all their other retailers. As a direct result, those retailers lost their ability to compete on price, including their ability to sell the most popular e-books for $9.99 or for other low prices. Once in control of retail prices, the Publisher Defendants limited retail price competition among themselves. Millions of e-books that would have sold at retail for $9.99 or for other low prices instead sold for the prices indicated by the price schedules included in the Apple Agency Agreements—generally, $12.99 or $14.99. Other price and non-price competition among e-book publishers and among e-book retailers also was unlawfully eliminated to the detriment of U.S. consumers.

9.     The purpose of this lawsuit is to enjoin the Publisher Defendants and Apple from further violations of the nation's antitrust laws and to restore the competition that has been lost due to the Publisher Defendants' and Apple's illegal acts.

10.     Defendants' ongoing conspiracy and agreement have caused e-book consumers to pay tens of millions of dollars more for e-books than they otherwise would have paid.

11.     The United States, through this suit, asks this Court to declare Defendants' conduct illegal and to enter injunctive relief to prevent further injury to consumers in the United States.

## II. DEFENDANTS

12.　Apple, Inc. has its principal place of business at 1 Infinite Loop, Cupertino, CA 95014. Among many other businesses, Apple, Inc. distributes e-books through its iBookstore.

13.　Hachette Book Group, Inc. has its principal place of business at 237 Park Avenue, New York, NY 10017. It publishes e-books and print books through publishers such as Little, Brown, and Company and Grand Central Publishing.

14.　HarperCollins Publishers L.L.C. has its principal place of business at 10 E. 53rd Street, New York, NY 10022. It publishes e-books and print books through publishers such as Harper and William Morrow.

15.　Holtzbrinck Publishers, LLC d/b/a Macmillan has its principal place of business at 175 Fifth Avenue, New York, NY 10010. It publishes e-books and print books through publishers such as Farrar, Straus and Giroux and St. Martin's Press. Verlagsgruppe Georg von Holtzbrinck GmbH owns Holtzbrinck Publishers, LLC d/b/a Macmillan and has its principal place of business at Gänsheidestraße 26, Stuttgart 70184, Germany.

16.　Penguin Group (USA), Inc. has its principal place of business at 375 Hudson Street, New York, NY 10014. It publishes e-books and print books through publishers such as The Viking Press and Gotham Books. Penguin Group (USA), Inc. is the United States affiliate of The Penguin Group, a division of Pearson plc, which has its principal place of business at 80 Strand, London WC2R 0RL, United Kingdom.

17.　Simon & Schuster, Inc. has its principal place of business at 1230 Avenue of the Americas, New York, NY 10020. It publishes e-books and print books through publishers such as Free Press and Touchstone.

6

### III. JURISDICTION, VENUE, AND INTERSTATE COMMERCE

18.     Plaintiff United States of America brings this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, to obtain equitable relief and other relief to prevent and restrain Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C § 1.

19.     This Court has subject matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

20.     This Court has personal jurisdiction over each Defendant and venue is proper in the Southern District of New York under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because each Defendant transacts business and is found within the Southern District of New York.  The U.S. component of each Publisher Defendant is headquartered in the Southern District of New York, and acts in furtherance of the conspiracy occurred in this District.  Many thousands of the Publisher Defendants' e-books are and have been sold in this District, including through Defendant Apple's iBookstore.

21.     Defendants are engaged in, and their activities substantially affect, interstate trade and commerce.  The Publisher Defendants sell e-books throughout the United States.  Their e-books represent a substantial amount of interstate commerce.  In 2010, United States consumers paid more than $300 million for the Publisher Defendants' e-books, including more than $40 million for e-books licensed through Defendant Apple's iBookstore.

### IV. CO-CONSPIRATORS

22.     Various persons, who are known and unknown to Plaintiff, and not named as defendants in this action, including senior executives of the Publisher Defendants and Apple, have participated as co-conspirators with Defendants in the offense alleged and have performed acts and made statements in furtherance of the conspiracy.

## V.  THE PUBLISHING INDUSTRY AND BACKGROUND OF THE CONSPIRACY

### A.  *Print Books*

23.      Authors submit books to publishers in manuscript form.  Publishers edit manuscripts, print and bind books, provide advertising and related marketing services, decide when a book should be released for sale, and distribute books to wholesalers and retailers. Publishers also determine the cover price or "list price" of a book, and typically that price appears on the book's cover.

24.      Retailers purchase print books directly from publishers, or through wholesale distributors, and resell them to consumers.  Retailers typically purchase print books under the "wholesale model."  Under that model, retailers pay publishers approximately one-half of the list price of books, take ownership of the books, then resell them to consumers at prices of the retailer's choice.  Publishers have sold print books to retailers through the wholesale model for over 100 years and continue to do so today.

### B.  *E-books*

25.      E-books are books published in electronic formats.  E-book publishers avoid some of the expenses incurred in producing and distributing print books, including most manufacturing expenses, warehousing expenses, distribution expenses, and costs of dealing with unsold stock.

26.      Consumers purchase e-books through websites of e-book retailers or through applications loaded onto their reading devices.  Such electronic distribution allows e-book retailers to avoid certain expenses they incur when they sell print books, including most warehousing expenses and distribution expenses.

27.      From its very small base in 2007 at the time of Amazon's Kindle launch, the e-book market has exploded, registering triple-digit sales growth each year.  E-books now

8

constitute at least ten percent of general interest fiction and non-fiction books (commonly known as "trade" books[1]) sold in the United States and are widely predicted to reach at least 25 percent of U.S. trade books sales within two to three years.

> *D.    Publisher Defendants and "The $9.99 Problem"*

28.    The Publisher Defendants compete against each other for sales of trade e-books to consumers. Publishers bid against one another for print- and electronic-publishing rights to content that they expect will be most successful in the market. They also compete against each other in bringing those books to market. For example, in addition to price-setting, they create cover art and other on-book sales inducements, and also engage in advertising campaigns for some titles.

29.    The Publisher Defendants are five of the six largest publishers of trade books in the United States. They publish the vast majority of their newly released titles as both print books and e-books. Publisher Defendants compete against each other in the sales of both trade print books and trade e-books.

30.    When Amazon launched its Kindle device, it offered newly released and bestselling e-books to consumers for $9.99. At that time, Publisher Defendants routinely wholesaled those e-books for about that same price, which typically was less than the wholesale price of the hardcover versions of the same titles, reflecting publisher cost savings associated with the electronic format. From the time of its launch, Amazon's e-book distribution business has been consistently profitable, even when substantially discounting some newly released and bestselling titles.

---

[1] Non-trade e-books include electronic versions of children's picture books and academic textbooks, reference materials, and other specialized texts that typically are published by separate imprints from trade books, often are sold through separate channels, and are not reasonably substitutable for trade e-books.

9

31.     To compete with Amazon, other e-book retailers often matched or approached Amazon's $9.99-or-less prices for e-book versions of new releases and *New York Times* bestsellers. As a result of that competition, consumers benefited from Amazon's $9.99-or-less e-book prices even if they purchased e-books from competing e-book retailers.

32.     The Publisher Defendants feared that $9.99 would become the standard price for newly released and bestselling e-books. For example, one Publisher Defendant's CEO bemoaned the "wretched $9.99 price point" and Penguin USA CEO David Shanks worried that e-book pricing "can't be $9.99 for hardcovers."

33.     The Publisher Defendants believed the low prices for newly released and bestselling e-books were disrupting the industry. The Amazon-led $9.99 retail price point for the most popular e-books troubled the Publisher Defendants because, at $9.99, most of these e-book titles were priced substantially lower than hardcover versions of the same title. The Publisher Defendants were concerned these lower e-book prices would lead to the "deflation" of hardcover book prices, with accompanying declining revenues for publishers. The Publisher Defendants also worried that if $9.99 solidified as the consumers' expected retail price for e-books, Amazon and other retailers would demand that publishers lower their wholesale prices, further compressing publisher profit margins.

34.     The Publisher Defendants also feared that the $9.99 price point would make e-books so popular that digital publishers could achieve sufficient scale to challenge the major incumbent publishers' basic business model. The Publisher Defendants were especially concerned that Amazon was well positioned to enter the digital publishing business and thereby supplant publishers as intermediaries between authors and consumers. Amazon had, in fact, taken steps to do so, contracting directly with authors to publish their works as e-books—at a

higher royalty rate than the Publisher Defendants offered. Amazon's move threatened the Publisher Defendants' traditional positions as the gate-keepers of the publishing world. The Publisher Defendants also feared that other competitive advantages they held as a result of years of investments in their print book businesses would erode and, eventually, become irrelevant, as e-book sales continued to grow.

        E.     *Publisher Defendants Recognize They Cannot Solve "The $9.99 Problem" Alone*

        35.     Each Publisher Defendant knew that, acting alone, it could not compel Amazon to raise e-book prices and that it was not in its economic self-interest to attempt unilaterally to raise retail e-book prices. Each Publisher Defendant relied on Amazon to market and distribute its e-books, and each Publisher Defendant believed Amazon would leverage its position as a large retailer to preserve its ability to compete and would resist any individual publisher's attempt to raise the prices at which Amazon sold that publisher's e-books. As one Publisher Defendant executive acknowledged Amazon's bargaining strength, "we've always known that unless other publishers follow us, there's no chance of success in getting Amazon to change its pricing practices." In the same email, the executive wrote, "without a critical mass behind us Amazon won't 'negotiate,' so we need to be more confident of how our fellow publishers will react. . . ."

        36.     Each Publisher Defendant also recognized that it would lose sales if retail prices increased for only its e-books while the other Publisher Defendants' e-books remained competitively priced. In addition, higher prices for just one publisher's e-books would not change consumer perceptions enough to slow the erosion of consumer-perceived value of books that all the Publisher Defendants feared would result from Amazon's $9.99 pricing policy.

## VI.  DEFENDANTS' UNLAWFUL ACTIVITIES

37.     Beginning no later than September 2008, the Publisher Defendants' senior executives engaged in a series of meetings, telephone conversations and other communications in which they jointly acknowledged to each other the threat posed by Amazon's pricing strategy and the need to work collectively to end that strategy.  By the end of the summer of 2009, the Publisher Defendants had agreed to act collectively to force up Amazon's retail prices and thereafter considered and implemented various means to accomplish that goal, including moving under the guise of a joint venture.  Ultimately, in late 2009, Apple and the Publisher Defendants settled on the strategy that worked—replacing the wholesale model with an agency model that gave the Publisher Defendants the power to raise retail e-book prices themselves.

38.     The evidence showing conspiracy is substantial and includes:

- Practices facilitating a horizontal conspiracy.  The Publisher Defendants regularly communicated with each other in private conversations, both in person and on the telephone, and in e-mails to each other to exchange sensitive information and assurances of solidarity to advance the ends of the conspiracy.

- Direct evidence of a conspiracy.  The Publisher Defendants directly discussed, agreed to, and encouraged each other to collective action to force Amazon to raise its retail e-book prices.

- Recognition of illicit nature of communications.  Publisher Defendants took steps to conceal their communications with one another, including instructions to "double delete" e-mail and taking other measures to avoid leaving a paper trail.

- Acts contrary to economic interests.  It would have been contrary to the economic interests of any Publisher Defendant acting alone to attempt to impose agency on all of its retailers and then raise its retail e-book prices.  For example, Penguin Group CEO John Makinson reported to his parent company board of directors that "the industry needs to develop a common strategy" to address the threat "from digital companies whose objective may be to disintermediate traditional publishers altogether" because it "will not be possible for any individual publisher to mount an effective response," and Penguin later admitted that it would have been economically disadvantaged if it "was the only publisher dealing with Apple under the new business model."

- Motive to enter the conspiracy, including knowledge or assurances that competitors also will enter. The Publisher Defendants were motivated by a desire to maintain both the perceived value of their books and their own position in the industry. They received assurances from both each other and Apple that they all would move together to raise retail e-book prices. Apple was motivated to ensure that it would not face competition from Amazon's low-price retail strategy.

- Abrupt, contemporaneous shift from past behavior. Prior to January 23, 2010, all Publisher Defendants sold their e-books under the traditional wholesale model; by January 25, 2010, all Publisher Defendants had irrevocably committed to transition all of their retailers to the agency model (and Apple had committed to sell e-books on a model inconsistent with the way it sells the vast bulk of the digital media it offers in its iTunes store). On April 3, 2010, as soon as the Apple Agency Agreements simultaneously became effective, all Publisher Defendants immediately used their new retail pricing authority to raise the retail prices of their newly released and bestselling e-books to the common ostensible maximum prices contained in their Apple Agency Agreements.

A.     *The Publisher Defendants Recognize a Common Threat*

39.     Starting no later than September of 2008 and continuing for at least one year, the Publisher Defendants' CEOs (at times joined by one non-defendant publisher's CEO) met privately as a group approximately once per quarter. These meetings took place in private dining rooms of upscale Manhattan restaurants and were used to discuss confidential business and competitive matters, including Amazon's e-book retailing practices. No legal counsel was present at any of these meetings.

40.     In September 2008, Penguin Group CEO John Makinson was joined by Macmillan CEO John Sargent and the CEOs of the other four large publishers at a dinner meeting in "The Chef's Wine Cellar," a private room at Picholene. One of the CEOs reported that business matters were discussed.

41.     In January 2009, the CEO of one Publisher Defendant, a United States subsidiary of a European corporation, promised his corporate superior, the CEO of the parent company, that he would raise the future of e-books and Amazon's potential role in that future at an upcoming

meeting of publisher CEOs. Later that month, at a dinner meeting hosted by Penguin Group CEO John Makinson, again in "The Chef's Wine Cellar" at Picholene, the same group of publisher CEOs met once more.

42. On or about June 16, 2009, Mr. Makinson again met privately with other Publisher Defendant CEOs and discussed, *inter alia*, the growth of e-books and Amazon's role in that growth.

43. On or about September 10, 2009, Mr. Makinson once again met privately with other Publisher Defendant CEOs and the CEO of one non-defendant publisher in a private room of a different Manhattan restaurant, Alto. They discussed the growth of e-books and complained about Amazon's role in that growth.

44. In addition to the CEO dinner meetings, Publisher Defendants' CEOs and other executives met in-person, one-on-one to communicate about e-books multiple times over the course of 2009 and into 2010. Similar meetings took place in Europe, including meetings in the fall of 2009 between executives of Macmillan parent company Verlagsgruppe Georg von Holtzbrinck GmbH and executives of another Publisher Defendant's parent company. Macmillan CEO John Sargent joined at least one of these parent company meetings.

45. These private meetings provided the Publisher Defendants' CEOs the opportunity to discuss how they collectively could solve "the $9.99 problem."

     B.    *Publisher Defendants Conspire To Raise Retail E-book Prices Under the Guise of Joint Venture Discussions*

46. While each Publisher Defendant recognized that it could not solve "the $9.99 problem" by itself, collectively the Publisher Defendants accounted for nearly half of Amazon's e-book revenues, and by refusing to compete with one another for Amazon's business, the

Publisher Defendants could force Amazon to accept the Publisher Defendants' new contract terms and to change its pricing practices.

47.    The Publisher Defendants thus conspired to act collectively, initially in the guise of joint ventures. These ostensible joint ventures were not meant to enhance competition by bringing to market products or services that the publishers could not offer unilaterally, but rather were designed as anticompetitive measures to raise prices.

48.    All five Publisher Defendants agreed in 2009 at the latest to act collectively to raise retail prices for the most popular e-books above $9.99. One CEO of a Publisher Defendant's parent company explained to his corporate superior in a July 29, 2009 e-mail message that "[i]n the USA and the UK, but also in Spain and France to a lesser degree, the 'top publishers' are in discussions to create an alternative platform to Amazon for e-books. The goal is less to compete with Amazon as to force it to accept a price level higher than 9.99 . . . . I am in NY this week to promote these ideas and the movement is positive with [the other four Publisher Defendants]." (Translated from French).

49.    Less than a week later, in an August 4, 2009 strategy memo for the board of directors of Penguin's ultimate parent company, Penguin Group CEO John Makinson conveyed the same message:

> Competition for the attention of readers will be most intense from digital companies whose objective may be to disintermediate traditional publishers altogether. This is not a new threat but we do appear to be on a collision course with Amazon, and possibly Google as well. It will not be possible for any individual publisher to mount an effective response, because of both the resources necessary and the risk of retribution, so the industry needs to develop a common strategy. This is the context for the development of the Project Z initiatives [joint ventures] in London and New York.

15

C.     *Defendants Agree To Increase and Stabilize Retail E-book Prices by Collectively
       Adopting an Agency Model*

50.     To raise e-book prices, the Publisher Defendants also began to consider in late

2009 selling e-books under an "agency model" that would take away Amazon's ability to set low

retail prices.  As one CEO of a Publisher Defendant's parent company explained in a December

6, 2009 e-mail message, "[o]ur goal is to force Amazon to return to acceptable sales prices

through the establishment of agency contracts in the USA . . . . To succeed our colleagues must

know that we entered the fray and follow us." (Translated from French).

51.     Apple's entry into the e-book business provided a perfect opportunity for

collective action to implement the agency model and use it to raise retail e-book prices.  Apple

was in the process of developing a strategy to sell e-books on its new iPad device.  Apple

initially contemplated selling e-books through the existing wholesale model, which was similar

to the manner in which Apple sold the vast majority of the digital media it offered in its iTunes

store.  On February 19, 2009, Apple Vice President of Internet Services Eddy Cue explained to

Apple CEO Steve Jobs in an e-mail, "[a]t this point, it would be very easy for us to compete and

I think trounce Amazon by opening up our own ebook store."  In addition to considering

competitive entry at that time, though, Apple also contemplated illegally dividing the digital

content world with Amazon, allowing each to "own the category" of its choice—audio/video to

Apple and e-books to Amazon.

52.     Apple soon concluded, though, that competition from other retailers – especially

Amazon – would prevent Apple from earning its desired 30 percent margins on e-book sales.

Ultimately, Apple, together with the Publisher Defendants, set in motion a plan that would

compel all non-Apple e-book retailers also to sign onto agency or else, as Apple's CEO put it,

the Publisher Defendants all would say, "we're not going to give you the books."

16

53.     The executive in charge of Apple's inchoate e-books business, Eddy Cue, telephoned each Publisher Defendant and Random House on or around December 8, 2009 to schedule exploratory meetings in New York City on December 15 and December 16.  Hachette and HarperCollins took the lead in working with Apple to capitalize on this golden opportunity for the Publisher Defendants to achieve their goal of raising and stabilizing retail e-book prices above $9.99 by collectively imposing the agency model on the industry.

54.     It appears that Hachette and HarperCollins communicated with each other about moving to an agency model during the brief window between Mr. Cue's first telephone calls to the Publisher Defendants and his visit to meet with their CEOs.  On the morning of December 10, 2009, a HarperCollins executive added to his calendar an appointment to call a Hachette executive at 10:50 AM.  At 11:01 AM, the Hachette executive returned the phone call, and the two spoke for six minutes.  Then, less than a week later in New York, both Hachette and HarperCollins executives told Mr. Cue in their initial meetings with him that they wanted to sell e-books under an agency model, a dramatic departure from the way books had been sold for over a century.

55.     The other Publisher Defendants also made clear to Apple that they "certainly" did not want to continue "the existing way that they were doing business," *i.e.*, with Amazon promoting their most popular e-books for $9.99 under a wholesale model.

56.     Apple saw a way to turn the agency scheme into a highly profitable model for itself.  Apple determined to give the Publisher Defendants what they wanted while shielding itself from retail price competition and realizing margins far in excess of what e-book retailers then averaged on each newly released or bestselling e-book sold.  Apple realized that, as a result of the scheme, "the customer" would "pay[] a little more."

17

57.     On December 16, 2009, the day after both companies' initial meetings with Apple, Penguin Group CEO John Makinson had a breakfast meeting at a London hotel with the CEO of another Publisher Defendant's parent company. Consistent with the Publisher Defendants' other efforts to conceal their activities, Mr. Makinson's breakfast companion wrote to his U.S. subordinate that he would recount portions of his discussion with Mr. Makinson only by telephone.

58.     By the time Apple arrived for a second round of meetings during the week of December 21, 2009, the agency model had become the focus of its discussions with all of the Publisher Defendants. In these discussions, Apple proposed that the Publisher Defendants require *all* retailers of their e-books to accept the agency model. Apple thereby sought to ensure that it would not have to compete on retail prices. The proposal appealed to the Publisher Defendants because wresting pricing control from Amazon and other e-book retailers would advance their collusive plan to raise retail e-book prices.

59.     The Publisher Defendants acknowledged to Apple their common objective to end Amazon's $9.99 pricing. As Mr. Cue reported in an e-mail message to Apple's CEO Steve Jobs, the three publishers with whom he had met saw the "plus" of Apple's position as "solv[ing the] Amazon problem." The "negative" was that Apple's proposed retail prices – topping out at $12.99 for newly released and bestselling e-books – were a "little less than [the publishers] would like." Likewise, Mr. Jobs later informed an executive of one of the Publisher Defendant's corporate parents that "[a]ll major publishers" had told Apple that "Amazon's $9.99 price for new releases is eroding the value perception of their products in customer's minds, and they do not want this practice to continue for new releases."

18

60. As perhaps the only company that could facilitate their goal of raising retail e-book prices across the industry, Apple knew that it had significant leverage in negotiations with Publisher Defendants. Apple exercised this leverage to demand a thirty percent commission—a margin significantly above the prevailing competitive margins for e-book retailers. The Publisher Defendants worried that the combination of paying Apple a higher commission than they would have liked and pricing their e-books lower than they wanted might be too much to bear in exchange for Apple's facilitation of their agreement to raise retail e-book prices. Ultimately, though, they convinced Apple to allow them to raise prices high enough to make the deal palatable to them.

61. As it negotiated with the Publisher Defendants in December 2009 and January 2010, Apple kept each Publisher Defendant informed of the status of its negotiations with the other Publisher Defendants. Apple also assured the Publisher Defendants that its proposals were the same to each and that no deal Apple agreed to with one publisher would be materially different from any deal it agreed to with another publisher. Apple thus knowingly served as a critical conspiracy participant by allowing the Publisher Defendants to signal to one another both (a) which agency terms would comprise an acceptable means of achieving their ultimate goal of raising and stabilizing retail e-book prices, and (b) that they could lock themselves into this particular means of collectively achieving that goal by all signing their Apple Agency Agreement.

62. Apple's Mr. Cue e-mailed each Publisher Defendant between January 4, 2010, and January 6, 2010 an outline of what he tabbed "the best approach for e-books." He reassured Penguin USA CEO David Shanks and other Publisher Defendant CEOs that Apple adopted the

approach "[a]fter talking to all the other publishers." Mr. Cue sent substantively identical e-mail messages and proposals to each Publisher Defendant.

63.     The outlined proposal that Apple circulated after consulting with each Publisher Defendant contained several key features. First, as Hachette and HarperCollins had initially suggested to Apple, the publisher would be the principal and Apple would be the agent for e-book sales. Consumer pricing authority would be transferred from retailers to publishers. Second, Apple's proposal mandated that every other retailer of each publisher's e-books – Apple's direct competitors – be forced to accept the agency model as well. As Mr. Cue wrote, "all resellers of new titles need to be in agency model." Third, Apple would receive a 30 percent commission for each e-book sale. And fourth, each Publisher Defendant would have identical pricing tiers for e-books sold through Apple's iBookstore.

64.     On January 11, 2010, Apple e-mailed its proposed e-book distribution agreement to all the Publisher Defendants. As with the outlined proposals Apple sent earlier in January, the proposed e-book distribution agreements were substantially the same. Also on January 11, 2010, Apple separately e-mailed to Penguin and two other Publisher Defendants charts showing how the Publisher Defendant's bestselling e-books would be priced at $12.99 – the ostensibly maximum price under Apple's then-current price tier proposal – in the iBookstore.

65.     The proposed e-book distribution agreement mainly incorporated the principles Apple set out in its e-mail messages of January 4 through January 6, with two notable changes. First, Apple demanded that the Publisher Defendants provide Apple their complete e-book catalogs and that they not delay the electronic release of any title behind its print release. Second, and more important, Apple replaced the express requirement that each publisher adopt the agency model with each of its retailers with an unusual most favored nation ("MFN") pricing

provision. That provision was not structured like a standard MFN in favor of a retailer, ensuring Apple that it would receive the best available wholesale price. Nor did the MFN ensure Apple that the Publisher Defendants would not set a higher retail price on the iBookstore than they set on other websites where they controlled retail prices. Instead, the MFN here required each publisher to guarantee that it would lower the retail price of each e-book in Apple's iBookstore to match the lowest price offered by any other retailer, even if the Publisher Defendant did not control that other retailer's ultimate consumer price. That is, instead of an MFN designed to protect Apple's ability to compete, this MFN was designed to protect Apple from having to compete on price at all, while still maintaining Apple's 30 percent margin.

66.     The purpose of these provisions was to work in concert to enforce the Defendants' agreement to raise and stabilize retail e-book prices. Apple and the Publisher Defendants recognized that coupling Apple's right to all of their e-books with its right to demand that those e-books not be priced higher on the iBookstore than on any other website effectively required that each Publisher Defendant take away retail pricing control from all other e-book retailers, including stripping them of any ability to discount or otherwise price promote e-books out of the retailer's own margins. Otherwise, the retail price MFN would cause Apple's iBookstore prices to drop to match the best available retail price of each e-book, and the Publisher Defendants would receive only 70 percent of those reduced retail prices. Price competition by other retailers, if allowed to continue, thus likely would reduce e-book revenues to levels the Publisher Defendants could not control or predict.

67.     In negotiating the retail price MFN with Apple, "some of [the Publisher Defendants]" asserted that Apple did not need the provision "because they would be moving to

an agency model with [the other e-book retailers,]" regardless. Ultimately, though, all Defendants agreed to include the MFN commitment mechanism.

68. On January 16, 2010, Apple, via Mr. Cue, offered revised terms to the Publisher Defendants that again were identical in substance. Apple modified its earlier proposal in two significant ways. First, in response to publisher requests, it added new maximum pricing tiers that increased permissible e-book prices to $16.99 or $19.99, depending on the book's hardcover list price. Second, Apple's new proposal mitigated these price increases somewhat by adding special pricing tiers for e-book versions of books on the *New York Times* fiction and non-fiction bestseller lists. For e-book versions of bestsellers bearing list prices of $30 or less, Publisher Defendants could set a price up to $12.99; for bestsellers bearing list prices between $30 and $35, the e-book price cap would be $14.99. In conjunction with the revised proposal, Mr. Cue set up meetings for the next week to finalize agreements with the Publisher Defendants.

69. Each Publisher Defendant required assurances that it would not be the only publisher to sign an agreement with Apple that would compel it either to take pricing authority from Amazon or to pull its e-books from Amazon. The Publisher Defendants continued to fear that Amazon would act to protect its ability to price e-books at $9.99 or less if any one of them acted alone. Individual Publisher Defendants also feared punishment in the marketplace if only its e-books suddenly became more expensive at retail while other publishers continued to allow retailers to compete on price. As Mr. Cue noted, "all of them were very concerned about being the only ones to sign a deal with us." Penguin explicitly communicated to Apple that it would sign an e-book distribution agreement with Apple only if at least three of the other "major[]" publishers did as well. Apple supplied the needed assurances.

70.     While the Publisher Defendants were discussing e-book distribution terms with Apple during the week of January 18, 2010, Amazon met in New York City with a number of prominent authors and agents to unveil a new program under which copyright holders could take their e-books directly to Amazon – cutting out the publisher – and Amazon would pay royalties of up to 70 percent, far in excess of what publishers offered. This announcement further highlighted the direct competitive threat Amazon posed to the Publisher Defendants' business model. The Publisher Defendants reacted immediately. For example, Penguin USA CEO David Shanks reported being "really angry" after "hav[ing] read [Amazon's] announcement." After thinking about it for a day, Mr. Shanks concluded, "[o]n Apple I am now more convinced that we need a viable alternative to Amazon or this nonsense will continue and get much worse." Another decisionmaker stated he was "p****d" at Amazon for starting to compete directly against the publishers and expressed his desire "to screw Amazon."

71.     To persuade one of the Publisher Defendants to stay with the others and sign an agreement, Apple CEO Steve Jobs wrote to an executive of the Publisher Defendant's corporate parent that the publisher had only two choices apart from signing the Apple Agency Agreement: (i) accept the status quo ("Keep going with Amazon at $9.99"); or (ii) continue with a losing policy of delaying the release of electronic versions of new titles ("Hold back your books from Amazon"). According to Jobs, the Apple deal offered the Publisher Defendants a superior alternative path to the higher retail e-book prices they sought: "Throw in with Apple and see if we can all make a go of this to create a real mainstream e-books market at $12.99 and $14.99."

72.     In addition to passing information through Apple and during their private dinners and other in-person meetings, the Publisher Defendants frequently communicated by telephone to exchange assurances of common action in attempting to raise the retail price of e-books.

23

These telephone communications increased significantly during the two-month period in which the Publisher Defendants considered and entered the Apple Agency Agreements. During December 2009 and January 2010, the Publisher Defendants' U.S. CEOs placed at least 56 phone calls to one another. Each CEO, including Penguin's Shanks and Macmillan's Sargent, placed at least seven such phone calls.

73.     The timing, frequency, duration, and content of the Publisher Defendant CEOs' phone calls demonstrate that the Publisher Defendants used them to seek and exchange assurances of common strategies and business plans regarding the Apple Agency Agreements. For example, in addition to the telephone calls already described in this complaint:

- Near the time Apple first presented the agency model, one Publisher Defendant's CEO used a telephone call – ostensibly made to discuss a marketing joint venture – to tell Penguin USA CEO David Shanks that "everyone is in the same place with Apple."

- After receiving Apple's January 16, 2010 revised proposal, executives of several Publisher Defendants responded to the revised proposal and meetings by, again, seeking and exchanging confidential information. For example, on Sunday, January 17, one Publisher Defendant's CEO used his mobile phone to call another Publisher Defendant's CEO and talk for approximately ten minutes. And on the morning of January 19, Penguin USA CEO David Shanks had an extended telephone conversation with the CEO of another Publisher Defendant.

- On January 21, 2010, the CEO of one Publisher Defendant's parent company instructed his U.S. subordinate via e-mail to find out Apple's progress in agency negotiations with other publishers. Four minutes after that e-mail was sent, the U.S. executive called another Publisher Defendant's CEO, and the two spoke for over eleven minutes.

- On January 22, 2010, at 9:30 a.m., Apple's Cue met with one Publisher Defendant's CEO to make what Cue hoped would be a "final go/no-go decision" about whether the Publisher Defendant would sign an agreement with Apple. Less than an hour later, the Publisher Defendant's CEO made phone calls, two minutes apart, to two other Publisher Defendants' CEOs, including Macmillan's Sargent. The CEO who placed the calls admitted under oath to placing them specifically to learn if the other two Publisher Defendants would sign with Apple prior to Apple's iPad launch.

- On the evening of Saturday, January 23, 2010, Apple's Cue e-mailed his boss, Steve Jobs, and noted that Penguin USA CEO David Shanks "want[ed] an assurance that he is 1 of 4 before signing." The following Monday morning, at 9:46 a.m., Mr. Shanks called another Publisher Defendant's CEO and the two talked for approximately four minutes. Both Penguin and the other Publisher Defendant signed their Apple Agency Agreements later that day.

74. On January 24, 2010, Hachette signed an e-book distribution agreement with Apple. Over the next two days, Simon & Schuster, Macmillan, Penguin, and HarperCollins all followed suit and signed e-book distribution agreements with Apple. Within these three days, the Publisher Defendants agreed with Apple to abandon the longstanding wholesale model for selling e-books. The Apple Agency Agreements took effect simultaneously on April 3, 2010 with the release of Apple's new iPad.

75. The final version of the pricing tiers in the Apple Agency Agreements contained the $12.99 and $14.99 price points for bestsellers, discussed earlier, and also established prices for all other newly released titles based on the hardcover list price of the same title. Although couched as maximum retail prices, the price tiers in fact established the retail e-book prices to be charged by Publisher Defendants.

76. By entering the Apple Agency Agreements, each Publisher Defendant effectively agreed to require all of their e-book retailers to accept the agency model. Both Apple and the Publisher Defendants understood the Agreements would compel the Publisher Defendants to take pricing authority from all non-Apple e-book retailers. A February 10, 2010 presentation by one Publisher Defendant applauded this result (emphasis in original): "The Apple agency model deal means that we will have to **shift to an agency model with Amazon which [will] strengthen our control over pricing**."

77. Apple understood that the final Apple Agency Agreements ensured that the Publisher Defendants would raise their retail e-book prices to the ostensible limits set by the

Apple price tiers not only in Apple's forthcoming iBookstore, but on Amazon.com and all other

consumer sites as well. When asked by a *Wall Street Journal* reporter at the January 27, 2010

iPad unveiling event, "Why should she buy a book for . . . $14.99 from your device when she

could buy one for $9.99 from Amazon on the Kindle or from Barnes & Noble on the Nook?"

Apple CEO Steve Jobs responded, "that won't be the case . . . . the prices will be the same."

78.     Apple understood that the retail price MFN was the key commitment mechanism

to keep the Publisher Defendants advancing their conspiracy in lockstep. Regarding the effect of

the MFN, Apple executive Pete Alcorn remarked in the context of the European roll-out of the

agency model in the spring of 2010:

> I told [Apple executive Keith Moerer] that I think he and Eddy
> [Cue] made it at least halfway to changing the industry
> permanently, and we should keep the pads on and keep fighting for
> it. I might regret that later, but right now I feel like it's a giant win
> to keep pushing the MFN and forcing people off the [A]mazon
> model and onto ours. If anything, the place to give is the pricing --
> long run, the mfn is more important. The interesting insight in the
> meeting was Eddy's explanation that it doesn't have to be that
> broad -- any decent MFN forces the model.

79.     Within the four months following the signing of the Apple Agency Agreements,

and over Amazon's objections, each Publisher Defendant had transformed its business

relationship with all of the major e-book retailers from a wholesale model to an agency model

and imposed flat prohibitions against e-book discounting or other price competition on all non-

Apple e-book retailers.

80.     For example, after it signed its Apple Agency Agreement, Macmillan presented

Amazon a choice: adopt the agency model or lose the ability to sell e-book versions of new

hardcover titles for the first seven months of their release. Amazon rejected Macmillan's

ultimatum and sought to preserve its ability to sell e-book versions of newly released hardcover

titles for $9.99. To resist Macmillan's efforts to force it to accept either the agency model or

delayed electronic availability, Amazon effectively stopped selling Macmillan's print books and e-books.

81.     When Amazon stopped selling Macmillan titles, other Publisher Defendants did not view the situation as an opportunity to gain market share from a weakened competitor. Instead, they rallied to support Macmillan. For example, the CEO of one Publisher Defendant's parent company instructed the Publisher Defendant's CEO that "[Macmillan CEO] John Sargent needs our help!" The parent company CEO explained, "M[acm]illan have been brave, but they are small. We need to move the lines. And I am thrilled to know how A[mazon] will react against 3 or 4 of the big guys."

82.     The CEO of one Publisher Defendant's parent company assured Macmillan CEO John Sargent of his company's support in a January 31, 2010 email: "I can ensure you that you are not going to find your company alone in the battle." The same parent company CEO also assured the head of Macmillan's corporate parent in a February 1 email that "others will enter the battle field!" Overall, Macmillan received "hugely supportive" correspondence from the publishing industry during Macmillan's effort to force Amazon to accept the agency model.

83.     As its battle with Amazon continued, Macmillan knew that, because the other Publisher Defendants, via the Apple Agency Agreements, had locked themselves into forcing agency on Amazon to advance their conspiratorial goals, Amazon soon would face similar edicts from a united front of Publisher Defendants. And Amazon could not delist the books of all five Publisher Defendants because they together accounted for nearly half of Amazon's e-book business. Macmillan CEO John Sargent explained the company's reasoning: "we believed whatever was happening, whatever Amazon was doing here, they were going to face – they're going to have more of the same in the future one way or another." Another Publisher Defendant

similarly recognized that Macmillan was not acting unilaterally but rather was "leading the charge on moving Amazon to the agency model."

84.     Amazon quickly came to fully appreciate that not just Macmillan but all five Publisher Defendants had irrevocably committed themselves to the agency model across all retailers, including taking control of retail pricing and thereby stripping away any opportunity for e-book retailers to compete on price. Just two days after it stopped selling Macmillan titles, Amazon capitulated and publicly announced that it had no choice but to accept the agency model, and it soon resumed selling Macmillan's e-book and print book titles.

   D.     *Defendants Further the Conspiracy by Pressuring Another Publisher To Adopt the Agency Model*

85.     When a company takes a pro-competitive action by introducing a new product, lowering its prices, or even adopting a new business model that helps it sell more product at better prices, it typically does not want its competitors to copy its action, but prefers to maintain a first-mover or competitive advantage. In contrast, when companies jointly take collusive action, such as instituting a coordinated price increase, they typically want the rest of their competitors to join them in that action. Because collusive actions are not pro-competitive or consumer friendly, any competitor that does not go along with the conspirators can take more consumer friendly actions and see its market share rise at the expense of the conspirators. Here, the Defendants acted consistently with a collusive arrangement, and inconsistently with a pro-competitive arrangement, as they sought to pressure another publisher (whose market share was growing at the Publisher Defendants' expense after the Apple Agency Contracts became effective) to join them.

86.     Penguin appears to have taken the lead in these efforts. Its U.S. CEO, David Shanks, twice directly told the executives of the holdout major publisher about his displeasure

with their decision to continue selling e-books on the wholesale model. Mr. Shanks tried to justify the actions of the conspiracy as an effort to save brick-and-mortar bookstores and criticized the other publisher for "not helping" the group. The executives of the other publisher responded to Mr. Shanks's complaints by explaining their objections to the agency model.

87. Mr. Shanks also encouraged a large print book and e-book retailer to punish the other publisher for not joining Defendants' conspiracy. In March 2010, Mr. Shanks sent an e-mail message to an executive of the retailer complaining that the publisher "has chosen to stay on their current model and will allow retailers to sell at whatever price they wish." Mr. Shanks argued that "[s]ince Penguin is looking out for [your] welfare at what appears to be great costs to us, I would hope that [you] would be equally brutal to Publishers who have thrown in with your competition with obvious disdain for your welfare. . . . I hope you make [the publisher] hurt like Amazon is doing to [the Publisher Defendants]."

88. When the third-party retailer continued to promote the non-defendant publisher's books, Mr. Shanks applied more pressure. In a June 22, 2010 email to the retailer's CEO, Mr. Shanks claimed to be "baffled" as to why the retailer would promote that publisher's books instead of just those published by "people who stood up for you."

89. Throughout the summer of 2010, Apple also cajoled the holdout publisher to adopt agency terms in line with those of the Publisher Defendants, including on a phone call between Apple CEO Steve Jobs and the holdout publisher's CEO. Apple flatly refused to sell the holdout publisher's e-books unless and until it agreed to an agency relationship substantially similar to the arrangement between Apple and the Publisher Defendants defined by the Apple Agency Agreements.

E.      *Conspiracy Succeeds at Raising and Stabilizing Consumer E-book Prices*

90.     The ostensible maximum prices included in the Apple Agency Agreements' price schedule represent, in practice, actual e-book prices. Indeed, at the time the Publisher Defendants snatched retail pricing authority away from Amazon and other e-book retailers, not one of them had built an internal retail pricing apparatus sufficient to do anything other than set retail prices at the Apple Agency Agreements' ostensible caps. Once their agency agreements took effect, the Publisher Defendants raised e-book prices at all retail outlets to the maximum price level within each tier. Even today, two years after the Publisher Defendants began setting e-book retail prices according to the Apple price tiers, they still set the retail prices for the electronic versions of all or nearly all of their bestselling hardcover titles at the ostensible maximum price allowed by those price tiers.

91.     The Publisher Defendants' collective adoption of the Apple Agency Agreements allowed them (facilitated by Apple) to raise, fix, and stabilize retail e-book prices in three steps: (a) they took away retail pricing authority from retailers; (b) they then set retail e-book prices according to the Apple price tiers; and (c) they then exported the agency model and higher retail prices to the rest of the industry, in part to comply with the retail price MFN included in each Apple Agency Agreement.

92.     Defendants' conspiracy and agreement to raise and stabilize retail e-book prices by collectively adopting the agency model and Apple price tiers led to an increase in the retail prices of newly released and bestselling e-books. Prior to the Defendants' conspiracy, consumers benefited from price competition that led to $9.99 prices for newly released and bestselling e-books. Almost immediately after Apple launched its iBookstore in April 2010 and the Publisher Defendants imposed agency model pricing on all retailers, the Publisher

Defendants' e-book prices for most newly released and bestselling e-books rose to either $12.99 or $14.99.

93.     Defendants' conspiracy and agreement to raise and stabilize retail e-book prices by collectively adopting the agency model and Apple price tiers for their newly released and bestselling e-books also led to an increase in average retail prices of the balance of Publisher Defendants' e-book catalogs, their so-called "backlists." Now that the Publisher Defendants control the retail prices of e-books – but Amazon maintains control of its print book retail prices – Publisher Defendants' e-book prices sometimes are higher than Amazon's prices for print versions of the same titles.

## VII.  VIOLATION ALLEGED

94.     Beginning no later than 2009, and continuing to date, Defendants and their co-conspirators have engaged in a conspiracy and agreement in unreasonable restraint of interstate trade and commerce, constituting a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. This offense is likely to continue and recur unless the relief requested is granted.

95.     The conspiracy and agreement consists of an understanding and concert of action among Defendants and their co-conspirators to raise, fix, and stabilize retail e-book prices, to end price competition among e-book retailers, and to limit retail price competition among the Publisher Defendants, ultimately effectuated by collectively adopting and adhering to functionally identical methods of selling e-books and price schedules.

96.     For the purpose of forming and effectuating this agreement and conspiracy, some or all Defendants did the following things, among others:

        a.      Shared their business information, plans, and strategies in order to formulate ways to raise retail e-book prices;

31

b.      Assured each other of support in attempting to raise retail e-book prices;

c.      Employed ostensible joint venture meetings to disguise their attempts to raise retail e-book prices;

d.      Fixed the method of and formulas for setting retail e-book prices;

e.      Fixed tiers for retail e-book prices;

f.      Eliminated the ability of e-book retailers to fund retail e-book price decreases out of their own margins; and

g.      Raised the retail prices of their newly released and bestselling e-books to the agreed prices – the ostensible price caps – contained in the pricing schedule of their Apple Agency Agreements.

97.      Defendants' conspiracy and agreement, in which the Publisher Defendants and Apple agreed to raise, fix, and stabilize retail e-book prices, to end price competition among e-book retailers, and to limit retail price competition among the Publisher Defendants by fixing retail e-book prices, constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

98.      Moreover, Defendants' conspiracy and agreement has resulted in obvious and demonstrable anticompetitive effects on consumers in the trade e-books market by depriving consumers of the benefits of competition among e-book retailers as to both retail prices and retail innovations (such as e-book clubs and subscription plans), such that it constitutes an unreasonable restraint on trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

99.      Where, as here, defendants have engaged in a *per se* violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, geographic market, or market power are required.  To the extent such allegations may otherwise be necessary, the relevant product market for the purposes of this action is trade e-books.  The anticompetitive acts

32

at issue in this case directly affect the sale of trade e-books to consumers. No reasonable substitute exists for e-books. There are no technological alternatives to e-books, thousands of which can be stored on a single small device. E-books can be stored and read on electronic devices, while print books cannot. E-books can be located, purchased, and downloaded anywhere a customer has an internet connection, while print books cannot. Industry firms also view e-books as a separate market segment from print books, and the Publisher Defendants were able to impose and sustain a significant retail price increase for their trade e-books.

100.    The relevant geographic market is the United States. The rights to license e-books are granted on territorial bases, with the United States typically forming its own territory. E-book retailers typically present a unique storefront to U.S. consumers, often with e-books bearing different retail prices than the same titles would command on the same retailer's foreign websites.

101.    The Publisher Defendants possess market power in the market for trade e-books. The Publisher Defendants successfully imposed and sustained a significant retail price increase for their trade e-books. Collectively, they create and distribute a wide variety of popular e-books, regularly comprising over half of the *New York Times* fiction and non-fiction bestseller lists. Collectively, they provide a critical input to any firm selling trade e-books to consumers. Any retailer selling trade e-books to consumers would not be able to forgo profitably the sale of the Publisher Defendants' e-books.

102.    Defendants' agreement and conspiracy has had and will continue to have anticompetitive effects, including:

   a.    Increasing the retail prices of trade e-books;

   b.    Eliminating competition on price among e-book retailers;

33

    c.      Restraining competition on retail price among the Publisher Defendants;

    d.      Restraining competition among the Publisher Defendants for favorable relationships with e-book retailers;

    e.      Constraining innovation among e-book retailers;

    f.      Entrenching incumbent publishers' favorable position in the sale and distribution of print books by slowing the migration from print books to e-books;

    g.      Making more likely express or tacit collusion among publishers; and

    h.      Reducing competitive pressure on print book prices.

103.    Defendants' agreement and conspiracy is not reasonably necessary to accomplish any procompetitive objective, or, alternatively, its scope is broader than necessary to accomplish any such objective.

## VIII.  REQUEST FOR RELIEF

104.    To remedy these illegal acts, the United States requests that the Court:

    a.      Adjudge and decree that Defendants entered into an unlawful contract, combination, or conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

    b.      Enjoin the Defendants, their officers, agents, servants, employees and attorneys and their successors and all other persons acting or claiming to act in active concert or participation with one or more of them, from continuing, maintaining, or renewing in any manner, directly or indirectly, the conduct alleged herein or from engaging in any other conduct, combination, conspiracy, agreement, understanding, plan, program, or other arrangement having the same effect as the alleged violation or that otherwise violates Section 1 of the Sherman Act, 15 U.S.C. § 1, through fixing the

method and manner in which they sell e-books, or otherwise agreeing to set the price or release date for e-books, or collective negotiation of e-book agreements, or otherwise collectively restraining retail price competition for e-books;

        c.      Prohibit the collusive setting of price tiers that can de facto fix prices;

        d.      Declare null and void the Apple Agency Agreements and any agreement between a Publisher Defendant and an e-book retailer that restricts, limits, or impedes the e-book retailer's ability to set, alter, or reduce the retail price of any e-book or to offer price or other promotions to encourage consumers to purchase any e-book, or contains a retail price MFN;

        e.      Reform the agreements between Apple and Publisher Defendants to strike the retail price MFN clauses as void and unenforceable; and

        f.      Award to Plaintiff its costs of this action and such other and further relief as may be appropriate and as the Court may deem just and proper.

DATED:  APRIL 11, 2012
FOR PLAINTIFF
UNITED STATES OF AMERICA:

_____
SHARIS A. POZEN
Acting Assistant Attorney General for
Antitrust


_____
JOSEPH F. WAYLAND
Deputy Assistant Attorney General


_____
GENE KIMMELMAN
Chief Counsel for Competition Policy and
Intergovernmental Relations


_____
PATRICIA A. BRINK
Director of Civil Enforcement
MARK W. RYAN
Director of Litigation
mark.w.ryan@usdoj.gov


_____
JOHN R. READ
Chief
DAVID C. KULLY
Assistant Chief
Litigation III Section
david.kully@usdoj.gov

_____
DANIEL MCCUAIG
NATHAN P. SUTTON
MARY BETH MCGEE
OWEN M. KENDLER
WILLIAM H. JONES II
STEPHEN T. FAIRCHILD
 Attorneys for the United States
Litigation III Section
450 Fifth Street, N.W., Suite 4000
Washington, D.C. 20530
Telephone: (202) 307-0520
Facsimile: (202) 514-7308
daniel.mccuaig@usdoj.gov
nathan.sutton@usdoj.gov
mary.beth.mcgee@usdoj.gov
owen.kendler@usdoj.gov
bill.jones2@usdoj.gov
stephen.fairchild@usdoj.gov

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
UNITED STATES OF AMERICA,               :
                                        :
                     Plaintiff,         :    12 Civ. 2826 (DLC)
          -v-                           :
                                        :
APPLE INC., et al.,                     :
                                        :
                     Defendants.        :
                                        :    OPINION & ORDER
----------------------------------------X
                                        :
THE STATE OF TEXAS, et al.,             :
                                        :
                     Plaintiffs,        :
          -v-                           :    12 Civ. 3394 (DLC)
                                        :
PENQUIN GROUP (USA) INC., et al.,       :
                                        :
                     Defendants.        :
                                        :
----------------------------------------X

APPEARANCES:

<u>For plaintiff the United States</u>:

Mark W. Ryan
Lawrence E. Buterman
Daniel McCuaig
Stephen T. Fairchild
Nathan P. Sutton
Carrie Syme
Bill Jones
United States Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 4000
Washington, DC 20530

For plaintiff States:

For State of Texas, Liaison Counsel for Plaintiff States

Gabriel Gervey
Eric Lipman
David Ashton
Office of the Attorney General of Texas
P.O. Box 12548
Austin, TX 78711

For State of Connecticut, Liaison Counsel for Plaintiff States

W. Joseph Nielsen
Gary M. Becker
Office of the Attorney General of Connecticut
55 Elm Street
Hartford, CT 06106

For defendant Apple Inc.:

Orin Snyder
Lisa H. Rubin
Gibson, Dunn & Crutcher, LLP
200 Park Avenue, 47th Floor
New York, NY 10166

Daniel S. Floyd, Pro hac vice
Daniel G. Swanson, Pro hac vice
Gibson, Dunn & Crutcher, LLP
333 South Grand Ave.
Los Angeles, CA 90071

Cynthia Richman
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036

Howard E. Heiss
O'Melveny & Myers LLP
7 Times Square
New York, NY 10036

Table of Contents

PROCEDURAL HISTORY...........................................5
SUMMARY OF FINDINGS..........................................9
BACKGROUND.................................................13
  A.  Development of the E-book Market ....................14
  B.  Publishers' Discontent with the $9.99 Price Point ...15
  C.  January 2009-December 2009: Publisher Defendants
  Pursue Strategies to Combat Amazon Pricing...............16
  D.  Apple's Development of iBooks ......................26
  E.  December 15 to 16, 2009:  Apple's First New York
  Meetings with Publishers................................30
  F.  Apple Switches Gears and Presents An Agency Model
  with 30% Commission.....................................37
  G.  Apple's Term Sheet: All E-tailers to Agency and
  Pricing Caps............................................45
  H.  Creation of the MFN Clause .........................47
  I.  January 11: Apple Distributes Draft Agency Agreements50
    1.  MFN Negotiations ..................................52
    2.  30 Percent Commission Negotiations ...............58
    3.  Price Tier Negotiations ..........................59
  J.  January 18-27: Publishers Initiate Agency
  Negotiations with Amazon................................66
  K.  January 21-26:  Execution of Agreements ............73
  L.  January 27:  The Launch of the iPad and iBookstore ..85
  M.  January 28 to 31:  The Publisher Defendants Force
  Amazon to Adopt the Agency Distribution Model...........86
  N.  The Five Amazon Agency Agreements ..................90
  O.  Prices after Agency ...............................94
  P.  Random House Adopts an Agency Model ................99
  Q.  The Publisher Defendants Require Google to Adopt an
  Agency Model...........................................101
  R.  Concluding Observations ...........................102
DISCUSSION................................................104
  A.  Legal Standard ....................................104
  B.  Analysis of the Evidence ..........................113
APPLE'S ARGUMENTS.........................................122
  A. The Monsanto Decision and Apple's Independent Business
  Interests..............................................125
  B.  Apple's Intent ....................................135
  C.  Windowing .........................................140
  D.  Characterization of the Evidence ..................142
    1.  Initial Meetings with the Publishers .............144
    2.  Conspiracy by Telepathy ..........................146
    3.  Steve Jobs's Statements ..........................149
    4.  The Publishers Raised Prices, Not Apple ..........150

    E.   Per Se Liability ................................... 152
    F.   Avoiding a Dangerous Precedent .................... 155
CONCLUSION............................................... 159

DENISE COTE, District Judge:

    This Opinion explains how and why the prices for many electronic books, or "e-books," rose significantly in the United States in April 2010. Plaintiffs the United States of America ("DOJ") and thirty-three states and U.S. territories (the "States") (collectively, "Plaintiffs"), filed these antitrust suits on April 11, 2012, alleging that defendant Apple Inc. ("Apple") and five book publishing companies conspired to raise, fix, and stabilize the retail price for newly released and bestselling trade e-books in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 ("Sherman Act"), and various state laws. These cases represent two of four related actions brought before this Court alleging the same e-books price-fixing conspiracy between Apple and the publishers.[1] The publishers are Hachette Book Group, Inc. ("Hachette"), HarperCollins Publishers LLC ("HarperCollins"), Holtzbrinck

---

[1] The other two cases are <u>State of Texas, et al. v. Hachette Book Group, Inc., et al.</u>, 12 Civ. 6625 (DLC), in which forty-nine states, the District of Columbia, and the U.S. Territories and Possessions the Virgin Islands, Puerto Rico, the Northern Mariana Islands, Guam, and American Samoa, bringing claims as <u>parens patriae</u>, have settled their claims against Hachette, HarperCollins, and Simon & Schuster ("Settlement Action"); and <u>In re: Electronic Books Antitrust Litigation</u>, 11 MD 2296 (DLC), in which class action plaintiffs bring claims for damages ("Class Action").

Publishers LLC d/b/a Macmillan ("Macmillan"), Penguin Group (USA), Inc. ("Penguin"), and Simon & Schuster, Inc. ("Simon & Schuster" or "S&S") (collectively, "Publisher Defendants").

Only Apple proceeded to trial; the Publisher Defendants have settled their claims with both the DOJ and the States. This Opinion presents the Court's findings of fact and conclusions of law following the bench trial that was held from June 3 to 20, 2013 to resolve the issue of Apple's liability and the scope of any injunctive relief. As described below, the Plaintiffs have shown that Apple conspired to raise the retail price of e-books and that they are entitled to injunctive relief. A trial on damages will follow.

PROCEDURAL HISTORY

Fact and expert discovery in these actions concluded on March 22, 2013. The parties' Joint Pretrial Order, proposed findings of fact and conclusions of law, and pretrial memoranda were submitted on April 26 and, following rulings on redactions, were filed on May 14.

At the time the trial was scheduled, the parties agreed that a bench trial would resolve claims for liability and injunctive relief. With the parties' consent, the trial was conducted in accordance with the Court's customary practices for non-jury proceedings, which includes taking direct testimony

5

from witnesses under a party's control through affidavits submitted with the pretrial order. The parties also served with the Joint Pretrial Order copies of all exhibits and deposition testimony that they intended to offer as evidence in chief at trial.[2]

At trial, the Plaintiffs called twelve fact witnesses and two expert economists. The Plaintiffs' fact witnesses included three Apple employees: Eddy Cue ("Cue"), Senior Vice President of Internet Software and Services at Apple; Keith Moerer ("Moerer"), a Director of iTunes at Apple; and Kevin Saul ("Saul"), Associate General Counsel at Apple, and the lead business lawyer supporting Apple's Internet and Software Services division. The Plaintiffs also called senior executives from each of the five Publisher Defendants: David Shanks ("Shanks"), CEO of Penguin; Carolyn Reidy ("Reidy"), President

---

[2] The Court's procedures for non-jury proceedings were discussed in detail at conferences held on June 22 and October 26, 2012, and May 8, 2013. As the parties were informed, the Court prepared a draft opinion in advance of the bench trial based on the witness affidavits and other documents submitted with the pretrial order and the arguments of counsel in their trial memoranda. At trial, the affiants swore to the truth of the contents of their affidavits and were tendered for cross and redirect examination, and the other trial evidence was formally received. The parties understood that the Court's final findings of fact and conclusions of law would incorporate all of this evidence. Consistent with these procedures, and with the expectation that the Court had already prepared a draft opinion, the parties jointly asked the Court for its preliminary views on the merits at the final pretrial conference held on May 23, 2013.

and CEO of Simon & Schuster; Brian Murray ("Murray"), CEO of
HarperCollins; John Sargent ("Sargent"), CEO of Macmillan; and
David Young ("Young"), Chairman and CEO of Hachette from 2006
through March 2013, who currently serves as Chairman of the
Board of Directors of Hachette.  The Plaintiffs called four
additional fact witnesses: Russell Grandinetti ("Grandinetti"),
Vice President -- Kindle at non-party Amazon.com ("Amazon");
David Naggar ("Naggar"), Vice President of Kindle Content at
Amazon; Laura Porco ("Porco"), Amazon's Director of Kindle Books
from 2006 to 2011; and Thomas Turvey ("Turvey"), Director of
Strategic Partnerships at non-party Google Inc. ("Google").  The
Plaintiffs' expert witnesses were Dr. Richard Gilbert
("Gilbert"), Emeritus Professor of Economics and Professor of
the Graduate School at the University of California, Berkeley,
and a Senior Consultant (Affiliate) at Compass Lexecon, an
economic consulting firm; and Dr. Orley Ashenfelter
("Ashenfelter"), the Joseph Douglas Green 1895 Professor of
Economics at Princeton University.

Affidavits submitted by the Plaintiffs constituted the
direct testimony of four of their fact witnesses -- Grandinetti,
Naggar, Porco, and Turvey -- and both of their expert witnesses.
Apple had intended to call seven of Plaintiffs' witnesses in its
own case -- Cue, Moerer, Murray, Reidy, Sargent, Saul, and
Young.  Thus, these witnesses' affidavits were also received

during the Plaintiffs' case in chief.  The Plaintiffs subpoenaed
Shanks to testify at trial.[3]  Each of these witnesses appeared at
trial and was cross-examined.

The Plaintiffs also offered excerpts from the depositions
of John Makinson ("Makinson"), Chairman and CEO of the Penguin
Group, the parent company of Penguin; Arnaud Nourry ("Nourry"),
Chairman and CEO of Hachette Livre, the parent company of
Hachette; and Maja Thomas ("Thomas"), Senior Vice-President at
Hachette.  Apple offered counter-designations as to Nourry and
Thomas.

During the presentation of its defense, Apple presented
affidavits constituting the direct testimony of three fact
witnesses and three expert economists.  Apple's fact witnesses
were Robert McDonald ("McDonald"), the manager of Apple's U.S.
iBookstore; Theresa Horner ("Horner"), Vice President of Digital
Content for Barnesandnoble.com, a subsidiary of non-party Barnes
& Noble, Inc. ("Barnes & Noble"); and Madeline McIntosh
("McIntosh"), Chief Operating Officer of non-party Random House,
Inc. ("Random House").  Apple's expert witnesses were Dr.
Benjamin Klein ("Klein"), Professor Emeritus of Economics at the
University of California, Los Angeles, Senior Consultant at

---

[3] Penguin settled these actions on the eve of trial and therefore
the affidavit constituting the direct testimony of Shanks, which
had been submitted with the Joint Pretrial Order, was not
offered at trial.

Compass Lexecon, and President of EAC Associates, Inc.; Dr. Michelle Burtis ("Burtis"), Ph.D., Senior Advisor at Cornerstone Research, Inc., an economic and financial consulting firm; and Dr. Kevin Murphy ("Murphy"), George J. Stigler Distinguished Service Professor of Economics at the University of Chicago, and Faculty Research Associate at the National Bureau of Economic Research. Each of these witnesses, except McIntosh, appeared at trial and was cross-examined. The Plaintiffs did not seek to cross-examine McIntosh.

As noted, the bench trial was held from June 3 to June 20, 2013, and this Opinion presents the Court's findings of fact and conclusions of law. The findings of fact appear principally in the following Background section, but also appear in the remaining sections of the Opinion.

SUMMARY OF FINDINGS

The Plaintiffs have shown that the Publisher Defendants conspired with each other to eliminate retail price competition in order to raise e-book prices, and that Apple played a central role in facilitating and executing that conspiracy. Without Apple's orchestration of this conspiracy, it would not have succeeded as it did in the Spring of 2010.

There is, at the end of the day, very little dispute about many of the most material facts in this case. Before Apple even

met with the first Publisher Defendant in mid-December 2009, it knew that the "Big Six" of United States publishing -- the Publisher Defendants and Random House (collectively, the "Publishers") -- wanted to raise e-book prices, in particular above the $9.99 prevailing price charged by Amazon for many e-book versions of New York Times bestselling books ("NYT Bestsellers") and other newly released hardcover books ("New Releases").  Apple also knew that Publisher Defendants were already acting collectively to place pressure on Amazon to abandon its pricing strategy.

At their very first meetings in mid-December 2009, the Publishers conveyed to Apple their abhorrence of Amazon's pricing, and Apple assured the Publishers it was willing to work with them to raise those prices, suggesting prices such as $12.99 and $14.99.  Over the course of their negotiations in December 2009 and January 2010, Apple and the Publisher Defendants educated one another about their other priorities. Apple strongly hoped to announce its new iBookstore when it launched the iPad on January 27, 2010, but would only do so if it had agreements in place with a core group of Publishers by that date, could assure itself it would make a profit in the iBookstore, and could offer e-book titles simultaneously with their hardcover releases.  For their part, if the Publisher Defendants were going to take control of e-book pricing and move

the price point above $9.99, they needed to act collectively;
any other course would leave an individual Publisher vulnerable
to retaliation from Amazon.

Apple and the Publisher Defendants shared one overarching
interest -- that there be no price competition at the retail
level. Apple did not want to compete with Amazon (or any other
e-book retailer) on price; and the Publisher Defendants wanted
to end Amazon's $9.99 pricing and increase significantly the
prevailing price point for e-books. With a full appreciation of
each other's interests, Apple and the Publisher Defendants
agreed to work together to eliminate retail price competition in
the e-book market and raise the price of e-books above $9.99.

Apple seized the moment and brilliantly played its hand.
Taking advantage of the Publisher Defendants' fear of and
frustration over Amazon's pricing, as well as the tight window
of opportunity created by the impending launch of the iPad on
January 27 (the "Launch"), Apple garnered the signatures it
needed to introduce the iBookstore at the Launch. It provided
the Publisher Defendants with the vision, the format, the
timetable, and the coordination that they needed to raise e-book
prices. Apple decided to offer the Publisher Defendants the
opportunity to move from a wholesale model -- where a publisher
receives its designated wholesale price for each e-book and the
retailer sets the retail price -- to an agency model, where a

11

publisher sets the retail price and the retailer sells the
e-book as its agent.

The agency agreements that Apple and the Publisher
Defendants executed on the eve of the Launch divided New Release
e-books among price tiers. The top of each tier, or cap, was
essentially the new price for New Release e-books. The caps
included $12.99 and $14.99 for many books then being sold at
$9.99 by Amazon.

The agreements also included a price parity provision, or
Most-Favored-Nation clause ("MFN"), which not only protected
Apple by guaranteeing it could match the lowest retail price
listed on any competitor's e-bookstore, but also imposed a
severe financial penalty upon the Publisher Defendants if they
did not force Amazon and other retailers similarly to change
their business models and cede control over e-book pricing to
the Publishers. As Apple made clear to the Publishers, "There
is no one outside of us that can do this for you. If we miss
this opportunity, it will likely never come again."

Through the vehicle of the Apple agency agreements, the
prices in the nascent e-book industry shifted upward, in some
cases 50% or more for an individual title. Virtually overnight,
Apple got an attractive, additional feature for its iPad and a
guaranteed new revenue stream, and the Publisher Defendants
removed Amazon's ability to price their e-books at $9.99. A

12

detailed explanation of how Apple facilitated this conspiracy and changed the face of the e-book industry follows.

BACKGROUND

Defendant Apple engages in a number of businesses, but as relevant here it sells the iPad tablet device and distributes e-books through its iBookstore.  E-books are books that are sold to consumers in electronic form, and that can and must be read on a dedicated electronic device such as the iPad, the Barnes & Noble Nook, or Amazon's Kindle.  The Publisher Defendants publish both e-books and print books.  The five Publisher Defendants and Random House represent the six largest publishers of "trade" books in the United States.[4]  These six firms are often referred to within the publishing industry as the "Big Six."[5]  The Publisher Defendants sold over 48% of all e-books in the United States in the first quarter of 2010.

---

[4] Trade books consist of general interest fiction and non-fiction books.  They are to be distinguished from "non-trade" books such as academic textbooks, reference materials, and other texts.

[5] Titles from the Bix Six publishers accounted for over 90% of all U.S. NYT Bestseller book sales in 2010.  Random House is the largest of the Big Six, followed, in descending order of size, by Penguin, Simon & Schuster, HarperCollins, Hachette, and Macmillan.  When it comes to e-books, the largest of the Big Six in early 2010 was Penguin, followed in descending order by Random House, HarperCollins, Hachette, S&S, and Macmillan.

A. Development of the E-book Market

Amazon's Kindle was the first e-reader to gain widespread commercial acceptance.  When the Kindle was launched in 2007, Amazon quickly became the market leader in the sale of e-books and e-book readers.[6]  Through 2009, Amazon dominated the e-book retail market, selling nearly 90% of all e-books.[7]

Amazon utilized a discount pricing strategy through which it charged $9.99 for certain New Release and bestselling e-books.  Amazon was staunchly committed to its $9.99 price point and believed it would have long-term benefits for its consumers.  In order to compete with Amazon, other e-book retailers also adopted a $9.99 or lower retail price for many e-book titles.

Prior to April 2010, the Publishers distributed print and digital books through a wholesale pricing model, in which a content provider sets a list price (also known as a suggested retail price) and then sells books and e-books to a retailer -- such as Amazon -- for a wholesale price, which is often a percentage of the list price.  The retailer then offers the book and e-book to consumers at whatever price it chooses.  Prior to

---

[6] The Nook was released two years later, in November of 2009, offering some competition to Amazon.  The iPad was released in April 2010.

[7] At present, the largest U.S. retailers of trade e-books include Apple, and non-parties Amazon, Barnes & Noble, Google, Kobo Inc., and Sony Corporation.

2009, many publishers set a wholesale price for e-books at a 20% discount from the equivalent physical book wholesale price to reflect the many cost savings associated with the distribution and sale of e-books.  For instance, there is no cost for the printing, storage, packaging, shipping, or return of e-books. With a digital book discount, Amazon's $9.99 price point roughly matched the wholesale price of many of its e-books.

B. Publishers' Discontent with the $9.99 Price Point

The Publishers were unhappy with Amazon's $9.99 price point and feared that it would have a number of pernicious effects on their profits, both in the short run and long-term.  In the short-term, the Publishers believed the low price point was eating into sales of their more profitable hardcover books, which were often priced at thirty dollars or more, and threatening the viability of the brick-and-mortar stores in which hardcover books were displayed and sold.  Over the long-term, they feared that consumers would grow accustomed to e-books priced at $9.99 and that the $9.99 price point would erode prices for all books, thereby threatening the business model for the publishing industry.  They believed that this low price failed to reflect the true value of many books and also failed to distinguish among books in terms of the effort entailed to create and produce them and in terms of their quality, however one might measure quality.

15

The Publishers also feared Amazon's growing power in the book distribution business. They were concerned that, should Amazon continue to dominate the sale of e-books to consumers, it would start to demand even lower wholesale prices for e-books and might begin to compete directly with publishers by negotiating directly with authors and literary agents for rights -- a process referred to as disintermediation.[8]

As a result, the Publisher Defendants determined that they needed to force Amazon to abandon its discount pricing model. As Hachette's Young bluntly put it, they had to "defea[t] [Amazon's] $9.99 pricing policy," and prevent the "wretched $9.99 price point becoming a de facto standard."

C. January 2009-December 2009: Publisher Defendants Pursue Strategies to Combat Amazon Pricing

Beginning in at least early 2009, the Publisher Defendants began testing different ways to address what Macmillan termed "book devaluation to $9.99," and to confront what S&S's Reidy described as the "basic problem: how to get Amazon to change its pricing" and move off its $9.99 price point. They frequently coordinated their efforts to increase the pressure on Amazon and decrease the likelihood that Amazon would retaliate -- an outcome each Publisher Defendant feared if it acted alone.

---

[8] In fact, as described below, Amazon announced a new initiative in January 2010 that would assist authors in self-publishing through Amazon on the Kindle Digital Platform.

16

One of the strategies that they employed was the elimination of the existing discount on wholesale prices of e-books. This meant that the wholesale price for e-books would equal the wholesale price for physical books, and as a result, the wholesale price that Amazon paid for an e-book would be set at several dollars above Amazon's $9.99 price point. This tactic, however, failed to convince Amazon to change its pricing policies and it continued to sell many NYT Bestsellers as loss leaders at $9.99.[9]

The Publishers were not shy about expressing their displeasure to Amazon about its $9.99 pricing. In February 2009, Penguin told Amazon that "their 9.99 model" was "not a good sustainable one." HarperCollins similarly warned Amazon that it was "seriously considering changes to our discount structure and our digital list prices for all retailers." In March 2009, Macmillan's Sargent met with Amazon to express his own concern with the $9.99 price point, and indicated that "all the pubs" were talking about it. In June 2009, S&S's Reidy bluntly told Amazon that the $9.99 price point was "a mistake" and that she would "continue to be vocal because she thinks it's terrible for the business." In early December 2009, Hachette's

---

[9] Among other strategies that two or more of the Publishers discussed with each other were retail price maintenance, mandatory minimum advertised pricing, and a joint venture to sell e-books.

Nourry met with Amazon's Naggar, and told him that Amazon's $9.99 pricing posed a "big problem" for the industry. According to Nourry, if Amazon raised e-book prices by even one or two dollars it would "solve the problem."

The Publisher Defendants did not believe, however, that any one of them acting alone could convince Amazon to change its pricing policy. They also feared that if they did not act as a group, Amazon would use its ever-growing power in the book distribution business to retaliate against them. As a result, the Publisher Defendants conferred about their need to act collectively if they were to have any impact on Amazon's pricing. As a Penguin executive reported to the Penguin Group Board of Directors under the heading "competition and collaboration," it "will not be possible for any individual publisher to mount an effective response" to Amazon "because of both the resources necessary and the risk of retribution, so the industry needs to develop a common strategy."

Thus, as early as December 2008, Stefan von Holtzbrinck of Macmillan and Hachette's Nourry agreed "to exchange information and cooperate very tightly on all issues around e-books and the Kindle." Nourry explained that "at the heart of our strategy" are discussions among "top publishers" in the United States "to create an alternative platform to Amazon for ebooks." He observed, however, that the goal of these ventures is "less to

compete with Amazon than to force it to accept a price level higher than 9.99." During the Summer of 2009, Nourry came to New York and met with the CEOs of Hachette's competitors on June 29 and 30. Nourry reported after his first day of meetings that "the movement is positive" with respect to Macmillan, S&S, HarperCollins, and Penguin. While he expressed his continued fear that Amazon's pricing would lead to "selling content at 7$ . . . [l]ike it works in the music business," he was reassured to know that "none of our competitors" wanted this to happen either.

On a fairly regular basis, roughly once a quarter, the CEOs of the Publishers held dinners in the private dining rooms of New York restaurants, without counsel or assistants present, in order to discuss the common challenges they faced, including most prominently Amazon's pricing policies. Before one such dinner, Hachette's Young promised Nourry that he would raise with his competitors their options to confront the "potentially dominant role played by . . . Amazon" in e-books, "in order to control their strategy and pricing." As Young put it, "I hate [Amazon's] bullying behavior and will be happy to support a strategy that restricts their plans for world domination."

As the Publisher Defendants' CEOs testified, the Publishers did not compete with each other on price; while they were serious competitors, their preferred fields of competition were

19

over authors and agents. Thus, they felt no hesitation in freely discussing Amazon's prices with each other and their joint strategies for raising those prices.

In the Fall of 2009, Reidy explained to her superior at Simon & Schuster's parent company CBS Corporation, Leslie Moonves ("Moonves"), that S&S was considering several different options to "get Amazon to change its pricing." As Reidy explained,

> we've always known that unless other publishers follow us, there's no chance of success in getting Amazon to change its pricing practices. . . . And of course you were right that without a critical mass behind us Amazon won't 'negotiate,' so we need to be more confident of how our fellow publishers will react if we make a move."

Reidy assured Moonves, however, that she was "fairly sure that at least two of them would quickly follow us" and would "keep thinking of how to attack the problem (as we perceive it) of current eBook pricing; as you realize, we think it's too important to ignore." Reidy acknowledged to Moonves that "we need to 'gather more troops' and ammunition first!"

In addition to raising the wholesale price of e-books, another strategy that Publisher Defendants adopted in 2009 to combat Amazon's $9.99 pricing was the delayed release or "withholding" of the e-book versions of New Releases, a practice

that was also called "windowing."[10]  By the end of 2009, four of
the Publisher Defendants -- Macmillan, Simon & Schuster,
Hachette, and HarperCollins -- had announced or implemented a
policy of windowing some of their most popular e-book titles on
Amazon.  By making the more expensive hardcover version
available to the public before the lower priced e-book, the
Publisher Defendants hoped to protect the sales of New Release
hardcover books and to pressure Amazon to raise its e-book
prices.  Sargent explained his support for withholding e-books
from Amazon in the following terms, "Right now it is all about
tactics while we try to get hardcovers over the artificially low
9.99 price point," and "we need to do something to budge Amazon
from their current strategy."  Hachette's Young similarly
believed that "windowing . . . was the only way we could deal
with Amazon selling off the family jewels."

In order for the tactic of windowing to succeed, the
Publishers knew they needed to act together.  That several
Publishers synchronized the adoption and announcement of their
windowing strategies was thus no mere coincidence.  For example,

---

[10] Publishers had traditionally delayed the release of paperback
versions of hardcover books.  This practice is known as
windowing.  While the delayed release of some e-book titles,
particularly those of popular New Releases, is more technically
known as withholding, many in the publishing industry also
called it windowing, and that term will also be used in this
Opinion to refer to the delayed release of e-books as a strategy
employed by the Publisher Defendants to pressure Amazon to lift
its e-book prices.

Hachette's Young told Nourry in late Fall 2009, "[c]ompletely confidentially, Carolyn [Reidy] has told me that they [S&S] are delaying the new Stephen King, with his full support, but will not be announcing this until after Labor Day." Understanding the impropriety of this exchange of confidential information with a competitor, Young advised Nourry that "it would be prudent for you to double delete this from your email files when you return to your office." When HarperCollins soon followed with its own windowing announcement, delaying the digital release of Sarah Palin's Going Rogue, Hachette's Nourry congratulated Murray on his decision: "Well done for the Palin book," Nourry wrote, "and welcome to the Club!"

The Publisher Defendants' synchronized windowing strategy was publicly reported and tied to their discontent with Amazon's pricing. A Wall Street Journal article of December 9, entitled "Two Major Publishers to Hold Back E-Books," reported that S&S was windowing in order to "tak[e] a dramatic stand against the cut-rate $9.99 pricing of e-book best sellers," and that Hachette would follow suit in an effort to "preserve our industry" from authors' work being "sold off at bargain-basement prices." The article's author noted that "publishers have come to fear that the bargain prices will lead consumers to conclude that books are worth only $10, or less, upsetting the pricing model that has survived for decades." The article reported that

22

S&S was intentionally focusing its windowing efforts on its most popular titles; as an S&S executive explained, she was concerned that e-book sales were "cannibalizing new best-selling hardcovers, which are the mainstay of the publishing business."

A New York Times article of the same day entitled "Publishers Delay E-book Releases," described an even broader effort among the Publisher Defendants to delay the digital release of certain popular titles. It reported that "[p]ublishers have been debating the timing of e-books in part as a way to protest the low prices -- typically $9.99 -- that online retailers like Amazon and Sony are offering on ebook versions of new releases and best sellers." It stated that at least four Publishers -- S&S, Hachette, HarperCollins, and Macmillan -- already had begun or announced an intention to window e-books in the coming year. The article described the economics of windowing and tied the strategy to the protection of Publishers' physical book business, stating that

> Although publishers currently receive the same wholesale price for an e-book that they receive for a print book (meaning the retailer takes a loss on the sale of the most popular e-books), publishing houses worry that eventually, Amazon and other e-book retailers will pressure publishers to take a smaller cut on e-books. In addition, since 95 percent of the business still comes from print booksellers, the publishers want to prevent those retailers from reducing orders.

The next day, the Wall Street Journal similarly announced that others had joined the windowing movement, reporting that

23

"HarperCollins Joins Ranks of Those Delaying E-Books," as "the debate over the timing and pricing of e-books heats up."  The article stated that, beginning in early 2010, HarperCollins will delay the release of "five to ten hardcover titles each month." It quoted Murray saying, "We have to believe that delaying the e-book edition helped hardcover sales."  The article also reported that Penguin was "watching the current situation with interest."

The three Publisher Defendants who had announced their adoption of a windowing policy hoped that Macmillan, Penguin, and Random House would join their campaign.  As Nourry expressed on December 6, in order "[t]o succeed our colleagues must . . . follow us."  Five days later, S&S's Reidy advised Macmillan that it would "love" for Macmillan "to join" Hachette, HarperCollins, and S&S in windowing, and "fel[t] if one more publisher comes aboard, everyone else will follow suit."  On December 15, Macmillan announced that, starting in January, it would delay release of most of its e-books for 90 days.[11]  It was reported in the Wall Street Journal on December 16.

This left only two of the Big Six not yet committed to windowing.  Penguin's Makinson reported in December that Hachette had started to "put a lot of pressure" on Penguin "to join the windowing movement," but Penguin refused to do so.

---

[11] As it turned out, Macmillan never implemented this policy.

24

Penguin's McCall was well aware that "[i]f other publishers
don't follow suit" with windowing, Amazon's $9.99 "predatory
pricing will continue, and we'll lose."  When Penguin and Random
House chose not to join their competitors and delay the release
of e-books, Hachette's Young found their refusal "deeply
divisive and disappointing."

Even though by the Winter of 2009, four of the Publisher
Defendants had delayed the release of some e-books or announced
an intention to so, they knew that windowing was not a long-term
solution to Amazon's $9.99 pricing model.  Among other things,
windowing carried serious risks.  As Sargent recognized,
windowing was "really bad" because it encouraged piracy.  Reidy
noted that windowing "did not seem the wisest course" since "it
doesn't seem smart to penalize the eBook reader: we in fact want
to encourage eBook purchases, so long as we can maintain our
margins and income."  She feared that windowing could "alienate
an entire portion (and a growing one) of our audience."  As
Sargent admitted to an author on December 14, while windowing
could be used as a short-term tactic, "[w]indowing is entirely
stupid," and "actually makes no damn sense at all really."  As a
Penguin study showed, when a Publisher delayed the release of
e-books, its sales never recovered.  The lost customers neither
bought the print book at a higher price nor returned to purchase
those e-books when they finally became available.

25

Sargent, for one, hoped that over time Publishers would be able to move to a system of simultaneous release of e-books with their physical counterparts, but at a higher price point of between $12.95 and $14.95.  In order to do so, the Publishers would need to find a way to gain long-term control over pricing, including on Amazon.  "The questions is," Sargent wondered, "how to get there?"  Other Publisher Defendants envisioned even higher price points for e-books, but pondered the same fundamental dilemma.  It was in this context that Apple arrived on the scene and provided the Publisher Defendants with the means to achieve their shared goal.

D. Apple's Development of iBooks

Apple is one of America's most admired, dynamic, and successful technology companies.  Its innovative devices are immensely popular not only in this country but around the world.  But, as of 2009, Apple had no e-bookstore.  Consumers could read e-books on Apple's devices through third party software, such as apps, but Apple did not yet have its own e-reading software or e-bookstore with a collection of books available for purchase.

Apple did not have an e-bookstore in 2009 because it did not yet have a device that its founder Steve Jobs ("Jobs") believed would be a great e-reader.  He demanded no less before he would invest his company's energies in e-books.  That was about to change.

In 2009, Apple was close to unveiling the iPad. With this revolutionary tablet, Apple was able to contemplate the arrival of its first great device for reading e-books. Therefore, under the direction of Apple's Cue, Moerer and others began studying the e-book industry. As of 2009, Cue had worked at Apple for twenty years and had played a major role in creating Apple's content stores, beginning with Apple's Online Store in 1998, the iTunes Store in 2003, and the App Store in 2008. Since 2004, Cue had been responsible for running all of Apple's digital content stores and had led Apple's negotiations in its deals with major content providers.

By June, Cue's team had assembled data that showed that the book market in North America was larger than the music market. The book industry was estimated to be roughly $35 to $42 billion in size, with trade books comprising $12.5 billion of that figure. While trade e-books accounted for just $100 million or so of those numbers, that market was growing at an exponential rate. Apple's McDonald predicted that the e-book market could reach nearly $1 billion in 2010.

Apple, of course, knew that Amazon was the dominant e-retailer ("e-tailer") of books. While part of Amazon's success could be attributed to its Kindle, Apple understood that another reason for Amazon's success in the e-book market was its low prices. As of that time, Apple had little experience with

competing on price when selling content; indeed, it considered itself a price "leader" in selling music, apps, and other content.

It was also clear to Cue that "all the content owners hate Amazon."[12]  As early as February 2009, Cue recognized that "[t]he book publishers would do almost anything for us to get into the ebook business."  Apple had also discovered analyst reports in June 2009 that indicated that a price of $12.99 could be a more profitable price point for e-books than Amazon's $9.99.

By November 2009, Apple had compiled a "Business Outlook" for audio book and e-book opportunities.  It concluded that selling e-books as individual apps was "flawed."  It was at that relatively late date that Jobs authorized Cue to pursue the development of a dedicated Apple e-bookstore (the "iBookstore") for the iPad.  Apple planned to demonstrate the iPad to the public at the Launch on January 27, 2010, and planned to ship the devices to stores in early April 2010.

Apple believed that the iPad would be a transformational e-reader.  In contrast to the black-and-white e-reader devices on the market at the time, the iPad would have the capacity to display not only e-book text but also e-book illustrations and photographs in color on a backlit screen.  The iPad would also

---

[12] Cue attributed the Publishers' hatred of Amazon to Amazon "leveraging [its] force in physical [books] to force [the Publishers] into bad deals" in e-books.

28

have audio and video capabilities and a touch screen, which
Apple believed would be seen by readers as a particularly
attractive feature.

Even though the iPad Launch would happen with or without an
iBookstore, Apple did hope to announce its new iBookstore at the
Launch.  This would ensure maximum consumer exposure and provide
a dramatic component of the Launch.  But, this left Cue with
less than two months for Apple to acquire enough content to
create a viable Apple e-bookstore, and that period included the
Christmas and New Year holidays.[13]  As a result, Apple
streamlined its efforts and concentrated on executing agreements
with the Big Six Publishers for trade e-books.  It would broaden
its campaign to add more publishers and to include other kinds
of e-books, including textbooks and every other kind of e-book,
after the Launch.

Cue also had his own reasons for working hard to make the
iBookstore a reality in time for the Launch.  He was, of course,
an able and experienced negotiator.  He took pride in all he had
achieved for Apple and wanted to succeed in adding an
e-bookstore to its other content domains.  Cue believed that
with the introduction of the iPad the iBookstore held the

---

[13] The record does not reveal when Apple began to develop the
software for the iBookstore, but it is clear that Apple was
intensely engaged in that development throughout this two month
window.

potential to be another rousing success for his company.  But,
beyond professional pride, Cue had more personal reasons for
making the iBookstore a reality in record-breaking time.  Cue
knew that Jobs was seriously ill and that this would be one of
his last opportunities to bring to life one of Jobs's visions
and to demonstrate his devotion to the man who had given him the
opportunity to help transform American culture.

E. December 15 to 16, 2009:  Apple's First New York Meetings
with Publishers

Beginning on December 8, 2009, Cue's team contacted the
Publishers to set up meetings the following week to discuss an
"extremely confidential" subject.  Apple made it clear in these
calls that it would be trying to meet with each of the Big Six
CEOs on its whirlwind trip to New York City.

Apple's requests for meetings in New York was an exciting
turn of events for the Publishers and prompted a flurry of
telephone calls among them.  They speculated about how they
might turn Apple's entry into the e-book business to their
advantage in their battle with Amazon.  They were well aware of
the press reports that Apple would be announcing the arrival of
another revolutionary device.  Reidy, Murray, and Young
exchanged at least five telephone calls on December 10 and 11
alone.  These calls among the Publisher Defendants' CEOs would
continue and intensify at critical moments during the course of

30

the Publishers' ensuing negotiations with Apple.[14]  See
Appendix A.

Even before it met with any of the Publishers on December
15, Apple already knew several things that are important to the
events that would unfold in the coming weeks.  As previously
described, Apple understood that the Publishers wanted to
pressure Amazon to raise the $9.99 price point for e-books, that
the Publishers were searching for ways to do that, and that they
were willing to coordinate their efforts to achieve that goal.
By December 15, the Wall Street Journal and New York Times
articles of December 9 and 10 had described the windowing
commitment made by three of the Big Six.  Cue viewed the e-book
market at the time to be dysfunctional and ripe for Apple's
arrival.

For its part, Apple had decided that it would not open the
iBookstore if it could not make money on the store and compete
effectively with Amazon.[15]  Apple knew that it needed access to a

---

[14] The telephone calls among the Publisher Defendants during the
period of their negotiations with Apple represented a departure
from the ordinary pattern of calls among them.  By contrast,
there was only one telephone call made between these CEOs during
the week prior to Apple's first contact with the Publishers on
December 8.

[15] Some months earlier, Apple had considered proposing to Amazon
that they simply divide the e-market for books and music, with
iTunes acting as "an ebook reseller exclusive to Amazon and
Amazon becom[ing] an audio/video iTunes reseller exclusive to
Apple."

large number of titles.  It was unwilling to allow e-books to be
windowed at any Apple store.  Apple also preferred to sell
e-books at prices below their physical counterparts, although
that object largely fell by the wayside in the coming weeks.
Prior to meeting with the Publishers, Apple assumed that it
would purchase e-books from them under the wholesale model and
resell them, in line with the arrangement Apple used to obtain
movies and TV shows for resale through its iTunes store.

    As a master negotiator, Cue came well prepared for his
meetings.  He knew how to convey Apple's conditions for entry
and at the same time give the Publishers an incentive for
entering, almost overnight, into a partnership with Apple.  He
decided to entice the Publishers by conveying an unambiguous
message that Apple was willing to sell e-books at prices up to
$14.99, that is, at a price point $5 above Amazon's price for
many New Releases and NYT Bestsellers.

    Cue, Moerer, and their in-house attorney Saul met
separately with Hachette, Penguin, and Random House on December
15, and with HarperCollins, Macmillan, and S&S on December 16.
If there was one Publisher that Apple most desired to have in
its iBookstore, it was Random House, the largest Publisher.  As
events unfolded, however, that would be the only Publisher who
declined to join the iBookstore before the Launch.

32

Following a script, Apple conveyed in each of these meetings that it hoped to be able to begin selling e-books through an e-bookstore within the next 90 days as a feature on a new web-enabled machine.  Apple expected that its entry into the market with an iBookstore on this device would help make books "cool" for the iTunes generation and quickly make Apple the vehicle through which a significant percentage of e-books were sold.

Cue emphasized that Apple would only launch an e-bookstore if it got all of the major Publishers to sign on.  As Cue intended, each of the Publishers understood that this was a reference to the Big Six.

The parties exchanged thoughts about a workable business model in these meetings.  Apple learned that current wholesale prices for e-books typically fell in the range of $13 to $15, and some were even sold at prices as high as $17.50.  Cue told Publishers that they would need to lower their wholesale prices for Apple if Apple were to enter the business.  In order for Apple to compete with Amazon it needed to be able to price e-books as cheaply as Amazon did, and it was not willing to pursue a strategy of loss leaders.  As Reidy recorded, Apple expressed that it "cannot tolerate a market where the product is sold significantly more cheaply elsewhere."

Well aware of the Publishers' experimentation with windowing, Apple also told Publishers that it opposed windowing; it believed that withholding e-books alienated customers and led to piracy. Random House and Macmillan agreed, telling Apple that they believed windowing was "a terrible, self-destructive idea," even though Macmillan admitted that it might be considering "holdbacks" on some NYT Bestsellers.

Hachette and later HarperCollins surprised Apple with their suggestion that, instead of a wholesale model, Apple adopt an agency model for the distribution of e-books. Hachette told Apple that it had already discussed switching to an agency model with Barnes & Noble and had concluded that it was an attractive business model for selling e-books.[16] During these meetings, Cue rejected the idea. Within days, however, he would reconsider their suggestion.

Mainly, however, the Publishers told Apple how unhappy they were with Amazon's $9.99 price point. Every Publisher with whom Apple met lamented Amazon's pricing New Releases and NYT Bestsellers at $9.99. Several of them made clear that they were actively searching for a way to gain more control over pricing and were implementing tactics they did not enjoy, like

---

[16] Hachette's Thomas had spoken to a HarperCollins executive on December 10, in advance of their meetings with Apple, regarding exploring agency as an alternative business model.

34

windowing, in an attempt to effect the change that was of utmost importance to them.

For example, Penguin in its meeting with Apple shared its view that a $9.99 e-book was not a "sustainable model." The next day, S&S frankly admitted "hating" Amazon pricing, and HarperCollins revealed that it was interested in the agency model in order "to fix Amazon pricing." HarperCollins advocated that e-book prices be set in the range of $18 to $20, which Cue viewed as utterly unrealistic. Listening to the Publishers, Cue understood that they were afraid that Amazon's pricing strategy threatened their overall business.

Apple, in turn, assured the Publishers that it was not interested in entering the e-book market by pursuing a low-price strategy. Apple opined that $9.99 was not yet "engrained" in the consumer mind, and suggested in each meeting pricing e-books at between $11.99 and $14.99. The Publishers were thrilled. Macmillan agreed immediately with Apple's suggested $14.99 retail price for New Releases.

As Cue promptly reported to Jobs on December 15, after he had completed the first three of his six meetings, "[c]learly, the biggest issue is new release pricing and they want a proposal from us." Cue was confident that he would be able to build the iBookstore in time for the Launch. As he told Jobs, "[n]othing scared me or made me feel like we can't get these

35

deals done right away."  In his view, the Publishers had been
"ecstatic" about what Apple's arrival could mean for "their
industry."

On the heels of their initial meetings with Apple, the
Publisher Defendants enthusiastically shared the good news that
Apple was willing to enter the e-book market with a
significantly higher price point for newly-released e-books.  On
December 17, Reidy reported the "[t]errific news!" to Moonves
that Apple was entering the e-book market and "was not
interested in a low price point for digital books."  Reidy
understood that "they [Apple] don't want Amazon's $9.95 to
continue."  Hachette's Nourry similarly told Cue after their
initial meeting that he was glad it appeared "our business
interests are very much aligned."  HarperCollins later reflected
that Apple was the Publishers' "best partner" because it
"do[es]n't like deep discounting."

Several of the Publishers hashed over their meetings with
Apple with one another.  After Young had met with Apple but
before S&S had its meeting, Young could not resist calling Reidy
to share the wonderful news that the "Top Man" at Apple opposed
$9.99 pricing.  He hesitated to say more because S&S would be
meeting with Apple the following day, and he did not want to
"spoil [the] fun."  Young and Reidy promised to "check in" with
each other after S&S had its meeting with Apple, and did so in

36

several calls over the course of the next two days.[17]  At a
breakfast meeting, Penguin's Makinson discussed the Apple
meetings with Hachette's Nourry.  On December 17, Rupert
Murdoch, Chairman and CEO of HarperCollins' parent company News
Corp, relayed to Random House that Apple would soon be launching
an e-reader and would be "selling books at 15 dollars."  Charlie
Redmayne, a HarperCollins' digital officer, bluntly suggested to
Murray immediately after their meeting with Apple on December 16
that they coordinate a response to Apple with the other
Publishers.  As Redmayne wrote, in light of their "[g]reat
meeting . . . I wou[l]ld talk to the other CEO's early and look
to present in early Jan."

> F. Apple Switches Gears and Presents An Agency Model with
>    30% Commission

Having received an enthusiastic reception from the
Publishers, the Apple team returned to Apple's headquarters in
Cupertino, California and quickly absorbed what it had heard.
One idea that it considered proposing to the Publishers, but
rejected, was an across-the-board 25% discount for e-books off
the wholesale price for physical books.  With many NYT
Bestsellers having a $12 wholesale price for the hardcover book,
this would allow a $9 digital wholesale price, which Apple's

---

[17] On December 15, Hachette's Young spoke to S&S's Reidy by
telephone prior to his meeting with Cue.  On December 16, Reidy
called Young just minutes after her meeting with Cue had ended.
The next day, the two exchanged three calls.

Moerer thought should be "acceptable" to the Publishers for all of their e-books with the possible exception of a few blockbusters.

Cue quickly decided, however, to go a different route. Unless the Publishers agreed to lower wholesale prices for e-books, Apple would run the risk of losing money if it tried or was forced to match Amazon's pricing to remain competitive. The wholesale model also allowed the Publishers to try to control digital book prices by windowing e-books. As Apple had expressed to the Publishers, it strongly believed that withholding content would interfere with the growth of the digital market and was inconsistent with its business goals and practices. Apple thus embraced the model that Hachette and HarperCollins had proposed -- the agency model. Apple was already familiar with this model since it used the agency model to sell apps through its App Store.

Apple realized that the recent turmoil in the digital book business strengthened its hand in proposing this new business model to the Publishers. Apple did not have to open an e-bookstore when it launched the iPad; it could add the iBookstore later. On the other hand, the Publishers were searching for an alternative to Amazon's pricing policies and excited about Apple's entry into the e-book industry and the prospect that that entry would give them leverage in their negotiations with

Amazon.  Apple appreciated that, in the words of Macmillan's
Sargent, the Publishers viewed Apple as "offer[ing] the single
best opportunity [they] would ever have to correct the imbalance
in our e-book market."

Apple settled on an agency model with a 30% commission, the
same commission it was using in its App Store.  Agency would
give the Publishers the control over e-book pricing that they
desired, and ensured that Apple would make a profit from every
e-book sale in its iBookstore without having to compete on
price.  Apple realized, however, that in handing over pricing
decisions to the Publishers, it needed to restrain their desire
to raise e-book prices sky high.  It decided to require retail
prices to be restrained by pricing tiers with caps.  While Apple
was willing to raise e-book prices by as much as 50% over
Amazon's $9.99, it did not want to be embarrassed by what it
considered unrealistically high prices.

The agency model presented one significant problem.  Apple
wanted its iBookstore to be a rousing success.  For that to
happen, Apple needed not only content but also customers.  Apple
realized that if it moved to an agency model with the
Publishers, Apple would be at a competitive disadvantage so long
as Amazon remained on the wholesale model and could price New
Releases and NYT Bestsellers at $9.99, or even lower to compete
with Apple.  Since it was inevitable that the Publishers would

39

raise e-book prices when given the opportunity -- indeed, Apple expected the Publishers to raise the prices to the tier caps -- e-books priced at $9.99 by Amazon would doom the iBookstore. Why would a consumer buy an e-book in the iBookstore for $14.99 when it could download it from Amazon for $9.99?

To ensure that the iBookstore would be competitive at higher prices, Apple concluded that it needed to eliminate all retail price competition. Thus, the final component of its agency model required the Publishers to move all of their e-tailers to agency. Apple expected that this proposal would appeal to the Publishers. After all, it would allow them to "fix" their "problem" with Amazon's pricing.

Apple's first meetings with the Publishers in New York had occurred on a Tuesday and Wednesday. Just three days later, on Saturday, Cue was ready to test drive his agency model and hear preliminary reactions from the Publishers. On December 19, Cue emailed three of the six Publishers' CEOs to set up thirty minute meetings for the following Monday or Tuesday to "update you [on] all my findings and thoughts." Cue already knew from the meetings earlier in the week that Hachette and HarperCollins were enamored of the agency model and did not contact them again at this stage. He had pegged Penguin's CEO as a "follower," and chose to hold off on contacting him. After all, Penguin and Random House were the only Publishers that had not publicly

40

announced any plans to withhold e-books from Amazon.  Cue
decided instead to test his proposal with S&S, Macmillan, and
Random House.

Cue chose these three Publishers carefully.  He considered
Reidy a real "leader" among her fellow CEOs.  He was not wrong.
As described below, she was instrumental in convincing both
Penguin and Macmillan to sign up with Apple when they were
wavering.  She was in frequent contact with Young, Shanks and
Sargent at every critical juncture in the weeks before the
Launch.

Cue reached out to Macmillan's Sargent for a different
reason.  He had been impressed with Sargent's personal history,
in particular his family's storied connection with the
publishing industry.[18]  Cue believed that a partnership with
Macmillan would add caché.  But, most importantly, Cue wanted
the largest Publisher, Random House, to come on board.

Cue succeeded in speaking with key executives from each of
these three Publishers early the following week.  He explained
that he had met with all of the Big Six the preceding week, and
had come to the conclusion that the way forward would involve
four components.  First, the e-book "industry" needed to move to
the agency model, which would allow the Publishers to set the

---

[18] Sargent's father, John Turner Sargent, Sr., was the President
and CEO of the Doubleday & Company publishing house from 1963 to
1978, and led the company's expansion into an industry giant.

41

prices and introduce what Cue euphemistically termed "some level of reasonable pricing."  Second, Apple would need a 30% margin on e-books sold through Apple.  Third, he proposed setting prices for New Release e-books at $12.99, that is, $3 over Amazon's $9.99 price.  Finally, to remove all retail price competition, the Publishers would have to adopt the agency model for all of their e-tailers.

Reidy described her conversation with Cue in a detailed email to colleagues at S&S that day.  According to Reidy, Cue "didn't think anything [other than the agency model] would keep the market from its current pricing 'craziness.'"  Reidy did not hesitate over the suggestion that the industry as a whole be moved to an agency model; Reidy had replied to Cue, "if we make these our terms, then they are our terms."  Overall, Reidy was intrigued, but worried that the 30% commission for Apple would be too "steep."

Markus Dohle ("Dohle"), Chairman and CEO of Random House at the time, similarly described his conversation with Cue to colleagues at Random House.  Dohle reported that Cue "thinks that book prices are becoming too low -- he is worried about the consumer perception.  Therefore he suggests an 'agency model.'"  Eliminating price competition with Amazon was essential to Cue since "[h]e assumes that if we find a new TOS [terms of sale, wholesale] model which would provide A[pple] with an acceptable

margin, Amazon would lower the prices again following . . .
their loss leader[] strategy."  As Dohle reported, when he
expressed concern about Amazon's willingness to accept an agency
model, Cue suggested that "windowing could be used to establish
a distributor [agent] model" if Amazon balked.

Shortly after his conversation with Cue, Sargent wrote to
Cue to suggest a pricing strategy that would allow Publishers to
price some e-books at $19.95, but that "put the majority of new
releases at the 14.95 or 12.95 price points."  Introducing the
concept of a dual model, an idea that would continue to have
appeal for Sargent in the following weeks, Sargent also
suggested that Apple offer two alternative terms of sale -- a
"30% agency model with no windowing," and "[a] [d]iscount model
that includes windowing" -- allowing each Publisher to "decid[e]
which model to buy under."  Sargent later reflected to another
Macmillan executive that he believed this dual approach "[w]ould
force Amazon's hand."

On December 21, Cue advised Jobs that his talks with the
Publishers had gone "well and everyone understood our position
and thought it was reasonable."  Cue observed that the
Publishers recognized "the plus" of moving to an agency model,
namely it "solves Amazon issue."[19]  On the "negative" side, they

---

[19] Cue asserted at trial that "solves Amazon issue" referred to
pricing e-books in the iBookstore above $9.99, and was not a

43

were troubled by a commission for Apple that was as high as 30%. That gave the Publishers a "little less" than they would like. As of that point, Cue believed that the Publishers were willing to pursue a strategy of moving all of their e-tailers to the agency model, and in fact several Publishers had told him so. The Publishers believed, however, that a $12.99 price for an e-book would be too low if the physical book sold for more than $35. Cue reported that he had urged them to focus "on the other 99% and we can figure out how to solve the exceptions" later.

---

reference to raising prices across the industry or eliminating Amazon's ability to set prices. Indeed, Cue protested at trial that, throughout its negotiations with the Publisher Defendants, Apple was concerned only with the pricing that would prevail in the iBookstore and sought only to "fix" Amazon's pricing or "solve the Amazon issue" in its own e-bookstore. In this and several other aspects of Cue's testimony, regrettably, he was not credible. The documentary record and the commercial context of the negotiations leave room for no other conclusion. Apple's pitch to the Publishers was -- from beginning to end -- a vision for a new industry-wide price schedule. Any other course would have left the Publishers vulnerable to Amazon's pricing strategies and would have forced Apple to compete on price. Accordingly, Cue's repeated assertion at trial that his sole "focus" was on thinking about the agency deals and their effects "from an Apple point of view," cannot be taken at face value. As a savvy negotiator he knew how to place himself in the Publishers' shoes, understand their interests, and appeal to their concerns, as he eventually admitted toward the end of his testimony. Cue recognized that the Publishers were consumed first and foremost by a desire to eliminate Amazon's $9.99 price for e-books across the market. His colleagues, including Saul, acknowledged that they understood at the time that Apple could not solve the Publisher's problem with $9.99 if the Publishers left Amazon on wholesale. Thus, Cue and his team found a way to solve the "Amazon problem" for the Publishers; not just "as to Apple," but industry-wide.

Buoyed by the reactions of the three Publishers to Apple's proposal that the entire e-book industry be converted to an agency model -- with higher prices for e-books, a 30% commission for Apple and no retail price competition -- Cue's team turned their energies toward fleshing out a structure for this arrangement. They entered the Christmas break with every hope that an iBookstore could be announced at the Launch.

### G. Apple's Term Sheet: All E-tailers to Agency and Pricing Caps

Shortly after the Christmas holidays, Cue wrote to each of the Publishers to present Apple's term sheet. On January 4 and 5, the first Monday and Tuesday in the new year, Cue wrote six essentially identical emails.[20] Only the introduction varied. For the three Publishers with whom he had talked in late December, Cue began his emails with, "As we discussed." For the other three, he began with the following comment: "After talking to all the other publishers and seeing the overall book environment, here is what I think is the best approach for ebooks."[21]

In these emails, Cue recapped the key components of Apple's proposed agency model. It included the elimination of retail

---

[20] Cue sent emails to Macmillan, S&S, Random House, and Hachette on January 4. Cue's emails to Penguin and HarperCollins were sent on January 5.

[21] For reasons unknown, Cue sent two emails to Macmillan, one with each greeting.

price competition and raising many e-book prices by at least $3.
Cue wrote, "Just like the App Store, we are proposing a
principal-agency model with you, where you would be the
principal and iTunes would sell your product as your agent for
your account.  In exchange for acting as your agent iTunes would
get a 30% commission for each transaction."  For "hardback
books" that retail for less than $35, the Publisher would set a
price for an e-book at any price up to $12.99; for trade or
mass-market paperback books, the price would be capped at $9.99;
and for any book that retailed above $35, the e-book price would
be capped at $14.99 and increments of $5 above that.  Cue added
that a "realistic" price for an e-book would be less than 50% of
the retail price for the hardcover book.  He emphasized that "to
sell e-books at realistic prices . . . all resellers of new
titles need to be in agency model."  In closing, Cue reiterated
that Apple "think[s] these agency terms accomplish[] all the
goals we both have."

It was as apparent to the Publishers as it was to Apple
that Apple's proposal would only allow the Publishers to raise
the consumer prices for e-book versions of their key titles
above Amazon's $9.99 price point to the proposed price caps if
they moved Amazon and their other e-tailers to agency.  Reidy
immediately advised her S&S colleagues that she was "in total
agreement" that the "[a]gency model should hold for all

46

retailers; these would become our terms." Reidy's notes on her copy of Cue's e-mail captured the benefits she saw accruing from Apple's proposal. The ability to raise e-book prices and protect the physical book business was front and center. Her notes read: "Higher price slows Ebks/casual purchaser/keeps retailers/stops authors leaving."

In the conversations that followed the dissemination of the term sheet, Publishers told Apple that the proposed price caps were too low. Apple reiterated that it would not tolerate windowing, it did not want to lose money, and it did not want any price competition. It advocated for an industry-wide adoption of the agency model as "the only way" to "move the whole market off 9.99."

H. Creation of the MFN Clause

One week after it distributed the term sheet, Apple distributed a draft contract. During the intervening week, however, Cue's thinking about how to achieve an industry-wide shift to the agency model changed. His in-house counsel had been working on an alternative way to reach that goal that was even more effective in protecting Apple's interests. Saul proposed using an MFN clause for retail prices. The MFN guaranteed that the e-books in Apple's e-bookstore would be sold for the lowest retail price available in the marketplace.

47

Apple had used an MFN in one of its music agreements, but the music had been purchased under a wholesale model. Apple's use of an MFN for a retail price was a unique feature of its e-book agency agreements.

By combining the MFN with the pricing tiers, the pricing discretion Apple gave to the Publishers with one hand, it took away with the other. While Publishers could theoretically raise e-book prices in the iBookstore above the $9.99 price point to the top of the Apple pricing tiers, unless the Publishers moved all of their e-tailers to an agency model and raised e-book prices in all of those e-bookstores, Apple would be selling its e-books at its competitors' lower prices. Using Saul's characterization, the "elegant" solution presented by the MFN accomplished all of Apple's objectives. It eliminated any risk that Apple would ever have to compete on price when selling e-books, while as a practical matter forcing the Publishers to adopt the agency model across the board. As Cue admitted to colleagues in Britain in the Spring, "any decent MFN forces the model."[22]

Cue had an opportunity to explain the concept of the MFN to Moerer on January 10. Moerer had been speaking with Random House, which was increasingly skeptical of Apple's proposals,

---

[22] Cue's words are captured in a colleague's memorandum. At trial, Cue denied that he had actually spoken in those terms.

and he wanted Cue's advice on how to respond to several of its questions.  One question was, "Are we willing to accept an agency model if other retailers continue a standard wholesale model for new releases without holdbacks?"  Cue responded, "We are (I don't think we can legally force this).[23]  What we care about is price so the contract will say we get it at 30% less whatever the lowest retail price out in the market is (whether agency or wholesale)."

With the adoption of the MFN, Apple dropped from the agency contract it was drafting the explicit requirement that had appeared in its term sheet that all e-tailers be placed on an agency model.  But, Apple did not change its thinking.  It believed that the Publishers should still move their e-tailers to agency, and in the weeks that followed, it made sure that happened.  Cue was able to report to Jobs on January 13, three days after his e-mail exchange with Moerer, that at least two of the Publishers had agreed to "go [to the] agency model for new releases with everyone else."  Thus, despite the fact that it would tell Random House during its increasingly difficult negotiations that it could accept a hybrid model where Random

---

[23] Apple takes the position that Cue's explanation that it couldn't "legally force" the Publishers to place all of their e-tailers on an agency contract is not a reference to the lawfulness of such a requirement, but is instead a reference to Apple's skepticism that it could legally enforce the clause against any Publisher who reneged on its commitment.  It is unnecessary to resolve this ambiguity.

House moves to agency with Apple but stays on wholesale with some retailers, there is no evidence that Apple ever communicated to any of the Publisher Defendants that they were free to leave their other retailers of e-books on a wholesale model or that Apple ever rescinded its demand that each of them move to an agency arrangement with all resellers.[24]

As described above, Apple, quite simply, did not want to compete with Amazon on price. Apple was confident that the iPad would be a revolutionary and wildly popular device. It was happy to compete with Amazon on that playing field, where it believed its strength resided. It would match its device -- the iPad -- against the Kindle. As HarperCollins executive Robert Zaffiris observed on January 20, "Apple is cutting a blanket agency deal to level the playing field and ultimately compete in two areas they feel good about -- technology and iTunes."

I. January 11: Apple Distributes Draft Agency Agreements

On Monday, January 11, Apple sent its proposed eBook Agency Distribution Agreement ("Draft Agreement") to each of the

---

[24] A great deal of time was spent at trial trying to understand a series of five emails drafted by Jobs on January 14. Cue wanted Jobs's approval for higher price caps, and Jobs's emails show that he was quite concerned about the profitability of the iBookstore. Jobs's final email in the chain indicates that the Publishers need to "move Amazon to the agent model too for new releases for the first year. If they don't, I'm not sure we can be competitive." The e-mails were addressed to Cue and he denies ever receiving any of them, including the last in the series.

Publishers.  With the iPad launch just sixteen days away, Cue
told Jobs that his "goal" was to "get at least 2 of them to sign
this week."

The Draft Agreement contained all of the essential elements
of the contracts that the Publisher Defendants would accept two
weeks later, including a "day and date" commitment to prohibit
windowing on the Apple iBookstore,[25] price tiers, the 30%
commission, and the MFN.  Although the Publisher Defendants were
able to negotiate around the edges, none of the material terms
of the contract changed.  Apple insisted that its agency
contract be uniform.  It assured the Publisher Defendants that
they would all be getting the same terms, as would every other
publisher who decided to sell e-books through the iBookstore.

In the end, each of the Publisher Defendants simply had to
decide whether they wanted to take this opportunity to raise the
price of e-books or not.  The risks of acting and of failing to
act were similarly large.  As explained below, if a Publisher
accepted Apple's terms it was bound to lose some of the revenue
it would otherwise make from selling e-books, and could be
assured that it would incur the wrath of Amazon.  If the
Publisher declined to join Apple it would lose this particular
opportunity, backed by Apple, to confront Amazon as one of an

---

[25] The day and date commitment required Publishers to give Apple
e-books on the same date they released physical books.

organized group of Publishers united in an effort to eradicate
the $9.99 price point.

In the two intervening weeks before the Launch, Apple and
the Publishers engaged in intensive negotiations. Apple's Cue,
Moerer, and Saul stayed in New York for the nine days
immediately preceding the Launch to conclude the negotiations.
Up until the very end, it was not clear precisely how many of
the five Publisher Defendants would agree to execute the agency
contract with Apple.

By all accounts, the negotiations were tough, particularly
because Apple made few concessions. The Apple team reminded the
Publishers though that this was a rare opportunity for them to
achieve control over pricing. As Cue put it bluntly to
Hachette, the agency model proposed by Apple was "the best
chance for publishers to challenge the 9.99 price point." Some
of the discussions regarding three contract terms -- the MFN,
the 30% commission, and the pricing tiers -- are described here.

### 1. MFN Negotiations

The MFN clause required publishers to match in Apple's
iBookstore any lower retail price of a New Release offered by
any other retailer. The proposed MFN read: "If, for any
particular New Release in hardcover format, the then-current
Customer Price at any time is or becomes higher than a customer
price offered by any other reseller ("Other Customer Price"),

then Publisher shall designate a new, lower Customer Price to meet such lower Other Customer Price." Customer Price was defined as "the price displayed to the [customer] on the [Apple] Online Store, as designated by [the] Publisher for each eBook by selecting from the prices set forth" in an exhibit to the contract.

As already described, the MFN effectively forced the Publisher Defendants to change their entire e-book distribution business to an agency model if they wanted to take control of retail pricing. Any other course would be a race to the bottom in e-book prices and would give the Publisher Defendants a fixed share of a far too small revenue stream.

Under the then-existing wholesale model for selling e-books, the Publisher Defendants received a designated wholesale price for each e-book. This wholesale model was more profitable for a Publisher's e-book business than the agency model proposed by Apple. Under a wholesale arrangement a Publisher received roughly 50% of the hardcover list price from the retailer, whereas under Apple's agency arrangement a Publisher received only 70% of the retail price. For example, as shown on this table, a Publisher might receive $13 on a wholesale basis for an e-book sold by Amazon for $9.99, but (because of the MFN) only $7 from Apple so long as Amazon was still selling that e-book for $9.99. Even if Apple and Amazon

were on the same agency arrangement with a Publisher, and that
Publisher were able to move the retail price of the e-book to
the top of the Apple price tier and sell it for $12.99, the
Publisher would still receive less revenue under the agency
model: $9.10 instead of the $13.00 in revenue under the
wholesale model.

Publisher Per Unit Earnings
for New Release and NYT Bestseller Titles
Wholesale vs. Agency Model

|  | Amazon on Wholesale prior to Apple's entry | Apple on Agency with MFN; Amazon on Wholesale | Apple and Amazon on Agency with MFN and Apple price tiers |
|---|---|---|---|
| Hardcover list price | $26.00 | $26.00 | $26.00 |
| E-book wholesale price (assuming 50%) | $13.00 | $13.00 | -- |
| Amazon retail price | $9.99 | $9.99 | $12.99 |
| Apple iBookstore retail price | -- | $9.99 | $12.99 |
| Publisher revenue received from Amazon | $13.00 | $13.00 | $9.10 |
| Publisher revenue received from Apple | -- | $7.00 | $9.10 |

Because the revenue each Publisher Defendant would receive
per e-book sold through the Apple store was substantially less
than what it was currently receiving under its wholesale
arrangements, there was no financial incentive for a Publisher
to sign an agency agreement with Apple unless those agreements
suited its long-term interests.  And as Apple well understood,

54

that long-term interest was compelling. The Publisher
Defendants wanted to shift their industry to higher e-book
prices to protect the prices of their physical books and the
brick and mortar stores that sold those physical books. While
no one Publisher could effect an industry-wide shift in prices
or change the public's perception of a book's value, if they
moved together they could.

To change the price of e-books across the industry,
however, the Publishers would have to raise Amazon's prices.
This is where the MFN became such a critical term in Apple's
contracts with the Publisher Defendants. It literally stiffened
the spines of the Publisher Defendants to ensure that they would
demand new terms from Amazon. Thus, the MFN protected Apple
from retail price competition as it punished a Publisher if it
failed to impose agency terms on other e-tailers.

Many of the documents received into evidence at trial as
well as trial testimony reflect this understanding. After
signing the Agreement, HarperCollins acknowledged that "[t]he
Apple agency model deal means that we will have to shift to an
agency model with Amazon" to "strengthen our control over
pricing."

Penguin's CFO acknowledged on February 15, 2010, "[g]iven
the clauses about price matching in the Apple contract, this
could mean that we have to suspend or delay certain sales of

e-books to Amazon until the contract is renegotiated" to move Amazon to the agency model. Recognizing the compulsive nature of the MFN, Shanks testified that in evaluating the Apple deal he came to understand that "the only way we could do [agency]" was if Penguin moved to agency with other e-book retailers as well.

Reidy testified that the MFN meant, as a practical business matter, that S&S would be moving all its other e-book retailers to agency "unless we wanted to make even less money." As Reidy had written to Moonves, remaining on a wholesale model with Amazon "would just enshrine the $9.99 price point at a later date and would require us to lower our own pricing to those who accept the agency model to that price point." Reidy knew that once S&S signed its Agreement with Apple, "we need to change our ebook selling terms with our other eRetailers before" the iBookstore opened, or risk "a situation whereby we must price our adult new release eBooks sold through Apple at $9.99, undercutting one of the reasons for making the deal."

Young also understood that the MFN required Hachette to move all of its e-book retailers to an agency relationship, and "ensure," in his words, "a competitive, level playing field for

e-book sellers."[26]  Fully recognizing the benefits and risks from
the Apple offer, Nourry told Young that he was "not against
[the] MFN as long as it is legal" because "[w]e need to find
higher pricing points."[27]

Cue explained that the Publisher Defendants generally did
not fight him on the MFN.[28]  He was even told that it was an
unnecessary feature of the contract since the Publishers were
going to move to an agency relationship with all e-book
retailers anyway.

The final agency agreements with the Publisher Defendants
(the "Agreements") included an MFN in paragraph 5(b).  Although
there were variations among the five paragraphs, the core
principle of the MFN remained intact.  The MFN assured that
Apple would face no retail price competition and that the
Publisher Defendants had no choice but to demand that Amazon,
and every other e-book retailer, adopt the agency model.  As
Saul insisted in an e-mail to an independent publisher who was

---

[26] The word "competitive" in this and many other contexts at the
trial means the opposite of competition.  It means the
eradication of retail price competition.

[27] Macmillan also identified that the antitrust risk of signing
the agency agreement with the MFN could be "huge."

[28] Although Cue attempted to deny this fact at trial, at his
deposition Cue admitted that the Publisher Defendants generally
"accepted" the MFN, and although the term was negotiated, Cue
never felt it was discussed "in [the] completely material way of
saying, no, we're not doing that."  Instead, the conversations
were focused mainly on "trying to create loopholes or exceptions
to it."

frustrated that the MFN removed the publisher's control over pricing, "There are possible unilateral ways you can comply with our [MFN] provision, such as get others on an agency model, or withhold content.  Others have agreed to this and we cannot make any changes."

### 2. 30 Percent Commission Negotiations

The 30% commission on which Apple insisted in its agency agreements meant that any increase in retail prices, even up to the caps of the pricing tiers, would not compensate for the revenue loss the Publisher Defendants would experience from the sale of e-books under the agency model.  Some of the Publisher Defendants predicted that the loss would be roughly 17% of their e-book gross revenue and amount to millions of dollars.

HarperCollins' Murray immediately recognized that "[t]he combination of Apple's proposed pricing tiers and the 30% commission meant that HarperCollins would make less money per book than it was then making on a wholesale model."  To address this problem, HarperCollins suggested that Apple take a commission of just 20%.

Apple refused to budge.  This was the same commission it charged in the App Store.  It would give Apple only a single digit positive margin and, in Apple's view, was necessary to generate the revenue Apple needed to build a great iBookstore.

The 30% commission was ultimately adopted across all of Apple's
final Agreements.

### 3. Price Tier Negotiations

The Publisher Defendants fought hardest over the price
caps. They and Apple knew that these negotiations were really
about setting the new industry prices for e-books.

These negotiations were intense even though the Draft
Agreement included more generous price tiers than the term sheet
had proposed.[29] The Draft Agreement capped e-book prices at
$12.99 for New Release titles with hardcover list prices of $30
or under, and set a $14.99 price tier cap for New Release titles
with hardcover list prices above $30, with incremental price
tier increases for every $5 increase in the hardcover list price
above $30. For books other than New Releases, the price cap was
set at $9.99.

To dramatize the immediate increase in the price of e-books
that the Publishers could achieve under the Apple agency
agreement, and to assure each Publisher Defendant that it was
being treated no differently than its competitors, Moerer sent a
table of proposed book prices to them in identical e-mails on

---

[29] The January 4 term sheet had set a price cap at $14.99 for any
book with a hardcover list price above $35, and $12.99 for any
hardcover book listed below $35. The Draft Agreement, by
contrast, set the demarcation between $12.99 and $14.99 at $30,
allowing for higher e-book prices in relation to a title's
hardcover list price.

the same day Apple sent out the Draft Agreements.  The table
showed fiction NYT Bestsellers from every member of the Big Six.
It listed the book's title, author, and publisher.  It showed
each title's hardcover list price, followed by its retail prices
when sold as an Amazon hardcover book; Amazon e-book; Barnes &
Noble e-book; and finally, as a proposed iTunes e-book.[30]  The
proposed prices under the iTunes column were always either
$12.99 or $14.99, and were always several dollars higher than
the then-existing e-book price at Amazon and Barnes & Noble.  In
some cases, the iTunes e-book price was even higher than the
Amazon hardcover price.[31]  While the final column would only
display Apple's e-book prices for titles published by the
particular Publisher receiving that version of the table, the
layout made it easy for the Publishers to see that they were all
being treated identically.  The first page of one of these
tables is set out below.

---

[30] Sensitive to the fact that the table looked like an Apple
retail price list, Moerer clarified in a follow-up email to
Shanks that the prices in the table's final column designating
the "iTunes eBook Retail Price" are the "top price tier we've
proposed" and that "[i]n the agency model, Penguin would set
retail prices at its sole discretion, at this price or any lower
price, with Apple acting as your agent."

[31] The Amazon price for e-books, by contrast, was always lower
than its retail price for a title's corresponding physical book.

Subject: our meeting tomorrow
Date: Mon, 11 Jan 2010 14:34:29 -0800
From: Keith Moerer <kmoerer@apple.com>
To: <david.shanks@us.penguingroup.com>
Cc: Eddy Cue <cue@apple.com>
Message-ID: <75004564-BE31-48CE-A0EC-EC9ECC08D588@apple.com>

David--

I look forward to meeting with you and Genevieve tomorrow morning.

Kevin Saul has sent a draft agreement in separate email. Eddy has also asked me to send you our pricing analysis of Jan. 1 NYT bestsellers, which will help explain the price tiers we've proposed for hardcover new releases.

Best, Keith

NYT Bestsellers Hardcover Fiction

| Title | Author | Publisher | Hardcover List Price | Amazon Hardcover Retail Price | Amazon eBook Retail Price | B&N eBook Retail Price | iTunes eBook Retail Price |
|---|---|---|---|---|---|---|---|
| The Lost Symbol | Dan Brown | Random House | $29.95 | $12.00 | $9.60 | $9.60 | |
| I, Alex Cross | James Patterson | Hachette | $27.99 | $16.79 | $9.99 | $9.99 | |
| Under the Dome | Stephen King | Simon & Schuster | $35.00 | $21.00 | $9.99 | $9.99 | |
| The Help | Kathryn Stockett | Penguin | $24.95 | $9.50 | $8.55 | $8.55 | $12.99 |
| Pirate Latitudes | Michael Crichton | HarperCollins | $27.99 | $14.00 | $9.99 | $9.99 | |
| Ford County | John Grisham | Random House | $24.00 | $11.00 | NA | NA | |
| U is for Undertow | Sue Grafton | Penguin | $27.95 | $14.96 | $9.99 | $9.99 | $12.99 |
| The Last Song | Nicholas Sparks | Hachette | $24.99 | $12.96 | $8.80 | $8.80 | |
| The Christmas Sweater | Glenn Beck | Simon & Schuster | $19.99 | $11.97 | $9.99 | $9.99 | |
| Breathless | Dean Koontz | Random House | $28.00 | $14.00 | $9.99 | $9.99 | |
| The Lacuna | Barbara Kingsolver | HarperCollins | $26.99 | $13.00 | $9.99 | $9.99 | |
| True Blue | David Baldacci | Hachette | $27.99 | $13.97 | $9.99 | $9.99 | |
| Wolf Hall | Hilary Mantel | Macmillan | $27.00 | $11.00 | $8.80 | $8.80 | |
| The Gathering Storm | Robert Jordan | Macmillan | $29.99 | $17.54 | NA | NA | |
| Half Broke Horses | Jeannette Walls | Simon & Schuster | $26.00 | $14.46 | $9.99 | $9.99 | |
| Pursuit of Honor | Vince Flynn | Simon & Schuster | $27.99 | $12.47 | $8.00 | $8.00 | |
| The Scarpetta Factor | Patricia Cornwell | Penguin | $27.95 | $14.97 | $9.99 | $9.99 | $12.99 |
| The Girl Who Played with Fire | Stieg Larsson | Random House | $25.95 | $13.00 | $7.99 | $7.99 | |
| The Wrecker | Clive Cussler | Penguin | $27.95 | $15.97 | NA | NA | $12.99 |
| South of Broad | Pat Conroy | Random House | $29.95 | $16.97 | $9.99 | $9.99 | |
| Last Night in Twisted River | John Irving | Random House | $28.00 | $15.97 | $9.99 | $9.99 | |
| Too Much Happiness | Alice Munro | Random House | $25.95 | $15.17 | $9.99 | $9.99 | |
| Nanny Returns | Emma McLaughlin | Simon & Schuster | $25.00 | $14.39 | $9.99 | $9.99 | |
| Too Much Money | Dominick Dunne | Random House | $26.00 | $15.21 | $9.99 | $9.99 | |
| Her Fearful Symmetry | Audrey Niffenegger | Simon & Schuster | $26.99 | $13.49 | $5.79 | $5.79 | |
| Heat Wave | Richard Castle | HarperCollins | $19.99 | $11.69 | $9.99 | $9.99 | |
| Divine Misdemeanors | Laurell K. Ballantine | Random House | $26.00 | $14.97 | $9.99 | $9.99 | |

Penguin, HarperCollins, Hachette, and S&S quickly told Apple that they were willing to do an agency model for New

Releases, and that they would "go with" the agency model with
"everyone else," but that they needed higher price caps.  The
debate over the caps essentially ended on Saturday, January 16.
This was five days after the Draft Agreements had been
distributed.  Despite their efforts, the Publisher Defendants
achieved only modest adjustments to the price caps.

On January 16, Cue sent nearly identical e-mails to each of
the Publisher Defendants with a revised pricing proposal.  Under
this new regime, Cue decreased the hardcover list price triggers
for the $12.99 and $14.99 e-book caps a second time, but carved
out NYT Bestsellers for special treatment.  When a NYT Bestseller
was listed for $30 or less, the iTunes price would be capped at
$12.99; when it was listed above $30 and up to $35, the iTunes
price would be no greater than $14.99.[32]  For all other New
Releases, the caps in the Draft Agreement would be applied to
physical books with slightly lower list prices.  For example,
the $12.99 cap now applied to titles with list prices between
$25.01 and $27.50 instead of those at $30 or less; the $14.99
cap applied to books with list prices between $27.51 and $30
instead of over $30.  Cue also added two additional price caps
at $16.99 and $19.99 for books listed between $30.01-$35 and
$35.01-$40, respectively.

---

[32] Cue's January 16 offer kept the price caps for NYT Bestsellers
at the caps listed for all New Releases in the Draft Agreement.

In his e-mails to the Publisher Defendants, Cue outlined the advantages he perceived they would gain from Apple's entry into the market, defended the pricing tiers of $12.99 and $14.99 for NYT Bestsellers, explaining that "it is critical that we appear at least reasonable" in relation "to the heavy discounting that is happening for NYT bestsellers." Cue added that, "This gives you significantly more tiers and higher prices." Except for small exceptions which were immaterial to Apple, this pricing proposal was the one finally adopted in the Agreements.

Cue had described these tiers to Jobs as prices that would "push [the Publisher Defendants] to the very edge," but still create a "credible offering in the market." Cue warned Jobs that "[t]his will be hard to get because they [the Publishers] will be losing an additional $1.40, but we should try."

Further confirming that Apple well understood that the negotiations over the price "caps" were actually negotiations over ultimate e-book prices, Cue's calculation of the $1.40 loss arose from his proposal that the prices of the NYT Bestsellers be capped at prices lower than other New Releases at similar hardcover list prices, and lower than the Publisher Defendants had been expecting. If a New Release with a list price of $30 or less was a NYT Bestseller, the cap moved from $14.99 to

63

$12.99, meaning that the Publisher would receive 70% of $12.99 instead of 70% of $14.99, or $1.40 less.

Cue was right to expect pushback from the Publishers over the carve-out for NYT Bestsellers.  Hachette's Thomas identified the ceilings of $14.99 and $12.99 for NYT Bestsellers as a drawback when writing to her colleagues on January 19.  Thomas warned that these prices would represent a "significant" loss to Hachette's profit margin.

The Publisher Defendants recognized that Apple's pricing regime would be a game-changer for the e-book industry.  Because these caps would become the new standard industry-wide prices, they continued to push for higher ceilings.  As Hachette's Nourry testified, the whole concept of price "caps," when coupled with the Publishers' move to an agency model of distribution, was that "people all have the same prices."  Nourry was thus particularly "reluctant to fixing best seller prices at 12$90" with Apple "because it may be our last chance to bring it back up to say 14$99."

HarperCollins similarly understood that the "upshot" of the Apple agreement "is that Apple would control price and that price would be standard across the industry."  Indeed, it believed that the benefit of moving to an agency model with Apple's price cap structure was the creation of "uniform prices"

64

for e-books and an "increase" in price "from 9.99 to 12.99 or 14.99 for most books."[33]

Ultimately, the Publisher Defendants all capitulated to Cue's revised pricing regime. Even though Penguin's McCall still wanted to see all NYT Bestsellers capped at $14.99, he recognized on January 19 that Apple's proposal of $12.99 was "probably the middle ground where compromise is going to have to happen." The reference to "middle ground" was a reference to the spread between Amazon's $9.99 price for the e-book version of NYT Bestsellers and the Barnes & Noble price for the physical book version. He observed as well that "[i]f we migrate all accounts to agency selling, the price spread shouldn't matter, since we'll have a level playing field."

Macmillan was also unhappy with the price caps proposed by Apple. It opposed the concept of price caps in general, but, as Sargent recognized, Apple wanted the price caps "as protection against excessively high prices that could either alienate [its] customers or subject [it] to ridicule." S&S accepted the price caps proposed on January 16 on the condition that Apple would agree to "review pricing" after one year on the new model. Cue readily agreed.

---

[33] Through a process known as translation, the prices for digital books are automatically set according to a predetermined relationship to the prices of their physical counterparts.

The January 16 pricing tiers were incorporated into Apple's final Agreements and were identical for each Publisher Defendant. Through Apple's adoption of price caps in its Agreements, it took on the role of setting the prices for the Publisher Defendants' e-books and eventually for much of the e-book industry. As described below, the Publisher Defendants largely moved the prices of their e-books to the caps, raising them consistently higher than they had been albeit below the prices that they would have preferred.

As of January 16, the Launch was just eleven days away and Cue did not have a single Agreement executed. At that point, he had set a deadline of Thursday, January 21, as the final date by which the Publishers had to sign agency agreements with Apple.[34] As noted above, Cue and his team came to New York for this final push. They arrived on Monday, January 18, and stayed until January 26, the day before the Launch. By January 26, Apple had executed its fifth Agreement.

J. January 18-27: Publishers Initiate Agency Negotiations with Amazon

As already recounted, this entire endeavor was shaped by the Publishers' desire to raise the price of e-books being sold through Amazon. With nearly a 90% market share for e-books in

---

[34] Cue wanted to be sure he had the Agreements in place early enough so that Jobs could finalize his presentation introducing the iBookstore during the Launch.

2009, Amazon was the single most important seller of e-books in America, and also a dominant seller of physical books.  Because of this power, the Publishers feared retaliation from Amazon unless they acted in unison.  The confrontation with Amazon began the week of January 18, before any of the Publisher Defendants had actually signed an Apple Agreement.

Press reports on January 18 and 19 alerted the publishing world and Amazon to the Publishers' negotiations with Apple.  A Wall Street Journal article titled "Publisher in Talks with Apple Over Tablet" reported on January 18 that HarperCollins and Apple were in discussions over an agency relationship and that this shift might mean higher prices for e-books.  The article explained that "HarperCollins is expected to set the prices of the e-books . . . with Apple taking a percentage of sales," and noted that "[o]ther publishers have also met with Apple."  The article reported that "enhanced" e-book new releases could be priced as high as $14.99 or $19.99.[35]  A detailed article on January 19 in the trade publication Publishers Lunch also reported that the Big Six were negotiating terms with Apple that would give them an opportunity to impose an agency model on the entire industry and to raise prices.

---

[35] While Murray chose to describe the price increases as related to e-books "enhanced" with special features, in fact the price increases implemented through the Apple Agreements applied to all e-books.

67

On the night of January 18, Amazon received confirmation from a former colleague who was now working at Random House that most of the Publishers were likely to enter agency agreements with Apple. Random House's McIntosh confirmed to Amazon's Porco that several of the Publisher Defendants were negotiating e-book agency distribution agreements with Apple and that Random House "was under pressure from other publishers" to join them. Porco was concerned that Random House would be the only Publisher who decided to keep the "current model" that allowed retailers like Amazon make pricing decisions.

Amazon was adamantly opposed to adoption of the agency model and did not want to cede pricing authority to the Publishers.[36] On January 20, Amazon disclosed how it would respond. It would appeal directly to authors and encourage something the Publishers feared: disintermediation.

---

[36] Apple has suggested that Amazon was less opposed to the agency model than the evidence shows. It points to a single brainstorming session between two Amazon employees in early 2009, in which they tried to come up with ideas to mollify the Publishers. The two employees pondered whether the Publishers would agree to accept a flat percentage of the retail price for e-books and quickly dismissed the idea since it would mean a significant loss of revenue for the Publishers. This was not a discussion of the agency model; there was no discussion about Amazon ceding control over the retail price. There is simply no credible evidence that Amazon moved willingly to the agency model in 2010. On January 31, 2010, after the Publisher Defendants executed the Agreements, these two individuals expressed astonishment that Publishers had agreed to a deal that resulted in a significant loss of revenue for them.

That day, Amazon announced that authors and publishers of Kindle e-books could choose a "new 70 percent royalty option" for e-books with a list price "between $2.99 and $9.99." Under this option, the author would receive 70% of the list price, net of delivery costs. Using as an example an e-book being sold for $8.99, the author would make just $3.15 under the standard option, but $6.25 with the "new 70 percent option."

This was not happy news for the Publishers. With an author receiving $6.25 of $8.99, and Amazon keeping the rest, this amounted to a naked play to eliminate the Publishers as a middle-man between authors and Amazon. Shanks observed, "On Apple I am now more convinced that we need a viable alternative to Amazon or this nonsense will continue and get much worse." HarperCollins' parent News Corp also reacted with anger. News Corp's Rupert Murdoch called HarperCollins to complain and in no uncertain terms expressed a desire to take revenge on Amazon.

During this week, Amazon had a long-scheduled set of meetings in New York with the Publishers. In separate conversations on January 20 and over the next few days, the Publisher Defendants all told Amazon that they wanted to change to an agency distribution model with Amazon. HarperCollins had a particularly contentious meeting with Amazon on January 20,

69

when it told Amazon that it "had to" move to agency.[37]  Amazon
made clear that it preferred to continue to do business on the
wholesale model.

On January 22, alluding to its negotiations with Apple and
the deadline associated with the impending Launch, HarperCollins
outlined its terms in writing to Amazon.  The message referred
to the "tremendous change" occurring in the e-book industry
"this week and next week."  It warned that Amazon had to act
quickly since

> [d]eliberations are moving fast.  If I could get your
> support to this kind of agency model in principle, I have
> less need to support other partners who wish to enter the
> ebook business.  As I mentioned we haven't made any
> decisions yet about how we will sell ebooks to consumers
> yet, but decision time is approaching.

Attempting to leverage its Apple negotiations to get a better
deal with Amazon, HarperCollins included a proposed retail price
for the majority of titles at either $12.99 or $14.99, but a
commission of just 5% for Amazon.  HarperCollins then leveled
its threat to Amazon.  If Amazon declined its offer,
HarperCollins would delay for six months the release of any
e-book sold on a wholesale basis.

On January 20, Amazon also met with Macmillan.  At a lunch
between Macmillan's Sargent and Amazon's Grandinetti, Sargent

---

[37] In internal emails that morning, HarperCollins executives
explained that a "big win of the Agency model is that by us
setting price we can protect the value of our hard covers."

announced that Macmillan was planning to offer Amazon the option
to choose either an agency and reseller model.  But, Sargent was
mistaken.  Neither Apple nor his fellow Publisher Defendants
would allow Amazon the option of remaining on a wholesale model.
At a dinner that night, Cue explained to Sargent that Macmillan
had no choice but to move Amazon to an agency model if it wanted
to sign an agency agreement with Apple.  The next morning, on
January 21, Sargent wrote to Cue and in a carefully crafted
message admitted that he had "misread" Cue in their previous
discussions, and warned that "[t]he stumbling block is the
single large issue we clearly had a misunderstanding about."
That stumbling block was "significant enough for us that we may
in fact give you a no later today."  Referring to the commitment
to move all resellers of e-books to an agency model, Cue
responded that afternoon that he "d[id]n't believe we are asking
you to do anything, you haven't told us you are doing.  We are
just trying to get a commitment."  He requested that they all
"sit down . . . and talk through it."[38]

---

[38] Neither Sargent nor Cue was credible during the trial when
they denied that Cue had explained at dinner that Macmillan was
required to put Amazon on the agency model.  Sargent protested
that he could not remember the conversation, even though his
email on the following day referred to "the single large issue"
that might lead Macmillan to abandon its negotiations with
Apple.  Cue explained in his deposition that the biggest issues
during his negotiations with Macmillan were the MFN and price
tiers, and that he thought the discussion at dinner had been
about pricing tiers; then at trial explained that he now

Cue also enlisted Sargent's competitors to intercede with him: Cue spoke with Reidy, the CEO he considered a leader in the industry, for over twenty minutes after receiving Sargent's email on January 21. Cue also called Murray immediately after hanging up with Reidy, and they talked for ten minutes later that day. At that point, Cue called Sargent and urged him to speak with Murray and Reidy. Sargent spoke to both Murray and Reidy by telephone for eight and fifteen minutes, respectively.

The straight talk from Reidy, Murray, and Cue worked.[39] Sargent called Grandinetti immediately after hanging up with Reidy, and told him that the Apple contract "required" Macmillan to offer Amazon the agency model only.

Amazon received a virtually identical message from a third Publisher Defendant on January 20. Hachette told Amazon that day that it was looking at the agency model, and believed that it could offer only one pricing model to retailers, either the agency or reseller model, but not both.

---

remembered that they had discussed one-off promotions. Cue's contemporaneous notes, however, indicate that the core issue in dispute with Macmillan was, in fact, the MFN and its implications. In an email to Jobs on the evening of January 21, just hours after sending his email to Sargent, Cue reported that "[a]fter a long afternoon with their general counsel, we are in agreement on the terms" with Macmillan, "but the CEO and GC have legal concerns over the price matching."

[39] While Murray was fully supportive of the requirement that all e-tailers be moved to an agency model, as described below, he remained unhappy over the size of Apple's commission and the existence of price caps.

On Friday, January 22, S&S's Reidy advised Amazon that it was likely to move its entire business to the agency model. Amazon asked if it could continue to sell under the wholesale model after a window of ninety days.  Reidy said she would look at the idea, but did not actually consider it to be a realistic option since it "would just enshrine the $9.99 price point at a later date."  Amazon's Grandinetti expressed appreciation for the call, but said he was not sure "what this would mean in terms of our overall relationship."  Reidy explained her expectations about pricing going forward, and underscored that she did not intend to go as low as $9.99.

Thus, by the end of that week, four of the five Publisher Defendants had put Amazon on notice that they were joining forces with Apple and would be altering their relationship with Amazon in order to take control of the retail price of e-books.[40] It was clear to Amazon that it was facing a united front.

K. January 21-26:  Execution of Agreements

Even though Apple had told the Big Six in December that it needed all of them to sign on in order to open its e-bookstore, on January 21 it learned that Random House, the largest Publisher, would not sign an agency agreement.  Apple decided to

---

[40] Amazon had reached out to Penguin during that period, but Penguin had not responded.

73

proceed without Random House.  It let the Publisher Defendants know about Random House's decision and of its own decision to proceed with an iBookstore so long as four of them agreed to its terms before the Launch.  In the days that followed, Apple kept the Publisher Defendants apprised about who was in and how many were on board.

The Publisher Defendants kept each other informed as well. The CEOs of the Publisher Defendants made over 100 telephone calls to one another in the short period of time between December 8, when Cue first contacted them, and January 26, when the Agreements were signed.  In the critical negotiation period, over the three days between January 19 and 21, Murray, Reidy, Shanks, Young, and Sargent called one another 34 times, with 27 calls exchanged on January 21 alone.[41]

On Thursday, January 21, Cue briefed Jobs on the status of his negotiations with the Publishers.[42]  Cue was confident that S&S and Penguin would sign.  Penguin did not want to be alone, but Cue predicted that if he had secured as few as two other

---

[41] While many of these calls were simply efforts to reach the other person, those efforts and the conversations that occurred during some of them reflect the intensity of the communications in this period.

[42] At this stage, it was Cue's judgment that Random House would wait until after the Launch to make a decision whether to convert to the agency model.  Cue relayed Random House's email describing its "excitement" about Apple entering the market and "building a bookstore", but expressing several reservations about Apple's terms.

Publishers, Penguin would sign on. Cue reported that Hachette
and Macmillan had legal concerns over the "price matching," that
is, the MFN. HarperCollins was still trying to get Apple to
accept a 10% commission on New Releases and to shorten the
definition of a New Release to a title that had been in the
market two months.[43] Cue believed that the Publishers'
hesitation to make a commitment to Apple was due to their fear
over how difficult it was going to be to force Amazon to convert
to an agency relationship. As Cue explained, "[i]n the end,
they want us and see the opportunity we give them but they're
scared to commit! It [has] less to do with the terms and more
about the dramatic business change for them. . . . They just
have to get some balls."

By Friday evening, January 22, Cue was able to report
progress. He informed Jobs that he had commitments from
Hachette, S&S, Macmillan, and Penguin that they would sign. At
this point, Penguin required assurance that three other
Publishers were also signing Agreements. As Cue admits, in
these final days the Publishers needed reassurance that they
would not be alone in signing an agency agreement with Apple
because they feared Amazon's reaction, reassurance that Cue
readily provided.

---

[43] The "new release" period would be set in the final Agreements
at seven months.

The first Publisher to agree to Apple's terms was S&S.  S&S signed its Agreement on Monday, January 25.  Reidy advised Moonves that at the Launch Apple would announce that NYT Bestsellers would be priced at $12.99.

Hachette's Young had agreed to sign by January 22, but needed approval from France.  Hachette executed its Agreement on January 24.  As Nourry explained, Hachette signed the Agreement because the agency model "will put an end to price deflation . . . .  We do not like the 12,90 price point, but it is much better than 9,99."  Hachette also committed to Apple that it would move all of its relationships with distributors to an agency relationship.

On January 21, Cue sent substantively identical e-mails to Macmillan and Penguin stating that Apple had completed its first agency agreement and was "very close" on two more.  By the next day, January 22, Macmillan had agreed to the deal.  As Cue told Sargent, Macmillan was the third Publisher to agree to Apple's terms.  Macmillan executed the Agreement on January 25. Macmillan's Sargent testified that he decided to sign the Agreement even though he was "not completely happy with some of Apple's terms," because it was a "much better business strategy than simply continuing the status quo with Amazon."

On January 22, Penguin's Shanks had asked Cue whether Apple had "any more of the [B]ig [S]ix confirmed yet?"  Even though

76

three other Publishers had joined with Apple by the morning of
January 25, a Monday, Penguin was still hesitant. Shanks wanted
assurance that he could price e-book versions of paperbacks,
particularly trade paperbacks, above $9.99. Once again, S&S's
Reidy played a pivotal role. Cue called Shanks, and the two
spoke for twenty minutes that morning. Less than an hour after
getting off the telephone with Cue, Shanks called Reidy to
discuss Penguin's status in its negotiations with Apple. By
that afternoon, Penguin had executed its Agreement. Penguin
advised Apple that it would be moving to an agency arrangement
with all of its e-tailers.

That same day, Penguin reported to its board that when
Apple announces "its long-awaited entry into the e-reader
market" on Wednesday, "you may also see in the media that
Penguin, along with a few other major trade publishers, has made
a partnership with Apple for the sale of US eBooks in the iTunes
store." The report explained the agency model it had agreed to
adopt with Apple, and stated that "we don't think [the agency
model and the discount model we currently use with Amazon] for
eBooks can coexist very long, and so we're going to be telling
all our re-selling middlemen (Amazon, Barnes & Noble, e.g.) that
we're going to deal with them for eBooks on the agency basis in
the future, too." At its next "Road Show" Penguin credited
Apple with its own decision to begin the "monumental effort" of

77

moving its other e-tailers to agency. It reported that, in light of the "pending release of the iPad," and "[a]s a way to enter the market place, Apple proposed moving the entire industry to an agency model."

HarperCollins was the last of the five Publisher Defendants to agree to execute an Agreement. As late as Friday, January 22, Murray wrote to Cue to thank him for his visit that morning, but to underscore HarperCollins' demands. HarperCollins wanted "flexibility" on price outside the tiers; it wanted to sell through other "agents" at a higher price than the retail prices in the iBookstore; it wanted to limit the commission to 10%; and it wanted a shorter "new release window." Reflecting his understanding that his company would be trying to get all of its distributors to adopt an agency relationship, Murray explained, "We need to have flexibility on the agency window. We believe this window should be 6 months rather than 12 months in the event that one or more large retailers do not move to an agency model."

Cue was concerned that HarperCollins wanted to "drive ebook prices sky high." So, Cue suggested that Jobs call James Murdoch of News Corp, HarperCollins' parent company, and "tell him we have 3 signed so there is no leap of faith here."[44]

---

[44] Jobs and Cue had met James Murdoch for the first time on January 14, when representatives from News Corp had visited

Jobs called Murdoch on January 22 about HarperCollins'
intransigence.  While Murdoch wanted to do business with Apple,
he remained concerned about the economics of the deal, as he
described in some detail in an email he sent to Jobs.  Jobs's
lengthy response on Saturday, January 23, included the
following:

> 1. The current business model of companies like Amazon
> distributing ebooks below cost or without making a
> reasonable profit isn't sustainable for long.  As ebooks
> become a larger business, distributors will need to make at
> least a small profit, and you will want this too so that
> they invest in the future of the business with
> infrastructure, marketing, etc.
>
> 2.  All the major publishers tell us that Amazon's
> $9.99 price for new releases is eroding the value
> perception of their products in customer's minds, and they
> do not want this practice to continue for new releases.
>
> 3.  Apple is proposing to give the cost benefits of a
> book without raw materials, distribution, remaindering,
> cost of capital, bad debt, etc., to the customer, not
> Apple.  This is why a new release would be priced at
> $12.99, say, instead of $16.99 or even higher.  Apple
> doesn't want to make more than the slim profit margin it
> makes distributing music, movies, etc.
>
> 4.  $9 per new release should represent a gross margin
> neutral business model for the publishers.  We are not
> asking them to make any less money.  As for the artists,
> giving them the same amount of royalty as they make today,
> leaving the publisher with the same profits, is as easy as
> sending them all a letter telling them that you are paying
> them a higher percentage for ebooks.  They won't be sad.
>
> 5. Analysts estimate that Amazon has sold slightly
> more than one million Kindles in 18+ months (Amazon has
> never said).  We will sell more of our new devices than all

Apple's Cupertino headquarters to discuss a broad range of
mutual business interests.

of the Kindles ever sold during the first few weeks they are on sale.  If you stick with just Amazon, B&N, Sony, etc., you will likely be sitting on the sidelines of the mainstream ebook revolution.

6. Customers will demand an end-to-end solution, meaning an online bookstore that carries the books, handles the transactions with their credit cards, and delivers the books seamlessly to their device.  So far, there are only two companies who have demonstrated online stores with significant transaction volume -- Apple and Amazon.  Apple's iTunes Store and App Store have over 120 million customers with credit cards on file and have downloaded over 12 billion products.  This is the type of online assets that will be required to scale the ebook business into something that matters to the publishers.

So, yes, getting around $9 per new release[45] is less than the $12.50 or so that Amazon is currently paying.  But the current situation is not sustainable and not a strong foundation upon which to build an ebook business.  And the amount we will pay should be gross margin neutral.  Apple is the only other company currently capable of making a serious impact, and we have 4 of the 6 big publishers signed up already.  Once we open things up for the second tier of publishers, we will have plenty of books to offer.  We'd love to have HC among them.

Murdoch still demurred, particularly with respect to

Apple's proposed price points, so Jobs wrote again on the

morning of January 24.

Our proposal does set the upper limit for ebook retail pricing based on the hardcover price of each book.  The reason we are doing this is that, with our experience selling a lot of content online, we simply don't think the ebook market can be successful with pricing higher than $12.99 or $14.99.  Heck, Amazon is selling these books at $9.99, and who knows, maybe they are right and we will fail even at $12.99.  But we're willing to try at the prices

---

[45] Jobs's reference to $9 in revenue is a reference to the 70% of a $12.99 e-book price that a Publisher would receive under Apple's agency Agreement.

we've proposed.  We are not willing to try at higher prices because we are pretty sure we'll all fail.

As I see it, HC has the following choices:

1.    Throw in with apple and see if we can all make a go of this to create a real mainstream ebooks market at $12.99 and $14.99.

2.    Keep going with Amazon at $9.99.  You will make a bit more money in the short term, but in the medium term Amazon will tell you they will be paying you 70% of $9.99.  They have shareholders too.

3.    Hold back your books from Amazon.  Without a way for customers to buy your ebooks, they will steal them.  This will be the start of piracy and once started there will be no stopping it.  Trust me, I've seen this happen with my own eyes.

Maybe I'm missing something, but I don't see any other alternatives.  Do you?

On January 23, Cue had sent his own message to Murray.  "I wanted to let you know that we have 4 publishers completed so it is real shame" to not have an agreement with HarperCollins.  The next day, Cue also wrote to an executive at News Corp.  He expressed that Apple "think[s] our customers will pay a reasonable price (. . . 50-100% more than existing e-books)" and candidly laid out Apple's "basic deal points," including that Apple is offering "new release hardback pricing maximums which are way higher than $9.99 -> &12.99 or $14.99 for most."

Murray had a round of telephone calls with other Publisher Defendants prior to signing.  In the end, HarperCollins concluded that the deal Apple was offering was the best it could

81

get at that time.  It considered the economics of the deal to be
"terrible" for it and its authors but "the strategic value" of
creating an Apple e-bookstore to be "very high."  It principally
feared "Amazon[']s reaction," but as the fifth Publisher to
adopt an agency agreement with Apple, it hoped the reaction
would be "muted."  Ultimately, HarperCollins understood this was
a "once-in-a-lifetime chance to flip the model."  On January 26,
the day before the Launch, HarperCollins became the fifth
Publisher Defendant to accept the Agreement.

The only Publisher to decline to sign the Agreement was
Random House.  As noted, it had informed Apple of its decision
on January 21.  Apple had been as inflexible in its bargaining
with Random House as it had been with the Publisher Defendants.
Random House declined to adopt the Agreement for several
reasons.  It believed it "would be better off economically
sticking with the wholesale model."  It also realized that it
was not well equipped at that time to set efficient retail
prices, and that it would be necessary to make a "complete
switch to agency" if it entered into an agency agreement with
Apple, which it was not prepared to do.

Thus, in less than two months, Apple had signed agency
contracts with five of the six Publishers, and those Publisher
Defendants had agreed with each other and Apple to solve the
"Amazon issue" and eliminate retail price competition for

e-books.  The Publisher Defendants would move as one, first to force Amazon to relinquish control of pricing, and then, when the iBookstore went live, to raise the retail prices for e-book versions of New Releases and NYT Bestsellers to the caps set by Apple.

Each of the Publisher Defendants realized that its negotiations with Amazon would be difficult, but in their view they had embarked upon a mission that was necessary to protect the publishing business.  They took comfort in their knowledge that the five of them stood together, and in Apple's presence in the market.  As Reidy wrote to Cue on the day before the iBookstore was officially announced, it was her hope that the iPad Launch "will sustain us as we move through the next steps in this process of changing the industry."

This would not have happened without Apple's ingenuity and persistence.  Apple's task had not been easy, but it had succeeded.  As Reidy acknowledged in an email to Cue on January 21, working with the Publishers had been like "herding . . . cats."  For his part, Cue appreciated all that Reidy had done to convince her peers to join forces with Apple at several critical junctures.  He thanked Reidy for being a "real leader."

The Publisher Defendants took those "next steps" to "chang[e] the industry" immediately; the coordinated pressure on Amazon began at once.  On the day of the Launch, January 27,

HarperCollins advised Amazon in writing that it had reached its first agency agreement with Apple. "In the interest of 'no surprises,'" HarperCollins advised Amazon that it had decided to move all of their New Release e-books to the agency model, and had "reached an agreement with our first agent, Apple" last night. Penguin also called Amazon on January 27, right after the Launch, to explain that it had moved to agency with its "first customer," referring to Apple.[46] Macmillan's Sargent did not attend the Launch, because as he had told Cue on January 24, "I expect I will be in Seattle or traveling back," from delivering the news in person to Amazon.[47]

---

[46] Grandinetti responded that he did not understand why Penguin was "working so hard to have [Amazon send it] less money on each sale while at the same time, reducing total sales and frustrating us."

[47] Cue admitted at trial that Apple "expected" each of the Publisher Defendants to demand that Amazon move to an agency model, but denied actually "knowing" that they would. This testimony was not credible, for many reasons. Cue's denial of prior knowledge of Sargent's trip to Amazon was particularly brazen given the January 24 email in which Sargent explained his inability to attend the Launch because he would be traveling to Seattle, Jobs's comment to his biographer on January 28 -- the day of Sargent's meeting with Amazon -- that the Publisher Defendants "went to Amazon and said, 'You're going to sign an agency contract or we're not going to give you the books,'" a January 30 email exchange between Saul and Cue monitoring news about Amazon's decision to remove Macmillan's buy buttons and wondering whether Cue had "talk[ed] with [J]on" Sargent and a January 31 email in which Sargent reported to Cue on the trip.

L. January 27:  The Launch of the iPad and iBookstore

On January 27, Jobs launched the iPad.  As part of a
beautifully orchestrated presentation, he also introduced the
iPad's e-reader capability and the iBookstore.  He proudly
displayed the names and logos of each Publisher Defendant whose
books would populate the iBookstore.  To show the ease with
which an iTunes customer could buy a book, standing in front of
a giant screen displaying his own iPad's screen, Jobs browsed
through his iBooks "bookshelf," clicked on the "store" button in
the upper corner of his e-book shelf display, watched the shelf
seamlessly flip to the iBookstore,[48] and purchased one of
Hachette's NYT Bestsellers, Edward M. Kennedy's memoir, <u>True
Compass</u>, for $14.99.  With one tap, the e-book was downloaded,
and its cover appeared on Jobs's bookshelf, ready to be opened
and read.

When asked by a reporter later that day why people would
pay $14.99 in the iBookstore to purchase an e-book that was
selling at Amazon for $9.99, Jobs told a reporter, "Well, that
won't be the case."  When the reporter sought to clarify, "You
mean you won't be 14.99 or they won't be 9.99?"  Jobs paused,
and with a knowing nod responded, "The price will be the same,"
and explained that "Publishers are actually withholding their

---

[48] To the public's delight, Jobs described this transition as
"like a secret passageway."

books from Amazon because they are not happy." With that statement, Jobs acknowledged his understanding that the Publisher Defendants would now wrest control of pricing from Amazon and raise e-book prices, and that Apple would not have to face any competition from Amazon on price.

The import of Jobs's statement was obvious. On January 29, the General Counsel of S&S wrote to Reidy that she "cannot believe that Jobs made the statement" and considered it "[i]ncredibly stupid."

> M. January 28 to 31: The Publisher Defendants Force Amazon to Adopt the Agency Distribution Model

As previously discussed, the Publishers recognized that any one of them acting alone would not be able to compel Amazon to move to agency. Five of them had now agreed to join forces, but none of them was eager to be the first to meet with Amazon. As Sargent explained, however, he knew the Apple Agreement gave the Publishers "a point in time when we could actually address our . . . issues with Amazon"; it "gave us the chance to change the entire business model for digital books." So Sargent made the first move.

Skipping the Launch to which he had been invited, Sargent flew instead to Seattle, accompanied by Napack. Thus, Macmillan, the smallest of the five Publishers, did the honorable thing and delivered its message in person. Sargent

86

did not expect the meeting to go well.  As he put it, he was "on [his] way to Seattle to get [his] ass kicked by Amazon."  He was right.

At their meeting, Sargent advised Amazon on January 28 that it had just two options: either (1) move to an agency arrangement or (2) not receive Macmillan's Kindle versions of New Releases for seven months.  Seven months was no random period -- it was the number of months for which titles were designated New Release titles under the Apple Agreement and restrained by the Apple price caps and MFN.  The meeting lasted roughly twenty minutes.  Amazon let Macmillan know in blunt terms that it was unhappy.

Macmillan had anticipated that Amazon might retaliate against it by removing the "buy buttons" on the Amazon site that allow customers to purchase books from Amazon's online store or from the Kindle, or by eliminating Macmillan's products from its sites altogether.  That night, Macmillan learned which option Amazon had chosen.  Amazon removed the buy buttons for both print and Kindle versions of Macmillan titles.  Customers could view the Macmillan books on the Amazon website but could not purchase them.

On January 30, Sargent took out an ad in an industry publication to communicate quickly with the industry.  Written in the form of a letter to "Macmillan authors/illustrators and

the literary agent community," Sargent described the terms he offered to Amazon during their Thursday meeting, including the "deep windowing of titles" if Amazon did not switch to the agency model. He explained that Macmillan would price most titles at first release under the agency model between $12.99 and $14.99. Sargent expressed his regret at Amazon's reaction to his ultimatum, and explained the reasons he had for acting as he did.

> In the ink-on-paper world we sell books to retailers far and wide on a business model that provides a level playing field, and allows all retailers the possibility of selling books profitably. Looking to the future and to a growing digital business, we need to establish the same sort of business model, one that encourages new devices and new stores. One that encourages healthy competition. One that is stable and rational. It also needs to insure that intellectual property can be widely available digitally at a price that is both fair to the consumer and allows those who create it and publish it to be fairly compensated.

Macmillan knew it would not stand alone. Sargent wrote to a friend several days later that "the deal that 5 of us did with Apple meant someone was gonna have to do it [first]. . . . The optics make it look like I stood alone, but in the end I had no doubt that the others would eventually follow."[49] Hachette's Nourry had written to Sargent the day after the publication of Sargent's letter to the industry stating, "I can ensure you that

---

[49] Conscious that he should not admit the truth, Sargent disingenuously added: "Interesting in that we did the Apple deal with no contact with other publishers, yet when Jobs announced he had 5 on the agency plan things were clear."

you are not going to find your company alone in the battle" with Amazon.[50]  The next day, Penguin's Makinson similarly wrote, "[j]ust to say that I'm full of admiration for your articulation of Macmillan's position on this.  Bravo."  Internally, Hachette's Nourry told Young that he wanted to "enter in the battle as soon as possible," and in an allusion to Macmillan's small size, that he was "thrilled to know how A will react against 3 or 4 of the big guys."

Over the weekend, it became obvious to Amazon that its strategy had failed.  The feedback was mixed, but included intense criticism of Amazon by customers and publishers.  Nourry celebrated on Monday, February 1, by observing that "Amazon's stock is down 9%!"[51]

Amazon knew that its battle was not just with Macmillan but with five of the Big Six.  As Grandinetti testified, "[i]f it had been only Macmillan demanding agency, we would not have negotiated an agency contract with them.  But having heard the same demand for agency terms coming from all the publishers in such close proximity . . . we really had no choice but to negotiate the best agency contracts we could with these five

---

[50] The next day, Nourry wrote a similar email to Sargent's superior, Stefan von Holtzbrinck, assuring him that he "very much appreciate[s] what MacMillan is doing" and he can "[b]e sure others will enter the battle field!"

[51] The subject line of the email was "Now it must really hurt . . .".

publishers."  Unless it moved to an agency distribution model
for e-books, Amazon customers would cease to have access to many
of the most popular e-books, which would hurt Kindle customers
and the attractiveness of the Kindle.

Amazon announced on its website on Sunday, January 31, that
it would "capitulate and accept" Macmillan's agency terms
"because Macmillan has a monopoly over their own titles, and we
will want to offer them to you even at prices we believe are
needlessly high for e-books."  Shortly thereafter, Amazon sent a
letter to the Federal Trade Commission complaining about the
simultaneous nature of the demands for agency from the
Publishers who had signed with Apple.

N. The Five Amazon Agency Agreements

On Sunday, January 31, Amazon signaled to Macmillan that it
was willing to negotiate.  That night, Sargent sent an e-mail
marked "URGENT!!" to Cue.  Sargent explained that he was "gonna
need to figure out our final agency terms of sale tonight.  Can
you call me please?"  Cue and Sargent spoke that night.[52]  With
help from Apple, Macmillan negotiated an agency agreement with
Amazon, which was signed that Friday, February 5.

---

[52] While Cue denied at trial that their conversation was about
the Macmillan negotiations with Amazon, his denial was not
credible.  Macmillan had executed its Agreement with Apple a
week earlier; the only final agency terms still under discussion
were with Amazon.

Macmillan made no secret of its intention to raise prices.
Sargent wrote to Grandinetti on February 2, that "[w]e can not
budge on the final price that the consumers pay for our books. .
. . That is the very heart of the agency model, and it is why
we are doing this. . . . [W]e can not give up control of price.
If we do we are much worse off than we were before." But,
referring to Macmillan's across-the-board shift to agency,
Sargent assured Amazon that it "will never be disadvantaged on
[the] pricing" for Macmillan's e-books.

In light of their overlapping threats to remove content
from Amazon's platform if it did not move to agency in early
April, when the iPad became available, Amazon moved quickly to
execute agency agreements with the remaining Publisher
Defendants. But, to avoid being vulnerable in the future to
collective pressure during contract negotiations, Amazon
insisted that each of the five agency agreements have a
different termination date. The final five contracts ranged in
length from terms of eighteen months to three years, or ended on
different dates, from January 31, 2012 to June 30, 2012.

Amazon did not want to give up control over pricing or
raise its prices, and like Apple, assumed that under an agency
model each of the Publisher Defendants would set retail prices
at the price caps. During the negotiations, therefore, it
shared data with the Publisher Defendants illustrating how the

wholesale model was more profitable for the Publishers.  Amazon also included a "model parity" clause in any agreement.  This gave Amazon the option to return to a wholesale model of distribution in the event any Publisher agreed to a wholesale distribution arrangement with any other e-tailer.

During their negotiations with Amazon, the Publisher Defendants shared their progress with one another.  As Naggar testified, whenever Amazon "would make a concession on an important deal point," it would "come back to us from another publisher asking for the same thing or proposing similar language."  For example, when Amazon agreed with one Publisher Defendant to forego any promotional activity in exchange for assurance that it would never be disadvantaged on price, it received a call the next day from another saying, "so I understand . . . you're willing to forego promotions." Similarly, with respect to the length of the agreements, Penguin's McCall left a voicemail for Naggar indicating that Penguin had been "hearing through the grapevine that you guys are maybe coming to some agreements that are less than three years . . . maybe you're moving off of that," and suggesting they chat.

By the end of March 2010, Amazon had completed agency agreements with Macmillan, HarperCollins, Hachette, and S&S. Because of circumstances that were unique to Penguin and its

reseller contract, its agency agreement with Amazon was the last to be executed.  Penguin signed its agency contract with Amazon on June 2, 2010, but before that date, Penguin had refused to allow Amazon to sell any of Penguin's new e-books.

Apple closely monitored the progress of the Publisher Defendants in their negotiations with Amazon.[53]  The Publisher Defendants told Apple when their agency agreements with Amazon had been signed, and Apple watched as they swiftly moved their prices for New Release e-books on Amazon to the top of Apple's tiers.  On April 3, 2010, Cue emailed Jobs to report that "[w]e have reviewed all the books on Amazon and they have switched to agency with the publishers. . . .  Overall, our NYT bestsellers and new releases are the same as Amazon."  At that point, Penguin was the only Publisher Defendant who had not yet signed an agency agreement with Amazon.  As such, Cue told Jobs that Apple was "changing a bunch of Penguin titles to $9.99 . . . because they didn't get their Amazon deal done."  When Penguin's Shanks wrote to Cue to share the news it had "finally" reached an agreement with Amazon "on our new terms of sale," he added

---

[53] At trial, Moerer at first denied that he had watched the prices of the Publisher Defendants' e-books on Amazon or had noticed that they had increased to the price caps.  As a director of iTunes for Apple, this was not credible, and Apple witnesses, included Moerer, eventually came to admit that they did track these price increases as they were occurring.

that "The playing field is now level." Cue responded, "Great news and congratulations!!!"

O. Prices after Agency

Just as Apple expected, after the iBookstore opened in April 2010, the price caps in the Agreements became the new retail prices for the Publisher Defendants' e-books. In the five months that followed, the Publisher Defendants collectively priced 85.7% of their New Release titles sold through Amazon and 92.1% of their New Release titles sold through Apple within 1% of the price caps. This was also true for 99.4% of the NYT Bestseller titles on Apple's iBookstore, and 96.8% of NYT Bestsellers sold through Amazon. The increases at Amazon within roughly two weeks of moving to agency amounted to an average per unit e-book retail price increase of 14.2% for their New Releases, 42.7% for their NYT Bestsellers, and 18.6% across all of the Publisher Defendants' e-books.

The following chart, prepared by one of Apple's experts, illustrates this sudden and uniform price increase. While the average prices for Random House's e-books hovered steadily around $8, for four of the Publisher Defendants, the price increases occurred at the opening of the iBookstore; Penguin's price increases awaited the execution of its agency agreement with Amazon and followed within a few weeks. The bottom flat line represents the average prices of non-major publishers.

94



The Publisher Defendants raised more than the prices of just New Release e-books.  The prices of some of their New Release <u>hardcover</u> books were also raised in order to move the e-book version into a correspondingly higher price tier.[54]  And, all of the Publisher Defendants raised the prices of their backlist e-books, which were not governed by the Agreements'

---

[54] The relationship between the price of e-books and their hardcover counterpart is a complex topic that was only tangentially explored at trial.  Apple conceded, however, that it had not been Amazon's policy to price e-books above their hardcover version, but that the Publishers who adopted an agency model for distribution of their e-books did not always follow that practice.  There is evidence that, with the adoption of the agency model, as many as 20% of trade e-books became more expensive for consumers than their physical counterpart.

price tier regimen.  As Cue had anticipated, the Publisher Defendants did this in order to make up for some of the revenue lost from their sales of New Release e-books.

The following two charts, one prepared by the Plaintiffs' expert and another from an expert for Apple, respectively, compare the price increases for the Publisher Defendants' New Releases with the price increases for their backlist books. Despite drawing from different time periods, their conclusions are very similar.  The Publisher Defendants used the change to an agency method for distributing their e-books as an opportunity to raise the prices for their e-books across the board.

E-Book Average Price Increases at Amazon by Publisher Defendants Following the Move to Agency

Amazon Weighted Average Price Increases

| Publisher | All eBooks | New Releases | NYT Bestsellers | Backlist |
|---|---|---|---|---|
| Hachette | 33.0% | 14.1% | 37.9% | 37.5% |
| HarperCollins | 13.6% | 12.5% | 44.0% | 15.2% |
| Macmillan | 11.6% | 14.0% | - | 11.2% |
| Penguin | 18.3% | 19.5% | 43.6% | 17.6% |
| Simon & Schuster | 18.0% | 15.1% | 28.7% | 19.8% |
| Defendant Publishers | 18.6% | 14.2% | 42.7% | 19.6% |
| Random House | 0.01% | 1.9% | 0.2% | 0.3% |
| Non-Majors | -0.2% | -0.9% | 1.1% | 0.1% |

Average E-book Prices of Backlist and New Release Titles
in the Periods Before and After Agency

|  | Amazon | Barnes & Noble | Sony |
|---|---|---|---|
| **Backlist** | | | |
| Before Agency | $7.16 | $6.84 | $8.07 |
| After Agency | $8.78 | $8.20 | $8.43 |
| Percent Change | 23% | 20% | 4% |
| **Hardcover New Release and NYT Bestsellers** | | | |
| Before Agency | $10.37 | $9.99 | $11.31 |
| After Agency | $12.28 | $11.60 | $11.97 |
| Percent Change | 18% | 16% | 6% |

Not surprisingly, the laws of supply and demand were not suspended for e-books.  When the Publisher Defendants increased the prices of their e-books, they sold fewer books.

There were various measurements offered at trial to quantify the lost sales.  One study found that the Publisher Defendants who shifted their e-tailers to agency in early April 2010 sold 12.9% fewer units at major retailers in a two-week period following the implementation of agency prices than they had in a two-week period preceding it, at least for books that were available in both periods.[55]  Another expert opined that the Publisher Defendants' sales decreased by 14.5% relative to a control group consisting of Random House.[56]

---

[55] By contrast, in this study non-party publishers' sales increased 5.4% in the same period.

[56] Apple argued at trial that the decline in sales of the Publisher Defendants' e-books compared to those sold by Random House was attributable to Amazon's promotion of Random House

97

Amazon prepared charts for the Publisher Defendants illustrating the impact of their pricing decisions on their sales.  Amazon concluded that "[c]ompared to the 3 agency publishers -- Harper, Hachette and Penguin, who had overall kindle book units decline in Q2 compared to Q1, Random House had an increase of 41%."  It is unnecessary to quantify the precise decline in the sales for the Publisher Defendants that can be properly attributed to their decisions to raise their e-book prices.  It is abundantly clear, and not surprising, that each of the Publisher Defendants lost sales of e-books due to the price increases.

Thus, consumers suffered in a variety of ways from this scheme to eliminate retail price competition and to raise e-book prices.  Some consumers had to pay more for e-books; others bought a cheaper e-book rather than the one they preferred to purchase; and it can be assumed that still others deferred a purchase altogether rather than pay the higher price.  Now that the Publisher Defendants were in control of pricing, they were also less willing to authorize retailers to give consumers the benefit of promotions.  As Macmillan explained to Barnes &

---

books during the time Random House remained on a wholesale model of distribution.  Apple did not offer persuasive evidence, however, that the loss in sales was substantially due to anything other than the fact that Amazon continued to price many Random House New Releases at $9.99 while the Publisher Defendants raised the prices of their e-books substantially higher.

Noble, it would not agree to a proposed promotion because "[w]e worked hard to push the price of our new Ebooks up just a few dollars -- and this would immediately signal not an increase in value, but a decrease in value."

While conceding that the prices for the Publisher Defendants' e-books went up after Apple opened the iBookstore, Apple argued at trial that the opening of the iBookstore actually led to an overall decline in trade e-book prices during the two-year period that followed that event. Its evidence was not persuasive. Apple's experts did not present any analysis that attempted to control for the many changes that the e-book market was experiencing during these early years of its growth, including the phenomenon of disintermediation and the extent to which other publishers decided to remain on the wholesale model. The analysis presented by the Plaintiffs' experts as well as common sense lead invariably to a finding that the actions taken by Apple and the Publisher Defendants led to an increase in the price of e-books. After all, the Publisher Defendants accounted for roughly 50% of the trade e-book market in April 2010, and it is undisputed that they raised the prices for not only their New Release but also their backlist e-books substantially.

P. Random House Adopts an Agency Model

If there were any doubt about the impact of the Apple agency Agreement on e-book prices, at least in so far as the

99

market for trade e-books is concerned, the experience of Random House confirms each of the observations just made about the prices and sales of the five Publisher Defendants. Random House adopted the agency model in early 2011, and promptly raised the prices of its e-books and experienced a concomitant decline in e-book sales.[57]

Random House had resisted Apple's overtures to adopt the agency model and therefore its e-books were not available in 2010 in the iBookstore. It was Cue's assessment that the iBookstore was not as successful as Apple had hoped because e-books from Random House, the largest of the Big Six, were not being sold there. Cue believes that consumers expect all the books they may want to buy to be available in a bookstore and when they cannot find what they want, they go elsewhere and may never return.

While the Publisher Defendants were pricing their e-books at or close to the $12.99 and $14.99 price caps, Amazon continued to price many Random House New Releases and NYT Bestseller e-books at $9.99, as it did with other publishers that remained on its wholesale terms. This increased Random House's sales and market share during that period.

---

[57] Dr. Ashenfelter calculated an increase in Random House's prices for e-books of 18.3% on average, and a decrease in its unit sales of e-books of 16.7%.

100

Apple decided to pressure Random House to join the iBookstore. As Cue wrote to Apple CEO Tim Cook, "when we get Random House, it will be over for everyone." Apple had its opportunity in the Fall of 2010, when Random House submitted some e-book apps to Apple's App Store. Cue advised Random House that Apple was only interested in doing "an overall deal" with Random House. By December, they had begun negotiations, and Random House executed an agency agreement with Apple in mid-January 2011. In an email to Jobs, Cue attributed Random House's capitulation in part to "the fact that I prevented an app from Random House from going live in the app store this week."

Q. The Publisher Defendants Require Google to Adopt an Agency Model

The decision by the Publisher Defendants and later by Random House to adopt the agency model of distribution and raise e-book prices effected a change across the entire industry. Once the Publisher Defendants agreed with Apple to move to an agency relationship for the sale of their e-books, they not only demanded that Amazon change their relationship to an agency model, they negotiated agency agreements with their other e-book distributors to eliminate all retail price competition.

One of the companies that was planning to become an e-book distributor was Google, and the Publisher Defendants demanded

101

that Google as well adopt an agency agreement in January 2010. Google had begun to plan its entry into the e-book business as early as 2007. Before January 2010, Google understood from its discussions with the Publisher Defendants that the parties would use the wholesale model to sell digital books. But, in January 2010, each of the Publisher Defendants did an about-face and suddenly advised Google that they were switching to an agency model and would no longer be offering books under wholesale terms. Google, like Amazon, would have preferred to use the wholesale model and set the retail prices for its e-books, but the Publisher Defendants refused to allow it that option. The Publisher Defendants conveyed to Google that their Agreements with Apple made them "unwilling to enter into non-agency agreements with Google."

R. Concluding Observations

While many of the trial's fact witnesses who are employed by Apple and the Publisher Defendants were less than forthcoming, the contemporaneous documentary record was replete with admissions about their scheme. The preceding findings have therefore come not only from the testimony presented at trial, where the witnesses were cross-examined and questioned again through re-direct examination, but has also been derived liberally from the documentary record.

Based on these documents, it is difficult for either Apple or the Publisher Defendants to deny that they worked together to achieve the twin aims of eliminating retail price competition and raising the prices for trade e-books. As Macmillan frankly acknowledged in writing to the trade in the Spring of 2010, one of its goals in moving to the agency model was to "[i]ncrease[e] prices" of e-books. As Penguin's McCall wrote, "Agency is anti-pricewar territory. We don't need to compete with other publishers on the price of our books." Penguin executives told authors after signing the Apple Agreement that they had "fought to protect high prices; . . . fought against $9.99 pricing" to demand higher, "better" prices. It continued, "who knows, it is $14.99 this year, but in a few years it may be $16.99 or $19.99." HarperCollins recognized that, with the Apple Agreements, Apple had become the "gatekeeper" on e-book pricing "for the industry." As Cue admitted at trial, raising e-book prices was simply "all part of" the bargain in creating the iBookstore.

Jobs himself was frank in explaining how this scheme worked when he spoke to biographer Walter Isaacson the day after the Launch. Jobs described it as an "a[i]kido move" to move all retailers to agency and eliminate price competition with Amazon. In Jobs's own words:

Amazon screwed it up.  It paid the wholesale price for some
books, but started selling them below cost at $9.99.  The
publishers hated that -- they thought it would trash their
ability to sell hardcover books at $28.  So before Apple
even got on the scene, some booksellers were starting to
withhold books from Amazon.  So we told the publishers,
"We'll go to the agency model, where you set the price, and
we get our 30%, and yes, the customer pays a little more,
but that's what you want anyway."  But we also asked for a
guarantee that if anybody else is selling the books cheaper
than we are, then we can sell them at the lower price too.
So they went to Amazon and said, "You're going to sign an
agency contract or we're not going to give you the books."


DISCUSSION

The United States of America has brought a single claim
against Apple for violation of Section 1 of the Sherman Act.
The States have brought claims against Apple based on violations
of the state statutes "to the extent those laws are congruent
with Section 1 of the Sherman Act."  Following a description of
the legal standard for a Section 1 claim, this Opinion will
apply that law to the facts presented at trial.  After finding
that the Plaintiffs' have carried their burden of showing that
Apple violated Section 1, the Opinion will address the six
principal arguments that Apple has presented in its defense.

A. Legal Standard

Section 1 of the Sherman Act ("Section 1") outlaws "[e]very
contract, combination . . . , or conspiracy, in restraint of
trade or commerce among the several States."  15 U.S.C. § 1.  To
establish a conspiracy in violation of Section 1, then, proof of

joint or concerted action is required.  <u>Monsanto Co. v. Spray-
Rite Service Corp.</u>, 465 U.S. 752, 761 (1984).  In particular,
plaintiffs must show (1) "a combination or some form of
concerted action between at least two legally distinct economic
entities" that, (2) "constituted an unreasonable restraint of
trade either per se or under the rule of reason."  <u>Primetime 24
Joint Venture v. Nat'l Broad. Co.</u>, 219 F.3d 92, 103 (2d Cir.
2000) (citation omitted); <u>see</u> <u>Capital Imaging Assocs, P.C. v.
Mohawk Valley Medical Assocs, Inc.</u>, 996 F.2d 537, 542 (2d Cir.
1993).  Overall, "[c]ircumstances must reveal a unity of purpose
or a common design and understanding, or a meeting of minds in
an unlawful arrangement."  <u>Monsanto</u>, 465 U.S. at 764 (citation
omitted); <u>Apex Oil Co. v. DiMauro</u>, 822 F.2d 246, 252 (2d Cir.
1987).

Notwithstanding its broad language, Section 1 does not
disallow any and all agreements; it "outlaws only unreasonable
restraints."  <u>Leegin Creative Leather Prods., Inc. v. PSKS,
Inc.</u>, 551 U.S. 877, 885 (2007) (citation omitted).  Thus, in
many cases, "antitrust plaintiffs must demonstrate that a
particular contract or combination is in fact unreasonable and
anticompetitive before it will be found unlawful."  <u>Texaco Inc.
v. Dagher</u>, 547 U.S. 1, 5 (2006).  Some agreements, however, "are
so plainly anticompetitive that no elaborate study of the
industry is needed to establish their illegality."  <u>Id</u>.

105

(citation omitted).  Such agreements are illegal per se, and are
not subject to the rule of reason.  The per se rule thus
"eliminates the need to study the reasonableness of an
individual restraint in light of the real market forces at
work."  Leegin, 551 U.S. at 886.

By contrast, under the rule of reason, "the plaintiffs bear
an initial burden to demonstrate the defendants' challenged
behavior had an actual adverse effect on competition as a whole
in the relevant market."  Geneva Pharms Tech Corp. v. Barr Labs
Inc., 386 F.3d 485, 506-07 (2d Cir. 2004) (citation omitted).

> If the plaintiffs satisfy their initial burden, the burden
> shifts to the defendants to offer evidence of the pro-
> competitive effects of their agreement.  Assuming
> defendants can provide such proof, the burden shifts back
> to the plaintiffs to prove that any legitimate competitive
> benefits offered by defendants could have been achieved
> through less restrictive means.  Ultimately, the fact
> finder must engage in a careful weighing of the competitive
> effects of the agreement -- both pro and con -- to
> determine if the effects of the challenged restraint tend
> to promote or destroy competition.

Id. at 507 (citation omitted).

Use of the per se rule is limited to restraints "that would
always or almost always tend to restrict competition and
decrease output," and is appropriate "only after courts have had
considerable experience with the type of restraint at issue."
Leegin, 551 U.S. at 886 (citation omitted).  "Under the Sherman
Act a combination formed for the purpose and with the effect of

106

raising, depressing, fixing, pegging, or stabilizing the price
of a commodity in interstate or foreign commerce is illegal per
se." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223
(1940). Generally speaking, price-fixing agreements or
agreements to divide markets that are horizontal in nature --
meaning that the parties to the agreement are "competitors at
the same level of the market structure," Anderson News, L.L.C.
v. American Media, Inc., 680 F.3d 162, 182 (2d Cir. 2012)
(citation omitted) -- are per se unlawful. Starr v. Sony BMG
Music Entm't, 592 F.3d 314, 326 n.4 (2d Cir. 2010); Leegin, 551
U.S. at 886 ("Restraints that are per se unlawful include
horizontal agreements among competitors to fix prices."). In
other words, "they are prohibited despite the reasonableness of
the particular prices agreed upon." Starr, 592 F.3d at 326 n.4.
Non-price restrictions that are otherwise lawful are also "per
se unlawful if undertaken as part of an illegal scheme to fix
prices." Monsanto, 465 U.S. at 760 n.6 (citation and emphasis
omitted).

By contrast, vertical price restraints, such as resale
price maintenance agreements, that do not involve price-fixing
are subject to the rule of reason. See Leegin, 551 U.S. at 882.
A manufacturer has a right to refuse to deal "with whomever it
likes, as long as it does so independently." Monsanto, 465 U.S.
at 761.

A plaintiff may rely on either direct or circumstantial evidence to establish that a defendant entered into an agreement in violation of the antitrust laws.  Mayor and City Council of Baltimore, Md. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013) (pleading standard).  Direct evidence "would consist, for example, of a recorded phone call in which two competitors agreed to fix prices at a certain level."  Id.

Because unlawful conspiracies tend to form in secret, however, proof of a conspiracy will rarely consist of explicit agreements.  Rather, conspiracies "nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators."  Anderson News, 680 F.3d at 183 (citation omitted).  In fact, even direct evidence in antitrust cases "can sometimes require a factfinder to draw inferences to reach a particular conclusion."  In re Publ'n Paper Antitrust Litig., 690 F.3d 51, 64 (2d Cir. 2012) ("Perhaps on average circumstantial evidence requires a longer chain of inferences." (citation omitted)).  Circumstantial evidence is no less persuasive than direct evidence; indeed, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."  Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003).

Thus, to prove an antitrust conspiracy, "the antitrust plaintiff should present direct or circumstantial evidence that

reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." <u>Monsanto</u>, 465 U.S. at 764 (citation omitted). The evidence must also "prove defendants had the intent to adhere to an agreement that was designed to achieve an unlawful objective; specific intent to restrain trade is not required." <u>Geneva Pharms</u>, 386 F.3d at 507. Since "the essence of any violation of § 1 [of the Sherman Act] is the illegal agreement itself," <u>Summit Health, Ltd. v. Pinhas</u>, 500 U.S. 322, 330 (1991), the evidence must demonstrate a "meeting of the minds." <u>Monsanto</u>, 465 U.S. at 765. In evaluating the existence of an antitrust conspiracy, courts consider the "totality of the evidence." <u>Publ'n Paper</u>, 690 F.3d at 64; see <u>Cont'l Ore Co. v. Union Carbide & Carbon Corp.</u>, 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." (citation omitted)). Just as a conspiracy's "failure to achieve its ends" after an intended period may be "strong evidence" that the conspiracy did not in fact exist, <u>Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 592 (1986), the success of the conspiracy in achieving its goals may confirm the very existence of the conspiracy. See <u>Oreck Corp. v. Whirlpool Corp.</u>, 563 F.2d 54, 63 (2d Cir. 1977) ("Proof that a combination was formed for the

purpose of fixing prices and that it caused them to be fixed or
contributed to that result is proof of the completion of a
price-fixing conspiracy under § 1 of the Act." (citation
omitted)); cf. United States v. Quinones, 511 F.3d 289, 308 (2d
Cir. 2007) (defendants' cocaine purchases "were obviously
relevant to proof of the existence of th[e narcotics]
conspiracy" charged).

　　　"Unambiguous evidence of an agreement to fix prices . . .
is all the proof a plaintiff needs" to establish a violation of
Section 1. Publ'n Paper, 690 F.3d at 63 (citation omitted).
Where the evidence of conspiracy is "ambiguous," however,
"antitrust law limits the range of permissible inferences" that
may be drawn. Matsushita, 475 U.S. at 588; see Apex, 822 F.2d
at 253. Where conduct is as consistent with permissible
competition as with illegality, a plaintiff "must present
evidence that tends to exclude the possibility that the alleged
conspirators acted independently." Matsushita, 475 U.S. at 588
(citation omitted). Thus, "standing alone," ambiguous conduct
is inadequate to support an inference of illegality. Id.
Moreover, where a plaintiff's theory of recovery is implausible
-- in other words, "if the claim is one that simply makes no
economic sense," id. at 587 -- it takes "strong direct or
circumstantial evidence to satisfy Matsushita's tends to exclude
standard." Publ'n Paper, 690 F.3d at 63 (citation omitted).

"By contrast, broader inferences are permitted, and the 'tends
to exclude' standard is more easily satisfied, when the
conspiracy is economically sensible for the alleged conspirators
to undertake and the challenged activities could not reasonably
be perceived as procompetitive." Id. (citation omitted).

Even where a plaintiff relies on ambiguous evidence,
however, to prove its claim, the plaintiff does not bear the
burden of showing that the existence of a conspiracy is the
"sole inference" to be drawn from the evidence. Id. The
plaintiff is only required to present evidence that is
sufficient to allow the fact-finder "to infer that the
conspiratorial explanation is more likely than not." Id.
(citation omitted).

Conduct that stems from independent decisions is
permissible under Section 1, see Starr, 592 F.3d at 321, as are
"independent responses to common stimuli," and "interdependence
unaided by an advance understanding among the parties." Bell
Atlantic Corp. v. Twombly, 550 U.S. 544, 556 n.4 (2007)
(citation omitted). As a result, while evidence of parallel
conduct is probative of an antitrust conspiracy, such evidence
"alone cannot suffice." Apex, 822 F.2d at 252; Matsushita, 475
U.S. at 588. Instead, to infer a horizontal agreement through
parallel conduct, a court may draw inferences from "plus
factors" to rule out purely interdependent decision making by

111

rivals.  Mayor, 709 F.3d at 136 (citation omitted).  Plus factors commonly considered by courts include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, . . . evidence of a high level of interfirm communications," id., and the "use of facilitating practices" like information sharing.  Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001).  An abrupt shift from defendants' past behavior and near-unanimity of action by several defendants may also strengthen the inference.  See Interstate Circuit v. United States, 306 U.S. 208, 222 (1939); Toys "R" Us, Inc. v. FTC, 221 F.3d 928, 935 (7th Cir. 2000).  For instance, a "complex and historically unprecedented change[] in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason," may provide sufficient evidence of an illegal conspiracy.  Mayor, 709 F.3d at 137 (citation omitted) (discussion of pleading standard).

Per se price-fixing agreements may also include those where a vertical player participates in and facilitates a horizontal conspiracy.  See Toys "R" Us, 221 F.3d at 934, 936.  Where a vertical actor is alleged to have participated in an unlawful horizontal agreement, plaintiffs must demonstrate both that a horizontal conspiracy existed, and that the vertical player was a knowing participant in that agreement and facilitated the

112

scheme.  See, e.g., id. at 936; Interstate Circuit, 306 U.S. at
225-29 (1939).

B. Analysis of the Evidence

The Plaintiffs have shown through compelling evidence that
Apple violated Section 1 of the Sherman Act by conspiring with
the Publisher Defendants to eliminate retail price competition
and to raise e-book prices.  There is overwhelming evidence that
the Publisher Defendants joined with each other in a horizontal
price-fixing conspiracy.  Through that conspiracy, the Publisher
Defendants raised the prices of many of their New Releases and
NYT Bestsellers above the $9.99 price at which they had
previously been sold through Amazon.  They also raised the
prices of many of their backlist e-books.  The Plaintiffs have
also shown that Apple was a knowing and active member of that
conspiracy.  Apple not only willingly joined the conspiracy, but
also forcefully facilitated it.

There is little dispute that the Publisher Defendants
conspired together to raise the prices of their e-books.[58]  They
shared a common motivation: the elimination of the "wretched"

---

[58] During summation Apple chose not to concede that the
plaintiffs had proven at trial that the Publisher Defendants
engaged in a horizontal price fixing conspiracy.  Apple did not
expend an effort, however, to argue that such a conspiracy did
not exist or that the evidence was insufficient to find that it
existed.  Apple confined its argument to its purported lack of
knowledge that the Publisher Defendants were conspiring with
each other.

$9.99 retail price that Amazon, the chief distributor of their e-books, chose for many of their New Releases, including NYT Bestsellers.  They believed that this price point in the nascent but swiftly growing e-book market would, if left unchallenged, unalterably affect the consumer perception of the value of a book and severely undermine their more profitable physical book business.  To protect their then-existing business model, the Publisher Defendants agreed to raise the prices of e-books by taking control of retail pricing.

From late 2008 through 2009, the Publisher Defendants had collectively tried through a variety of means to pressure Amazon to raise the prices of their e-books.  Their efforts proved futile.  Then, through agency agreements that each Publisher Defendant executed with Apple over the course of just three days in January 2010, and with Amazon (and other e-retailers) in the weeks that followed, the Publisher Defendants simultaneously switched from a wholesale to an agency model for the distribution of their e-books.  When the iPad went on sale and the iBookstore went live in early April 2010 (or shortly thereafter, in the case of Penguin), each of the Publisher Defendants used their new pricing authority to raise the prices of their e-books overnight and substantially.

This price-fixing conspiracy would not have succeeded without the active facilitation and encouragement of Apple.

114

Before Apple even met with the Publisher Defendants in mid-December 2009, it was fully aware that the Publishers were adamantly opposed to Amazon's $9.99 price point and were actively searching for an effective means, including through collective action, to pressure Amazon to raise its prices. Inspired by the impending Launch of the revolutionary iPad, scheduled for January 27, Apple seized the moment.

Apple met with the Publishers in December 2009 and heard their unanimous condemnation of the $9.99 price point and desire to raise e-book prices. Volunteering that it was willing to price e-books as high as $14.99 in an e-bookstore, Apple won their rapt attention. Apple then presented a strategy -- the agency Agreements -- that would allow the Publishers to take control of and raise e-book retail prices in a matter of weeks. Knowing full well, however, that the Publisher Defendants wanted to raise e-book retail prices significantly above the $9.99 price point, even in some instances above the retail prices of the corresponding physical book, Apple placed pricing restrictions or caps on categories of e-books to ensure that the prices in its iBookstore were "realistic" and didn't embarrass Apple. In negotiating the caps for its pricing tiers, Apple understood that it was setting the new retail prices at which e-books would be sold.

Apple had several reasons for engaging as it did with the Publisher Defendants. It wanted to announce a well-stocked iBookstore in less than two months, when it launched its iPad; it wanted to avoid competing with Amazon, an arch rival in the market, on the basis of price; and it wanted a guaranteed profit on any new business it entered. To accomplish these goals, Apple was willing to offer the Publisher Defendants a roadmap for raising retail e-book prices well above Amazon's $9.99 price point and urged the Publisher Defendants to use that roadmap to do so. In short, Apple convinced the Publisher Defendants that Apple shared their goal of raising e-book prices, and helped them to realize that goal.

Apple included the MFN, or price parity provision, in its Agreements both to protect itself against any retail price competition and to ensure that it had no retail price competition. Apple fully understood and intended that the MFN would lead the Publisher Defendants inexorably to demand that Amazon switch to an agency relationship with each of them. As Apple's Cue reminded Macmillan's Sargent, this was no more than what the Publisher Defendants had already assured Apple that they wanted to, and would, do.

Because of the MFN, Apple concluded that it did not need to include as an explicit term in its Agreements a demand that a Publisher Defendant move all of its resellers to agency. The

116

MFN was sufficient to force the change in model. The economics of the Agreements were, simply put, "terrible" for the Publishers. The Publisher Defendants already expected to lose revenue from their substitution of an agency model for the wholesale model of e-book distribution. Unless a Publisher Defendant followed through and transformed its relationships with Amazon and other resellers into an agency relationship, it would be in significantly worse terms financially as a result of its agency contract with Apple. As significantly, unless the Publisher Defendants joined forces and together forced Amazon onto the agency model, their expected loss of revenue would not be offset by the achievement of their ultimate goal: the protection of book value.

A chief stumbling block to raising e-book prices was the Publishers' fear that Amazon would retaliate against any Publisher who pressured it to raise prices. Each of them could also expect to lose substantial sales if they unilaterally raised the prices of their own e-books and none of their competitors followed suit. This is where Apple's participation in the conspiracy proved essential. It assured each Publisher Defendant that it would only move forward if a critical mass of the major publishing houses agreed to its agency terms. It promised each Publisher Defendant that it was getting identical terms in its Agreement in every material way. It kept each

Publisher Defendant apprised of how many others had agreed to
execute Apple's Agreements.  As Cue acknowledged at trial, "I
just wanted to assure them that they weren't going to be alone,
so that I would take the fear awa[y] of the Amazon retribution
that they were all afraid of."  As a result, the Publisher
Defendants understood that each of them shared the same set of
risks and rewards.

Working against its own internal deadline, Apple achieved
for this industry in a matter of weeks what the Publisher
Defendants had been unable to accomplish for months before Apple
became their partner.  In the words of Simon & Schuster's Reidy,
Apple herded cats.  Apple gave the Publishers a deadline and
required them to examine with care but quickly how committed
they were to challenging Amazon and altering the landscape of
e-book pricing.  And when it appeared a Publisher Defendant
might be too scared to commit to this dramatic business change,
Cue reminded that Publisher Defendant that Apple's entry into
the market represented a once-in-a-lifetime opportunity to
eliminate Amazon's control over pricing.  As he warned Penguin
just days before the Launch, "There is no one outside of us that
can do this for you.  If we miss this opportunity, it will
likely never come again."

Without the collective action that Apple nurtured, it is
unlikely any individual Publisher would have succeeded in

unilaterally imposing an agency relationship on Amazon. Working together, and equipped with Apple's agency Agreements, Apple and the Publisher Defendants moved the largest publishers of trade e-books and their distributors from a wholesale to agency model, eliminated retail price competition, and raised e-book prices.

The evidence of this conspiracy can be found in Jobs's admissions to a reporter, to James Murdoch, and to his biographer; in contemporaneous e-mails pulled from the files of Apple, the Publishers, Amazon, and others; in the web of telephone calls among Publisher Defendants' CEOs surrounding each turning point in the presentation and execution of the Agreements;[59] and as compellingly, in the circumstantial evidence. This circumstantial evidence includes the following:

---

[59] Apple has contended that the existence of any conversations among the Publisher Defendants CEOs during their negotiations with Apple is neither unusual nor incriminating. This is not the occasion to describe the metes and bounds of lawful communication among competitors when they are engaged in simultaneous negotiations with either a common supplier or a shared distributor. Instead, the Court focuses here on the ways in which the Publisher Defendants' frequent discussions are relevant to this Opinion, including that the Publisher Defendants' denials at trial that they discussed the Apple Agreement with one another in those communications, or that those conversations occurred at all, in the face of overwhelming evidence to the contrary, strongly supports a finding of consciousness of guilt. They knew they were coordinating their efforts to raise the e-book prices and jointly confront Amazon, and have tried to hide that fact. Moreover, the pattern of their coordination in meetings and telephone calls, and their expectation that they would not compete on price -- all of which was apparently well established before Apple reached out to them but continued throughout their negotiations with Apple -- serves as strong evidence of this conspiracy.

each of the Publisher Defendants shared the identical goal to
raise the $9.99 price point to protect its physical book
business; the agency Agreements represented an "abrupt shift"
from the past model for the distribution of e-books; the
Publisher Defendants each demanded that Amazon adopt this new
model within days of each other; the agency model protected
Apple from price competition; the rise in trade e-book prices to
or close to the price caps established in the Agreements was
large and essentially simultaneous; in adopting a model that
deprived each of them of a stream of expected revenue from the
sale of e-books on the wholesale model, the Publisher Defendants
all acted against their near-term financial interests; and each
of the Publisher Defendants acted in identical ways even though
each was also afraid of retaliation by Amazon. See Toys "R" Us,
221 F.3d at 935-36; PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d
101, 110 (2d Cir. 2002).

In sum, the Plaintiffs have shown not just by a
preponderance of the evidence, see Herman & MacLean v.
Huddleston, 459 U.S. 375, 390 (1983), but through compelling
direct and circumstantial evidence that Apple participated in
and facilitated a horizontal price-fixing conspiracy. As a
result, they have proven a per se violation of the Sherman Act.
See Arizona v. Maricopa Cnty. Med. Soc., 457 U.S. 332, 346-47
(1982); Toys "R" Us, 221 F.3d at 936. If it were necessary to

analyze this evidence under the rule of reason, however, the Plaintiffs would also prevail.

Apple has not shown that the execution of the Agreements had any pro-competitive effects.[60]  The form Agreements eliminated retail price competition, and there is no evidence that the Publisher Defendants have ever competed with each other on price.  To the contrary, several of the Publishers' CEOs explained that they have not competed with each other on that basis.  The pro-competitive effects to which Apple has pointed, including its launch of the iBookstore, the technical novelties of the iPad, and the evolution of digital publishing more generally, are phenomena that are independent of the Agreements and therefore do not demonstrate any pro-competitive effects flowing from the Agreements.  In any event, the Plaintiffs have shown that the Agreements did not promote competition, but destroyed it.  The Agreements compelled the Publisher Defendants to move Amazon and other retailers to an agency model for the distribution of e-books, removed the ability of retailers to set the prices of their e-books and compete with each other on price, relieved Apple of the need to compete on price, and allowed the Publisher Defendants to raise the prices for their e-books, which they promptly did on both New Releases and NYT

---

[60] Plaintiffs have defined the relevant market as trade e-books in the United States; Apple does not dispute that characterization.

121

Bestsellers, as well as backlist titles. Apple's experts did little to counter the evidence of this across-the-board price increase in e-books sold by the Publisher Defendants and by Random House when it moved to agency.[61] Because of this rise in prices, and at least until Random House also adopted the agency model, the Publisher Defendants sold fewer e-books than they otherwise would have done. For this and many other reasons, if it were necessary to evaluate Apple's conduct under the rule of reason, Plaintiffs have carried their burden to show a violation of Section 1 of the Sherman Act under that test as well.

APPLE'S ARGUMENTS

Apple vigorously contested its liability at trial. This Opinion turns now to Apple's principal arguments in its defense.

Apple's defense has somewhat shifted over time. Apple in its opening statement identified five essential links in the chain of evidence that the Plaintiffs had to establish at trial.[62] They were:

---

[61] The testimony by Apple's experts that the prices of e-books generally, including self-published e-books, decreased on average in the years following the introduction of the iBookstore, does not affect this conclusion. The Apple experts did not offer any scientifically sound analysis of the cause for this purported price decline or seek to control for the factors that may have led to it.

[62] In its pretrial memorandum of law, Apple's defense focused almost exclusively on Monsanto's "tends to exclude" standard and its contention that Plaintiffs' evidence is insufficient to

> First is that the publishers sign Apple's agency agreements
> with an MFN and price caps.
>
> The second is that that MFN sharpened the publishers'
> incentives to demand agency from Amazon.
>
> The next is that that demand for agency convinces a
> company, Amazon, of the futility of continued resistance to
> agency.
>
> Amazon adopts agency in circumstances where absent the
> Apple MFN it would not have adopted agency.
>
> And the final chain in the alleged conspiracy is that the
> publishers raise prices to the price caps by agreement.
>
> All of these links in the chain are required for the
> government to meet its burden of proving that Apple
> participated in a price fixing scheme.

Apple also highlighted in its opening how much Apple likes low

prices and that it did not know how the Publishers would price

their e-books under the agency model.

Over the course of the trial, Apple abandoned each of these

arguments. All of the "links" that Apple identified in its

opening statement were established at trial, and Apple did not

argue otherwise in its summation. Apple similarly abandoned by

summation its theory that Apple was unaware that the Publisher

Defendants would use their new pricing authority to raise e-book

prices; over the course of the trial, Apple's witnesses admitted

that they expected the Publisher Defendants to raise their

---

exclude the possibility of independent action. This remains
Apple's chief argument in its defense.

e-book prices to Apple's price caps.  Instead, in the end, Apple appears to make six principal arguments in its defense.

First, it relies on the Supreme Court's decision in Monsanto, 465 U.S. 752, to assert that Apple is entitled to a verdict in its favor since the evidence does not "tend to exclude" the possibility that Apple acted in a manner consistent with its lawful business interests.  Second, Apple argues that it never intended to conspire with the Publisher Defendants to raise e-book prices.  Third, Apple argues that the Plaintiffs have failed to show that the Publisher Defendants actually "increased" e-book prices since, in the absence of Amazon's adoption of an agency model, the Publisher Defendants would have simply withheld e-books from Amazon.  Apple also offers its own reading of different portions of the trial record, and that reading will be addressed as its fourth set of contentions. Fifth, Apple presents additional legal arguments suggesting that its conduct must be analyzed under the rule of reason.  Finally, Apple argues that a verdict in favor of the Plaintiffs will set a dangerous precedent and will discourage businesses from entering other markets.  Each of these defenses will be discussed in turn.

A. The <u>Monsanto</u> Decision and Apple's Independent Business
   Interests

Throughout these proceedings, Apple has relied on <u>Monsanto</u>
and its "tends to exclude" formulation as the crown jewel of its
defense.  According to Apple, any fact-finder in this case must
begin by answering the following question: "Does the evidence
show that Apple acted to facilitate a conspiracy among the
Publisher Defendants to force Amazon onto agency and raise
prices, or rather was its conduct just as consistent with
independent, unilateral action?"  If the evidence regarding
participation in a conspiracy is ambiguous, then Apple contends
that, under <u>Monsanto</u>, the fact-finder may only find Apple liable
if it concludes that Apple's participation in a conspiracy is
"the more likely explanation" for its conduct.  Apple also
asserts that when the most natural inference from the evidence
is that a defendant had a legitimate, independent reason for its
actions, then no fact-finder may infer that it engaged in a
conspiracy.

Applying this reading of precedent, Apple argues that it
had legitimate, independent business reasons for executing the
Agreements with the Publisher Defendants, and that these
independent business reasons necessarily render any evidence of
its participation in a conspiracy ambiguous.  Because the
Plaintiffs have been unable to show that Apple did not have

125

legitimate reasons for acting as it did, Apple asserts that the Plaintiffs have failed to exclude the possibility that Apple acted lawfully.  As a result, according to Apple, <u>Monsanto</u> dictates that a verdict be entered in its favor.  Apple misreads <u>Monsanto</u> and its progeny.  It also perceives ambiguity where none exists.

In <u>Monsanto</u>, 465 U.S. 752, the Supreme Court upheld a jury verdict that a manufacturer had engaged in a <u>per se</u> illegal vertical price-fixing scheme with "some of its distributors." The goal of the conspiracy was the termination of a rival distributor that was running a "discount operation."  <u>Id</u>. at 756, 764-65.  Because a manufacturer and its distributors "have legitimate reasons to exchange information about the prices and the reception of their products in the market," <u>id</u>. at 762, and because of dangers that flow from permitting an inference of conspiracy to be drawn "from highly ambiguous evidence," <u>id</u>. at 763, the Court held that a plaintiff must present evidence of "something more" than complaints from distributors to the manufacturer about their cost-cutting rival.  <u>Id</u>. at 764.  Using the phrase upon which Apple seizes, the Court observed that there "must be evidence that <u>tends to exclude</u> the possibility that the manufacturer and nonterminated distributors were acting independently."  <u>Id</u>. (emphasis supplied).  In other words, direct or circumstantial evidence must be present that "tends to

126

prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." Id. (citation omitted).

Applying that standard, the Court examined the evidence presented at trial, and held that the direct and circumstantial evidence supported the jury's finding that there was an agreement between the manufacturer and one or more distributors to maintain prices. Id. at 767. In doing so, it noted that the choice between "two reasonable interpretations of the testimony" is properly left for the fact-finder. Id. at 768 n.12.

Two years later, in Matsushita, 475 U.S. 574, the Court returned to this topic in the context of summary judgment practice. It observed that "anti-trust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." Id. at 588. The Court explained that "if the factual context renders respondents' claim implausible –- if the claim is one that simply makes no economic sense –- respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." Id. at 587. Moreover, where there is conduct "as consistent with permissible competition as with illegal conspiracy," that conduct "standing alone" will not support an inference of conspiracy. Id. at 588. Thus, to "survive a motion for summary judgment or for a directed verdict, a plaintiff . . . must present evidence that

127

tends to exclude the possibility that the alleged conspirators acted independently." Id. (citation omitted). Applying these principles to the case at hand, the Court noted that there could be no inference of a conspiracy when the accused "had no rational economic motive" to engage in a conspiracy and its conduct was "consistent with other, equally plausible explanations." Id. at 596. Therefore, to support liability, the evidence must "tend to exclude the possibility" that the accused engaged in legitimate behavior rather than engaging in "an economically senseless conspiracy." Id. at 597-98 (citation omitted).

These discussions of the "tend to exclude" formulations in Monsanto and Matsushita have occasioned commentary by academicians and courts of appeal. The Court of Appeals for the Second Circuit has warned that "[r]equiring a plaintiff to 'exclude' or 'dispel' the possibility of independent action places too heavy a burden on the plaintiff." Publ'n Paper, 690 F.3d at 63. According to the Second Circuit,

> [i]t is important not to be misled by Matsushita's statement . . . that the plaintiff's evidence, if it is to prevail, must "tend . . . to exclude the possibility that the alleged conspirators acted independently." The Court surely did not mean that the plaintiff must disprove all nonconspiratorial explanations for the defendants' conduct. Not only did the court use the word "tend," but the context made clear that the Court was simply requiring sufficient evidence to allow a reasonable fact-finder to infer that the conspiratorial explanation is more likely than not.

128

<u>Id</u>. (citing Phillip E. Areeda and Herbert Hovenkamp,
<u>Fundamentals of Antitrust Law</u>, § 14.03(b), at 14-25 (4th ed.
2011)). Accordingly, "if a plaintiff relies on ambiguous
evidence to prove its claim, the existence of a conspiracy must
be a reasonable inference that the jury could draw from that
evidence; it need not be the <u>sole</u> inference." <u>Id</u>.
Characterizing as a "trap" the fallacy that "if no single item
of evidence presented by the plaintiff points unequivocally to
conspiracy, the evidence as a whole cannot defeat summary
judgment," the Court of Appeals for the Seventh Circuit has
opined that the question for the fact-finder is simply "whether,
when the evidence was considered as a whole, it was more likely
that the defendants had conspired to fix prices than that they
had not conspired to fix prices." <u>In re High Fructose Corn</u>
<u>Syrup Antitrust Litigation</u>, 295 F.3d 651, 655-56 (7th Cir.
2002).

  For the reasons described earlier in this Opinion, there is
abundant direct and circumstantial evidence, and this Court has
found, that Apple knowingly and intentionally participated in
and facilitated a horizontal conspiracy to eliminate retail
price competition and to raise the retail prices of e-books.
Apple made a conscious commitment to join a scheme with the
Publisher Defendants to raise the prices of e-books. <u>See</u>
<u>Monsanto</u>, 465 U.S. at 764. Apple did not and could not have

acted independently to achieve the results it achieved here.  It required the coordinated effort and conscious commitment of the Publisher Defendants and Apple to change the business model for the distribution of e-books, impose that new model on Amazon against its will, and effect a significant increase in the retail prices of e-books.  The finding that Apple engaged in an illegal conspiracy is based not simply on a finding that the "conspiratorial explanation is more likely than not," Publ'n Paper, 690 F.3d at 63; it is based on powerful direct evidence corroborated by compelling circumstantial evidence.  Even if Apple had been successful at trial in showing that the evidence of its participation in the asserted conspiracy was equally balanced between two reasonable interpretations, Monsanto, 465 U.S. at 768 n.12, and it was not, the Plaintiffs have shown by a preponderance of the evidence that Apple violated the antitrust laws.

This conclusion is based on an evaluation of the entirety of the evidentiary record, including those portions on which Apple relies in arguing that it acted in ways that were consistent with its independent business interests.  It is not surprising that Apple chose to further its own independent, economic interests.  Such a motivation, however, does not insulate a defendant from liability for illegal conduct.  It has long been observed that it is of "no consequence, for purposes

of determining whether there has been a combination or
conspiracy under s[ection] 1 of the Sherman Act, that each party
acted in its own lawful interest." United States v. General
Motors Corp., 384 U.S. 127, 142 (1966).

To the extent that Apple is arguing that the evidence of
its participation with the Publisher Defendants in the
conspiracy is ambiguous, it is wrong. Instead, the evidence not
only "tends to exclude the possibility" that Apple acted
independently; it overwhelmingly demonstrates that it did not.

In asserting that its behavior was consistent with its
legitimate business interests and with standard business
practices, Apple emphasizes the following: it wanted to enter
and compete successfully in the e-books market; it did not want
to begin a business in which it would sustain losses; it wanted
to avoid the windowing or withholding of e-books from its e-
bookstore; the agency model, particularly one with price caps
and an MFN, was a logical fit; and it was helpful to advise
Publishers that it was offering the same terms to their
competitors and would open the iBookstore only if it reached
agreements with enough of them to have a successful e-bookstore.
Apple contends that each of these practices was and is a lawful
business practice. It argues that no proper inference that
Apple conspired to raise price can be drawn from the several
terms in the Agreements or the components of Apple's negotiating

131

strategy because the Supreme Court has found actions of this type essential to the operation of efficient markets.

The Plaintiffs do not argue, and this Court has not found, that the agency model for distribution of content, or any one of the clauses included in the Agreements, or any of the identified negotiation tactics is inherently illegal.  Indeed, entirely lawful contracts may include an MFN, price caps, or pricing tiers.  Lawful distribution arrangements between suppliers and distributors certainly include agency arrangements.  It is also not illegal for a company to adopt a form "click-through" contract, negotiate with all suppliers at the same time, or share certain information with them.  Indeed, as Apple indicates, many common business practices have been found necessary for the efficient distribution of goods and services. See Monsanto, 465 U.S. at 763-64.  That does not, however, make it lawful for a company to use those business practices to effect an unreasonable restraint of trade.  And here, the evidence taken as a whole paints quite a different picture -- a clear portrait of a conscious commitment to cross a line and engage in illegal behavior with the Publisher Defendants to eliminate retail price competition in order to raise retail prices.

Apple urges the Court to focus solely on each of the terms of the Agreements and to conclude that there is nothing

132

inherently illegal in those terms or the contract as a whole. By asking the Court to focus exclusively on whether the final terms of the Agreements by themselves reflect an agreement in restraint of trade, Apple ignores the six weeks of negotiations leading up to their execution, when the conspiracy and Apple's participation in it took shape, and the weeks that followed, during which time the import of the Agreements became apparent. The Court is obligated to consider the totality of the evidence. Therefore, the Agreements must be considered in the context of the entire record. When that is done, it becomes evident that the caps for the price tiers were the fiercely negotiated new retail prices for e-books and that the MFN was the term that effectively forced the Publisher Defendants to eliminate retail price competition and place all of their e-tailers on the agency model.

Apple also argues that it is particularly unfair to find that it engaged in illegal conduct since Amazon and Google, among others, used similar negotiating tactics and included nearly identical terms, including MFNs, when they subsequently executed their own agency agreements with the Publishers. There are several reasons that this is not a persuasive argument.

First, it is no defense to participation in an illegal price fixing conspiracy to suggest that others did it too. Second, focusing on the precise terms of agency agreements and

the extent to which they may have been similar is far too narrow
a focus.  The issue is not whether an entity executed an agency
agreement or used an MFN, but whether it conspired to raise
prices.  Apple has pointed to no evidence that either Amazon or
Google desired either to eliminate retail price competition or
to raise retail prices.  Quite the contrary.  Amazon was adamant
in its support of retail price competition and lower prices.  It
did not relinquish its control over retail pricing easily.  As
Penguin's Shanks described at trial, when Penguin demanded that
Amazon yield its discretion over retail pricing, Amazon "yelled
and screamed and threatened.  It was a very unpleasant meeting."
For its part, Google had been negotiating wholesale distribution
agreements with Publishers and only switched to agency
agreements at their insistence.  Amazon was so hopeful that the
Publisher Defendants would relent and revert to a wholesale
model once they saw how much money they were losing with the
agency model that it added a "model-parity" clause in its
agreements.

In sum, Apple's independent business reasons for creating
an e-bookstore and for adopting an agency model to do so have
not created any ambiguity in the evidentiary record that should
require hesitation before finding Apple liable.  The totality of
the evidence leads inextricably to the finding that Apple chose

to join forces with the Publisher Defendants to raise e-book prices and equipped them with the means to do so.

B. Apple's Intent

Apple's second defense is related to its first. It argues that it never intended to conspire with the Publisher Defendants to raise the retail prices of e-books. Apple emphasizes that it was the Publisher Defendants who raised the prices, and Apple should not be found liable just because those Publishers used Apple's Agreements as a tool to force an industry change to the agency model and then used their newly acquired price-setting authority to raise the retail prices of e-books.

Apple asserts it was solely focused on accomplishing its core business objectives and on providing the best possible e-reading experience for consumers. Apple identifies those business objectives as the development of an iBookstore with comprehensive content and competitive pricing.[63] At trial, its witnesses stressed the benefits that accrued to readers from its iPad (color functionality, backlit screen, and video capability) and from the iBookstore e-reader software (landscape view option, an attractive page-curl function, and an end-to-end platform to browse, buy, and read an e-book in one seamless interface).

---

[63] Apple uses the term "competitive" to convey that it wanted its prices to be the lowest in the marketplace, not to convey that it wanted prices arrived at through the process of competition.

135

These business considerations undoubtedly drove Apple's conduct throughout its negotiations with the Publisher Defendants. Of course, Apple hoped to launch a new content store that was both profitable and popular. It described with enthusiasm at trial the improvements to the iBookstore that allowed cooks to learn the proper technique for preparing boeuf bourguignon by watching Julia Child, and allowed children to run their fingers over a color touchscreen while reading the illustrated pages of Winnie the Pooh. But, as the trial evidence made abundantly clear, there was more to Apple's entry into the trade e-book market than the presentation of innovative software on a remarkable device.

Apple's entirely appropriate or even admirable motives do not preclude a finding that Apple also intentionally engaged with the Publisher Defendants in a scheme to raise e-book prices. From its very first meetings with the Publishers, Apple appealed to their desire to raise prices and offered them a vision of how they could reach that objective. By the end of the trial, Apple's witnesses no longer denied that they fully understood that the Publisher Defendants would raise e-book prices to the Agreements' pricing caps as soon as the iBookstore appeared on the market. Understanding that no one Publisher could risk acting alone in an attempt to take pricing power away from Amazon, Apple created a mechanism and environment that

136

enabled them to act together in a matter of weeks to eliminate all retail price competition for their e-books.  The evidence is overwhelming that Apple knew of the unlawful aims of the conspiracy and joined that conspiracy with the specific intent to help it succeed.  Apple's desire to create a profitable iBookstore on a superior e-reader does not obliterate the abundant record evidence that Apple made a commitment to act as the Publisher Defendants' partner in raising e-book prices materially above $9.99.

In a related argument, Apple contends that the Plaintiffs have paid unwarranted attention to the mechanism of an agency agreement and to the Agreements' MFN clause.  Apple asserts that several reasons unrelated to price increases motivated its decision to endorse the agency model for distributing e-books along with an MFN clause, and that these business decisions thus cannot serve as evidence that Apple had any culpable intent to raise e-book prices.  With respect to the agency model, Apple emphasizes that it was entering the e-book market at a time of turmoil, when Publishers were at war with their principal distributor.  It points out that Barnes & Noble was actively considering the adoption of the agency model and that two of the Publishers -- Hachette and HarperCollins -- recommended the agency model to Apple at their December meetings.

137

But, the Plaintiffs have not argued that there is anything inherently wrong with an agency model or that Apple should not have advocated for its adoption.  The question instead is whether competitors joined forces to eliminate price competition and raise prices and whether Apple knowingly and actively participated in that conspiracy.  The Apple agency Agreements are important because they were the instrument that the conspirators chose to effect their scheme.

With respect to the MFN, Apple asserts that its sole intention in crafting that provision was to protect itself from price competition.  It highlights the MFN's function in <u>lowering</u> consumer-facing prices, not raising them, and claims this fact undercuts any inference that the provision was intended as a mechanism to compel an industry-wide shift in price upward.  But, just as Apple had multiple motivations in its negotiations, there was more than one function for the MFN.  The MFN did lower the prices in the iBookstore below the price caps set in the tiers if a Publisher did not immediately move its other resellers to an agency arrangement.  As described above, however, for that very same reason the MFN <u>also</u> forced the Publishers to convert all of their e-book distribution arrangements to agency arrangements and to raise e-book prices.  Otherwise, a bad economic arrangement became a disastrous one for the Publishers.  That is why Apple labeled the MFN an

"elegant" alternative to its initial demand that the Publishers
move all of their e-book retailers to an agency model.[64]  Without
that explicit requirement, Apple achieved the same end by means
of the MFN.[65]

Finally, Apple argues that the contentious nature of the
negotiations -- particularly with respect to the caps on the
price tiers -- proves that there was no meeting of the minds to
raise prices and therefore no conspiracy.  But the fact that
provisions, even key provisions, in the Agreements were the
focus of hard-fought negotiations does not preclude a finding of
liability.  As the Seventh Circuit observed, "[a] co-conspirator
who used his power to guide or direct other conspirators
qualifies as an organizer even though his control was not
absolute.  The need to negotiate some details of the conspiracy
with the cartel members also does not strip a defendant of the

---

[64] Apple argued at trial that the MFN gave it more protection
against price discrimination by Publishers than the requirement
that the Publishers move all retailers to an agency arrangement.
That is so as a theoretical matter, but there is no basis to
find based on the trial record that Apple ever had reason to
fear that the Publishers would use their power over retail
pricing to lower prices anywhere.  Instead, the evidence is that
Apple feared retail price competition with Amazon.  Apple
preferred to compete with Amazon on the strength of its device
rather than through price wars.

[65] Apple argued in summation, relying again on the Monsanto
decision, that if the MFN had both illegal and legal purposes,
then the existence of a lawful purpose would prevent a finding
of liability.  For the reasons described above, this argument
misreads both the law and the record evidence.

organizer role."  United States v. Andreas, 216 F.3d 645, 679-80
(7th Cir. 2000).

It is true that the Publisher Defendants pushed for price
caps, and thereby e-book prices, that were higher than those
Apple thought consumers would "realistically" be willing to pay.
But that was in the context of their overarching agreement to
raise prices above the $9.99 industry norm.  It is also worth
remembering that, when the Publisher Defendants pushed back
during negotiations and asked for more and higher price caps,
Apple agreed on January 16 to their demands.  A meeting of the
minds to raise e-book prices by working together could not be
more clear on this record.

C. Windowing

A third defense that Apple introduced toward the end of the
trial is that there was literally no "increase" in e-book prices
and by definition therefore no conspiracy to raise e-book
prices.  It reasons that, but for its entry into the market, the
Publisher Defendants would have withheld their books from
Amazon.  As a result, there would have been no established $9.99
price to raise.  Apple argued in summation that, while its entry
into the market meant that e-books were now available at $14.99
and $12.99, without their entry those e-books would not have
been available at all.

140

This creative argument fails for several reasons.  While it is difficult to know how the threats in late 2009 of four of the Publishers to withhold e-books from Amazon would have played out in 2010 if Apple had not entered the scene, there is no reason to find that windowing would have become widespread, long-lasting, or effective.  Indeed, the Publishers (as well as Apple) realized that the delayed release of e-books was a foolish and even dangerous idea.  The two largest Publishers -- Random House and Penguin -- never announced an intention to withhold e-books from Amazon.  Those that did announce plans to window e-books only did so for 37 titles.  At least one Publisher did internal research that showed that it would never make up sales lost due to the windowing of e-books.  A Publisher had to assume that the lost sales were lost for good and that a competitor had gained a new reader in the process, unless the reader chose to purchase the e-book through the iBookstore or another e-tailer.  The Publishers also recognized, and Apple concurred, that the delayed release of e-books encouraged piracy and posed an existential threat to the legitimate e-book industry.

Second, there was never any threat (before Apple encouraged one) to withhold all e-books.  Many of the Publisher Defendants' most popular books were not, nor were they slated to be, windowed, including <u>True Compass</u>, the e-book Jobs bought for

$14.99 at the Launch.  Moreover, the Publisher Defendants raised the prices not just of New Releases but also of their backlist e-books.

Finally, it is ironic for Apple to claim credit for the end to windowing when it was Apple that encouraged the Publisher Defendants to present Amazon with a blanket threat of windowing for a seven month period, i.e., the defined term of a New Release in the Apple Agreements.  As Amazon testified, it was that threat, delivered simultaneously by five of the Big Six, that left it with no alternative but to sign agency agreements with each of them.  Viewed from any perspective, Apple's conduct led to higher consumer prices for e-books.

D. Characterization of the Evidence

Confronted with the substantial evidence of its participation in a conspiracy with the Publisher Defendants, Apple has offered a counter-narrative of the events that transpired in December 2009 and January 2010.  To the extent that its version of key events has not already been addressed, it will be done so here and treated as Apple's fourth principal defense.  Broadly speaking, Apple contends that the trial record shows that Apple acted independently and as a lawful participant in a series of negotiations that would be unexceptional for any new market entrant.

142

   In making these assertions Apple must surmount several
hurdles.  First and foremost, the Plaintiffs' reading of the
evidence is consistent with the documents.  There is a
voluminous documentary record in this case which repeatedly
demonstrates Apple's willingness to join with the Publisher
Defendants to eliminate retail price competition and raise the
prices for e-books.  The Opinion has quoted liberally from a
fraction of these documents.  The attempts by several witnesses
to circumnavigate this documentary record were entirely
unsuccessful and informed this Court's analysis of their
credibility.[66]

   Second, the circumstantial evidence provides ample
corroboration for the Plaintiffs' theory of the case.  There is
very little dispute about the circumstantial evidence, and Apple
has not been able to construct a persuasive alternative reading
of this evidence.

---

[66] This Opinion has already described several instances in which
testimony given by Cue and Sargent was unreliable.  Other
witnesses who were noteworthy for their lack of credibility
included Moerer, Saul, and Reidy.  Their demeanor changed
dramatically depending on whether Apple or the Plaintiffs were
questioning them; they were adamant in denials until confronted
with documents or their prior deposition testimony; instead of
answering questions in a straightforward manner, they would pick
apart the question and answer it narrowly or avoid answering it
altogether.  Thus, the findings in this Opinion are informed by
the documentary record, the circumstantial evidence, including
an understanding of the competitive landscape in which these
events were unfolding, and that portion of each witness'
testimony that appeared reliable and credible.

Finally, Apple is confronted with the fact that the conspiracy succeeded. It not only succeeded, it did so in record-setting time and at the precise moment that Apple entered the e-book market.

Apple's narrative, by contrast, ignores much of the evidence or relies on strained readings thereof. To adopt Apple's theory, a fact-finder would be confronted with the herculean task of explaining away reams of documents and blinking at the obvious. A few remaining examples of Apple's contentions concerning the evidence follow.

### 1. Initial Meetings with the Publishers

Apple repeatedly argued at trial that its initial round of meetings with the Publishers in mid-December 2009 was merely an information-gathering exercise. It emphasizes that no binding commitments were entered into at these meetings and that a draft contract was not even circulated until weeks after the meetings. While Apple hoped to add an announcement of the iBookstore to the Launch of the iPad on January 27, as of these meetings it had no idea whether that would be possible.

Apple's entry into the conspiracy had to start somewhere, and the evidence is that it started at those initial meetings in New York City with the Publishers. Apple is a sophisticated company and had done its homework before its team flew to New York from California. It understood the depth of the

144

Publishers' unhappiness with, and indeed fear of, the $9.99
price point and used that unhappiness and fear as its leverage.
While the Apple team did listen in those meetings (and in doing
so heard repeated expressions of anger at Amazon's pricing
strategy), Apple also came prepared with a script.  Using that
script, across all its meetings, it set out several of its own
conditions for entry into the market, but also offered the
enticement that it knew would be music to the Publishers' ears:
Apple was willing to sell its e-books at prices as high as
$14.99.  From that moment on, Apple had the Publishers' full
attention.

The suggestion that Apple came to those New York meetings
with no agenda is at odds with recitations of the meetings laid
out in the contemporaneous documentary record.  It is also at
odds with common sense, and any appreciation of the daunting
task that Apple had set for itself.  Cue and his team are
accomplished professionals.  Apple had been studying the
publishing industry for months.  Newspapers were prominently
featuring stories about the Publishers' battle with Amazon over
pricing.  Apple had less than two months to get commitments from
the Publishers that it could announce at the Launch.  Cue was
personally invested in making that happen.  The idea that Apple
was simply a passive participant in the coordinated meetings
that it had scheduled with the Publishers is not credible.

145

One could ask why Apple has taken pains to argue that the mid-December meetings were simply a commercial listening tour. It may matter to Apple because it is beyond dispute that Apple offered the Publishers a $14.99 price point at those meetings. Any finding that this was not a casual comment but a component of Apple's considered strategy confirms that Apple intended from the very beginning to assist the Publishers to shift the price of e-books upward.

### 2. Conspiracy by Telepathy

Apple asserts that there were too few meetings and telephone calls between Apple and any individual Publisher to establish its membership in the Publisher Defendants' conspiracy. Since there can be "no conspiracy by telepathy," Apple argues, there is insufficient evidence of a "meeting of the minds" to further any unlawful purpose between Apple and the Publisher Defendants.

Counting telephone calls during the key six-week period, particularly one that was interrupted by the Christmas and New Year holidays, is hardly a litmus test for knowing and intentional participation in a conspiracy. As Apple has observed, albeit in another context, it is the substance of the contacts, not their number, that counts.[67]

---

[67] While admitting that very few e-books were actually withheld from Amazon by the four Publishers, Apple's Cue observed at

But, it is worth observing that in the short time between December 15 and January 26, Cue made three separate trips to New York City from Cupertino. His last trip was unprecedented in length -- it lasted nine days -- and as Cue described, for that entire period, if he was not eating or sleeping, he was negotiating. He also sent members of his team to New York to meet with the Publishers when he was not there, such as Moerer's trip to New York in the days following Apple's distribution of the Draft Agreement.

Cue and the Publishers also exchanged many telephone calls. Some of the more dramatic of these calls have already been highlighted. For example, Cue called three Publishers in late December to confirm that they would be willing to adopt an agency model across all of their resellers of e-books if that were a pathway to higher prices. He told Hachette's Thomas over the telephone that Apple was providing "the best chance for publishers to challenge the 9.99 price point." Cue called Reidy on January 21 to enlist her help in convincing Macmillan's Sargent to execute the Agreement, and called Sargent to assist Macmillan's agency negotiations with Amazon.

And, of course, in this era, telephone calls are only one avenue of electronic communication. Cue and Moerer each

---

trial that what mattered was which books were withheld, not how many.

147

exchanged numerous e-mails with the Publishers, many of which corroborate in writing Apple's commitment to the Publisher Defendants' scheme to raise e-book prices, including Cue's January 16 e-mail to the Publisher Defendants providing them with "significantly more tiers and higher prices" for e-books; Cue's message reminding Sargent of his commitment to move Amazon to agency and asserting that he "didn't believe we are asking you to do anything, you haven't told us you are doing" in following through with that promise; and Cue's blunt appeal to HarperCollins that the "basic deal" Apple is providing to the Publishers with its Agreement is "new release hardback pricing maximums which are way higher than $9.99 -> &12.99 or $14.99 for most."

In any event, while this conspiracy was complex to execute, its terms were relatively simple and required no extended discussion.  The issue was whether Apple and the Publishers would join together to eliminate Amazon's power to set retail prices and then to raise prices to the point that Apple would permit.  The most hotly contested negotiations revolved around just how high those prices would go.  The risks and rewards of joining the conspiratorial enterprise were also easy to understand.  The evidence is overwhelming that Apple and the Publisher Defendants' "minds met" and they moved as one to achieve their conspiratorial objective.

### 3. Steve Jobs's Statements

Compelling evidence of Apple's participation in the conspiracy came from the words uttered by Steve Jobs, Apple's founder, CEO, and visionary. Apple has struggled mightily to reinterpret Jobs's statements in a way that will eliminate their bite. Its efforts have proven fruitless.

Jobs's statements to James Murdoch that he understood the Publishers' concerns that "Amazon's $9.99 price for new releases is eroding the value perception of their products . . . and they do not want this practice to continue," and that Apple was thus "willing to try at the [$12.99 and $14.99] prices we've proposed," underscored Apple's commitment to a scheme with the Publisher Defendants to raise e-book prices. Jobs's purchase of an e-book for $14.99 at the Launch, and his explanation to a reporter that day that Amazon's $9.99 price for the same book would be irrelevant because soon all prices will "be the same" is further evidence that Apple understood and intended that Amazon's ability to set retail prices would soon be eliminated. When Jobs told his biographer the next day that, in light of the MFN, the Publisher Defendants "went to Amazon and said, 'You're going to sign an agency contract or we're not going to give you the books,'" Jobs was referring to the fact that Sargent was in Seattle that very day to deliver Macmillan's ultimatum to Amazon.

Apple could find no effective way at trial to escape the
import of Jobs's remarks.  While Apple stressed particular
aspects of these statements, when taken as a whole and in
context the statements remain powerful evidence of
conspiratorial knowledge and intent.  For example, Apple pointed
to one line in Jobs's e-mail to James Murdoch where he muses
about Amazon's $9.99 price point, "who knows, maybe they are
right."  But, focusing on that one line ignores paragraphs of
statements, over two days of e-mails, in which Jobs tried to
persuade Murdoch, and through him HarperCollins, to join with
Apple in an effort to get control of and raise e-book prices.
The sentence also does nothing to controvert Jobs's intent to
raise e-book prices; it simply indicates his doubts over
consumers' reaction to these higher prices.  Jobs sums up his
argument to Murdoch by urging him to "[t]hrow in with apple and
see if we can all make a go of this to create a real mainstream
ebooks market at $12.99 and $14.99."  In this and every other
instance, Apple's efforts to explain away Jobs's remarks have
been futile.

### 4. The Publishers Raised Prices, Not Apple

Apple argues that, even if the Agreements "sharpened" the
Publishers' incentives to force Amazon to distribute their e-
books as an agent, at the end of the day it was the Publishers
who had to decide whether to convert to an agency distribution

150

system and it was the Publishers who had to decide whether to raise e-book prices once they were in charge of retail pricing. As Jobs maintained in response to consumer complaints, and as Cue asserted from the witness stand, Apple did not raise prices; the Publishers raised prices. Apple claims it should not be held liable for the "business decisions" the Publisher Defendants made in the early part of 2010.

Apple is correct that the conspiracy required the full participation of the Publisher Defendants if it were to achieve its goals. It is also correct that the Publishers wanted to change Amazon's pricing policies and to raise e-book prices, and that they had wanted to do that for many months before Apple arrived on the scene. But, those facts do not erase Apple's own intentions in entering into this scheme. Apple did not want to compete with Amazon on price and proposed to the Publishers a method through which both Apple and the Publishers could each achieve their goals.[68] Apple was an essential member of the charged conspiracy and was fully complicit in the scheme to raise e-book prices even though the Publisher Defendants also had their own roles to play.

---

[68] The record is equivocal on whether Apple itself desired higher e-book prices than those offered at Amazon. It is unequivocal though that Apple embraced higher prices so convincingly that the Publishers believed that Apple was content with, and even wanted, higher prices, and that Apple's cooperation with the Publisher Defendants enabled them to raise prices.

151

Apple also attempts to argue in this regard that it cannot
be held responsible for the Publisher Defendants' actions
because it never knew the Publishers were working together to
raise prices.  To the contrary, the evidence consistently points
not only to Apple's awareness but also its facilitation of the
Publisher Defendants' collective action.  From the beginning,
Apple conducted its campaign with the understanding that it
wanted all six, and needed at least four, of the Publishers to
join its terms.  Cue urged the Publisher Defendants' CEOs to
have discussions with one another to clarify aspects of the
Agreements or to convince others to sign on.  This enterprise
depended on joint action.  As Apple fully appreciated, the
Publishers required the protection offered by collective action
if they were to succeed in taking control over prices from
Amazon and changing the public's perception about how much books
should cost.

E. Per Se Liability

Apple strenuously objects to the Plaintiffs' contention
that this case may be analyzed as a per se violation of the
Sherman Act.  It asserts that there are two reasons why this
Court may only apply a rule of reason analysis.  The first
hinges on the fact that Apple is a vertical player vis-à-vis the
Publisher Defendants, and that courts apply the rule of reason
in assessing the legality of agreements between vertical players

152

in an industry.  Second, it contends that Plaintiffs' reliance on the traditional "hub and spoke" conspiracy cases which found per se violations of the antitrust laws, such as Toys "R" Us, 221 F.3d 928, and Interstate Circuit, 306 U.S. 208, is not appropriate here because Apple was a new market entrant and not a dominant player.  Both of these arguments fail.

While vertical restraints are subject to review under the rule of reason, Leegin, 551 U.S. at 907, Apple directly participated in a horizontal price-fixing conspiracy.  As a result, its conduct is per se unlawful.  The agreement between Apple and the Publisher Defendants is, "at root, a horizontal price restraint" subject to per se analysis.  In re: Elec. Books Antitrust Litig., 859 F. Supp. 2d 671, 685 (S.D.N.Y. 2012).  As such, it is not properly viewed as either a vertical price restraint or solely through the lens of traditional "hub and spoke" conspiracies.

In any event, the fact that Apple was not a dominant player in the relevant market in no way diminishes the instructive value of the traditional hub and spoke conspiracy cases here. Courts have never found that the vertical actor must be a dominant purchaser or supplier in order to be considered a traditional "hub," only that this is "generally" the case.  See Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 255 (3d Cir. 2010).  Moreover, as Apple has conceded in its

153

filings, the "hub" defendant's liability in those cases existed because "there was no doubt . . . that the 'hub' defendant was aware of the purported scheme -- the only question was whether the horizontal defendants agreed to it."  See Interstate Circuit, 306 U.S. at 222 (defendant organized and implemented the plan); Toys "R" Us, 221 F.3d at 933 (defendant communicated messages from manufacturer to manufacturer and "served as the central clearinghouse for complaints about breaches in the agreement").  Here we have every necessary component: with Apple's active encouragement and assistance, the Publisher Defendants agreed to work together to eliminate retail price competition and raise e-book prices, and again with Apple's knowing and active participation, they brought their scheme to fruition.

The observations of the Supreme Court in Interstate Circuit are equally apt here:

> [i]t was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it.  Each distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan.  They knew that the plan, if carried out, would result in a restraint of commerce, which . . . was unreasonable within the meaning of the Sherman Act, and knowing it, all participated in the plan.

306 U.S. at 226-27.

F. Avoiding a Dangerous Precedent

Finally, Apple warns that a ruling against Apple would set a dangerous precedent. It predicts that a finding that it violated the antitrust laws will deter entry into concentrated markets and punish innovation. It contends that its conduct was pro-competitive and created a healthier market. Censuring Apple for entering a tumultuous new market, in Apple's view, will have a "chilling and confounding . . . effect not only on commerce but specifically on content markets throughout this country."

It is certainly true that our nation's antitrust laws should be applied with care. Courts must be sensitive to the unique features of any market and the ambiguities of commercial conduct to avoid chilling lawful competition. Providing new entrants with the ability to access markets has long been a mainstay of our economy and any court should be wary of discouraging such access or interfering with the natural evolution of markets. See, e.g., United States v. Grinnell Corp., 384 U.S. 563, 589 (1966). As the Second Circuit observed in Capital Imaging, 996 F.2d 537, "[a]ntitrust law is not intended to be available as an over-the-counter cold remedy, because were its heavy power brought into play too readily it would not safeguard competition, but destroy it." Id. at 539.

It is not entirely clear to what Apple is alluding, however, when it describes its pro-competitive behavior and

155

creation of healthy competition.  If it is alluding to the Launch of the iPad, a revolutionary device that has encouraged innovation and competition, then its conduct can fairly be described as pro-competitive.  But, this case has been only incidentally about the iPad.  The iBookstore was not an essential feature of the iPad, and the iPad Launch would have occurred without any iBookstore.  It was the pre-existing, remarkable features of the iPad that made the iBookstore an obvious addition to the device.

If Apple is alluding to the fact that Amazon's Kindle bookstore was the dominant e-retailer for books in 2009, and that the arrival of the iBookstore created another e-retailer, that is true.  But, as this Opinion explains, Apple demanded, as a precondition of its entry into the market, that it would not have to compete with Amazon on price.  Thus, from the consumer's perspective -- a not unimportant perspective in the field of antitrust -- the arrival of the iBookstore brought less price competition and higher prices.[69]

If Apple is suggesting that Amazon was engaging in illegal, monopolistic practices, and that Apple's combination with the

---

[69] As for some of the notable features of the iBookstore itself, features such as a page curl, Apple was not the first to invent these concepts.  Nonetheless, having the creativity and commitment of Apple invested in the enhancement of a product like the iBookstore is extremely beneficial to consumers and competition.

Publisher Defendants to deprive a monopolist of some of its market power is pro-competitive and healthy for our economy, it is wrong. This trial has not been the occasion to decide whether Amazon's choice to sell NYT Bestsellers or other New Releases as loss leaders was an unfair trade practice or in any other way a violation of law. If it was, however, the remedy for illegal conduct is a complaint lodged with the proper law enforcement offices or a civil suit or both. Another company's alleged violation of antitrust laws is not an excuse for engaging in your own violations of law. Nor is suspicion that that may be occurring a defense to the claims litigated at this trial.

If Apple is suggesting that an adverse ruling necessarily implies that agency agreements, pricing tiers with caps, MFN clauses, or simultaneous negotiations with suppliers are improper, it is wrong. As explained above, the Plaintiffs have not argued and this Court has not found that any of these or other such components of Apple's entry into the market were wrongful, either alone or in combination. What was wrongful was the use of those components to facilitate a conspiracy with the Publisher Defendants.

It is doubtful that Apple is suggesting that the only way it could have entered the e-book market was to agree with the Publisher Defendants to raise e-book prices. Apple, often

157

through expert negotiations conducted by Cue, has entered many new content markets.  It did not attempt to argue or show at trial that the price of admission to new markets must be or is participation in illegal price-fixing schemes.

While a Court must take seriously a prediction that its decision will harm our nation's economy, particularly when made by skilled counsel on behalf of an esteemed company, it is difficult to see how competition will be stifled by the ruling in this Opinion.  This Opinion's findings arise from the specific events that unfolded in the trade e-book market as 2009 became 2010.  It does not seek to paint with a broader brush.

In the end, it is essential to remember that the antitrust laws were enacted for "the protection of competition, not competitors."  Brown Shoe Co. v. United States, 370 U.S. 294, 320 (1962).  The question in this case has always been a narrow one: whether Apple participated in a price-fixing scheme in violation of this country's antitrust laws.  Apple is liable here for facilitating and encouraging the Publisher Defendants' collective, illegal restraint of trade.  Through their conspiracy they forced Amazon (and other resellers) to relinquish retail pricing authority and then they raised retail e-book prices.  Those higher prices were not the result of regular market forces but of a scheme in which Apple was a full participant.

CONCLUSION

Based on the trial record, and for the reasons stated herein, this Court finds by a preponderance of the evidence that Apple conspired to restrain trade in violation of Section 1 of the Sherman Act and relevant state statutes to the extent those laws are congruent with Section 1.  A scheduling order will follow regarding the Plaintiffs' request for injunctive relief and damages.


SO ORDERED:

Dated:     New York, New York
           July 10, 2013

                            _____
                            DENISE COTE
                     United States District Judge

Appendix A



Calls Between Publisher Defendant CEOs
from December 1, 2009 to January 31, 2010

**Dec. 8, 2009**
Apple begins reaching out to publishers
(PX-0314)

**Dec. 15, 2009**
Apple holds initial meeting with Big Six publishers
(PX-0262)

**Jan. 4-5, 2010**
Apple sends identical e-mails to publishers proposing key terms
(PX-0021; PX-0473, PX-0476, PX-0041; PX-0040, PX-0306)

**Jan. 11, 2010**
Apple sends draft contracts to each publisher
(PX-0248; PX-0249; PX-0285; PX-0322; PX-0286)

**Jan. 21-22, 2010**
Apple's deadlines for publishers to commit to the deal
(PX-0707; PX-0042)

**Jan. 26, 2010**
All five publisher defendants have signed the agreement
(PX-0005)

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

               Plaintiff,

     v.

APPLE INC.,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12 Civ. 2826 (DLC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE STATE OF TEXAS,
THE STATE OF CONNECTICUT, *et al.*,

               Plaintiffs,

     v.

PENGUIN GROUP (USA) INC., *et al.*,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12 Civ. 3394 (DLC)

**APPLE INC.'S MEMORANDUM OF LAW IN RESPONSE TO
PLAINTIFF UNITED STATES' PROPOSED FINAL JUDGMENT AND
PLAINTIFF STATES' PROPOSED ORDER ENTERING PERMANENT INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

LEGAL STANDARD FOR INJUNCTIVE RELIEF ..................................................... 4

ARGUMENT .......................................................................................................... 6

I.    An Injunction Is Unnecessary Because Plaintiffs Have Already Achieved Their Legitimate Remedial Objectives ............................................................................ 6

II.   The Proposed Injunction Terms Are Unnecessary, Overbroad, Vague, and Punitive ........... 9

     A.   A Ten-Year External Compliance Monitorship Would Be Unprecedented and Unwarranted ............................................................................................ 9

     B.   The Proposed Regulation of the App Store Is Untethered to the Court's Findings or the Evidence Presented at Trial ................................................ 13

     C.   Plaintiffs' Regulation of Apple's Other Content Platforms Is Similarly Unwarranted ............................................................................................ 17

     D.   Any Injunction Should Apply Only to Apple's Relationships with the Publisher Defendants ............................................................................................... 20

     E.   Plaintiffs' Proposed Ten-Year Term is Punitive and Will Chill Competition ............. 21

     F.   Several Other Provisions of the Proposed Injunction Are Vague and Would Be Unconstitutional ...................................................................................... 23

APPLE'S PROPOSED REMEDY ............................................................................ 24

CONCLUSION ...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexander v. United States*,
    509 U.S. 544 (1993) ................................................................................................. 24

*American Needle, Inc. v. National Football League*,
    130 S. Ct. 2201 (2010) ..................................................................................... 3, 13, 14

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ................................................................................................. 16

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ............................................................................................. 15

*F. Hoffman-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004) ....................................................................................... 4, 6, 7, 8

*F.T.C. v. Colgate-Palmolive Co.*,
    380 U.S. 374 (1965) ....................................................................................... 11, 13, 14

*FCC v. Fox Television Stations, Inc.*,
    132 S. Ct. 2307 (2012) ......................................................................................... 6, 19

*Hartford-Empire Co. v. United States*,
    323 U.S. 386 (1945) ....................................................................................... 4, 5, 18, 21

*In the Matter of Toys "R" Us, Inc.*,
    1997 WL 832584 (F.T.C. Sept. 25, 1997) ............................................................... 11

*Int'l Salt Co. v. United States*,
    332 U.S. 392 (1947) ................................................................................................... 4

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ........................................................................................... 10, 19

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951) ................................................................................................. 5, 7

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984) ............................................................................................... 3, 12

*New York v. Microsoft Corp.*,
    224 F. Supp. 2d 76 (D.D.C. 2002) ................................................................ 5, 14, 16, 18, 22

*Pac. Bell Tel. v. LINKLINE Commc'ns*,
    555 U.S. 433 (2009) ................................................................................................. 14

*Schmidt v. Lessard*,
  414 U.S. 473 (1974) ........................................................................... 6, 19, 24

*Sorrell v. IMS Health, Inc.*,
  131 S. Ct. 2653 (2011) ........................................................................... 20, 24

*Standard Oil Co. of N.J. v. United States*,
  221 U.S. 1 (1911) ........................................................................................ 4

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ................................................................................... 12

*United States v. AMC Entm't, Inc.*,
  549 F.3d 760 (9th Cir. 2008) ................................................................... 6, 20

*United States v. Apple Inc.*,
  889 F. Supp. 2d 623 (S.D.N.Y. 2012) .................................................... 2, 7, 8

*United States v. AU Optronics Corp.*,
  No. 3:09-00110, (N.D. Cal. Oct. 2, 2012) ................................................... 10

*United States v. Blue Cross Blue Shield Mich.*,
  No. 2:10-cv-14155 (E.D. Mich. Mar. 25, 2013) ............................................ 5

*United States v. Columbia Artists Mgmt., Inc.*,
  662 F. Supp. 865 (S.D.N.Y. 1987) ............................................................... 5

*United States v. Concentrated Phosphate Export Ass'n, Inc.*,
  393 U.S. 199 (1968) ..................................................................................... 5

*United States v. Glaxo Grp.*,
  410 U.S. 52 (1973) ....................................................................................... 4

*United States v. Imperial Chem. Indus.*,
  105 F. Supp. 215 (S.D.N.Y. 1952) ...................................................... 4, 7, 9, 15

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ............................................................. 2, 4, 15

*United States v. Microsoft Corp.*,
  56 F.3d 1448 (D.C. Cir. 1995) ...................................................................... 2

*United States v. Nat'l Lead Co.*,
  332 U.S. 319 (1947) ................................................................................ 4, 11

*United States v. Or. State Med. Soc'y*,
  343 U.S. 325 (1952) .............................................................................. 5, 8, 17

*United States v. Visa U.S.A., Inc.*,
    163 F. Supp. 2d 322 (S.D.N.Y. 2001)........................................................... 5, 18

*United States v. W.T. Grant Co.*,
    345 U.S. 629 (1953).................................................................................. 5, 8, 18

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969).......................................................................................... 2

**Statutes**

15 U.S.C. §§ 1, 4.................................................................................................... 6

**Other Authorities**

2A Phillip E. Areeda & Herbert Hovenkamp,
    *Antitrust Law* (3d ed. 2010) ............................................................................ 4

*Guilty of Competition*,
    Wall St. J., July 11, 2013 ................................................................................. 1

L. Gordon Crovitz,
    *A Judge Convicts Apple of Competition*, Wall St. J., July 21, 2013 ......................... 1

Miriam Hechler Baer, *Governing Corporate Compliance*,
    50 B.C. L. Rev. 949 (2009)............................................................................ 12

Roger Parloff, *US v. Apple Could Go to the Supreme Court*,
    CNNMoney (June 5, 2013) ............................................................................... 1

Sharon Pian Chan, *Long Antitrust Saga Ends for Microsoft*,
    Seattle Times (May 11, 2001)........................................................................ 12

Steve Lohr & John Markoff,
    *Windows Is So Slow, But Why?*, N.Y. Times (Mar. 27, 2006) ............................ 12

*The E-Book Price-Fixing Conspiracy*,
    N.Y. Times, July 13, 2013 ............................................................................... 1

U.S. Dep't of Justice Antitrust Div.,
    *Antitrust Division Policy Guide to Merger Remedies* 4 (2011) ...................... 3, 4, 15

Vikramaditya Khanna & Timothy L. Dickinson,
    *The Corporate Monitor: The New Corporate Czar*,
    105 Mich. L. Rev. 1713 (2007)..................................................................... 12

## INTRODUCTION

Plaintiffs' proposed injunction is a draconian and punitive intrusion into Apple's business, wildly out of proportion to any adjudicated wrongdoing or potential harm. Plaintiffs propose a sweeping and unprecedented injunction as a tool to empower the Government to regulate Apple's businesses and potentially affect Apple's business relationships with thousands of partners across several markets. Plaintiffs' overreaching proposal would establish a vague new compliance regime—applicable only to Apple—with intrusive oversight lasting for ten years, going far beyond the legal issues in this case, injuring competition and consumers, and violating basic principles of fairness and due process. The resulting cost of this relief—not only in dollars but also lost opportunities for American businesses and consumers—would be vast.

Plaintiffs' theories of antitrust liability against Apple, as the Court recognized, arose "from the specific events that unfolded in the trade e-book market as 2009 became 2010." Op. at 158. The opinion explicitly "does not seek to paint with a broader brush." *Id.* But that is precisely what plaintiffs' proposed injunction seeks: to leverage the Court's findings to obtain an unwarranted and dangerous oversight of Apple's content businesses. Plaintiffs' antitrust theories are controversial and involve interpreting and harmonizing Supreme Court authority. Apple has strong arguments for appeal from this Court's July 10 ruling, which has generated significant debate and discussion.[1] But taking this Court's findings on their face for purposes of this injunction proceeding, the Court should reject plaintiffs' proposal for several reasons.

*First*, the proposed injunction seeks unnecessary relief for harms *already remedied* by the

---

[1] *See, e.g.*, L. Gordon Crovitz, *A Judge Convicts Apple of Competition*, Wall St. J., July 21, 2013, at A15; Editorial, *The E-Book Price-Fixing Conspiracy*, N.Y. Times, July 13, 2013, at A18 (Apple's agency agreements with the publishers "brought much-needed competition to the e-book marketplace .... That is healthier for the publishers and for consumers, too"); Editorial, *Guilty of Competition*, Wall St. J., July 11, 2013, at A14; Roger Parloff, *US v. Apple Could Go to the Supreme Court*, CNNMoney (June 5, 2013, 12:36 PM), http://tech.fortune.cnn.com/2013/06/05/us-v-apple-could-go-to-the-supreme-court/.

publishers' consent decrees. Those agreements required the publishers to terminate and renegotiate their agency agreements with Apple; eliminated the publishers' ability to use retail price MFNs for a five-year period; and prohibited the publishers from entering into agency agreements without discounting for a two-year period. The Court endorsed these terms, concluding they were "reasonably calculated to restore retail price competition to the market for trade e-books, to return prices to their competitive level, and to benefit e-books consumers and the public generally, at least as to the competitive harms alleged in the Complaint." *United States v. Apple Inc.*, 889 F. Supp. 2d 623, 632 (S.D.N.Y. 2012).

As a result of the publishers' consent decrees, there is no threat or recurrence of the conduct underlying the Court's finding of a Sherman Act violation. Because this Court is "not at liberty to enjoin 'all future [potential] violations of the antitrust laws … unrelated to violations found by the court'" (*United States v. Microsoft Corp.*, 56 F.3d 1448, 1460 (D.C. Cir. 1995) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132-33 (1969))), it should reject plaintiffs' proposal, which in very large part asks the Court to do just that.

*Second*, the proposed injunction contains broad, invasive, and vague provisions that are untethered to the actual findings of antitrust liability in this case, in violation of hornbook law. Indeed, plaintiffs' proposal flouts the requirement that the relief be "tailored to fit the wrong creating the occasion for the remedy." *United States v. Microsoft Corp.*, 253 F.3d 34, 107 (D.C. Cir. 2001) (en banc, per curiam). For example, plaintiffs' proposal would dictate terms for e-book retailer *apps* available through the App Store and regulate Apple's dealings with app providers, as well as in several other content markets. But there is no justification for this invasion into any of Apple's businesses that were not directly at issue in this lawsuit, for which no conspiracy allegations were made, and that were not found unlawful in the Court's decision.

Apple's unilateral conduct was not at issue, nor could it be as a matter of antitrust law. *See, e.g.*, *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201, 2209 & n. 2 (2010). Likewise, plaintiffs' extraordinary suggestion that the Court appoint an external monitor to oversee Apple for a ten-year period is wholly unjustified by law or fact and goes far beyond any "logical nexus" with the alleged violation. U.S. Dep't of Justice Antitrust Div., *Antitrust Division Policy Guide to Merger Remedies* 4 (2011) ("DOJ Policy Guide") ("There should be a close, logical nexus between the proposed remedy and the alleged violation—and the remedy should fit the violation and flow from the theory or theories of competitive harm").

As this Court recognized, "our nation's antitrust laws should be applied with care," with courts being "sensitive to the unique features of any market and the ambiguities of commercial conduct to avoid chilling lawful competition." Op. 155. Antitrust law's well-established concern for "deterr[ing] or penaliz[ing] perfectly legitimate conduct" (*Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)) makes equally clear that this Court must not enjoin lawful conduct or create sweeping remedies that chill such conduct for fear of a finding of contempt. The Court found that agency agreements generally, and the core terms here—MFN and price caps—are lawful and could be deemed competitive. Op. 132. But the proposed injunction would make these terms unavailable to Apple, even after the publishers' consent decrees expire, and would therefore harm Apple's ability to compete fairly with other retailers.

This Court also found that "Apple is one of America's most admired, dynamic, and successful technology companies," which has produced "innovative devices" popular around the world (Op. 26) and "transform[ed] American culture," *id.* at 30. Especially in these circumstances, the Court should impose a remedy that is "carefully tailored" to the alleged violation (DOJ Policy Guide at 3), not a sweeping mandate, disconnected from the issues,

evidence, and arguments in this case, that would hurt competition rather than foster it.

## LEGAL STANDARD FOR INJUNCTIVE RELIEF

Injunctive relief sought by the Government serves two related purposes: (1) "the 'undoing' of what the antitrust violation achieved," and (2) the "creat[ion of] a situation in which unrestrained competition can occur." 2A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶¶ 325a, 325c (3d ed. 2010). "The purpose of relief in an antitrust case is … [to] cure the ill effects of the illegal conduct, and assure the public freedom from its continuance." *United States v. Glaxo Grp.*, 410 U.S. 52, 64 (1973); *accord F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 170 (2004); *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 78 (1911).

Equally important is what a court's grant of relief may *not* do. "In an equity suit, the end to be served is not punishment of past transgression." *Int'l Salt Co. v. United States,* 332 U.S. 392, 401 (1947). "The purpose of the decree, therefore, is effective and fair enforcement, *not punishment*." *United States v. Nat'l Lead Co.*, 332 U.S. 319, 338 (1947) (emphasis added); *see also Hartford-Empire Co. v. United States*, 323 U.S. 386, 409 (1945) ("we may not impose penalties in the guise of preventing future violations"). As a result, the relief granted must "not embody harsh measures when less severe ones will do." Areeda, *supra*, ¶ 325a.

Any injunctive relief imposed "should be tailored to fit the wrong creating the occasion for the remedy." *Microsoft*, 253 F.3d at 107. "A court ... must base its relief on some clear indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended." *Id.* at 105. Thus, "[o]nly those provisions *reasonably necessary* to accomplish correction and adjustment of a dislocated competitive situation may be applied." *United States v. Imperial Chem. Indus.*, 105 F. Supp. 215, 220 (S.D.N.Y. 1952) (emphasis added); *see also* DOJ Policy Guide at 3-4. Injunctions should "not impose unnecessary restrictions," and "the procedure prescribed" should "not [be]

unduly burdensome." *Lorain Journal Co. v. United States*, 342 U.S. 143, 156 (1951). Courts have therefore rejected injunctions unnecessary to remedy a violation of Section 1. *See*, *e.g.*, *Hartford-Empire*, 323 U.S. at 413 ("The injunction as drawn is not directed at any combination, agreement or conspiracy"); *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 146 (D.D.C. 2002) ("There is no need to 'remedy' conduct for which no liability was ascribed"); *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 410 (S.D.N.Y. 2001) (rejecting provisions as "overbroad, uncertain, and risk prohibiting practices that may be on balance procompetitive").

A critical element in determining the need for injunctive restrictions is whether the challenged practices continue. *See United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The necessary determination is that there exists some cognizable danger of recurrent violation, something more than ... mere possibility"). Here, the actions were found unlawful only in the unique circumstances of the e-books market in 2009 and 2010, Op. 158, and are therefore unlikely to repeat. Since the "sole function" of an injunction "is to forestall future violations," there must be "a real threat of future violation." *United States v. Or. State Med. Soc'y*, 343 U.S. 325, 333 (1952). The "mere possibility" of a recurrent violation is insufficient. *W.T. Grant*, 345 U.S. at 633. Accordingly, courts have denied injunctive relief where the "likelihood of further violations is sufficiently remote to make injunctive relief unnecessary." *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203 (1968); *see*, *e.g.*, *W.T. Grant*, 345 U.S. at 633-36 (no injunctive relief where the challenged conduct was discontinued and defendants disclaimed any intention to revive them); *see also United States v. Blue Cross Blue Shield Mich.*, No. 2:10-cv-14155 (E.D. Mich. Mar. 25, 2013), ECF No. 246 (motion to dismiss action where challenged agreements were made void and ineffective); *United States v. Columbia Artists Mgmt., Inc.*, 662 F. Supp. 865, 866-67 (S.D.N.Y. 1987) (DOJ motion to terminate consent

order in light of changed circumstances in the industry).

Due process also constrains both the scope and terms of any injunction. Thus, injunctions, like any other remedy, must conform to the due process mandate that "the government provide citizens and other actors with sufficient notice as to what behavior complies with the law." *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 768 (9th Cir. 2008). Where an injunction burdens a defendant for conduct that took place "before the government gave fair notice" that such conduct violated the law, "the injunction violates due process." *Id.* at 762; *see also FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) ("regulated parties should know what is required of them so they may act accordingly"). Defendants must also receive fair notice of the precise *terms* of the injunction so they can order their conduct to avoid violating them (*see Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (per curiam) ("basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed")), which here cannot include punishment, given that neither Section 1 nor Section 4 of the Sherman Act authorizes punitive injunctions, *see* 15 U.S.C. §§ 1, 4.

## ARGUMENT

The proposed injunction is unnecessary, overbroad, vague, and punitive. The terms plaintiffs propose would violate the legal standard for injunctive relief and due process.

## I. An Injunction Is Unnecessary Because Plaintiffs Have Already Achieved Their Legitimate Remedial Objectives

The publishers' consent decrees have already accomplished the only legitimate objectives for plaintiffs' request for injunctive relief—"to obtain the relief necessary to protect the public from further anticompetitive conduct and to redress anticompetitive harm." *F. Hoffman-La Roche*, 542 U.S. at 170. The Court found that the consent decrees are "closely related to the violations alleged" in the case, and are aimed at "undoing the price-fixing conspiracy, ensuring

that price-fixing does not immediately reemerge, and ensuring compliance." *Apple*, 889 F. Supp. 2d at 632-33. In approving the decrees, the Court held that "it is reasonable to conclude that these remedies will result in a return to the pre-conspiracy status quo." *Id.* at 633.

The proposed injunction contains numerous unnecessary provisions for harms already remedied as a result of the publishers' consent decrees. It would require Apple to terminate its *current* agency agreements with the publisher defendants. Section IV.A. And for the next five years—three years longer than the corresponding term in the publishers' consent decrees—Apple would be enjoined from entering into any agreement with a publisher defendant "that restricts, limits, or impedes Apple's ability to set, alter, or reduce the Retail Price of any E-book or to offer price discounts," effectively ending its ability to enter into agency agreements. Section III.C. Apple would not be able to enforce, or enter into, any retail-price MFN in any agreement with any e-book publisher relating to the sale of e-books for five years. Sections III.A-B.

The Court's consent decrees already accomplish plaintiffs' objectives, and therefore achieve all that is "necessary to protect the public from further anticompetitive conduct." *F. Hoffman-La Roche*, 542 U.S. at 170; *see also Lorain Journal*, 342 U.S. at 156 ("While the decree should anticipate probabilities of the future, it is equally important that it do[es] not impose *unnecessary* restrictions") (emphasis added); *Imperial Chem. Indus.*, 105 F. Supp. at 220 ("Only those provisions *reasonably necessary* to accomplish correction and adjustment of a dislocated competitive situation may be applied") (emphasis added). The decrees "unravel[] both the [Apple] Agency Agreements and agreements with other e-book retailers implementing the broader shift to agency pricing." *Apple*, 889 F. Supp. 2d at 632.

Plaintiffs do not allege that any party has failed to comply with those decrees, or that Apple failed to cooperate; they therefore do not allege, let alone demonstrate, any "real threat of

future violation or a contemporary violation of a nature likely to continue or recur." *Or. State Med. Soc'y*, 343 U.S. at 333. As a result, there is no further need for injunctive relief at all beyond Apple's formally being bound by terms consistent with the prior decrees. *See*, *e.g.*, *W.T. Grant*, 345 U.S. at 633-36.

That is because plaintiffs have already obtained the relief necessary "to redress anticompetitive harm." *F. Hoffman-La Roche*, 542 U.S. at 170. As the Court found concerning the publishers, "[b]y effectively disallowing the Settling Defendants from using the agency model for at least two years, subject to limited exceptions, and from using Price MFNs for at least five, the proposed Final Judgment appears reasonably calculated to restore retail price competition to the market for trade e-books, to return prices to their competitive level, and to benefit e-books consumers and the public generally." *Apple*, 889 F. Supp. 2d at 632; *see also* Case No. 12 Civ. 2826, ECF Nos. 119, 259, 286-1.

Plaintiffs' proposal that Apple now be forced to terminate its *renegotiated* agreements with the publishers (*see* Section IV.A) cannot be justified. Plaintiffs nowhere point to facts revealed at trial (and subsequent to approval of the consent decrees) that require any relief beyond what the decrees provide. Nor could they: Average market prices were below pre-agency levels even by early 2011 and continued to decline thereafter; prices are by all accounts and appearances as low or lower today. *See*, *e.g.*, DX-719; Op. 122 n.61; Trial Tr. 1506:19-1507:1 (Ashenfelter); *id.* at 1510:19-1516:2; DX-473. And the publisher defendants' share of e-book sales has fallen, accounting for fewer than 30% of sales in March 2012. *See* DX-437. In this environment, where the consent decrees and new agreements have remedied the Section 1 violation that this Court found, forcing Apple to renegotiate lawful agreements is far from "reasonably necessary to accomplish correction and adjustment of" the alleged "dislocated

competitive situation." *Imperial Chem. Indus.*, 105 F. Supp. at 220.

## II.     The Proposed Injunction Terms Are Unnecessary, Overbroad, Vague, and Punitive

If the Court does issue an injunction, it should be narrowly tailored to the alleged unlawful conduct.  Plaintiffs' proposal includes an unwarranted ten-year external compliance monitorship, and regulates areas of Apple's business, like the App Store and Apple's relationships with providers of content other than e-books, which bear no relation to the wrongdoing alleged in this case.  These overbroad and vague terms violate principles of equity and antitrust law, as well as Apple's constitutional rights to fair notice of judicial penalties.

### A.     A Ten-Year External Compliance Monitorship Would Be Unprecedented and Unwarranted

Plaintiffs have grossly overreached in their proposal to appoint a third party to "monitor Apple's compliance with the terms of [the proposed] Final Judgment, to review and evaluate Apple's existing internal antitrust compliance policies and procedures, and to recommend to Apple changes to address any deficiencies in those policies and procedures."  Section VI.B.  The proposed provision effectively requests a decade-long roving mandate to parse *all* of Apple's business conduct, across all of its myriad businesses, for antitrust compliance.  Under the proposed injunction, the external monitor would have authority to conduct reviews into and report on all of Apple's internal antitrust compliance policies and procedures, and would be required to file quarterly reports regarding Apple's compliance with the final judgment for the entirety of the ten-year judgment period.  *See*, *e.g.*, Section V.E (requiring an annual antitrust compliance audit of all Apple officers and directors, as well as iBookstore employees); Section V.H (requiring Apple to turn over communications regarding noncompliance with the "Final Judgment *or* the antitrust laws"); Section VI.G (imposing a duty on the external monitor to turn over information regarding compliance with the "Final Judgment *or* the antitrust laws")

(emphasis added).  This unduly burdensome remedy is plainly punitive, not to mention out of proportion to the circumstances of this case, and it flies in the face of law and practice.

Apple is aware of only a single litigated price-fixing case in which the court imposed an external compliance monitorship as part of a final judgment:  *United States v. AU Optronics Corp.*, No. 3:09-00110, (N.D. Cal. Oct. 2, 2012), ECF No. 976 at 3.  But *AU Optronics* was a *criminal* case involving allegations of naked price-fixing.  *Id.*  And the Government argued that, "from its very inception, AUO's standard operating procedure has been collusion.  AUO has never known any other way of doing business and has never willingly operated lawfully."  ECF No. 948, at 53.  There was no conceivable procompetitive conduct associated with the Section 1 violation.  *See id.* at 1-7, 17-18.  And the defendant had "an inherent business culture of collusion" and "no antitrust compliance program whatsoever."  *Id.* at 54.  As a result, "[a] new corporate culture [had to] be created, and [the defendant had] neither the will nor the experience to institute these new business practices on its own."  *Id.* at 53.  Under these unusual and extreme circumstances, the Court imposed a three-year monitorship.  *Id.*, ECF No. 976, at 2-3.

The contrast with this case could not be clearer.  Far from having "an inherent business culture of collusion" and "never willingly operat[ing] lawfully," Apple is "an esteemed company" (Op. 158), a leading innovator, and one of the foremost contributors to economic growth in the nation.  Apple has an antitrust compliance program, which it has enhanced with a special antitrust legal department since the conduct that the Court found violated Section 1 in this case occurred.  And as this Court recognized, "having the creativity and commitment of Apple invested in the enhancement of a product like the iBookstore is extremely beneficial to consumers and competition."  Op. 156 n.69; *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 891 (2007) ("New products and new brands are essential to a dynamic

economy").  Plaintiffs' attempt to impose a more onerous and burdensome monitorship than was imposed in *AU Optronics* is nonsensical and unlawful.

Plaintiffs' proposed injunction seeks even broader relief than what was imposed in *Toys "R" Us*, where a "dominant" player with market power was enjoined from enforcing or entering into agreements that caused the anticompetitive restraints at issue, which were still largely in effect at the time of the remedy.  *See In the Matter of Toys "R" Us, Inc.*, 1997 WL 832584, at *48, *57, *77 (F.T.C. Sept. 25, 1997).  Given that "[e]ach of the provisions addresse[d] conduct that might be used by [Toys "R" Us] to perpetuate the restraint," the relief was "necessary to cause [Toys "R" Us] to discontinue the challenged conduct and dissipate the anticompetitive effects."  *Id.* at *58.  The FTC did not seek to appoint an independent compliance monitor.  *Id.*

During the parties' meet-and-confer session, plaintiffs suggested that the Court's credibility findings related to three Apple employees warrant a heavy-handed monitorship, but this fundamentally misunderstands the purpose of external monitoring of a defendant's compliance.[2]  An injunction must be tethered to the specific issues and violations warranting relief; a court's credibility findings do not give a plaintiff the right to smear the company and its personnel on a wholesale basis in order to obtain an overly broad and punitive injunction.  *See Nat'l Lead Co.*, 332 U.S. at 338 ("The purpose of the decree is ... not punishment."); *F.T.C. v. Colgate-Palmolive Co.*, 380 U.S. 374, 395-96 (1965) (injunction must "[have] a reasonable relation to the unlawful practices found to exist").  Plaintiffs' suggestion that Apple is somehow unsavory is not only baseless—the Court found that Apple was "esteemed" (Op. 158) and "admired" (*id.* at 26), and its products "revolutionary" (*id.* at 27)—but is also not a permissible

---

[2]  It also ignores the fact that the responsibility for internal supervision of compliance with the injunction would not be vested in any of the witnesses at trial, but, under Section V of the plaintiffs' proposal, in a newly-created post of Antitrust Compliance Officer who would report to the company's Audit Committee (or its equivalent).

basis for the severity of the proposed injunction. *Cf. State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422-23 (2003) (punishment may not be based on "dissimilar acts, independent from the acts upon which liability was premised"; rather, a "defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business").

External monitorships can be extremely costly and burdensome, and in a case like this would have few benefits. *See*, *e.g.*, Miriam Hechler Baer, *Governing Corporate Compliance*, 50 B.C. L. Rev. 949, 990 (2009) ("compliance regulation endures because it aids the two groups most invested in its proliferation: the DOJ and the compliance industry"); Vikramaditya Khanna & Timothy L. Dickinson, *The Corporate Monitor: The New Corporate Czar*, 105 Mich. L. Rev. 1713, 1728-29 (2007) (ongoing supervisory remedies more costly than other remedies). It makes no sense to inflict such an unprecedented burden on Apple, "one of America's most admired, dynamic, and successful technology companies." Op. 26. Requiring Apple to employ an external compliance monitor, and make all of Apple's officers, directors, and iBookstore employees log their communications with e-book retailers and publishers, will place bureaucratic tentacles around Apple's e-books business, stifling the company's ability to innovate and compete. *See Monsanto*, 465 U.S. at 763 ("A manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market"). Observers have pointed to such negative effects arising out of Microsoft's consent decree, which lasted for nearly ten years. *See*, *e.g.*, Sharon Pian Chan, *Long Antitrust Saga Ends for Microsoft*, Seattle Times (May 11, 2001), http://seattletimes.com/html/microsoft/2015029604_microsoft12.html (Microsoft became "much more cautious and much less aggressive," "slowly reacting to the world around them, rather than trying to get in there fast"); Steve Lohr & John Markoff, *Windows Is So Slow, But Why?*, N.Y. Times (Mar. 27, 2006),

http://www.nytimes.com/2006/03/27/technology/27soft.html (Microsoft's consent decree may have played a role in the delayed release of Microsoft's new operating system).

Rather than foster "unrestrained competition," the proposed injunction would undermine Apple's legitimate operations and slow procompetitive innovation throughout the technology sector. Its burdensome monitorship provision would force Apple into a rigid business posture affecting far more than its e-books operations, and its cost to the American economy could dwarf its cost to Apple. This provision serves neither the American consumer nor the purposes of antitrust law, and it should not be included in any injunction this Court issues.

B.     **The Proposed Regulation of the App Store Is Untethered to the Court's Findings or the Evidence Presented at Trial**

The proposed injunction also aims to dictate the terms on which Apple offers e-reader apps *on its App Store*, even though there was no evidence admitted at trial, or finding by the Court, that the conspiracy involved the App Store. Plaintiffs' proposed injunction would require Apple to carve out an exception to its blanket rule—applicable to the more than 850,000 apps in the App Store—that a commission applies to in-app sales of digital goods, and it would allow e-book retailers to make such sales commission-free. *See* Section IV.C. But although plaintiffs' proposed findings of fact included allegations regarding the App Store's treatment of e-book retailer apps (ECF No. 233-1 ¶¶ 35, 203), the evidence cited in support of those proposed findings (which did not involve an alleged conspiracy) was not admitted at trial, and the claim was effectively abandoned. The Court should therefore reject this proposed term in the injunction, because it is not based on the evidence or the Court's findings and is unrelated to the Court's underlying liability finding. *See Colgate-Palmolive*, 380 U.S. at 394-95 (injunction must "[have] a reasonable relation to the unlawful practices found to exist"); *American Needle*, 130 S. Ct. at 2009.

Apple is under no duty to allow other retailers to offer apps on the iPad in the first place, much less on terms that subsidize their operations. *Pac. Bell Tel. v. LINKLINE Commc'ns*, 555 U.S. 433, 450 (2009) ("if a firm has no antitrust duty to deal with its competitors at wholesale, it certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous"). Nevertheless, Apple allows all e-book retailer apps that are compliant with its policies—including those offered by Amazon, Barnes & Noble and other competing e-book retailers—to be offered in its App Store. Trial Tr. 1908:5-1909:21 (Cue). It also permits consumers to download e-books purchased through another e-book retailer's website or bookstore onto its e-reader devices without charge.

There was no evidence admitted at trial, and certainly no finding by this Court, that Apple's general policy requiring e-book retailers to pay a commission on in-app digital sales was part of the conspiracy that this Court found. Likewise, there is no evidence that Apple conspired to restrain the distribution of e-book apps or to impose less favorable terms on such apps. Rather, the Court found that Apple had an *independent, non-conspiratorial* preference for making e-book sales through the iBookstore over the App Store to avoid customer confusion. *See* Op. 28 ("By November 2009, Apple … concluded that selling e-books as individual apps was 'flawed'"). This cannot support an antitrust claim. *See American Needle*, 130 S. Ct. at 2209.

Without any basis in the evidence or the Court's findings, the proposed regulation of the App Store is simply outrageous and cannot be included in an injunction. An injunction must bear a "reasonable relation to the unlawful practices found to exist" (*Colgate-Palmolive*, 380 U.S. at 394-95), and "[t]here is no need to 'remedy' conduct for which no liability was ascribed," *Microsoft*, 224 F. Supp. 2d at 146. The court should reject these proposed terms, which are not

remotely consistent with plaintiffs' liability case. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). In other words, "[t]here should be a close, logical nexus between the proposed remedy and the alleged violation—and the remedy should fit the violation and flow from the theory or theories of competitive harm." DOJ Policy Guide at 4.

Plaintiffs suggested during the parties' meet-and-confer that Section IV.C is justified by the Court's observation that "Cue attributed Random House's capitulation in part to 'the fact that I prevented an app from Random House from going live in the app store this week.'" Op. 101. But the Court's remark was made merely in the context of explaining how Random House's experience "confirms each of the observations just made about the prices and sales of the five Publisher Defendants" (*id.* at 100), *not* in expounding the scope of the violation or the nature of the conspiracy. It also had nothing to do with other e-book retailers and their apps. The speculation of an Apple witness regarding the motivation of a non-defendant hardly justifies plaintiffs' fossilizing proposal.[3] Because the Court's observation was not a basis for the liability finding, it cannot support the onerous and punitive injunction plaintiffs seek to impose. *See Microsoft*, 253 F.3d at 107 (requiring a "significant causal connection between the conduct enjoined or mandated and the violation").

Nor would regulating the App Store serve to remedy a "dislocated competitive situation" (*Imperial Chem. Indus.*, 105 F. Supp. at 220), as is necessary to warrant an injunction. In fact, the App Store indisputably benefits the nation's economy. *See* DX-714 ¶ 20 (Cue Decl) (by

---

[3] This is especially so when there is no dispute about Random House's motivation for adopting agency. The only Random House witness at trial, executive Madeline McIntosh, explained that: "Even though we received short-term benefits by staying on a wholesale model with Amazon, Random House ultimately decided that its interests would be best served by using an agency model with e-retailers. That decision was primarily driven by our relationships with bricks-and-mortar resellers, such as Barnes & Noble, Books-a-Million, Indigo, and independent bookstores." DX-713 ¶ 23 (McIntosh Decl.). Plaintiffs did not dispute this, did not argue that Ms. McIntosh was "not a truth teller," (Trial Tr.. 1638:6-10), and declined to cross-examine her (and dropped Random House CEO Markus Dohle as a witness) because "we do not believe that Ms. McIntosh's affidavit has any bearing on any issues that … concern matters at issue now," *id.* at 1623:23-1624:1.

Spring 2013, consumers had downloaded 40 billion apps). Rather, this requirement would promote a competitive imbalance and serve to entrench Amazon's dominant position. To the extent the injunction would give Amazon the advantage of in-app purchasing through a hyperlink without requiring it to pay Apple for the privilege of direct access to Apple's iPad customers, the injunction simply protects Amazon—"the dominant e-retailer for books" (Op. 156)—from competition. But the purpose of the antitrust laws is "the protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962); *see also Microsoft*, 224 F. Supp. 2d at 185 (proposed injunction terms "antithetical to the goal of the remedy" where they "will provide significant benefit to competitors, but have not been shown to benefit competition"). The Court should reject the provision which, "[r]ather than rectify[ing] injury to consumers caused by diminished competition ... merely serve[s] to shield [defendant's] competitors from the rigors of the marketplace." *Microsoft*, 224 F. Supp. 2d at 185.

Similarly, prohibiting Apple from negotiating certain terms that are available to its competitors, such as retail price MFNs with non-defendant publishers, or restrictions on their own ability to set prices and offer discounts after the publisher consent decrees expire, would place Apple at a competitive disadvantage by limiting its flexibility to choose a business model. *Cf.* DX-714 ¶ 64 (Amazon, as a large book retailer, could use its leverage to get more favorable terms than Apple could negotiate); Trial Tr. 1824:2-13 (Cue).[4] These provisions seek to punish Apple and harm competition rather than correct any wrongdoing or benefit consumers.

Plaintiffs' proposal that Apple's commercial approach to existing e-book apps be frozen

---

[4] This is not some theoretical concern. Amazon remains the largest physical and e-book retailer, with a 65% share of the e-book market. It has negotiated business model and price MFNs, price caps, exclusivity of content from publishers and authors, and multi-year agreements. There was substantial evidence from publishers of both actual and feared retaliation across all of Amazon's business activity. There is absolutely no basis in the record for the proposition that Amazon was harmed by its switch to agency, or that Apple should be judicially handicapped in order for Amazon to have a fair opportunity to compete on the merits.

in amber for 10 years (*see* Section IV.B) also is unrelated to any violation found by the Court and is not necessary to "forestall future violations" of the antitrust laws. *Or. State Med. Soc'y*, 343 U.S. at 333. There are a host of legitimate reasons why Apple, in operating the App Store, might seek over time to alter terms or even seek to migrate e-book apps to the iBookstore. There is no connection between Apple's treatment of then-existing e-book apps and the actual antitrust violation that the Court found, and the Court should therefore reject the proposed injunction.

### C. Plaintiffs' Regulation of Apple's Other Content Platforms Is Similarly Unwarranted

Plaintiffs seek to regulate every one of Apple's content offerings, even though there is no connection whatsoever between those businesses and the Court's findings in this case. Plaintiffs would prohibit Apple from entering into or maintaining "any agreement with any E-book Publisher or *supplier of any other form of content* (e.g., music, other audio, movies, television shows, or apps) where such agreement likely will increase, fix, or set the price at which other E-book Retailers or retailers of other forms of content can acquire or sell E-books or other forms of content" for the entire ten-year period of the judgment. Section III.F (emphasis added). Plaintiffs would also require Apple to provide "any information that reasonably suggests to Apple that its *suppliers of any form of content* (e.g., books, music, other audio, movies, television shows, or apps) have impermissibly coordinated or are impermissibly coordinating on the terms on which they supply or offer their content to Apple or to any other Person." Section IV.D (emphasis added). This absurdly broad proposal is not only disconnected from any evidence adduced at trial or findings made by this Court, but would open Apple up to liability in virtually every content market for the actions of content producers, over which it has no control.

Neither the evidentiary record nor the Court's opinion offers any support for bridling any content businesses other than the iBookstore. The relevant market in the case is trade e-books in

the United States.  Op. 121 n.60.  The Court found that Apple "orchestrate[ed]" a conspiracy in that market to "eliminate retail price competition in order to raise e-book prices."  *id.* at 9.  While Apple strongly disagrees with this conclusion, no aspect of it or the Court's opinion could possibly justify a broad intrusion into any of Apple's businesses unrelated to the allegations and evidence in this case.  An injunction cannot be imposed that would subject Apple to contempt for agreements that have effects *outside of the market* that was the focus of this case (trade e-books), and for conduct neither related to any conspiracy, nor circumscribed by antitrust law.  *See W.T. Grant* , 345 U.S. at 635; *Hartford-Empire*, 323 U.S. at 413; *Visa U.S.A.*, 163 F. Supp. 2d at 410. Courts have roundly rejected proposed remedies that "venture[] into areas of conduct which, at best, are only tangentially related to the conduct for which [defendant] has been found liable."  *Microsoft*, 224 F. Supp. 2d at 144 (rejecting plaintiffs' proposed remedial provisions that "bear only a remote relationship to the liability findings").

Section III.F of the proposed injunction goes far beyond what plaintiffs have previously proposed and anything that could possibly be justified.  As plaintiffs conceded before trial, the only basis for a remedy extending to Apple's other businesses is "to ensure that Apple does not operate its other businesses such as the App Store in a manner that allows Apple to evade the purposes of the decree *and limit e-book competition*."  ECF No. 233-2 ¶ 88 (emphasis added).

Nor can plaintiffs take Apple's other content businesses captive on the ground that Apple employed similar negotiation strategies in other markets.  The Court's decision specifically and expressly refused to find these negotiation tactics themselves illegal—holding, for example, that "entirely lawful contracts may include an MFN, price caps, or pricing tiers," and that it is "not illegal for a company to adopt a form 'click-through' contract, negotiate with all suppliers at the same time, or share certain information with them."  Op. 132.  Although the Court further

concluded that in *this* case, Apple had used these lawful business practices to facilitate a specific conspiracy in the e-books market among the publisher defendants (*see id.* at 132, 157)—in no way did the Court find that Apple's negotiation strategy created even a risk of collusive activity in any other content market. *See id.* at 158 ("The question in this case has always been a narrow one"). The Court stated specifically that it did "not seek to paint with a broader brush." *Id.*

Section III.F is also alarmingly vague. It would force Apple to guess whether its business agreements with any individual content supplier "likely will increase" the prices at which other retailers "can … sell E-books or other forms of content." Section III.F. But "[m]any decisions a [seller] makes and carries out through concerted action can lead to higher prices. A [seller] might, for example, contract with different suppliers to obtain better inputs that improve product quality.… Yet no one would think these actions violate the Sherman Act because they lead to higher prices." *Leegin*, 551 U.S. at 896-97. Under the proposed injunction, Apple would risk contempt if any competing retailer made an *independent* and *perfectly lawful* decision to match such pricing. Similarly, Apple would be at risk if the price it agreed to pay for content convinced a supplier to hold out for a comparable price from its other customers (since "such agreement likely will increase, fix or set the price at with other [retailers] can acquire … content," Section III.F), a scenario that is not only perfectly lawful but is an ordinary attribute of a competitive market. Apple should not be open to potential liability for this perfectly lawful conduct.

This section's broad and vague restrictions also violate due process. "Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt*, 414 U.S. at 476. This "requirement of clarity in regulation is essential to the protections provided by the Due Process Clause." *Fox Television Stations, Inc.*, 132 S. Ct. 2307 at 2317. A corporation

laboring under an injunction is "entitled to know the rules by which the game will be played." *AMC Entm't, Inc.*, 549 F.3d at 768.

> **D.** **Any Injunction Should Apply Only to Apple's Relationships with the Publisher Defendants**

The proposed injunction would apply broadly to the thousands of independent and self-publishers who have relationships with Apple but who had no involvement in the conspiracy the Court found. The Court did not condemn the terms of Apple's agency agreements, or its negotiation tactics, as inherently illegal. *See* Op. 132; *id.* at 157. Rather, what was "wrongful," the Court found, "was the *use* of those components *to facilitate a conspiracy with the Publisher Defendants*." *Id.* at 157 (emphasis added). Nevertheless, the proposed injunction would place a five-year blanket prohibition on Apple's enforcing or entering into any agreement with *any* e-book publisher relating to the sale of e-books that contains a retail price MFN—thereby interfering with the contractual rights of thousands of publishers who are not parties to this case. *See* Sections III.A-B. While plaintiffs have disclaimed any such intent, the injunction is vague enough that it could also effectively prohibit Apple from employing price caps in its agreements with non-defendant e-book publishers for a period of ten years. *See* Section III.F.

Plaintiffs also seek to place oversight on communications between all of Apple's iBookstore employees and *all* e-book publishers. *See* Section V.I. All such terms reach well beyond what is reasonably necessary to eliminate collusion between Apple and the publisher defendants with regard to their e-book prices and could chill protected commercial speech as well as procompetitive conduct. *See Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2659 (2011) ("Speech in aid of … marketing" subject to heightened scrutiny).

Plaintiffs presented no proof, and the Court's opinion presents no findings, in support of an actual or potential conspiracy between Apple and non-defendant publishers to raise trade e-

book prices.  Far from evincing a desire on the part of these publishers to raise prices, the undisputed evidence demonstrated that independent publishers' and self-publishers' e-book prices *fell* following implementation of the Apple agency agreements.  *See* Op. 122 n.61; Trial Tr. 1506:19-1507:1 (Ashenfelter); *id.* at 1510:19-1516:2; DX-719; DX-473.  Moreover, the evidence did not support a finding that Apple itself actually desired higher e-book prices.  *See* Op. 151 n.68 ("The record is equivocal on whether Apple itself desired higher e-book prices than those offered at Amazon").  Nor did plaintiffs allege that Apple could influence Amazon's business model by having an MFN and/or price caps in its contracts with these other publishers.  In fact, evidence presented at trial demonstrated that with the exception of the publisher defendants and Random House, all publishers with agency agreements with Apple with price caps and MFNs employ a wholesale model with Amazon.  *See*, *e.g.*, Trial Tr. 835:10-15 (Porco); *see also* DX-317; DX-331; DX-332.

To the extent, therefore, that the proposed remedy would restrict Apple's ability to contract with parties outside any alleged conspiracy, it bears no logical nexus to the violation or anticompetitive harm and is not warranted.  *See Hartford-Empire*, 323 U.S. at 413 (modifying injunction that "binds every defendant forever irrespective of his connection with any other or of the independence of his action").

### E.  Plaintiffs' Proposed Ten-Year Term is Punitive and Will Chill Competition

Plaintiffs' proposed injunction exacerbates all of the foregoing concerns by imposing an unprecedented ten-year term on the entire judgment.  Such a lengthy injunction is unnecessary and would be improper, given the unique circumstances surrounding the violation the Court found, the nascent state of the e-book business, the lawfulness and procompetitive nature of the underlying contract terms, and the fact that such a time period was unnecessary with respect to Apple's co-conspirators, who actually set all the prices challenged.  Indeed, the publishers'

consent decrees have five-year terms, with some of their more restrictive provisions, such as the prohibition on agency agreements, limited to two years.  *See* ECF Nos. 119, 259, 286-1.  Two years is twice the length of the Apple agency agreements, which carried a short, one-year term. The Court's ruling thus does not anticipate, let alone require, a hand in the market well beyond the "specific events that unfolded in the trade e-book market as 2009 became 2010" and lasting into the next decade.  Op. 158.

Plaintiffs' ten-year term will only serve to stifle competition, not enhance it.  For example, placing a vague, ten-year restriction on Apple's ability to enter into certain agreements with digital content suppliers (Section III.F) will undoubtedly have a chilling effect on the types of agreements that Apple enters into across its business, and will affect Apple's decision to enter into new content markets, or expand in existing ones, regardless of any potential conspiracy. This, for sure, will harm consumers.

The benefits of plaintiffs' onerous terms are also doubtful.  Not only are many of them unrelated to the alleged wrongdoing, as explained above, but technology changes quickly, and the technology at issue in this case will likely be obsolete before the ten-year term expires.   The chilling effect of injunctive relief is all the more alarming where, as here, the industry at issue is marked by rapid evolution.  Thus, in *New York v. Microsoft Corp.*, the court specifically rejected plaintiffs' proposed ten-year term for the remedy where "the industry at issue in this case is remarkable for its constant and rapid change."  224 F. Supp. 2d at 184.  The court observed that "[i]mposing a remedy in this case is not unlike trying to shoe a galloping horse," and acknowledged that "[w]ere the Court to impose a ten-year term, it is likely that, by the latter half of the term, the market will have long since sent the horse to pasture in favor of more advanced technology."  *Id.*; *see also id.* ("it is beyond the capacity of this Court … to craft a remedy in

2002, for antitrust violations which commenced in the mid-1990s, which will be appropriately tailored to the needs of a rapidly changing industry in 2012").  Here, plaintiffs' proposed onerous terms are both harmful in the short term and, due to the pace of digital innovation, likely to be obsolete before the ten-year term expires.

## F.    Several Other Provisions of the Proposed Injunction Are Vague and Would Be Unconstitutional

The proposed injunction also places unnecessary restrictions—much broader than analogous provisions in the publishers' consent decrees—on Apple's ability to negotiate and communicate with e-book publishers, potentially subjecting Apple to contempt for entirely lawful and necessary business practices.

First, the injunction would prohibit Apple from retaliating against, punishing, or threatening to punish an e-book publisher for refusing to enter into "an agreement with Apple relating to the sale of E-books" or "for the terms on which the E-book publisher sells E-books through any other E-book retailer."   Section III.D.  This prohibition is vague and susceptible to mischief by enterprising publishers who could easily transform this provision from a shield to a sword.  For example, if Apple were to resist a contractual term pressed by a publisher, the publisher could accuse Apple of refusing the term in "retaliation" to "punish" the publisher for its deal with another e-book retailer.  Apple would then face potential contempt, despite legitimate business justifications for its refusal.  The parallel provision in the publisher consent decrees is limited to retaliation against an e-book retailer for conduct that the publisher defendant was prevented by the decree from limiting or restricting.  *See*, *e.g.*, ECF No. 119 (HarperCollins, Hachette, Simon & Schuster Final Judgments), Section V.D.  Thus, there was some limiting principle tethering the restriction to the conduct at issue.  By contrast, the proposed injunction leaves Apple to speculate helplessly about which of its innumerable business decisions affecting

competitors will expose it to "the threat of judicial punishment." *Schmidt*, 414 U.S. at 476. Due process and "basic fairness" demand better. *Id.*

The proposed injunction would also prohibit Apple from communicating, directly or indirectly, to any e-book publisher "any non-public competitively sensitive information it learns from any other E-book publisher," including "present" retail prices and a wide variety of other (specified) data and information. *See* Section III.E. This provision is drafted so broadly that it could prohibit Apple from even listing the price of an e-book (*i.e.*, the present retail price) on the iBookstore. The publisher consent decrees are tailored to address this problem by providing that publisher defendants are not prohibited from communicating "the cover prices or wholesale or retail prices of books sold in any format to potential purchasers," and by specifying a number of other exceptions. *See* ECF No. 119, Section V.F. But no such limitation or exception appears in the proposed injunction, even though "[s]peech in aid of … marketing" is "protected by the Free Speech Clause of the First Amendment." *Sorrell*, 131 S. Ct. at 2659. Indeed, "permanent injunctions ... are classic examples of prior restraints" that trigger even "greater protection" than subsequent punishment. *Alexander v. United States*, 509 U.S. 544, 550 (1993). Plaintiffs have not explained how their proposed restriction of commercial speech could withstand such "heightened judicial scrutiny." *Sorrell*, 131 S. Ct. at 2659.

Significantly, both these restrictions would remain in place for ten years, placing Apple at a competitive disadvantage vis-à-vis both its negotiating counterparties (*i.e.*, e-book publishers), as well as other e-book retailers who do not face similar restraints. At a minimum, these provisions should be reduced to five years, consistent with the publisher decrees, and should be redrafted to conform with the publisher consent decree terms.

## APPLE'S PROPOSED REMEDY

Apple does not believe it violated the antitrust laws, and, in any event, the conduct for

which the Court found it liable has ended and cannot recur as a result of the publishers' consent decrees. In light of these facts, no further injunction is warranted. However, if the Court does issue an injunction, its terms should be narrowly tailored to redress the specific conduct this Court found anticompetitive.

A potentially valid injunction could include: (1) reasonable limitations on Apple's ability to share information (akin to the publishers' consent decrees, *see* ECF No. 259 at 12-13; ECF No. 119 at 12-13; ECF No. 174-1 at 11-12); (2) a prohibition, tracking the publishers' consent decrees, on retail price MFNs in agreements with the publisher defendants; and (3) reasonable antitrust training obligations for Apple, lasting a reasonable term. No further relief can be justified under the legal standard governing antitrust injunctions or the Constitution.

## CONCLUSION

The Court should reject plaintiffs' proposed injunction outright, or in the alternative enter a narrower and more modest injunction that is carefully tailored to the Court's findings, the legal theories and issues in the case, and the evidence admitted at trial.

Dated: August 2, 2013                                      Respectfully submitted,


By:      _____/s/_____
         Orin Snyder
         Lisa H. Rubin
         Gibson, Dunn & Crutcher, LLP
         200 Park Avenue, 47th Floor
         New York, NY 10166
         (212) 351-4000
         osnyder@gibsondunn.com

         Daniel G. Swanson (*Pro Hac Vice*)
         Daniel S. Floyd (*Pro Hac Vice*)
         Gibson, Dunn & Crutcher, LLP
         333 South Grand Avenue
         Los Angeles, CA 90071
         (213) 229-7000

dfloyd@gibsondunn.com

Cynthia Richman (*Pro Hac Vice*)
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
(202) 955-8500
crichman@gibsondunn.com

Howard E. Heiss
Edward N. Moss
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY  10036
(212) 326-2000
hheiss@omm.com

*On behalf of Defendant Apple Inc.*

# EXHIBIT D

D8r9usaa

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                    Plaintiff,

5           v.                              12 Civ. 2826 (DC)

6   APPLE, INC., *et al.*,

7                    Defendants.

8   ------------------------------x

9                                          August 27, 2013
                                           2:00 p.m.
10  Before:

11                  HON. DENISE COTE,

12                                         District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

D8r9usaa

1    Strike the phrase "consultants, accountants, attorneys, or

2    other."

3            That takes us to the signature line where there is

4    that offending middle initial.

5            So, I think it would be important for counsel to have

6    time to look at all of this, to talk with each other, hopefully

7    give me a revised proposed injunction, preserving all of the

8    objections they've all made before and requests they've all

9    made before but understanding that this is my ruling on the

10   merits of those issues, agreement on the language.  Obviously

11   if you have continued disagreement on language, you would feel

12   free to present that too.

13           I think you need to read through this all carefully to

14   make sure it's coherent and complete.  And I think you should

15   in particular feel free to revise further the section on the

16   monitor.  Because, as you can tell, I've reshaped that

17   position.  And you need to reflect on the two tasks the monitor

18   would now have, which are -- one is the same but one is a

19   replacement for one of the requests the government had made.

20           I think what we should do is take a break, give you a

21   chance to consult among yourselves, and then come back.  If you

22   wish to be heard about any aspect of this now, fine.  But I

23   would like to sign this document next week.  So that's my

24   timetable.

25           Shall we say ten minutes.

1  Court's desire not to go farther than necessary to achieve the

2  objectives in this case.

3          I would urge the Court -- you put your finger on a

4  point we had made regarding section III(E)(b) which is the

5  provision that included the language about communications

6  regarding pricing.  And that provision, that's the one --

7          THE COURT:  We're on page 6?

8          MR. BOUTROUS:  Yes.  Thank you.  On page six.

9          Because it's very confusing to talk about

10  communications concerning past, present, or future prices.  And

11  we had suggested in our version that it be limited to future

12  prices.  And so I think the court's suggestion with

13  Mr. Buterman I think makes sense.  That was, in fact, one of

14  our suggestions.  I do think that that would be a good change.

15          And, again, I guess I should preface all of this with

16  we're reserving all our objections.  But I think the Court is

17  right, that it's strange to suggest there should be limits on

18  communications regarding past activity.

19          THE COURT:  Well, not if it's strategies.  The problem

20  is I think with subsection (b) is it's doing a lot of different

21  work.  There's probably very little reason to discuss another

22  publisher's strategies, be that past present or future.  But --

23          MR. BOUTROUS:  Your Honor, I had the same thought when

24  I was reviewing this, making our suggestions.  But I think (a)

25  covers that, business or strategies.  So it restricts

# EXHIBIT E

USDC SDNY
DOCUMENT
ELECTRONICALLY
DATE...
9/5/13

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 1:12-CV-2826 |
| ) | |
| v. ) | |
| ) | **PLAINTIFF UNITED STATES'** |
| APPLE, INC., *et al.*, ) | **FINAL JUDGMENT** |
| ) | |
| Defendants. ) | and |
| ) | |
| THE STATE OF TEXAS, *et al.*, ) | **PLAINTIFF STATES'** |
| ) | **ORDER ENTERING** |
| Plaintiffs, ) | **PERMANENT INJUNCTION** |
| ) | |
| v. ) | |
| ) | Civil Action No. 1:12-CV-3394[1] |
| PENGUIN GROUP (USA) INC., *et al.*, ) | |
| ) | |
| Defendants. ) | |

DENISE COTE,
UNITED STATES DISTRICT JUDGE

## I.  DEFINITIONS

As used in this Final Judgment and Order Entering Permanent Injunction:

A.       "Agency Agreement" means an agreement between an E-book Publisher and an

E-book Retailer under which the Retailer acts as an agent of the Publisher and is paid a

---

[1]  Pursuant to the agreement of the parties and Court order, the proceedings in *Texas et al. v. Penguin Group (USA) Inc. et al.*, Civ. A. No. 1:12-CV-3394, have been bifurcated.   Issues related to non-injunctive relief, including damages and civil penalties, will be addressed in subsequent proceedings.

commission (or a portion of the Retail Price) in connection with the sale of one or more of the Publisher's E-books.

      B.     "Apple" means Apple, Inc.

      C.     "E-book" means an electronically formatted book designed to be read on a computer, a handheld device, or other electronic devices capable of visually displaying E-books.

      D.     "E-book App" means a software application sold or distributed through Apple's "App Store" relating to the reading, browsing, purchase, sale, recommendation, selection, or cataloging of any book or E-book.

      E.     "E-book Publisher" means any Person that, by virtue of a contract or other relationship with an E-book's author or other rights holder, owns or controls the necessary copyright or other authority (or asserts such ownership or control) over any E-book sufficient to distribute the E-book within the United States to E-book Retailers and to permit such E-book Retailers to sell the E-book to consumers in the United States. Publisher Defendants are E-book Publishers. For purposes of this Final Judgment, E-book Retailers are not E-book Publishers.

      F.     "E-book Retailer" means any Person that lawfully sells (or seeks to lawfully sell) E-books to consumers in the United States, or through which a Publisher Defendant, under an Agency Agreement, sells E-books to consumers. Apple is an E-book Retailer. For purposes of this Final Judgment, Publisher Defendants and all other Persons whose primary business is book publishing are not E-book Retailers.

      G.     "Effective Date" means the date, under Section VIII.A of this Final Judgment, on which this Final Judgment takes effect.

2

H.　　"External Compliance Monitor" means the person appointed by the Court to perform the duties described in Section VI of this Final Judgment.

I.　　"Final Judgment" means this document:　the Final Judgment in *United States v. Apple, Inc., et al.*, Civil Action No. 1:12-CV-2826, and the Order Entering Permanent Injunction in *The State of Texas, et al. v. Penguin Group (USA) Inc., et al.*, Civil Action No. 1:12-CV-3394.

J.　　"Hachette" means Hachette Book Group, Inc.

K.　　"HarperCollins" means HarperCollins Publishers L.L.C.

L.　　"Macmillan" means Holtzbrinck Publishers, LLC d/b/a Macmillan and Verlagsgruppe Georg von Holtzbrinck GmbH.

M.　　"Penguin" means Penguin Group (USA), Inc., The Penguin Group, a division of U.K. corporation Pearson plc, The Penguin Publishing Company Ltd, Dorling Kindersley Holdings Limited, and Penguin Random House, a joint venture by and between Pearson plc and Bertelsmann SE & Co. KGaA, and any similar joint venture between Penguin and Random House Inc.

N.　　"Person" means any natural person, corporation, company, partnership, joint venture, firm, association, proprietorship, agency, board, authority, commission, office, or other business or legal entity, whether private or governmental.

O.　　"Plaintiff States" means the States and Commonwealths of Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, Delaware, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Missouri, Nebraska, New Mexico, New York, North Dakota, Ohio, Pennsylvania, Puerto Rico, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, West Virginia, and Wisconsin and the District of Columbia.

3

P.       "Publisher Defendants" means Hachette, HarperCollins, Macmillan, Penguin, and Simon & Schuster.

Q.       "Representative Plaintiff States" means, as of the Effective Date of this Final Judgment, the States of Texas and Connecticut.   The Plaintiff States may designate a different Plaintiff State as a substitute Representative Plaintiff State at any time by communicating the change in writing to Apple and the United States.

R.       "Retail Price" means the price at which an E-book Retailer or, under an Agency Agreement, an E-book Publisher sells an E-book to a consumer.

S.       "Retail Price MFN" means a term in an agreement between an E-book Publisher and an E-book Retailer under which the Retail Price at which an E-book Retailer or, under an Agency Agreement, an E-book Publisher sells one or more E-books to consumers depends in any way on the Retail Price, or discounts from the Retail Price, at which any other E-book Retailer or the E-book Publisher, under an Agency Agreement, through any other E-book Retailer sells the same E-book(s) to consumers.

T.       "Simon & Schuster" means Simon & Schuster, Inc.

## II.   <u>APPLICABILITY</u>

This Final Judgment applies to Apple and each of its affiliates, subsidiaries, officers, directors, agents, employees, successors, and assigns, to any successor to any substantial part of the business, and to all other Persons acting in concert with Apple and having actual notice of this Final Judgment.

4

## III.  **PROHIBITED CONDUCT**

A.      Apple shall not enforce any Retail Price MFN in any agreement with an E-book Publisher relating to the sale of E-books.

B.      Apple shall not enter into any agreement with an E-book Publisher relating to the sale of E-books that contains a Retail Price MFN.

C.      Apple shall not enter into or maintain any agreement with a Publisher Defendant that restricts, limits, or impedes Apple's ability to set, alter, or reduce the Retail Price of any E-book or to offer price discounts or any other form of promotions to encourage consumers to purchase one or more E-books.   The prohibitions in this Section III.C shall expire, for agreements between Apple and a Publisher Defendant, on the following dates:

1.      For agreements between Apple and Hachette:   24 months after the Effective Date of this Final Judgment;

2.      For agreements between Apple and Harper Collins:   30 months after the Effective Date of this Final Judgment;

3.      For agreements between Apple and Simon & Schuster:   36 months after the Effective Date of this Final Judgment;

4.      For agreements between Apple and Penguin:   42 months after the Effective Date of this Final Judgment; and

5.      For agreements between Apple and Macmillan:   48 months after the Effective Date of this Final Judgment.

D.      Apple shall not (1) retaliate against or punish, (2) threaten to retaliate against or punish, or (3) urge another Person to retaliate against or punish any E-book Publisher for refusing

5

to enter into an agreement with Apple relating to the sale of E-books or for the terms on which the E-book Publisher sells E-books through any other E-book Retailer. This provision does not require Apple to enter into an agreement with an E-book Publisher or E-book Retailer, or seek to prevent Apple from negotiating terms of agreement in good faith.

      E.     Apple shall not communicate, directly or indirectly, to any E-book Publisher (1) the status of its contractual negotiations with any other E-book Publisher; (2) the actual or proposed contractual terms or business plans or arrangements it has with any other E-book Publisher, or (3) any non-public competitively sensitive information it learns from any other E-book Publisher, including, but not limited to:

      a.     the E-book Publisher's business plans or strategies;

      b.     the E-book Publisher's past, present, or future pricing strategies or wholesale prices for E-books or audio books;

      c,     the E-book Publisher's future retail prices for E-books or audio books;

      d.     any terms in the E-book Publisher's agreement(s) with any retailer of books licensed or sold in any format; or

      e.     any terms in the E-book Publisher's agreement(s) with any author.

Nothing in this Section III.E prohibits Apple from developing and offering to E-book Publishers a standard form contract containing the terms on which Apple would agree to sell the E-book Publishers' E-books, and so informing an E-book Publisher that it is a standard from; nor shall this prohibit Apple from publicly communicating the retail price of E-books available on the iBookstore.

F.    Apple shall not enter into or maintain any agreement with an E-book Publisher where such agreement likely will increase, fix, or set the price at which other E-book Retailers can acquire or sell E-books.

Nothing in this Section III.F prohibits Apple from entering into or maintaining an agreement with an E-book Publisher merely specifying prices that Apple must pay for the E-book Publisher's E-books.

G.    Apple shall not enter into or maintain any agreement with any other E-book Retailer where such agreement likely will increase, fix, stabilize, or set the prices or establish other terms on which Apple or the other E-book Retailer sells E-books to consumers.

## IV.  REQUIRED CONDUCT

A.    On or before the Effective Date of this Final Judgment, Apple shall either modify any Agency Agreement with a Publisher Defendant to comply with Section III.C of this Final Judgment or terminate any Agency Agreement with a Publisher Defendant that does not comply with Section III.C of this Final Judgment.

B.    Apple shall apply the same terms and conditions to the sale or distribution of an E-book App through Apple's App Store as Apple applies to all other apps sold or distributed through Apple's App Store.

This provision does not prevent Apple from introducing new categories of apps with different terms and conditions or from changing its App Store terms and conditions and applying them in a reasonable manner so long as Apple does not discriminate against E-book Apps.

C.    Apple shall furnish to the United States and the Representative Plaintiff States, within ten business days of receiving such information, any information that reasonably suggests

7

to Apple that any E-book Publisher has impermissibly coordinated or is impermissibly coordinating the terms on which it supplies or offers its E-books to Apple or to any other Person.

## V.  **ANTITRUST COMPLIANCE**

To ensure its compliance with this Final Judgment and the antitrust laws, Apple shall perform the activities enumerated below in Sections V.A through V.J of this Final Judgment. Within thirty days after the Effective Date of this Final Judgment, Apple's Audit Committee, or another committee comprised entirely of outside directors (*i.e.*, directors not also employed by Apple), shall designate a person not employed by Apple as of the Effective Date of the Final Judgment to serve as Antitrust Compliance Officer, who shall report to the Audit Committee or equivalent committee of Apple's Board of Directors and shall be responsible, on a full-time basis until the expiration of this Final Judgment, for supervising Apple's antitrust compliance efforts and performance of the following:

A.      furnishing a copy of this Final Judgment, within thirty days of its Effective Date, to each member of Apple's Board of Directors, to its Chief Executive Officer, to each of its Senior Vice-Presidents, and to each of Apple's employees engaged, in whole or in part, in activities relating to Apple's iBookstore;

B.      furnishing a copy of this Final Judgment in a timely manner to each officer, director, or employee who succeeds to any position identified in Section V.A of this Final Judgment;

C.      ensuring that each person identified in Sections V.A and V.B of this Final Judgment, and appropriate employees in Apple iTunes and App Store businesses, receives comprehensive and effective training annually on the meaning and requirements of this Final

8

Judgment and the antitrust laws, such training to be delivered by an attorney with relevant experience in the field of antitrust law;

      D.     obtaining, within sixty days after the Effective Date of this Final Judgment and on each anniversary of the Effective Date of this Final Judgment, from each person identified in Sections V.A and V.B of this Final Judgment, and thereafter maintaining, a certification that each such person (a) has read, understands, and agrees to abide by the terms of this Final Judgment; and (b) is not aware of any violation of this Final Judgment or the antitrust laws or has reported any potential violation to the Antitrust Compliance Officer;

      E.     conducting, in consultation with the External Compliance Monitor, an annual antitrust compliance audit covering each person identified in Sections V.A and V.B of this Final Judgment, and maintaining all records pertaining to such audits;

      F.     communicating annually to Apple's employees that they may disclose to the Antitrust Compliance Officer, without reprisal, information concerning any potential violation of this Final Judgment or the antitrust laws;

      G.     taking appropriate action, within three business days of discovering or receiving credible information concerning an actual or potential violation of this Final Judgment, to terminate or modify Apple's conduct to assure compliance with this Final Judgment; and, within seven days of discovering or receiving such information, providing to the United States and the Representative Plaintiff States a description of the actual or potential violation of this Final Judgment and the corrective actions taken;

      H.     furnishing to the United States and the Representative Plaintiff States on a quarterly basis electronic copies of any non-privileged communications with any Person containing

9

allegations of Apple's noncompliance with any provisions of this Final Judgment or violations of the antitrust laws;

     I.     maintaining, and furnishing to the United States, the Representative Plaintiff States, and the External Compliance Monitor on a quarterly basis, a log of all oral and written communications, excluding privileged or public communications, between or among any person identified in Sections V.A or V.B of this Final Judgment and

        1.     any person employed by or associated with another E-book Retailer, relating, in whole or in part, to E-books or devices for reading E-books, but excluding any communications primarily involving the App Store; or

        2.     employees or representatives of two or more E-book Publishers, relating, in whole or in part, to E-books, devices for reading E-books, or E-book Apps,

including, but not limited to, an identification (by name, employer, and job title) of the author and recipients of and all participants in the communication, the date, time, and duration of the communication, the medium of the communication, and a description of the subject matter of the communication; and

     J.     providing to the United States and the Representative Plaintiff States annually, on or before the anniversary of the Effective Date of this Final Judgment, a written statement as to the fact and manner of Apple's compliance with Sections III, IV, and V of this Final Judgment.

## VI.  EXTERNAL COMPLIANCE MONITOR

     A.     The Court shall appoint an External Compliance Monitor to undertake the responsibilities and duties described in this Section VI.   The appointment shall be for a period of two years, provided that the appointment does not expire before Apple has completed two years of

the annual training required by Section V.C, and provided that the Court may *sua sponte* or on application of the United States or any Plaintiff State extend the appointment by one or more one-year periods. Promptly upon entry of this Final Judgment, but before its Effective Date, the United States and the Representative Plaintiff States will meet and confer with Apple to determine if the parties can agree on a recommended External Compliance Monitor. Apple may at any time suggest to the United States and the Representative Plaintiff States candidates for the position of External Compliance Monitor. On or before the Effective Date of this Final Judgment, the United States and the Representative Plaintiff States jointly shall recommend to the Court one or more persons to serve as External Compliance Monitor. Apple will have five days to object to the Court by letter to the recommended appointment. Apple is responsible for the reasonable expenses incurred by candidates for appointment as External Compliance Monitor in connection with any travel undertaken for interviews of the candidates by the United States or the Court.

B.    The External Compliance Monitor shall have the power and authority to review and evaluate Apple's existing internal antitrust compliance policies and procedures and the training program required by Section V.C of this Final Judgment, and to recommend to Apple changes to address any perceived deficiencies in those policies, procedures, and training.

C.    The External Compliance Monitor shall conduct a review to assess whether Apple's internal antitrust compliance policies and procedures, as they exist 90 days after his or her appointment, are reasonably designed to detect and prevent violations of the antitrust laws. The External Compliance Monitor shall also conduct a review to assess whether Apple's training program, required by Section V.C of this Final Judgment, as it exists 90 days after his or her appointment, is sufficiently comprehensive and effective. Within 180 days of his or her

11

appointment by the Court, and at six month intervals thereafter throughout the appointment, the External Compliance Monitor shall provide a written report to Apple, the United States, the Representative Plaintiff States, and the Court setting forth his or her assessment of Apple's internal antitrust compliance policies, procedures, and training and, if appropriate, making recommendations reasonably designed to improve Apple's policies, procedures, and training for ensuring antitrust compliance.

D.     The External Compliance Monitor may, at any time prior to the expiration of this Final Judgment, provide one or more additional written reports to Apple, the United States, the Representative Plaintiff States, and the Court setting forth additional recommendations reasonably designed to improve Apple's policies, procedures, and training for ensuring antitrust compliance. The External Compliance Monitor may provide such additional reports on his or her own initiative or at the request of the Court, the United States, or the Representative Plaintiff States.

E.     If Apple objects to any recommendation, it shall propose in writing to the External Compliance Monitor, the United States, and the Representative Plaintiff States, within 30 days after it receives the report, an alternative policy, procedure, or system designed to achieve the same objective or purpose.   If Apple and the External Compliance Monitor fail, after good faith discussions, to agree on an alternative policy or procedure within 30 days of Apple's objections to a recommendation, Apple shall, after consultation with the United States and the Representative Plaintiff States, apply to this Court within 14 days for relief.

F.     If the External Compliance Monitor in the exercise of his or her responsibilities under this Section VI discovers or receives evidence that suggests to the External Compliance Monitor that Apple is violating or has violated this Final Judgment or the antitrust laws, the

12

External Compliance Monitor shall promptly provide that information to the United States and the Representative Plaintiff States. The External Compliance Monitor shall take no further action, including seeking information from Apple pursuant to Section VI.G of this Final Judgment, to investigate any such potential violation of the Final Judgment or the antitrust laws.

G.     Apple shall assist the External Compliance Monitor in performance of the responsibilities set forth in this Section VI. Apple shall take no action to interfere with or to impede the External Compliance Monitor's accomplishment of its responsibilities. The External Compliance Monitor may, in connection with the exercise of his or her responsibilities under this Section VI, and on reasonable notice to Apple:

1.     interview, either informally or on the record, any Apple personnel, who may have counsel present; any such interview to be subject to the reasonable convenience of such personnel and without restraint or interference by Apple;

2.     inspect and copy any documents in the possession, custody, or control of Apple; and

3.     require Apple to provide compilations of documents, data, or other information, and to submit reports to the External Compliance Monitor containing such material, in such form as the External Compliance Monitor may reasonably direct.

H.     Any objections by Apple to actions by the External Compliance Monitor in fulfillment of the External Compliance Monitor's responsibilities must be conveyed in writing to the United States and the Representative Plaintiff States within ten calendar days after the action giving rise to the objection.

13

I.      The External Compliance Monitor may hire, subject to the approval of the United States, after consultation with the Representative Plaintiff States, any persons reasonably necessary to fulfilling the External Compliance Monitor's responsibilities.   The External Compliance Monitor and any persons hired to assist the External Compliance Monitor shall serve at the cost and expense of Apple, on such terms and conditions as the United States, after consultation with the Representative Plaintiff States, approves, including, but not limited to, the execution of customary confidentiality agreements.   The compensation of the External Compliance Monitor and any persons hired to assist the External Compliance Monitor shall be on reasonable and customary terms commensurate with the individuals' experience and responsibilities and consistent with reasonable expense guidelines.   The External Compliance Monitor shall submit a quarterly expense report to the United States and the Representative Plaintiff States.

J.      If the United States, after consultation with the Representative Plaintiff States, or Apple determines that the External Compliance Monitor has ceased to act or failed to act diligently or in a cost-effective manner, it may recommend that the Court appoint a substitute External Compliance Monitor.

## VII.   **PLAINTIFFS' ACCESS**

A.      For purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time duly authorized representatives of the United States Department of Justice Antitrust Division or the Representative Plaintiff States, including, but not limited to, consultants and other persons retained by the United States or the Representative

14

Plaintiff States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division or a joint written request by authorized representatives of each Representative Plaintiff State, and on reasonable notice to Apple, be permitted:

1.    access during regular business hours to inspect and copy, or at the option of the United States or the Representative Plaintiff States, to require Apple to provide to the United States and the Representative Plaintiff States hard copy or electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Apple, relating to any matters contained in this Final Judgment; and

2.    to interview, either informally or on the record, Apple's officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by Apple.

B.    Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division or a joint written request by authorized representatives of each Representative Plaintiff State, Apple shall submit written reports or respond to written interrogatories, under oath, relating to any of the matters contained in this Final Judgment. Written reports authorized under this paragraph may require Apple to conduct, at its cost, an independent audit or analysis relating to any of the matters contained in this Final Judgment.

C.    No information or documents obtained by the means provided in this Section shall be divulged by the United States or any Plaintiff State to any person other than an authorized representative of the executive branch of the United States, the Attorney General's Office of any Plaintiff State, or the External Compliance Monitor, except in the course of legal proceedings to which the United States or the relevant Plaintiff State(s) is a party (including, but not limited to, grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.    If at the time information or documents are furnished by Apple to the United States and the Representative Plaintiff States, Apple represents and identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, and Apple marks each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure," then the United States and the Representative Plaintiff States shall give Apple ten calendar days notice prior to divulging such material in any civil or administrative proceeding.

## VIII.    ADDITIONAL PROVISIONS

A.    This Final Judgment shall take effect 30 days after the date on which it is entered. If the Final Judgment is stayed, all time periods in the Final Judgment will be tolled during the stay.

B.    This Court retains jurisdiction to enable the United States, the Representative Plaintiff States, any other Plaintiff State (after consultation with the United States and the Representative Plaintiff States), or Apple to apply to this Court at any time for, or to act *sua sponte* to issue, further orders and directions as may be necessary or appropriate to carry out or construe

16

this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

C.    This Final Judgment shall expire by its own terms and without further action of this Court five years after its Effective Date, provided that, at any time prior to its expiration, the Court may *sua sponte* or on the application of the United States or any Plaintiff State extend the Final Judgment by one or more one-year periods, if necessary to ensure effective relief.

**SO ORDERED**:

_____

**DENISE COTE**
**UNITED STATES DISTRICT JUDGE**

Dated: September 5, 2013

17

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : |
| v. | :   12 Civ. 2826 (DLC) |
| APPLE INC., | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Defendant Apple Inc. ("Apple") appeals to the United States Court of Appeals for the Second Circuit from the Plaintiff United States' Final Judgment, entered in this action by Judge Denise Cote of this Court on September 6, 2013, including the injunction the Court entered against Apple.  Apple also hereby appeals from any and all orders and rulings that were adverse to it, whether or not subsumed within the September 6, 2013 Final Judgment, including—without limitation—this Court's July 10, 2013 Opinion & Order as well as other rulings on liability, admissibility of evidence, and certain discovery requests.

Dated:  October 3, 2013                    Respectfully submitted,


By:      /s/  Orin Snyder
           Orin Snyder
           Lisa H. Rubin
           Gibson, Dunn & Crutcher, LLP
           200 Park Avenue, 47th Floor
           New York, NY  10166
           (212) 351-4000
           osnyder@gibsondunn.com

           Theodore J. Boutrous, Jr. (*Pro Hac Vice*)
           Daniel G. Swanson (*Pro Hac Vice*)
           Daniel S. Floyd (*Pro Hac Vice*)
           Gibson, Dunn & Crutcher, LLP
           333 South Grand Avenue

Los Angeles, CA  90071
(213) 229-7000
dfloyd@gibsondunn.com

Cynthia Richman (*Pro Hac Vice*)
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
(202) 955-8500
crichman@gibsondunn.com

Howard E. Heiss
Edward N. Moss
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY  10036
(212) 326-2000
hheiss@omm.com

*On behalf of Defendant Apple Inc.*

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
UNITED STATES OF AMERICA,               :
                                        :
                      Plaintiff,        :     12 Civ. 2826 (DLC)
            -v-                         :
                                        :
APPLE INC., et al.,                     :
                                        :
                      Defendants.       :            ORDER
                                        :
----------------------------------------X
                                        :
THE STATE OF TEXAS, et al.,             :
                                        :
                      Plaintiffs,       :     12 Civ. 3394 (DLC)
            -v-                         :
                                        :
PENGUIN GROUP (USA) INC., et al.,       :
                                        :
                      Defendants.       :
                                        :
----------------------------------------X

DENISE COTE, District Judge:

On September 30, 2013, the Department of Justice and the

Plaintiff States submitted for consideration the names of two

well-qualified candidates to serve as the External Monitor

("Monitor") provided for in Section VI of the September 5 Order

Entering Permanent Injunction in this case. Having interviewed

both candidates, it is clear that either one is capable of doing

an exceptional job as Monitor. The Court is grateful to both

candidates for their commitment to public service and for taking

time to travel and interview with DOJ and the Court. It is

hereby

ORDERED that Michael Bromwich is appointed as Monitor.

IT IS FURTHER ORDERED that Bernard A. Nigro will assist Mr. Bromwich in discharging his responsibilities.


        SO ORDERED:

Dated:     New York, New York
           October 16, 2013

                              _____
                                      DENISE COTE
                              United States District Judge

# EXHIBIT H

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

                Plaintiff,

      v.

APPLE INC.,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12 Civ. 2826 (DLC)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE STATE OF TEXAS,
THE STATE OF CONNECTICUT, *et al.*,

                Plaintiffs,

      v.

PENGUIN GROUP (USA) INC., *et al.*,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12 Civ. 3394 (DLC)

**DEFENDANT APPLE INC.'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION BY ORDER TO SHOW CAUSE**
**FOR A STAY OF THE INJUNCTION PENDING APPEAL**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ............................................................................................................... 2

LEGAL STANDARD ........................................................................................................ 6

ARGUMENT .................................................................................................................... 8

I.      Apple Has a Substantial Possibility of Success on Appeal from the Court's
        Injunction and Modifications .............................................................................. 8

        A.      This Court Lacked Jurisdiction to Modify the Injunction During Apple's
                Appeal ................................................................................................... 8

        B.      The Injunction Is Not Authorized by Federal Rule of Civil Procedure 53 and
                Violates the Constitutional Separation of Powers. ..................................... 9

        C.      The Injunction Deprives Apple of Its Right to a "Disinterested Prosecutor" ........... 14

II.     Apple Will Suffer Irreparable Harm Absent a Stay ............................................ 15

        A.      The Injunction Irreparably Interferes with Apple's Business Operations ................. 16

        B.      The Risk of Disclosing Privileged or Confidential Information Is an
                Irreparable Injury .................................................................................... 19

        C.      The Significant and Unrecoverable Costs Being Imposed on Apple Warrant a
                Stay ...................................................................................................... 19

III.    A Stay of the Injunction Will Not Harm Plaintiffs or the Public Interest ......................... 20

CONCLUSION ................................................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACORN v. United States*,
  618 F.3d 125 (2d Cir. 2010) ................................................................. 6

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*,
  650 F.3d 876 (2d Cir. 2011) ................................................................. 6

*Benjamin v. Fraser*,
  343 F.3d 35 (2d Cir. 2003) ............................................................. 11, 12

*Berger v. United States*,
  295 U.S. 78 (1935)............................................................................. 14

*Bordelon v. Chi. Sch. Reform Bd. of Trs.*,
  8 F. Supp. 2d 779 (N.D. Ill. 1998) ...................................................... 18

*Brenntag Int'l Chems., Inc. v. Bank of India*,
  175 F.3d 245 (2d Cir. 1999) ........................................................... 7, 19

*Buckley v. Valeo*,
  424 U.S. 1 (1976)............................................................................... 13

*City of N.Y. v. Mickalis Pawn Shop, LLC*,
  645 F.3d 114 (2d Cir. 2011) ............................................................... 12

*Cobell v. Norton*,
  334 F.3d 1128 (D.C. Cir. 2003) ............................... 1, 9, 10, 12, 13, 14

*Freedom Holdings, Inc. v. Spitzer*,
  408 F.3d 112 (2d Cir. 2005) ............................................................... 18

*Griggs v. Provident Consumer Disc. Co.*,
  459 U.S. 56 (1982)............................................................................... 8

*Grutter v. Bollinger*,
  247 F.3d 631 (6th Cir. 2001) ................................................................ 7

*Hedges v. Obama*,
  724 F.3d 170 (2d Cir. 2013) ................................................................. 6

*Hilton v. Braunskill*,
  481 U.S. 770 (1987)............................................................................. 7

# TABLE OF AUTHORITIES *(cont.)*

**Page(s)**

*Ideal Toy Corp. v. Sayco Doll Corp.*,
  302 F.2d 623 (2d Cir. 1962) ............................................................. 9

*In re Adelphia Commc'ns Corp.*,
  361 B.R. 337 (S.D.N.Y. 2007) ......................................................... 16

*In re Peterson*,
  253 U.S. 300 (1920) ....................................................................... 11

*In re Prof'ls Direct Ins. Co.*,
  578 F.3d 432 (6th Cir. 2009) ......................................................... 19

*In re von Bulow*,
  828 F.2d 94 (2d Cir. 1987) ............................................................. 19

*Int'l Ass'n of Machinists v. E. Air Lines, Inc.*,
  847 F.2d 1014 (2d Cir. 1988) ...................................................... 8, 9

*Juan F. v. Weicker*,
  37 F.3d 874 (2d Cir. 1994) ............................................................. 12

*Kidder, Peabody & Co. v. Maxus Energy Corp.*,
  925 F.2d 556 (2d Cir. 1991) ........................................................... 9

*La Buy v. Howes Leather Co.*,
  352 U.S. 249 (1957) ....................................................................... 11

*LaRouche v. Kezer*,
  20 F.3d 68 (2d Cir. 1994) ............................................................... 7

*Missouri v. Jenkins*,
  515 U.S. 70 (1995) ......................................................................... 13

*Mitchell v. Cuomo*,
  748 F.2d 804 (2d Cir. 1984) ......................................................... 18

*Morrison v. Olson*,
  487 U.S. 654 (1988) ....................................................................... 13

*Muskrat v. United States*,
  219 U.S. 346 (1911) ....................................................................... 13

*Nken v. Holder*,
  556 U.S. 418 (2009) .................................................................... 6, 7

*People ex rel. Clancy v. Superior Court*,
  39 Cal. 3d 740 (1986) ................................................................... 14

## <u>TABLE OF AUTHORITIES</u> *(cont.)*

**Page(s)**

*Philip Morris USA, Inc. v. Scott,*
    131 S. Ct. 1 (2010) ............................................................................................ 19

*Reed v. Rhodes,*
    691 F.2d 266 (6th Cir. 1982) ........................................................................... 12

*Register.com, Inc. v. Verio, Inc.,*
    356 F.3d 393 (2d Cir. 2004) ............................................................................ 18

*RoDa Drilling Co. v. Siegal,*
    552 F.3d 1203 (10th Cir. 2009) ....................................................................... 17

*Salinger v. Colting,*
    607 F.3d 68 (2d Cir. 2010) .............................................................................. 18

*Thapa v. Gonzales,*
    460 F.3d 323 (2d Cir. 2006) .............................................................................. 7

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.,*
    60 F.3d 27 (2d Cir. 1995) ................................................................................ 18

*United States v. AU Optronics Corp.,*
    No. 3:09-00110 (N.D. Cal. Oct. 2, 2012) ....................................................... 11

*United States v. Grinnell Corp.,*
    86 S. Ct. 231 (1965) .......................................................................................... 6

*United States v. ITT Cont'l Baking Co.,*
    420 U.S. 223 (1975) ........................................................................................ 12

*United States v. Nat'l Lead Co.,*
    332 U.S. 319 (1947) .......................................................................................... 6

*United States v. Philip Morris USA Inc.,*
    566 F.3d 1095 (D.C. Cir. 2009) ...................................................................... 12

*United States v. Visa U.S.A., Inc.,*
    No. 98-cv-7076 (S.D.N.Y. Feb. 7, 2002) ......................................................... 6

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.,*
    339 F.3d 101 (2d Cir. 2003) ............................................................................ 17

*Young v. U.S. ex rel. Vuitton et Fils S.A.,*
    481 U.S. 787 (1987) .................................................................................. 13, 14

# TABLE OF AUTHORITIES *(cont.)*

**Page(s)**

**Statutes**

28 U.S.C. § 455 .................................................................................................. 15

**Other Authorities**

11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2948
(1973) ............................................................................................................ 18

Vikramaditya Khanna & Timothy L. Dickinson, *The Corporate Monitor: The New
Corporate Czar?*, 105 Mich. L. Rev. 1713 (2007) ...................................... 12

**Rules**

Fed. R. Civ. P. 53 ................................................................... 5, 8, 9, 10, 15

Fed. R. Civ. P. 53(a) ......................................................................................... 11

Fed. R. Civ. P. 53(a)(1)(C) ...................................................................... 10, 11

Fed. R. Civ. P. 53(a)(2) ..................................................................................... 15

Fed. R. Civ. P. 53(b)(3) ..................................................................................... 15

Fed. R. Civ. P. 62 ................................................................................................ 1

Fed. R. Civ. P. 62(c) ........................................................................................... 9

**Constitution**

U.S. Const. art. III, § 1 ................................................................................ 13, 14

Defendant Apple Inc. respectfully moves this Court pursuant to Federal Rule of Civil Procedure 62 for a stay of Section VI of the permanent injunction.

## PRELIMINARY STATEMENT

The "external compliance monitor" appointed by the Court, Michael Bromwich, is conducting a roving investigation that is interfering with Apple's business operations, risking the public disclosure of privileged and confidential information, and imposing substantial and rapidly escalating costs on Apple that it will never be able to recover if it prevails on its pending appeal of this Court's Final Judgment and the injunction.

The injunction, especially as it is being interpreted and implemented by Mr. Bromwich as the Court's agent, is flatly unconstitutional, and will be reversed on appeal. Neither the Federal Rules of Civil Procedure nor Article III of the Constitution authorizes the appointment of such a monitor. Indeed, the Department of Justice itself has successfully argued in another case that courts may not grant monitors broad investigatory powers like those exercised by Mr. Bromwich. *See Cobell v. Norton*, 334 F.3d 1128, 1140 (D.C. Cir. 2003). The significant interference with Apple's business operations, and the unrecoverable costs being imposed on Apple, constitute clear irreparable injury. Even if Apple prevails on appeal, the two-year monitorship will be (at least nearly) completed by that point, and all the very real costs imposed on Apple and the harm and disruption to its business from Mr. Bromwich's invasive investigation will have inflicted damage that neither Apple nor the Court will be able to undo. The likelihood of success by Apple on appeal, combined with the irreparable injury Apple is suffering from Mr. Bromwich's unwarranted inquisition of the company's high-level executives and board of directors, warrant a stay of the monitor provision of the injunction while Apple's appeal is heard by the Second Circuit.

## BACKGROUND

The Court stated that it was designing the injunction entered on September 6, 2013 "to rest as lightly as possible on the way Apple runs its business," and did not "charge[ the monitor] with assessing Apple's compliance generally with the terms of the final judgment." Dkt. 371 (Aug. 27, 2013 Hr'g Tr.) at 8-9, 17. While plaintiffs had asked for a monitor with expansive powers to review Apple's antitrust compliance for a period of ten years (*see* Dkt. 329 Ex.1 at 10, 16), the Court provided for a much more limited two-year monitorship. The Court authorized a monitor solely to review and report on Apple's antitrust compliance and training programs as they exist 90 days after the monitor's appointment. Dkt. 374 § VI. The monitor was also directed to make a report 180 days after appointment, which would be provided to Apple, the United States, the plaintiff states, and the Court. *Id*. § VI.C. To facilitate these reviews, the injunction authorized the appointed monitor to interview Apple personnel "who may have counsel present" "subject to the[ir] reasonable convenience." *Id*. § VI.G.1. While the injunction requires Apple to pay all fees associated with carrying out the monitorship, the fees must be "reasonable and customary." *Id.* § VI.I.

On October 3, 2013, Apple noticed its appeals from the judgment and the injunction in the DOJ and states' actions. Dkt. 379 at 1. Apple did not seek an immediate stay of the injunction because the company intended to revise and enhance its antitrust compliance and training programs irrespective of any court order to do so. On October 16, 2013, in a brief order that did not cite any authority for the appointment, the Court appointed Michael Bromwich (who

has no antitrust experience) as the external monitor and Barry Nigro of Fried Frank (who does) to assist him.  Dkt. 384.[1]

Immediately upon appointment, Mr. Bromwich began pushing far beyond the boundaries of his ostensibly narrow mandate, launching a broad and amorphous inquisition, at Apple's expense, that bears little relation to the underlying issues in this litigation.  The costs of his monitorship are piling up, and Mr. Bromwich's intrusion on Apple's business continues unabated—all while an appeal of the injunction is pending.

For example, although under the injunction Apple had 90 days to revise its programs, Mr. Bromwich pressed for immediate interviews with the very top executives at the company, such as CEO Tim Cook, and including others who have no involvement whatsoever in the day-to-day operation of the business unit at issue—such as lead designer Jony Ive and board member Al Gore.  Boutrous Decl. Ex. B at 5, Ex. I at 1.  Apple explained to Mr. Bromwich that his request "to begin interviewing Apple's entire board and its executive team, as well as additional senior executives on November 18 is premature, not authorized by the Final Judgment, and would not only be disruptive to Apple's business operations but also directly contrary to Judge Cote's intent."  *Id.* Ex. A at 2; *see also id.* Ex. A at 3 ("It makes no sense and would be extremely disruptive, to schedule those interviews before Apple has completed its internal assessment and developed its new antitrust training program").

Nevertheless, in an effort to adhere to the Court's injunction, Apple sought to accommodate Mr. Bromwich by arranging interviews with several high-level executives who were responsible for the compliance and training measures.  *Id.* Exs. C, F.  In response to

---

[1]  Apple objected to Mr. Bromwich's appointment due to his lack of antitrust experience, and suggested the Court simply appoint Mr. Nigro alone.  Boutrous Decl. ¶ 3.

Apple's offer to provide Mr. Bromwich with significant access to the individuals most relevant to his premature inquiry—which was not even authorized by the Final Judgment—Mr. Bromwich accused the company of not taking "its obligations and [Mr. Bromwich's] responsibilities under the Final Judgment very seriously." *Id.* Ex. B at 2. And when faced with the fact that some of the executives and directors he wished to interview could not upend their schedules to accommodate his travel preferences, Mr. Bromwich demanded that Apple "[b]e prepared to support any representations concerning [the] availability [of those individuals] with *detailed copies of their schedules for [the] entire week*" in which he planned to conduct interviews. *Id.* (emphasis added).

Apple offered to arrange interviews on November 18 with the Chief Compliance Officer and Head of Global Security (Tom Moyer), and the Associate General Counsel and Legal Liaison to the Audit and Finance Committee (Gene Levoff), and promised more interviews in the coming weeks. *See id.* Ex. F at 1. While Mr. Bromwich accepted this offer (*id.*), he pushed for more interviews. When he learned that Apple General Counsel Bruce Sewell was attending the *Apple v. Samsung* trial during the week of November 18, Mr. Bromwich proposed to "stop by the courthouse and meet him." *Id.* Ex. H. And he again sought to interview the new Antitrust Compliance Officer, even though the day of the interviews was her first day on the job. *Id.*[2]

Not satisfied with the bevy of interviews Apple agreed to arrange even before his review of the compliance and training programs is scheduled to commence, Mr. Bromwich continued his demand for more interviews and access, contending this investigatory activity was authorized

---

[2]  Pursuant to the Final Judgment, Apple has hired an Antitrust Compliance Officer who is working with the company to enhance and expand antitrust compliance and training. *See* Dkt. 374 § V; Levoff Decl. ¶ 3. Apple does not seek a stay of the provision of the injunction that requires and sets forth the duties of its Antitrust Compliance Officer.

by the Court in his *ex parte* pre-appointment interview.  *Id.* Ex. K.  Mr. Bromwich even

contacted Apple's Board of Directors directly in an explicit effort to develop a relationship "that

is *unfiltered through outside counsel.*"  *Id.* Ex. J at 5 (emphasis added).

Mr. Bromwich's investigation has already resulted in substantial, and unrecoverable, cost

to Apple.  He proposed an hourly rate for himself of $1,100 and an hourly rate of $1,025 for Mr.

Nigro of Fried Frank (Boutrous Decl. Ex. O at 2-3), plus a 15% "administrative fee"—something

never before seen by Apple (*id.* Ex. O at 2, Ex. N at 2-3).  Emphasizing his goal of "generat[ing]

profits," Mr. Bromwich defended his approach and refused Apple's request that he provide a

budget and work plan or adopt a fee structure comparable to many major law firms working on

Apple matters.  *Id.* Ex. N at 3-4.  In his first two weeks of work, before any documents were

exchanged, interviews scheduled, or meaningful travel conducted, Mr. Bromwich's invoice

totaled $138,432.40.  *Id.* Ex. O at 3.

While no party filed a request seeking amendment of the monitor provisions, in the midst

of Apple's attempts to resolve its disputes with Mr. Bromwich and the Department of Justice

concerning the nature, scope, timing and cost of his activities, this Court abruptly proposed

several amendments to the injunction, which would give the monitor even *greater* powers.

Invoking Rule 53 of the Federal Rules of Civil Procedure, the Court's proposed amendments

would allow the monitor to interview Apple personnel *ex parte* (Dkt. 410 ¶ 3), and deliver *ex*

*parte* oral briefings every month to the Court (*id.* ¶ 4).  The amendments also would require the

monitor to "make reasonable efforts to preserve all materials materially related to his duties,"

and would allow the Court to "order such materials publicly filed when in the interest of justice."

*Id.* ¶ 5.  And the amendments ordered the monitor "to proceed with all reasonable diligence."  *Id.*

¶ 1.  This Court issued an order sustaining only one of Apple's objections (Dkt. 411) to these

proposals—ruling that "the Court will not receive *ex parte* briefings or reports from the Monitor about his work" (Dkt. 413).[3]

Despite Apple's repeated objections, Mr. Bromwich has pushed forward, and continues to press for interviews with and *ex parte* access to Apple Board members and executives. *See, e.g.*, Boutrous Decl. ¶ 5. These unauthorized and unconstitutional investigatory efforts are extraordinarily intrusive, disruptive, and costly, and are causing irreparable harm to Apple.

## LEGAL STANDARD

This Court has "judicial discretion" (*Nken v. Holder*, 556 U.S. 418, 433 (2009)) to grant Apple a stay of the permanent injunction. *See, e.g.*, *Hedges v. Obama*, 724 F.3d 170, 188 (2d Cir. 2013) (granting stay of permanent injunction pending appeal); *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 890 (2d Cir. 2011) (same); *ACORN v. United States*, 618 F.3d 125, 133 (2d Cir. 2010) (same); *United States v. Visa U.S.A., Inc.*, No. 98-cv-7076, Dkt. 247 at 1 (S.D.N.Y. Feb. 7, 2002) (same in antitrust case); *see also*, *e.g.*, *United States v. Grinnell Corp.*, 86 S. Ct. 231 (1965) (Fortas, J., in chambers) (staying judgment in Sherman Act case); *United States v. Nat'l Lead Co.*, 332 U.S. 319, 324 (1947) (noting that stay under the Sherman Act injunction had been granted).

A motion for a stay "is a motion, not to [the court's] inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *Nken*, 556 U.S. at 434 (quotation marks

---

[3] Apple has fully complied with section VI.H of the injunction in its objections to the monitorship. *See* Boutrous Decl. Ex. Q. Apple served a letter on the Department of Justice and plaintiff states on October 31, 2013, outlining its objections to the timing, scope, and financial terms of the monitor's engagement. *See* Boutrous Decl. Ex. R. Apple has reiterated these concerns, including in a teleconference on November 4, 2013 (Boutrous Decl. ¶ 4); in its objections filed with the Court on November 27, 2013 (Dkt. 411); in a letter on December 6, 2013 (Boutrous Decl. Ex. Q); and again in a teleconference on December 9, 2013 (Boutrous Decl. ¶ 4).

omitted). Accordingly, in determining whether to issue a stay pending appeal, this Court examines four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The four factors operate as a "sliding scale," where "the necessary level or degree of possibility of success will vary according to the court's assessment of the other stay factors." *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (internal quotation marks omitted).

In order to warrant a stay, Apple must show only that it has "a substantial possibility, although *less than a likelihood*, of success on appeal." *LaRouche v. Kezer*, 20 F.3d 68, 72 (2d Cir. 1994) (emphasis added) (internal quotations omitted). Indeed, where, as here, "the balance of hardships tips decidedly in [Apple's] favor," Apple need only show "some possibility of success." *Thapa*, 460 F.3d at 335; *see also Grutter v. Bollinger*, 247 F.3d 631, 633 (6th Cir. 2001) (movant need only "show, at a minimum, serious questions going to the merits") (internal quotation marks omitted).

A party establishes irreparable harm where, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). And while "the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest," "[t]hese factors merge when the Government is the opposing party," as in this case. *Nken*, 556 U.S. at 435.

## ARGUMENT

## I. APPLE HAS A SUBSTANTIAL POSSIBILITY OF SUCCESS ON APPEAL FROM THE COURT'S INJUNCTION AND MODIFICATIONS

The Court's imposition of an external monitor on Apple wielding inquisitorial powers, who has a financial incentive to engage in the most extensive and time-consuming investigation possible, and who claims authority to interview Apple personnel without counsel present and potentially divulge that information to the public, violates the constitutional separation of powers and Apple's due process right to a disinterested prosecutor. Neither Rule 53, concerning "special masters," nor any other rule or source of authority permits appointment of such a monitor in the first place. In addition, the Court lacked jurisdiction to modify the injunction once Apple noticed its appeal. There is at the very least a substantial possibility that Apple will succeed on appeal of the Court's injunction and orders modifying the injunction.

### A. This Court Lacked Jurisdiction to Modify the Injunction During Apple's Appeal

The first reason Apple will prevail on appeal is that the Court's amendments materially modified the injunction entered on September 5, 2013. Because the appeal of the original injunction is currently pending (Dkt. 379 at 1), this Court lacks jurisdiction to further modify the Final Judgment.

The filing of a notice of appeal "confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam). Once a party notices an appeal, the district court may take actions "only in aid of the appeal or to correct clerical errors, and may not adjudicate substantial rights directly involved in the appeal." *Int'l Ass'n of Machinists v. E. Air Lines, Inc.*, 847 F.2d 1014, 1017 (2d Cir. 1988) (internal quotation marks omitted).

8

The Court's limited jurisdiction under Federal Rule of Civil Procedure 62(c) allows the Court to modify the injunction only where necessary "to preserve the status quo pending appeal" (*id.* at 1018; *see also Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 564-65 (2d Cir. 1991)) in order to protect the appellate court's exercise of exclusive jurisdiction. *Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623, 625 (2d Cir. 1962).

Here, however, the Court's modifications drastically modify the status quo, and serve to add additional errors to the injunction on appeal. The Final Judgment created a monitorship of limited scope and duration (*see* Dkt. 374 § VI), designed to tread "as lightly as possible on the way Apple runs its business" (Dkt. 371 [Aug. 27, 2013 Hr'g Tr.] at 8-9). The Final Judgment therefore allowed Apple personnel to "have counsel present" while being interviewed. Dkt. 374 § VI.G.1. The Court's amendments remove that critical protection, allowing Mr. Bromwich to interview Apple personnel *ex parte* (Dkt. 410 ¶ 3), and the Court to disclose the information gained therefrom and any of his other work materials to the public (*id.* ¶ 5). These substantive changes expand the monitor's role and are therefore prohibited while the Final Judgment is on appeal.

## B. The Injunction Is Not Authorized by Federal Rule of Civil Procedure 53 and Violates the Constitutional Separation of Powers.

Apple is likely to succeed on appeal from the injunction and the Court's modifications thereof, because the investigation the injunction authorizes, especially in light of Mr. Bromwich's interpretation of the scope of his authority and his conduct to date, far exceeds what is permitted under Rule 53 and violates the separation of powers.

Indeed, when the government was faced with a similar monitorship in another case, the Department of Justice took the *opposite* position it takes here and prevailed, arguing that a monitor may not be given broad investigative authority. *See Cobell*, 334 F.3d at 1140. *Cobell*

involved a one-year monitorship imposed on the Department of Interior with the parties' consent. The court "authorized the Monitor to engage in ex parte communications, and required the [defendant] to 'facilitate and assist' the Monitor, to 'provide him with access to any offices or employees to gather information,' and to pay his hourly fees and expenses."  *Id.* at 1141 (alterations omitted).  The *government* objected to the monitor's appointment unless the court placed certain conditions on the scope of his powers.  The district court, however, appointed him without regard to some of those conditions.

On appeal, the Department of Justice argued that the court had no authority to give the monitor "far-ranging investigative powers" or "require it to pay for his services," and that the monitor should be disqualified because of his "wide-ranging *ex parte* contacts with [Department of Interior] employees, including both oral discussions and the receipt of documents." Appellants' Brief, No. 02-5374, 2003 WL 25585726 (D.C. Cir. Mar. 14, 2003).   The D.C. Circuit agreed with the government, explaining that the monitor "became something like a party himself" because instead of resolving disputes that were brought to him, he "was charged with an investigative, quasi-inquisitorial, quasi-prosecutorial role."  334 F.3d at 1142.  The court held that "it was surely impermissible to invest the Court Monitor with wide-ranging extrajudicial duties over the Government's objection."  *Id.*  For these same reasons, the monitorship imposed by this Court is improper.

The Court acknowledged for the first time in its order proposing modifications to the injunction that its authority to appoint a monitor is governed by Rule 53 (Dkt. 410), which provides in relevant part that a court "may appoint a master only to: … address … posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district" (Fed. R. Civ. P. 53(a)(1)(C)).  Rule 53 authorizes district courts

to appoint a special master only to the extent necessary to "aid judges in the performance of specific *judicial duties*." *La Buy v. Howes Leather Co.*, 352 U.S. 249, 256 (1957) (emphasis added); *see also In re Peterson*, 253 U.S. 300, 312-13 (1920). As a result, appointment under Rule 53(a) gives a master (or monitor) the authority only to address issues that would otherwise be addressed "by an available district judge or magistrate judge." Fed. R. Civ. P. 53(a)(1)(C); *see La Buy*, 352 U.S. at 256.

Compliance monitorships arising out of litigated antitrust cases are extremely rare. Indeed, Apple knows of only one such case—*United States v. AU Optronics Corp.,* No. 3:09-00110, (N.D. Cal. Oct. 2, 2012)—a *criminal* case involving allegations of naked price fixing with no conceivable pro-competitive effects. No. 3:09-00110, Dkt. 976 at 1-7, 17-18. There the defendant's alleged "standard operating procedure ha[d] been collusion," it "had never known any other way of doing business [or] operated lawfully," and the company had "no antitrust compliance program whatsoever." No. 3:09-00110, Dkt. 948 at 53-54. To the extent they can ever even arguably be imposed by a federal court, monitorships should be reserved for only these very worst antitrust violators. They should not be imposed in a civil antitrust case such as this one that concerns only a six-week course of conduct that was critical for Apple, "an esteemed company" (Dkt. 326 at 158), to enter into a nascent and rapidly evolving e-books market.

Where a monitorship is appropriate, the "judicial duties" that may be delegated to a monitor include "the ability to convene and to regulate hearings, to rule on the admissibility of evidence, to subpoena and swear witnesses, and to hold non-cooperating witnesses in contempt." *Benjamin v. Fraser*, 343 F.3d 35, 45-46 (2d Cir. 2003), *overruled on other grounds by Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009)). These "quasi-judicial" functions are properly delegated to "quasi-judicial officers," such as special masters and possibly monitors, in their exercise of the

judicial power delegated to them by Article III judges.  *Id.* at 45; *see also Reed v. Rhodes*, 691 F.2d 266, 269 (6th Cir. 1982) (special masters act "in a quasi-judicial capacity"); *Cobell*, 334 F.3d at 1139 ("Special Master-Monitor … was serving as a judicial officer").

To be sure, monitors may be given additional authority when they are appointed as part of a negotiated consent decree before judgment between a private party and a government enforcement agency, as is generally the case.  *See* Vikramaditya Khanna & Timothy L. Dickinson, *The Corporate Monitor: The New Corporate Czar?*, 105 Mich. L. Rev. 1713, 1716 (2007).  In those instances, the monitorships "should be construed basically as contracts.'"  *Juan F. v. Weicker*, 37 F.3d 874, 879 (2d Cir. 1994) (quoting *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236-37 (1975)).  Indeed, the parties may agree to terms that otherwise would violate the defendant's constitutional rights.  *City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 146 (2d Cir. 2011).

But absent such an agreement, monitors may not engage in "'wide-ranging extrajudicial duties'" to fill "'an investigative, quasi-inquisitorial, quasi-prosecutorial role that is unknown to our adversarial legal system.'"  *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1149 (D.C. Cir. 2009) (per curiam) (quoting *Cobell*, 334 F.3d at 1142).  Here, Apple opposed the monitorship in a civil antitrust case as improper and unnecessary, reserved its right to challenge the appointment, and appealed the Final Judgment (*see* Dkt. 331 at 9-13; Dkt. 379); and the Court appointed Mr. Bromwich over Apple's objections (Boutrous Decl. ¶ 3).  As a result, "the district court must confine itself (and its agents) to its accustomed judicial role."  *Cobell*, 334 F.3d at 1142.

The injunction and Mr. Bromwich's authority go well beyond what is granted by Article III and are flatly unconstitutional.  Article III vests federal courts with only "[t]he judicial

12

power." U.S. Const. art. III, § 1; *see also Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 816 (1987) (Scalia, J., concurring in the judgment) (judicial power is "the only kind of power that federal judges may exercise by virtue of their Article III commissions"); *Muskrat v. United States*, 219 U.S. 346, 355 (1911) ("The power conferred on [federal courts] is exclusively judicial, and it cannot be required or authorized to exercise any other") (internal quotation marks omitted). As a result, courts may not exercise "executive or administrative duties of a nonjudicial nature." *Morrison v. Olson*, 487 U.S. 654, 677 (1988) (quoting *Buckley v. Valeo*, 424 U.S. 1, 123 (1976) (per curiam)); *see also Missouri v. Jenkins*, 515 U.S. 70, 132 (1995) (Thomas, J., concurring) ("There simply are certain things that courts, in order to remain courts, cannot and should not do").

The injunction purports to give Mr. Bromwich the power to conduct investigations and interviews with Apple personnel, but this is not a judicial function and therefore cannot be delegated by the Court. The injunction, especially as modified and as interpreted by Mr. Bromwich, improperly gives the monitor investigative powers generally reserved to prosecutors. *See Cobell*, 334 F.3d at 1141-42. In fact, the injunction gives the monitor the same powers provided to the Department of Justice and the State Attorneys General (*compare* Dkt. 374 § VII.A.1-2 (plaintiffs permitted "access … to inspect and copy" documents, and "to interview … Apple's officers, employees, or agents"), *with id.* § VI.G.1-3 (monitor may interview witnesses and demand documents)), plus *additional* power not given even to the government entities, such as interviewing witnesses *ex parte*. *Compare* Dkt. 410 ¶ 3 (monitor may "communicate with a party … on an *ex parte* basis") *with* Dkt. 374 § VII.A.2 (Apple personnel may have counsel present during interviews) *and id.* § VII.C ("No information or documents obtained by [the plaintiffs] … shall be divulged … to any person other than an authorized representative of the

executive branch of the United States, the Attorney General's Office of any Plaintiff State, or the External Compliance Monitor, except in the course of legal proceedings").

Broad investigations conducted with a general purpose of sniffing out wrongdoing are executive functions far outside "[t]he judicial power." U.S. Const. art. III, § 1. Apple thus has at least a substantial possibility of demonstrating on appeal that the Court erred in appointing a monitor to "act[] as an internal investigator" who "report[s] ... to the district court." *Cobell*, 334 F.3d at 1141.

### C.     The Injunction Deprives Apple of Its Right to a "Disinterested Prosecutor"

The injunction is also likely to be reversed on appeal because it deprives Apple of its right to a "disinterested prosecutor" without "a personal interest, financial or otherwise." *Young*, 481 U.S. at 808 (internal quotation marks omitted). Due process demands a "disinterested prosecutor with the unique responsibility to serve the public, rather than a private client" (or himself). *Young*, 481 U.S. at 814-15 (Blackmun, J., concurring).

Mr. Bromwich is being paid for investigating Apple and Apple alone (*see* Dkt. 410 ¶ 8; Dkt. 374 § VI.I), and it is *Apple's adversaries*, including the plaintiff states, that have the authority to approve the expenses that he intends to charge. *See* Dkt. 374 § VI.I. This creates a potential incentive for Mr. Bromwich to run as broad and intrusive an investigation as possible, and deprives Apple of its due process right to a neutral prosecutor. *See Young*, 481 U.S. at 804-05; *Berger v. United States*, 295 U.S. 78, 88 (1935); *People ex rel. Clancy v. Superior Court*, 39 Cal. 3d 740, 746 (1986).

This lucrative engagement also creates a personal incentive—or at least the appearance of such—for Mr. Bromwich to prolong the term of the monitorship as long as possible. For example, with the exception of broad statements about training, Mr. Bromwich has not offered

14

any concrete or constructive advice on developing good compliance programs (Boutrous Decl. ¶ 6), the only communication that would promote efficiency at this stage of the monitorship. And there is no incentive for Mr. Bromwich to act efficiently. The Final Judgment provides that his initial appointment shall "be for a period of two years," but permits the Court "*sua sponte* [to] extend the appointment by one or more one-year periods." Dkt. 374 § VI.A.

The monitorship also violates Federal Rule of Civil Procedure 53(a)(2), which requires that a special master (whether designated as a "master" or "monitor") "must not have a relationship to the parties, attorneys, action, or court that would require disqualification by a judge under 28 U.S.C. § 455, unless the parties, with the court's approval, consent to the appointment after the master discloses any potential grounds for disqualification." *Id.* To ensure a monitor who fails to meet this requirement is not appointed, Rule 53 allows a court to issue an order appointing a special master "*only after*: (A) the master files an affidavit disclosing whether there is any ground for disqualification under 28 U.S.C. § 455; and (B) if a ground is disclosed, the parties, with the court's approval, waive the disqualification." Fed. R. Civ. P. 53(b)(3) (emphasis added). To Apple's knowledge, Mr. Bromwich never filed such an affidavit with the Court, thus making his appointment facially invalid. And given his direct financial stake in the matter, this arrangement could not possibly satisfy 28 U.S.C. § 455's judicial disqualification standards.

## II. APPLE WILL SUFFER IRREPARABLE HARM ABSENT A STAY

The injunction, particularly as modified and as illustrated by the monitor's recent conduct, is already causing irreparable harm to Apple. And because, absent a stay, the monitorship will likely be complete prior to a decision by the Second Circuit, Apple will have no ability to obtain effective relief on appeal. *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 347-

48 (S.D.N.Y. 2007) ("where the denial of a stay pending appeal risks mooting any appeal of significant claims of error, the irreparable harm requirement is satisfied") (emphasis omitted). The irreparable injury flowing to Apple as a result of the injunction is substantial, and warrants a stay during the pendency of Apple's appeal.

### A.     The Injunction Irreparably Interferes with Apple's Business Operations

Mr. Bromwich's inappropriate demand for access to Apple's senior leadership—including officers, directors, and employees who have little or nothing to do with antitrust compliance or the iBooks Store—has already inflicted significant and irreparable harm by interfering with Apple's ability to manage its business.  Mr. Bromwich has consistently demanded that Apple's senior leaders meet with him on his schedule and on short notice—sometimes as short as two days.  *E.g.*, Boutrous Decl. Ex. B at 2-5, Ex S.  When some of those leaders—responsible for the day-to-day management of one of the largest companies in the world—have been unable to accommodate Mr. Bromwich's strict timetable, he has demanded "detailed copies of their schedules" (*Id.* Ex. B at 2), and even asked to meet Apple's General Counsel Bruce Sewell "at the courthouse" where Mr. Sewell was attending the high-stakes *Apple v. Samsung* trial (*id.* at Ex. H).

Rather than rein in this deeply intrusive conduct, the Court proposed amendments to the permanent injunction that explicitly authorize Mr. Bromwich to "meet with a party or a party's agent on an *ex parte* basis" (Dkt. 410 ¶ 3) and to retain any of Apple's documents he deems "materially related to his duties" (*Id.* ¶ 5).  Mr. Bromwich has maximized this authority to its fullest—contacting Apple's directors directly in a purported effort to build a relationship between Apple's leaders and the "monitoring team" that is "unfiltered through outside counsel."

Boutrous Decl. Ex. J at 5.  Even after Apple's objections, he has continued with this effort to communicate directly with Apple officials during his investigation.  Boutrous Decl. ¶ 5.

At a bare minimum, Apple officers, directors, and management are being harmed by the time-consuming distraction of Mr. Bromwich's roving investigation.  These individuals are subjected to Mr. Bromwich's indiscriminate demands for interviews and information—even where, like director Al Gore, they are not directly involved in the company's antitrust compliance efforts.  At worst, Mr. Bromwich's inquisitorial zeal for communication with Apple's employees "unfiltered through outside counsel" fosters an atmosphere of suspicion that is antithetical to the efficient operation of a major corporation.  In either case, Mr. Bromwich's investigation significantly interferes with the ability of Apple's managers to lead the company.

Where, as here, an activity interferes with the effective management of a business, courts recognize that it imposes real but unquantifiable harms.  "Conduct that unnecessarily frustrates efforts to obtain or preserve the right to participate in the management of a company may … constitute irreparable harm."  *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114-115 (2d Cir. 2003).  Barriers to "unfettered" management of a property or business "result[] in delays, missed opportunities, and, most importantly, unquantifiable damages."  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009).  The effect is particularly severe where a business's "income potential depends upon active management," which is indisputably true of a leading innovator in the rapidly evolving technology sector.  *Id.*  Time that Apple's leaders spend preparing for and sitting for interviews with Mr. Bromwich—as well as upending their schedules on short notice to accommodate his requests—is time they cannot spend investigating new business opportunities, promoting efficiency in their operations, or participating in the development of new technology.

Because Mr. Bromwich's significant interference with Apple's management affects the company's ability to identify and exploit new business opportunities by distracting its most senior personnel, it creates exactly the sort of business harm the Second Circuit has identified as irreparable. "[L]oss of ... business opportunities," like loss of goodwill and harm to a business's reputation, cannot be translated "with any precision [into an] amount of monetary loss" and therefore irreparably harms a company. *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004). So too do "anticipated loss of market share growth" and interference with the development and marketing of new and innovative products, which are both natural and foreseeable effects of Mr. Bromwich's overzealous romp through Apple's executive suite. *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005); *see also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) ("We have … found irreparable harm in the loss of a relatively unique product.").

Indeed, because Mr. Bromwich's conduct risks violating Apple's constitutional rights, this alone warrants a stay. "'When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.'" *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (quoting 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2948, at 440 (1973)); *see also Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (explaining that "loss of First Amendment Freedoms" necessarily "constitutes irreparable injury") (internal quotations omitted); *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 8 F. Supp. 2d 779, 789 (N.D. Ill. 1998) (finding a due process violation constituted irreparable harm).

There is no doubt that Mr. Bromwich's inquiry will continue to disrupt Apple's business operations and harm the company, though the quantity of the harm inflicted by Mr. Bromwich will be "very difficult," or impossible, "to quantify," *Tom Doherty Assocs.*, 60 F.3d at 38, and it

cannot be remedied after the fact.  This interference with Apple's business operations thus constitutes irreparable harm warranting a stay.

### B.    The Risk of Disclosing Privileged or Confidential Information Is an Irreparable Injury

The monitor's authority to conduct witness interviews and investigations on an *ex parte* basis also risks disclosure of privileged or confidential materials and communications.  Mr. Bromwich's attempts to contact Apple personnel directly, "unfiltered by outside counsel" (Boutrous Decl. Ex. J at 5), risk revealing privileged or confidential materials or communications to Mr. Bromwich, who would then be free to disclose that information in his reports to plaintiffs and the Court.

Erroneously disclosing such protected information is itself irreparable harm.  *See In re von Bulow*, 828 F.2d 94, 98-99 (2d Cir. 1987) (explaining that once confidential communications have been disclosed, an appeal is "often an exercise in futility"); *In re Prof'ls Direct Ins. Co.*, 578 F.3d 432, 438 (6th Cir. 2009) ("an erroneous forced disclosure of confidential information could not be adequately remedied on direct appeal because a court cannot restore confidentiality to documents after they are disclosed").

### C.    The Significant and Unrecoverable Costs Being Imposed on Apple Warrant a Stay

Because the costs of the monitor's efforts are not recoverable if Apple prevails on appeal, that monetary injury constitutes irreparable harm warranting a stay.  *See*, *e.g.*, *Brenntag Int'l Chems.*, 175 F.3d at 249-50 (noting that irreparable injury includes monetary obligations owed by insolvent parties); *see also Philip Morris USA, Inc. v. Scott*, 131 S. Ct. 1, 4 (2010) (Scalia, J., in chambers) ("Normally the mere payment of money is not considered irreparable, but that is

because money can usually be recovered from the person to whom it is paid. If expenditures cannot be recouped, the resulting loss may be irreparable.") (internal citations omitted).

Here, the injunction requires Apple to pay all costs and expenses associated with the monitorship. Dkt. 374 § VI.I. The rates Mr. Bromwich is charging are higher than any Apple has encountered in its known past matters (Boutrous Decl. Ex. O at 1), and exceed what Apple understands Mr. Bromwich has ever previously quoted (*see id.* Ex. O at 2).

For just the first two weeks of work, before the 90-day deadline triggering his review of Apple's compliance and training programs before any documents were exchanged, interviews scheduled, or meaningful travel conducted, Mr. Bromwich charged Apple $138,432.40. *See id.* Ex. O at 3. This number will surely skyrocket once Mr. Bromwich begins billing Apple for actual interviews, travel, and review of documents, which will result in millions of dollars of unrecoverable costs that Apple never should have incurred if, as Apple submits is likely to occur, the Court's Final Judgment is overturned on appeal.

## III. A STAY OF THE INJUNCTION WILL NOT HARM PLAINTIFFS OR THE PUBLIC INTEREST

By contrast, plaintiffs have no basis on which to claim that a stay of the injunction will harm them or the public interest. Plaintiffs *admit* that the public interest has already been vindicated through the publisher defendants' consent decrees. Although Apple believes its entry into the e-books market unleashed rather than restricted competition and will be making that argument on appeal, plaintiffs themselves declare that there is now "revitalized price competition among e-book retailers" as a result of the publisher consent decrees. Dkt. 329 at 11. They further note "the ongoing effective relief consumers are currently enjoying under the Publisher Defendant consent decrees" (*id.* at 6) and conclude that "[w]ith the Publisher Defendant consent decrees now operative, *price competition has returned to the marketplace.*" *Id.* at 11 (emphasis

added). In light of their unambiguous recognition that competition is flourishing *independently* of the injunction that Apple now seeks to stay, any claims of harm to the public interest are baseless.

Moreover, even though Apple is appealing this Court's July 10 decision and the Final Judgment in their entireties, Apple does not seek to stay provisions of the Final Judgment other than the external compliance monitorship—leaving in effect restrictions on Apple's contracts with publishers and the enhancements to Apple's compliance undertaken by the company during the pendency of the appeal. Apple has already renegotiated its agreements with the publisher defendants pursuant to the Final Judgment (Dkt. 374 §§ III, IV), and hired an outside law firm to assist Apple in enhancing its compliance programs (Levoff Decl. ¶ 3). And Apple has already distributed the Final Judgment to all relevant personnel, confirmed that they have read and understood the terms, and held three live trainings for employees on the meaning of the Final Judgment. *Id.* ¶ 4. These safeguards are more than sufficient to protect the public interest.

## CONCLUSION

For these reasons, this Court should stay Section VI of the injunction pending appeal.

Dated: December 12, 2013

Respectfully submitted,

Theodore J. Boutrous, Jr.
Daniel G. Swanson
Gibson, Dunn & Crutcher, LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000
tboutrous@gibsondunn.com

Cynthia Richman
Gibson, Dunn & Crutcher, LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
(202) 955-8500

*On behalf of Defendant Apple Inc.*

# EXHIBIT I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
UNITED STATES OF AMERICA,                           :
                                                    :
                     Plaintiff,                     :
                                                    :
       v.                                           :        12 Civ. 2826 (DLC)
                                                    :
APPLE INC., *et al.*,                               :
                                                    :
                     Defendants.                    :
                                                    :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
THE STATE OF TEXAS,                                 :
THE STATE OF CONNECTICUT, *et al.*,                 :
                                                    :
                     Plaintiffs,                    :
                                                    :
       v.                                           :        12 Civ. 03394 (DLC)
                                                    :
PENGUIN GROUP (USA) INC., *et al.*,                 :
                                                    :
                     Defendants.                    :
                                                    :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## DECLARATION OF GENE LEVOFF

1.    I, GENE LEVOFF, pursuant to 28 U.S.C. § 1746, declare:

2.    I am the Senior Director, Associate General Counsel, Corporate Law, and Assistant Secretary of Defendant Apple Inc. ("Apple"). In that position, I work closely with Apple's Board of Directors and senior executives. Specifically, I act as: the legal liaison to the Board and its committees, including the Audit and Finance Committee; the Co-Chair of the Management Disclosure Committee; and counsel to the Management Risk Oversight Committee. I am also an attorney duly licensed to practice law in the state of California. I respectfully submit this declaration in support of Defendant Apple Inc.'s Motion by Order to Show Cause For a Stay of the Injunction filed on December 12, 2013. I have personal knowledge of the matters stated herein and, if called upon to do so, could and would competently testify thereto.

3.    Apple has hired Deena Said as an Antitrust Compliance Officer who is working with the company to enhance and expand its compliance and training programs. Apple has renegotiated its agreements with the publisher defendants pursuant to the Final Judgment in this case. Dkt. 374 §§ III, IV. Apple has hired Simpson Thacher & Bartlett LLP to assist Apple in enhancing its compliance programs.

4.    Apple distributed the Final Judgment to all relevant personnel. Apple collected certifications from personnel indicating that they read and understood the terms of the Final Judgment. Apple held three live trainings for employees on the meaning of the Final Judgment.

5.    Since his appointment as monitor, Michael Bromwich has conducted 13 interviews of Apple personnel.

2

6. Mr. Bromwich's interview demands have disrupted Apple's business operations. They have forced the Chairman of the Audit and Finance Committee and senior executives to rearrange their schedule and required the Chairman of the Audit and Finance Committee, Ron Sugar, to travel to Sunnyvale for the sole purpose of the interview, and have distracted the company's leaders from their primary tasks. This disruption will continue if Mr. Bromwich is permitted to continue as monitor, causing significant and irreparable harm that will be difficult or impossible to quantify and that cannot be undone even if Apple prevails on appeal. Nonetheless, as the number of completed interviews indicates, Apple has worked diligently and in good faith to provide Mr. Bromwich with prompt access to the individuals most relevant to his monitorship.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Dated: December 12, 2013

Respectfully submitted,

_____

GENE LEVOFF

3

# EXHIBIT J

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :

UNITED STATES OF AMERICA,            :
                         :

           Plaintiff,           :
                         :

     v.                     :         12 Civ. 2826 (DLC)
                         :

APPLE INC., *et al.*,             :
                         :

           Defendants.         :
                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :

THE STATE OF TEXAS,             :
THE STATE OF CONNECTICUT, *et al.*,  :
                         :

           Plaintiffs,         :
                         :

     v.                     :         12 Civ. 03394 (DLC)
                         :

PENGUIN GROUP (USA) INC., *et al.*,    :
                         :

           Defendants.         :
                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**DECLARATION OF THEODORE J. BOUTROUS, JR.**

I, THEODORE J. BOUTROUS, JR., pursuant to 28 U.S.C. § 1746, declare:

1.       I am an attorney duly licensed to practice law in the State of California.  I have been given permission to appear before the United States District Court for the Southern District of New York *pro hac vice*.  I am a partner at Gibson, Dunn & Crutcher LLP and am one of the attorneys representing Apple Inc. in the above-captioned matter.  I respectfully submit this declaration in support of Defendant Apple Inc.'s Motion by Order to Show Cause For a Stay of the Injunction filed on December 12, 2013.  I have personal knowledge of the matters stated herein and, if called upon to do so, could and would competently testify thereto.

2.       An Order to Show Cause setting an expedited briefing schedule for this Motion is necessary to ensure that the Court reaches a decision whether to stay the injunction, and, if necessary, to allow Apple to file an emergency motion seeking a stay of the injunction from the Second Circuit in the event this Court denies a stay, before the injunction's January 14, 2014 deadline triggering review by the external compliance monitor, Micheal Bromwich, of Apple's enhanced compliance and training programs.  An expedited briefing schedule is also necessary because Apple is suffering ongoing irreparable harm from the injunction.  Finally, an expedited briefing schedule will also ensure that the briefing on this matter is complete before the holidays and that the Court has adequate time to review the parties' briefing before the hearing.

3.       On October 7, 2013, Apple submitted to the Court a letter objecting to Mr. Bromwich's appointment as monitor due to his lack of antitrust experience.  Apple also suggested in the letter that the Court simply appoint Barry Nigro alone.  Because the letter contains sensitive information, it was submitted for in camera review.

4.      During a teleconference on November 4, 2013, Apple discussed with the Department of Justice and the state plaintiffs its objections to the monitor.  Specifically, Apple discussed the objections Apple had outlined in its October 31, 2013 letter to the Department of Justice and the state plaintiffs, including its objections to the timing and scope of interview and other informational requests by the monitor, as well as the financial terms of his engagement.  Apple continued these discussions with the Department of Justice and state plaintiffs during a teleconference on December 9, 2013.

5.      On December 5, 2013, Mr. Bromwich interviewed Dr. Ronald Sugar, Apple's Chair of the Board of Director's Audit Committee.  During that interview, Mr. Bromwich asked Mr. Sugar if they could open a direct line of communication.

6.      To date, Mr. Bromwich has not offered Apple any concrete or constructive advice on developing good antitrust compliance programs, with the exception of a few broad statements about providing training to personnel.

7.      Attached hereto as Exhibit A is a letter from Theodore J. Boutrous, Jr. to Michael Bromwich, sent on October 31, 2013.

8.      Attached hereto as Exhibit B is an email exchange between Theodore J. Boutrous, Jr. and Michael Bromwich, spanning the period from November 7 to November 11, 2013.

9.      Attached hereto as Exhibit C is an email from Theodore J. Boutrous, Jr. to Michael Bromwich, sent on November 7, 2013.

10.      Attached hereto as Exhibit D is an email from Kyle Andeer to Michael Bromwich and Barry Nigro, sent on October 17, 2013.

11.      Attached hereto as Exhibit E is an email exchange between Theodore J.

Boutrous, Jr. and Michael Bromwich, spanning the period from November 7 to November 11, 2013.

12.     Attached hereto as Exhibit F is an email exchange between Theodore J. Boutrous, Jr. and Michael Bromwich, on November 12, 2013.

13.     Attached hereto as Exhibit G is an email from Daniel Swanson to Michael Bromwich, sent on November 17, 2013, and the meeting agenda which was attached thereto.

14.     Attached hereto as Exhibit H is an email from Michael Bromwich to Theodore J. Boutrous, Jr., sent on November 15, 2013.

15.     Attached hereto as Exhibit I is a letter from Matthew Reilly to Michael Bromwich, sent on November 22, 2013.

16.     Attached hereto as Exhibit J is a letter from Michael Bromwich to Apple's Board of Directors, sent on November 22, 2013.

17.     Attached hereto as Exhibit K is an email from Michael Bromwich to Matthew J. Reilly, sent on November 22, 2013.

18.     Attached hereto as Exhibit L is a letter from Michael Bromwich to Bruce Sewell, sent on November 5, 2013.

19.     Attached hereto as Exhibit M is a letter from Michael Bromwich to Timothy Cook and Bruce Sewell, sent on November 1, 2013.

20.     Attached hereto as Exhibit N is a letter from Michael Bromwich to Noreen Krall, sent on November 22, 2013.

21.     Attached hereto as Exhibit O is a letter from Noreen Krall to Michael Bromwich, sent on November 21, 2013.

22.     Attached hereto as Exhibit P is an email from Bruce Sewell to Michael Bromwich, sent on November 25, 2013.

23.     Attached hereto as Exhibit Q is a true and correct copy of a letter from Theodore J. Boutrous, Jr. to Lawrence J. Buterman and Gabriel R. Gervey sent on December 6, 2013.

24.     Attached hereto as Exhibit R is a true and correct copy of a letter from Theodore J. Boutrous, Jr. to J. Robert Kramer, II and Gabriel R. Gervey sent on October 31, 2013.

25.     Attached hereto as Exhibit S is a true and correct copy of an email from Michael Bromwich to Theodore J. Boutrous, Jr., Matthew Reilly, and Noreen Krall sent on November 19, 2013.

26.     No previous application has been made for the relief sought herein.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct.

Dated: December 12, 2013                                    Respectfully submitted,

Theodore J. Boutrous, Jr.

5

# EXHIBIT K

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel 213.229.7000
www.gibsondunn.com

Theodore J. Boutrous Jr.

Direct: +1 213.229.7804
Fax: +1 213.229.6804
TBoutrous@gibsondunn.com

October 31, 2013

<u>VIA E-MAIL</u>

Michael R. Bromwich
The Bromwich Group LLC
901 New York Avenue, NW 5th Floor
Washington, D.C. 20001

Re:    <u>External Antitrust Compliance Monitoring</u>

Dear Michael:

It was a pleasure meeting you last week, and Apple looks forward to working with you to achieve our shared objective of developing a comprehensive and effective antitrust training program consistent with Judge Cote's Final Judgment. Apple is fully committed to ensuring that its antitrust training program, and its policies and procedures related thereto, are both robust and effective.

I am writing to follow up on three issues arising from our discussion last week and your recent correspondence (letter of October 23, 2013[1] and e-mails on October 26 and 29, 2013). First, Apple believes that the timing and scope of your requests are inconsistent with the letter and spirit of the Final Judgment. Judge Cote was very clear that the injunction should be narrowly tailored to address the antitrust violation she found in this case and sought to avoid unnecessarily burdening Apple or limiting its ability to innovate and do business in this dynamic industry. *See* Hearing Transcript, *United States v. Apple Inc., et al.*, No. 1:12-CV-2826, at 8-9 (Aug. 27, 2013) ("I want this injunction to rest as lightly as possible on the way Apple runs its business.") (hereinafter "Aug. 27, 2013 Hearing Tr.").[2] Notably in this regard, the Final Judgment provides that the External Compliance Monitor's review of Apple's internal antitrust compliance policies and procedures and antitrust training program is not to commence until "90 days after his or her appointment." Final Judgment at § VI.C. Second, Apple also has concerns over the financial terms of your engagement, which the Final Judgment requires be "reasonable and customary" and approved by the

---

[1] As you are aware, Apple received a letter from you, in draft form, on October 23, 2013, which was not finalized until October 26, 2013.

[2] *See also* Aug. 27, 2013 Hearing Tr. at 27 ("I'm trying to think about, as I've indicated, where the real risks are and to minimize the burdens on Apple.")

Beijing · Brussels · Century City · Dallas · Denver · Dubai · Hong Kong · London · Los Angeles · Munich
New York · Orange County · Palo Alto · Paris · San Francisco · São Paulo · Singapore · Washington, D.C.

**GIBSON DUNN**

October 31, 2013
Page 2

Department of Justice ("DOJ"). Third, we also need to ensure that the confidentiality of any information Apple may share with you during the course of your activities as monitor is appropriately protected.

Apple is hopeful that these issues can be resolved quickly so that we can move forward together to achieve the objectives of the Final Judgment. Each of these issues is discussed in more detail below.

1.    **Timing and Scope of Monitor's Responsibilities**

As you mentioned at the outset of our introductory meeting, the Final Judgment defines the scope of your responsibilities in a manner that is clear and straightforward. The monitor's primary responsibility is to "conduct a review . . . [of] Apple's internal antitrust compliance policies and procedures, *as they exist 90 days after his or her appointment*" and to "also conduct a review to assess whether Apple's training program, required by Section V.C of this Final Judgment, *as it exists 90 days after his or her appointment*, is sufficiently comprehensive and effective." Final Judgment at § VI.C (emphasis added).

During the August 27 hearing Judge Cote explained, "I don't think that the [Monitor] should conduct a review or assessment of the current policies. I would expect that Apple would revise its current policy substantially and procedures and create an effective training program. That will require some time. So I think this should be revised to have the [Monitor] doing an assessment in three months from appointment and *beginning to engage Apple in a discussion at that point*." Aug. 27, 2013 Hearing Tr. at 20-21(emphasis added).

Apple is in the process of revising and enhancing its compliance training programs to ensure that they are robust, comprehensive, effective, and compliant with the terms of the Final Judgment. In this regard, Apple will soon be bringing on board its new Antitrust Compliance Officer, as directed by the Final Judgment, and adding new lawyers with antitrust compliance expertise in the legal department. In light of the express language of the Final Judgment, as well as Judge Cote's elaboration at the August 27 hearing, the time period for your review of Apple's antitrust policies and procedures and training program does not commence until January 14, 2013 (90 days from the date of appointment).

Accordingly, your request to begin interviewing Apple's entire board and its executive team, as well as additional senior executives on November 18 is premature, not authorized by the Final Judgment, and would not only be disruptive to Apple's business operations but also directly contrary to Judge Cote's intent. We fully understand and expect that there will be a need to conduct interviews with certain personnel at some point once Apple's new training programs are up and running. And you have Apple's assurance that it will be a most willing partner in facilitating those meetings. Furthermore, there will be ample opportunity over the course of your engagement to determine whether Apple's new training program is consistent with the Judge's Order and is effective in its impact.

**GIBSON DUNN**

October 31, 2013
Page 3

However, it makes no sense, and would be extremely disruptive, to schedule those interviews before Apple has completed its internal assessment and developed its new antitrust training program.

**2.      Financial Terms and Fiduciary Responsibilities**

The Final Judgment requires the monitor to operate on "reasonable and customary terms" that are "consistent with reasonable expense guidelines."  Final Judgment at § VI.I. Apple has already raised concerns regarding your hourly fees, the administrative fee you seek to impose in addition to those fees, the need for additional personnel, and finally, adherence to a defined expense policy.  Apple does not believe your proposed fee structure is reasonable and customary, whether for a monitor or a lawyer, and respectfully objects to it. Moreover, your dictate that we simply accept these fees and costs at face value without any support or explanation is inconsistent with the company's fiduciary responsibilities to its shareholders, and to the customary practices of Apple and other companies in conducting business or legal activities.  And, while the Final Judgment requires DOJ and Plaintiff States to approve your fee and expense structure (*see* Final Judgment at § VI.I), it appears from your correspondence you have not secured such approval but instead have simply submitted your proposed approach to DOJ and it has not acted upon it.

**3.      Confidentiality**

To protect the confidentiality of any information Apple may share with you during the monitorship, we have attached a non-disclosure agreement for your signature that is consistent with Apple's standard confidentiality agreements and the Stipulated Protective Order in this matter.  Apple also reserves its right to assert attorney-client privilege and work product protections as appropriate throughout this process.  Finally, Apple again requests that, consistent with its policies, you, the Bromwich Group, Goodwin Procter, and Fried Frank refrain from using Apple's name in any marketing materials or media communications like the press release Goodwin Procter issued announcing your appointment and containing a direct quote from you.

* * * * *

Concurrent with this response, Apple has submitted to DOJ and Plaintiff States a notice of its objections.  Please direct any future communications on these issues to me.  As we work to resolve these issues, Apple will continue to focus its efforts on its internal assessment and enhancement of its antitrust policies and procedures and the training program mandated by the Final Judgment.  As you know, Apple has retained seasoned antitrust practitioners and former government officials at the law firm of Simpson Thacher to aid it in this process.  We appreciate an honest and open dialogue on these issues, and look forward to

**GIBSON DUNN**

October 31, 2013
Page 4


working with you to establish antitrust compliance policies and training programs that are comprehensive and effective in satisfaction of the Final Judgment.


Very truly yours,

s/ Theodore J. Boutrous, Jr.

Theodore J. Boutrous, Jr.



Enclosure

# CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (the "Agreement") is entered into and is effective as of _____ (the "Effective Date") by and between Michael Bromwich, on behalf of the Bromwich Group, and Bernard Nigro (hereinafter "ECM") and Apple Inc. ("Apple" and, collectively, the "Parties") in connection with Section VI.I of the September 5, 2013 Final Judgment (the "Final Judgment") entered in *United States of America v. Apple, Inc.*, No. 1:12-CV-2826 (S.D.N.Y. Sept. 5, 2013) (the "Action"), and consistent with the May 7, 2012 Stipulated Protective Order entered in the Action (the "Protective Order").

Whereas, the Final Judgment contemplates that the Parties will execute customary confidentiality agreements in connection with ECM's monitoring responsibilities pursuant to the Final Judgment; and

Whereas, Apple contemplates that certain highly sensitive information and materials may be disclosed in connection with ECM's performance of his responsibilities pursuant to the Final Judgment; and

Whereas, the Parties agree that such materials should be kept confidential subject to the terms and conditions set forth below,

NOW, THEREFORE, the Parties do hereby agree and stipulate as follows:

1.  **DEFINITION OF CONFIDENTIAL INFORMATION.** ECM agrees that all information disclosed by Apple to ECM in any manner in connection with ECM's monitoring responsibilities pursuant to the Final Judgment will be considered and referred to collectively in this Agreement as "Confidential Information." Confidential Information, however, does not include information that: (a) is now or subsequently becomes generally available to the public through no fault or breach on the part of ECM; (b) ECM can demonstrate to have had rightfully in his possession prior to disclosure to ECM by Apple; (c) is independently developed by ECM without the use of any Confidential Information; or (d) ECM rightfully obtains from a third-party who has the right to transfer or disclose it to ECM without limitation.

2.  **NONDISCLOSURE AND NONUSE OF CONFIDENTIAL INFORMATION.** ECM agrees to protect Apple's Confidential Information, using at least the same degree of care that he uses to protect his own confidential and proprietary information of similar importance, but no less than a reasonable degree of care. ECM agrees to use Apple's Confidential Information for the sole purpose of performing his monitoring responsibilities in connection with the Final Judgment. ECM will not disclose, publish, or disseminate Confidential Information to anyone, and will not use Confidential Information in any manner, except as set forth in this Agreement.

3.  **INADVERTENT DISCLOSURE BY APPLE OF PRIVILEGED OR PROTECTED INFORMATION.** If Apple inadvertently discloses to ECM material subject to the attorney-client privilege, work-product protection, or any other applicable privilege or protection that ECM is not authorized to receive pursuant to the Final Judgment, the applicable privilege and/or protection will not be waived if Apple makes a request for return of such inadvertently produced material promptly after learning of its inadvertent production. Upon such notice, ECM will promptly return or destroy the materials subject to privilege and/or protection.

### 4. INADVERTENT DISCLOSURE BY ECM OF CONFIDENTIAL INFORMATION.

In the event of disclosure by ECM of any Confidential Information to any person or persons not authorized to receive such disclosure pursuant to this Agreement, ECM will promptly notify Apple of the disclosure and provide to Apple all known relevant information concerning the nature and circumstances of the disclosure. ECM will promptly thereafter take all reasonable measures to retrieve the improperly disclosed material and to ensure that no further or greater unauthorized disclosure and/or use thereof is made. Unauthorized or inadvertent disclosure will not change the confidential status of any Confidential Information.

### 5. AUTHORIZED DISCLOSURE OF CONFIDENTIAL INFORMATION BY ECM.

Information and materials designated as Confidential Information pursuant to this Agreement may only be disclosed by ECM to the persons and in the manner set forth below:

(a) To the extent necessary to discharge ECM's monitoring responsibilities pursuant to the Final Judgment, attorneys, employees, and associates of ECM, including attorneys and employees of The Bromwich Group LLC, and attorneys and employees of Fried, Frank, Harris, Schriver & Jacobson.

(b) United States Department of Justice attorneys and employees, in connection with their enforcement or monitoring of compliance with the Final Judgment;

(c) Attorneys and employees of the Attorney General's Office of any Representative Plaintiff State (as defined in the Final Judgment), in connection with their enforcement or monitoring of compliance with the Final Judgment; and

(d) The Court and all persons assisting the Court in the Action, in connection with enforcement or monitoring of the Final Judgment, including law clerks, court reporters, and stenographic or clerical personnel.

In addition, before any information designated as Confidential Information may be disclosed to any person described in subparagraphs 5(a)-(c) above, he or she must first read this Agreement or must have otherwise been instructed on his or her obligations pursuant to this Agreement, and must execute the Agreement included as Appendix A hereto prior to receiving Confidential Information. Each individual described in subparagraphs 5(a)-(c) above and to whom Confidential Information is disclosed must not disclose that information to any other individual, except as set forth in this Agreement.

Nothing in this Agreement prevents disclosure by ECM of Confidential Information to any current employee of Apple, and nothing in this Agreement prevents the United States or any Representative Plaintiff State (as defined in the Final Judgment), subject to taking appropriate steps to preserve the confidentiality of such information, from using or disclosing Confidential Information as permitted or required by the Final Judgment, for law enforcement purposes, or as may otherwise be required by law or binding court order.

**6.     NOTICE OF DISCLOSURE AND USE OF CONFIDENTIAL INFORMATION IN COURT PROCEEDINGS.**   Before disclosure of Confidential Information is made to any person or persons not authorized to receive the information pursuant to paragraph 5 above, ECM must give Apple at least ten (10) calendar days' advance notice in writing, including the name(s), address(es), and employer(s) of the person(s) to whom the disclosure will be made and the reason for the disclosure.  If, within that ten-day period, Apple objects to the disclosure, ECM must make a written request to the United States and Representative Plaintiff States (as defined in the Final Judgment) within ten (10) calendar days' receipt of Apple's objection.  In addition, in connection with any disclosure or use of Confidential Information in any court proceeding, ECM must take reasonable steps to maintain the confidentiality of those materials, including but not limited to filing documents under seal and satisfying the other requirements of paragraph 20 of the Protective Order.

**7.     PROCEDURES UPON COMPLETION OF ECM'S MONITORING RESPONSIBILITIES.**   The obligations imposed by this Agreement survive the termination of ECM's monitoring responsibilities as set forth in the Final Judgment.  Within ninety (90) days after termination of ECM's monitoring responsibilities in connection with the Final Judgment, ECM must certify to Apple in writing that it has destroyed or returned to Apple all Confidential Information and that it has endeavored in good faith to ensure that any Confidential Information disclosed pursuant to paragraph 5 above has been destroyed or returned to Apple.  However, nothing in this paragraph prevents the United States or the Representative Plaintiff States (as defined in the Final Judgment) from retaining or using Confidential Information, subject to taking appropriate steps to preserve the confidentiality of such information, as permitted or required by the Final Judgment, for law enforcement purposes, or as may otherwise be required by law or binding court order.

**8.     EQUITABLE RELIEF.**   ECM hereby acknowledges that unauthorized disclosure or use of Confidential Information could cause irreparable harm and significant injury to Apple that may be difficult to ascertain.  Accordingly, ECM agrees that Apple will have the right to seek and obtain immediate injunctive relief to enforce obligations under this Agreement in addition to any other rights and remedies it may have.

**9.     NO IMPLIED WAIVER.**   Apple's failure or delay in exercising any of its rights will not constitute a waiver of such rights unless expressly waived in writing.

**10.     ENTIRE AGREEMENT AND GOVERNING LAW.**   This Agreement, in conjunction with the terms set forth in the Final Judgment, constitutes the entire Agreement with respect to the Confidential Information disclosed pursuant to this Agreement and supersedes all prior or contemporaneous oral or written Agreements concerning such Confidential Information. This Agreement may not be amended except by written Agreement signed by authorized representatives of both Parties.  This Agreement shall be governed by and construed in accordance with the laws of the State of California, excluding that body of California law concerning conflicts of law.  The Parties further submit to and waive any objections to the exclusive jurisdiction of and venue in the United States District Court for the Southern District of New York for any litigation arising out of this Agreement.

Understood and agreed to by the parties:

MICHAEL BROMWICH:

By:  _____

Name:  _____

Title:  _____

BERNARD NIGRO:

By:  _____

Name:  _____

Title:  _____

On behalf of APPLE INC.:

By:  _____

Name:  _____

Title:  _____

## Appendix A

I am employed as _____ by _____.  I hereby certify that:

1.      I have read the Confidentiality Agreement between Michael Bromwich and Apple Inc. (the "Agreement") and understand its terms.

2.      I agree to be bound by the terms of the Agreement, including the terms relating to disclosure of Confidential Information (as defined in the Agreement) in paragraph 5 and the terms relating to the destruction or return of Confidential Information in paragraph 7 of the Agreement.

3.      I agree to use the information provided to me in connection with the Agreement only for the purpose of enforcement and monitoring of the Final Judgment (as defined in the Agreement).

4.      I understand that my failure to abide by the terms of the Agreement will subject me, without limitation, to liability for breach of the Agreement and this Appendix A.

5.      I submit to the jurisdiction of the United States District Court for the Southern District of New York solely for the purpose of enforcing the terms of the Agreement and this Appendix A and freely and knowingly waive any right I may otherwise have to object to the jurisdiction of said court.

I make this certificate on this _____ day of _____ , _____.

By:  _____

Name:  _____

Title:  _____

# ATTACHMENT 2

**Subject:**                                       Monitoring Letter


On Oct 26, 2013, at 8:47 AM, Michael Bromwich <michael.bromwich@bromwichgroup.com> wrote:


Dear Kyle,

Thanks very much for your response to my cover note and our draft letter. Unfortunately, I think you may have misconceived its purpose. It was not to begin a negotiation about fees, rates, and expenses, nor was it meant to provide you with an opportunity to provide us with guidelines that are applicable to providers of legal services where Apple is the client -- but that are inapplicable to firms providing independent monitoring services. It was to give you an opportunity to modify or revise the confidentiality provision. In light of your response, it probably makes sense to execute any enhancements to the confidentiality agreement separately. I have attached a signed copy of the monitoring letter. The only change is the date.

Without responding to each item in your note, I wanted to clarify the following:

1. Administrative fees are completely standard for consulting firms. The Bromwich Group is not a law firm and does not practice law. The normal range for the administrative/management fees for consulting firms is between 10% and 25%. Therefore, the 15% is at the low end of the range.

2. We will add additional personnel, whether from Fried Frank or elsewhere, only as necessary and appropriate. We will keep you informed if we add personnel performing significant substantive responsibilities but not if we use a lawyer to do a discrete research project or a legal assistant to provide support. We will do this as a courtesy and we do not intend to provide a rationale. It will be because we need additional assistance.


3. On expenses, please advise whether your lawyers from Gibson Dunn working on this matter, your Wilmer lawyers working on the Samsung matter in the ND of California, and other lawyers working on high-end litigation and corporate matters follow these expense guidelines without exception. If they do, we will seriously consider doing so. We are happy to receive from you a list of Apple's preferred hotels.

4. We are serving as an independent compliance monitor pursuant to a Court order, not as counsel to Apple subject to its direction and control. Accordingly, we will not be providing a budget. You are incorrect in stating that this is standard practice in monitorships. We will do everything we reasonably can to keep fees and expenses to a minimum. We plan to provide you each month with a statement of the number of hours spent by each timekeeper on this matter but not to provide descriptions of the amount of time spent on specific tasks. We will maintain such records and will share them with the Department of Justice, the Plaintiff States, and the Court if requested to do so.

5. We will submit our invoices directly to you, or to someone you designate. We will be happy to execute W-9s.

6. My consulting firm did not issue a press release. Goodwin Procter posted an item on its web site without my advance knowledge or consent to clarify that the firm itself would not be involved in the monitorship.

We very much look forward to your responses to the various substantive matters we discussed on Tuesday and to your confirming the particulars of our initial visit to Cupertino the week of November 18.

Best regards.


*MRB*


On Fri, Oct 25, 2013 at 10:45 PM, Kyle Andeer <kandeer@apple.com> wrote:

Dear Michael,

Thank you for sharing your draft letter  It is very helpful in that it tees up a number of different issues that make sense to address at the outset of our relationship.  As you noted, the treatment of confidential information is one of several issues that will require additional research and thought.  Although the disclosure of such information is highly unlikely given the narrow scope of the External Compliance Monitor's responsibilities, we agree that this is an issue we should seek to address at the outset.  It likely makes sense for us to execute one of our "customary confidentiality agreements" as contemplated in the Final Judgment.  Final Judgment at § VI.I, U.S. v. Apple, Inc., No. 1:12-CV-2826 (S.D.N.Y. Sept. 5, 2013).  We will provide a full response on these and other issues in the next week, as well as a retention obligations agreement and confidentiality agreements to address this point.

I do want to raise concerns with the compensation and expense terms outlined in your letter which are in tension with the terms of the Final Judgment which require the External Monitor to operate on "reasonable and customary terms" that are "consistent with reasonable expense guidelines." Final Judgment at § VI.I, U.S. v. Apple, Inc., No. 1:12-CV-2826 (S.D.N.Y. Sept. 5, 2013).   From our perspective they do not reflect the competitive realities of the marketplace.  We expect that your firm – like all of Apple's legal service providers – will comply with Apple's Outside Service Provider Policy ("OSP") (attached) and its standard expense policy (also attached).

1.  Administrative Fee.  You request that the Bromwich Group be paid a "management/ administrative fee" of 15% of all billable hours.  As you will note in the attached policies, Apple does not pay any of its legal vendors a "management/administrative fee."

2.  Hourly Rates.  You have requested that Apple pay you $1,100 per hour and Mr. Nigro $1,025 per hour.  These rates are very high, particularly when compared to the average rate Apple pays a law firm partner ($565 per hour).  Even if one looks at the top 25%, the average rate per partner is $801 per hour.  Apple is prepared to  compensate you at $800 per hour and Mr. Nigro at a rate of $700 per hour.  With the foregoing principles in mind, we also ask that you provide the hourly rate for Maria Cirincione.

3.  Additional Personnel.  Pursuant to Apple's Outside Service Provider Policy, the Bromwich Group (and Fried Frank) should notify Apple before adding new timekeepers to its team and provide a rational for the additional resources. As you appreciate, this is a standard requirement that ensures costs do not spiral out of control.

4. Expense policy.  Apple expects that you will adhere to its standard expense policy (attached)  Apple will pay for coach airfare, lodging at Apple preferred hotels, and per diems of $15 for breakfast, $25 for lunch and $30 for dinner.  The policy also outlines our guidelines on telephone and copying charges.  Apple will not reimburse for data storage and information technology services.  This is consistent with these policies is in keeping with the "reasonable expense guidelines" language in Section VI.I of the Final Judgment.

5. Budget and Invoicing.  The Bromwich Group should submit an expected budget for its services for the coming year.  As you know this is standard practice in any engagement, including in monitorships.  In addition, Apple expects that your invoices will describe time spent on tasks and a description of those tasks.  Apple reserves the right to challenge fees that are excessive, outside the scope your responsibilities, and/or unjustified pursuant to Sections VI.I. and VI.J. of the Final Judgment.

6. Billing.  Apple requires firms to submit invoices - within 30 days of service - via an electronic portal.  We can set up a meeting with our eBilling team as soon as you are ready.  Apple will also require a signed W9 in order to pay invoices for your firm.

7. Marketing.  Apple does not allow the firms it works with to market their representation of Apple (see OSP at 6).  We noted that your firm, Goodwin Proctor, your consulting practice, The Bromwich Group, and Mr. Nigro's firm, Fried Frank all issued press releases announcing your appointments.  We ask that you please refrain from using Apple's name in any marketing materials or media communications.

The requests in your letter do not reflect market realities.  That raises significant concerns on our part.  We sincerely hope that you will reflect on these points and that we can work out these issues without going to the Department of Justice and the courts.  Please let me know if you would like to discuss.

Best regards,

Kyle

On Oct 23, 2013, at 3:58 PM, Michael Bromwich <michael.bromwich@bromwichgroup.com> wrote:

Dear Kyle,

I have attached a draft letter that sets forth our duties and responsibilities as the external antitrust compliance monitor under the Final Judgment, and touches on other matters relevant to our monitoring work, including information about fees, expenses, and confidentiality.  This letter is specifically tailored to the provision of monitoring services under the Final Judgment.  Accordingly, it is different in various ways from the engagement letter that would be appropriate if Apple were a client of a law firm or my consulting firm.

Before I provided a signed version of the letter, I wanted to make sure it should be addressed to you rather than someone else at Apple, and give you the opportunity to suggest any revisions to Section 10 of the letter dealing with confidentiality.  I realize this may be a sensitive issue and I wanted to make sure the language I have crafted is acceptable.  I am willing to consider reasonable modifications.

Please confirm that you should be the recipient of this letter (or provide an alternative addressee) and suggest any reasonable changes to the confidentiality language as promptly as you can.

Thanks very much.

*MRB*
<Apple Monitoring Letter -- 10-23.doc>


<Apple -- 10-26 Letter.pdf>

_____
Confidentiality Notice: The information contained in this e-mail and any attachments may be legally privileged and confidential. If you are not an intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please notify the sender and permanently delete the e-mail and any attachments immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you.

# EXHIBIT L

| From: | Boutrous Jr., Theodore J. |
|---|---|
| Sent: | Monday, November 11, 2013 7:48 AM |
| To: | Michael Bromwich |
| Cc: | Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.; Richman, Cynthia |
| Subject: | RE: Apple -- Expense Guidelines |

Dear Michael:

      I am very surprised and disappointed in your email below. I thought that we had set things on a productive and collaborative path in our call last week and with my follow up list of potential interviewees (which was much broader and longer than the one I had suggested during the cordial November 6 call). During our call, I specifically noted that the week of November 18 might not be feasible or convenient and suggested that the week of December 2 (the week after the intervening Thanksgiving holiday week) might work well. When I then followed up and proposed December 2, you responded in your November 7 email that you would be in Europe the week of December 2 and had some other scheduling conflicts that week and the week of December 9. I then simply wrote back and asked if you could reshuffle your schedule so that we could make the December 9 timeframe work.

      Your response below was not in the spirit of our efforts and offer to host you at Apple headquarters for a full slate of interviews and provide other information well in advance of the date on which your review of the new compliance and training programs is to commence under the Final Judgment (January 14). As set forth in my October 31 letter, Judge Cote and the Final Judgment could not have been clearer regarding the timing and scope of your review and the need to avoid unduly intruding on Apple's business operations. The Final Judgment is also clear that any "interview [is] to be subject to the reasonable convenience of such personnel…." Final Judgment at VI.G.1. Contrary to your suggestions below, and as Apple's General Counsel Bruce Sewell made clear in his letter to you and I emphasized when we spoke and in my letter to you and in my conversations with the Justice Department and States on these issues, Apple takes its obligations and responsibilities under the Final Judgment very seriously. To that end, and among the other things it is doing on this front, Apple has made a reasonable proposal regarding the requested interviews and for working collaboratively and productively with you. Under the circumstances, your demands and approach are unreasonable, unnecessary and unwarranted, and go well beyond the scope of the Final Judgment and Judge Cote's guidance.

                                  Ted

**Theodore J. Boutrous Jr.**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7804 • Fax +1 213.229.6804
TBoutrous@gibsondunn.com • www.gibsondunn.com

**From:** Michael Bromwich [mailto:michael.bromwich@bromwichgroup.com]
**Sent:** Saturday, November 09, 2013 2:48 PM
**To:** Boutrous Jr., Theodore J.
**Cc:** Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.; Richman, Cynthia; scarroll@robbinsrussell.com
**Subject:** Re: Apple -- Expense Guidelines

Ted,

This is a very disappointing response, and very much at odds with what my understanding was during and after our call last Wednesday. The company was put on notice on October 22 that we intended to make our initial visit the week of November 18. Your response suggests that our request was not -- and is not -- taken seriously by the company. Apple is a can-do company, and I am confident that they can pull this together. If they maintain that they cannot, that suggests to me that they do not take its obligations and my responsibilities under the Final Judgment very seriously. The questions below need only be answered if the company maintains that that it unable to comply with our request for a series of interviews and meetings the week of November 18.

Please advise which of the 15 people (Sewell, Moyer, Levoff, Vetter, Andeer, Said, Persamperi, Moerer, McDonald, Cook, Schiller, Cue) identified in your e-mail and my response are unavailable for as little as an hour any day the week of November 18 (Monday through Friday). Be prepared to support any representations concerning their unavailability with detailed copies of their schedules for that entire week.

Please confirm that contact has been made with the 2-3 Board members identified in my e-mail who appear to work in the vicinity of Apple's headquarters, and that they are also unavailable for a meeting/interview of similar length.

Please advise which of the subjects identified in my recent e-mail cannot be addressed in a presentation/discussion (with almost two weeks notice) and why that is the case.

I remain willing to upend my schedule and make the trip this coming week rather than the week of November 18 if that will mean the company is better able to comply with our quite reasonable requests. I am not prepared to drag things out any longer than that.

Thanks.


*MRB*


On Sat, Nov 9, 2013 at 4:01 PM, Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com> wrote:

Michael:

      I have now heard back and, unfortunately, that week is very bad in terms of scheduling. I know you will be out of the country the week of December 2, but we would very much appreciate it if you could work on your scheduling conflicts the week of December 9 and make the trip that week. Apple will be able to have a full slate of interviewees for you to meet with that week along the lines of my prior email and the new ACO will have had time to get acclimated and up and running. This will get things off to a strong start and would be much better from the standpoints of efficiency and effectiveness. It doesn't make sense to have you fly all the way to California only to

meet with a few people the week of November 18.  In the meantime, we can start getting you some of the information you have requested.  We are also working on a new confidentiality arrangement based on the protective order.  Can we make this work?

**Theodore J. Boutrous Jr.**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7804 • Fax +1 213.229.6804
TBoutrous@gibsondunn.com • www.gibsondunn.com

---

**From:** Michael R. Bromwich [mailto:michael.bromwich@bromwichgroup.com]
**Sent:** Saturday, November 09, 2013 11:30 AM
**To:** Boutrous Jr., Theodore J.
**Cc:** Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.; Richman, Cynthia; scarroll@robbinsrussell.com
**Subject:** Re: Apple -- Expense Guidelines

Thanks, Ted. We appreciate it. We will plan to fly in late Sunday and be ready to go first thing Monday morning unless a Tuesday start would be significantly better for the company.

Also, we would be grateful for any of the materials we originally requested October 22.

Best.

MRB

On Nov 9, 2013, at 2:13 PM, "Boutrous Jr., Theodore J." <TBoutrous@gibsondunn.com> wrote:

Checking to see what can be pulled together for that week  Will report back

**Theodore J. Boutrous Jr.**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7804 • Fax +1 213.229.6804
TBoutrous@gibsondunn.com • www.gibsondunn.com

**From:** Michael Bromwich [mailto:michael.bromwich@bromwichgroup.com]
**Sent:** Thursday, November 07, 2013 12:58 PM
**To:** Boutrous Jr., Theodore J.
**Cc:** Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.
**Subject:** Re: Apple -- Expense Guidelines

Thanks, Ted. Let's keep trying for the week of November 18. The following two weeks are bad for me -- I'm out of the country and otherwise committed the week of December 2 and have some real scheduling difficulties the following week as well. And then we're into the holidays when we can expect people to be traveling everywhere.

We have always understood that we would not be able to grab everyone we would like to meet or interview the week of the 18th, but let's resolve to do the best we can. The list you have generated is an excellent start.

In addition to the people on this list, all of whom we want to meet/interview either the week of the 18th or at some point soon thereafter, we would like to interview/meet Tim Cook, Phil Schiller, and Eddie Cue. If there are other Senior VPs who touch antitrust-related issues in a meaningful way, we would like to add them to the list as well.

In addition, we would be very interested in gathering information while we are out there on the following.

1. A discussion of the overall compliance structure at Apple -- spheres of responsibility, reporting structure, and personnel involved in compliance.

2. Overview of the compliance activities that were commenced after the Final Judgment, as referred to in Bruce Sewell's November 4 letter.

3. Overview of the structure and operation of the Risk Management Committee.

4. Overview of the role of the Audit Committee in compliance

5. Overview of the evaluative tools -- e.g., outside audits and reviews -- currently used to review and monitor the compliance program.

6. Discussion of the tools and methods currently used within the company to promote compliance.

7. Structure for reporting and investigating suspected compliance violations (antitrust and other issues).

8. Existing system for imposing discipline on company personnel who violate compliance policies.

9. Mechanisms for reporting compliance violations and preventing retaliation.

These are just a few ideas about topics that I have found very worthwhile to explore at the outset of monitoring. I will leave to Apple which of these it wants to take up the week of 11/18 and which it would prefer to defer until our next trip -- realistically,

probably in early January. I am open to interviewing people who are the most knowledgeable on these subjects, or receiving presentations, which can then be later followed up on with interviews. I want to be as flexible as possible about this, but I have no doubt we will be able to usefully fill 2-3 days the week of 11/18.

We would also very much ask for the company's assistance in arranging interviews with its Board members. In addition to Mr. Cook, I note that Mr. Levenson and Mr. Campbell, both of whom are members of the Audit Committee, are based in Mountain View (Campbell) and South San Francisco (Levenson). My understanding is that Mr. Gore either lives of frequently visits Northern California. If one or more of these outside directors are available the week of the 18th, we would very much like to meet with them.

Thanks very much for your continued assistance and cooperation on this.

Best.

*MRB*

On Thu, Nov 7, 2013 at 3:16 PM, Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com> wrote:

Thank you Michael. I look forward to reviewing this and very much appreciated our call yesterday. The week of November 18 is looking bad from a scheduling standpoint (including because the new Antitrust Compliance Officer will be officially starting work that week and a number of other folks will be traveling), so we would like to propose the week of December 2. I am still working to confirm, but interviewees could potentially include:

Bruce Sewell, Senior Vice President, General Counsel, and Secretary Member of Management Risk Oversight Committee
Tom Moyer, Chief Compliance Officer and Head of Global Security
Gene Levoff, Senior Director, Associate General Counsel - Corporate Law and Assistant Secretary, Legal Counsel to Audit and Nominating and Corporate Governance Committee, Liaison to Board of Directors, Counsel Risk Management Committee
Doug Vetter, Vice President, Associate General Counsel Product Law and Assistant Secretary. Assumed responsibility in July 2013 for legal groups supporting hardware, software, and iTunes (including App Store and iBooks Store).
Kyle Andeer, Senior Director, Competition Law & Policy
Deena Said, Antitrust Compliance Officer
Annie Persamperi, Legal Counsel, iBooks Store

Keith Moerer, Director, iTunes content
Rob McDonald, Head of iBooks Store for the United States


I hope we can work together to make this a productive first trip for you to Apple and sets us on a joint path to achieving the objectives of this effort.

               Ted

Sent from my iPad


On Nov 7, 2013, at 1:00 PM, "Michael Bromwich" <michael.bromwich@bromwichgroup.com> wrote:

> Dear Ted,
>
> As promised during our call yesterday afternoon, attached please find a letter that sets forth the items included in Apple's expense policies that we feel comfortable signing on to.  As you will see, we have no objection to agreeing to follow those polices that don't raise independence concerns or otherwise seem inappropriate. Please let us know if you have any questions or need to discuss any of the specific items.
>
> Again, I want to thank you for the very productive discussion we had yesterday.  We look forward to receiving the list of people and groups the company is proposing we meet and/or interview the week of November 18 so we can reach closure on the issue as soon as possible and schedule the trip.
>
> Best regards.
>
>
>
> *MRB*
>
> <Apple -- Letter to Boutrous -- 11-7.PDF>

---

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

---

# EXHIBIT M

| | |
|---|---|
| **From:** | Boutrous Jr., Theodore J. |
| **Sent:** | Thursday, November 07, 2013 12:17 PM |
| **To:** | Michael Bromwich |
| **Cc:** | Nigro, Barry; Cirincione, Maria; Swanson, Daniel G. |
| **Subject:** | Re: Apple -- Expense Guidelines |

Thank you Michael.  I look forward to reviewing this and very much appreciated our call yesterday.  The week of November 18 is looking bad from a scheduling standpoint (including because the new Antitrust Compliance Officer will be officially starting work that week and a number of other folks will be traveling), so we would like to propose the week of December 2.  I am still working to confirm, but interviewees could potentially include:

Bruce Sewell, Senior Vice President, General Counsel, and Secretary Member of Management Risk Oversight Committee
Tom Moyer, Chief Compliance Officer and Head of Global Security
Gene Levoff, Senior Director, Associate General Counsel - Corporate Law and Assistant Secretary, Legal Counsel to Audit and Nominating and Corporate Governance Committee, Liaison to Board of Directors, Counsel Risk Management Committee
Doug Vetter, Vice President, Associate General Counsel Product Law and Assistant Secretary.  Assumed responsibility in July 2013 for legal groups supporting hardware, software, and iTunes (including App Store and iBooks Store).
Kyle Andeer, Senior Director, Competition Law & Policy
Deena Said, Antitrust Compliance Officer
Annie Persamperi, Legal Counsel, iBooks Store
Keith Moerer, Director, iTunes content
Rob McDonald, Head of iBooks Store for the United States


I hope we can work together to make this a productive first trip for you to Apple and sets us on a joint path to achieving the objectives of this effort.

> Ted
Sent from my iPad

On Nov 7, 2013, at 1:00 PM, "Michael Bromwich" <michael.bromwich@bromwichgroup.com> wrote:

> Dear Ted,
>
> As promised during our call yesterday afternoon, attached please find a letter that sets forth the items included in Apple's expense policies that we feel comfortable signing on to.  As you will see, we have no objection to agreeing to follow those polices that don't raise independence concerns or otherwise seem inappropriate. Please let us know if you have any questions or need to discuss any of the specific items.
>
> Again, I want to thank you for the very productive discussion we had yesterday.  We look forward to receiving the list of people and groups the company is proposing we meet

and/or interview the week of November 18 so we can reach closure on the issue as soon as possible and schedule the trip.

Best regards.


*MRB*

<Apple -- Letter to Boutrous -- 11-7.PDF>

# EXHIBIT N



**From:** Kyle Andeer [mailto:kandeer@apple.com]
**Sent:** Thursday, October 17, 2013 12:08 AM
**To:** Bromwich, Michael; barry.nigro@friedfrank.com
**Subject:** Introduction

Hi Michael & Barry,

I wanted to drop you a quick note of introduction in light of today's news.  I am responsible for Apple's in-house antitrust/competition legal team; I have spent three years here after a decade at the DOJ and the FTC.

I don't believe I have met either of you before but I am looking forward to it.  The circumstances (at least from my perspective) could be better but I am committed to working with both of you and developing a best of class antitrust compliance program for iTunes.  We are already hard at work developing such a program working with our internal compliance team here at Apple and Kevin Arquit and Matt Reilly at Simpson Thacher.  We are hopeful that the program that we will present to you in 90 days will meet our lofty goals.  That said, we recognize and expect that you will have thoughts and comments.  I really do hope this can be a collaborative effort.

I thought it might be helpful to at least introduce myself at the outset.  I am more than willing to get on a call (or a plane) at any time if that would be of interest.   And Michael, I apologize for using your Goodwin address . . . I did not have one for your consulting practice.  Let me know if there is a better contact.

Kyle

Kyle Andeer | Apple Legal | Senior Director, Competition Law & Policy/Commercial & Retail Law
1 Infinite Loop, Cupertino, California 95014 | T (408) 862-9307 | C (408) 464-2006 | kandeer@apple.com
The information in this e-mail and any attachment(s) is intended solely for the personal and confidential use of the designated recipients.  This message may be an attorney-client communication protected by privilege.  If you are not the intended recipient, you may not review, use, copy, forward, or otherwise disseminate this message.  Please notify us of the transmission error by reply e-mail and delete all copies of the message and any attachment(s) from your systems.

# EXHIBIT O

| From: | Michael Bromwich <michael.bromwich@bromwichgroup.com> |
|---|---|
| Sent: | Monday, November 11, 2013 8:34 AM |
| To: | Boutrous Jr., Theodore J.; Carroll, Sarah |
| Cc: | Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.; Richman, Cynthia |
| Subject: | Re: Apple -- Expense Guidelines |

Ted, let's see if we can make some progress on a phone call this afternoon rather than exchanging additional e-mails.  We don't think a slate of interviews and meetings next week, almost a full month after we identified it as the time we would like to begin our on site work, is at all unreasonable, especially because we have made clear that we will understand if some of the people we want to meet are unavailable next week.  I'm hopeful that we can work something out that isn't overly burdensome to the company but that doesn't cause us further delay.  I think we can.

Please let us know what times this afternoon would work for you.  Thanks.

*MRB*

On Mon, Nov 11, 2013 at 10:48 AM, Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com> wrote:

Dear Michael:


I am very surprised and disappointed in your email below.  I thought that we had set things on a productive and collaborative path in our call last week and with my follow up list of potential interviewees (which was much broader and longer than the one I had suggested during the cordial November 6 call).  During our call, I specifically noted that the week of November 18 might not be feasible or convenient and suggested that the week of December 2 (the week after the intervening Thanksgiving holiday week) might work well.  When I then followed up and proposed December 2, you responded in your November 7 email that you would be in Europe the week of December 2 and had some other scheduling conflicts that week and the week of December 9.  I then simply wrote back and asked if you could reshuffle your schedule so that we could make the December 9 timeframe work.

Your response below was not in the spirit of our efforts and offer to host you at Apple headquarters for a full slate of interviews and provide other information well in advance of the date on which your review of the new compliance and training programs is to commence under the Final Judgment (January 14).  As set forth in my October 31 letter, Judge Cote and the Final Judgment could not have been clearer regarding the timing and scope of your review and the need to avoid unduly intruding on Apple's business operations.  The Final Judgment is also clear that any "interview [is] to be subject to the reasonable convenience of such personnel…."  Final Judgment at VI.G.1.  Contrary to your suggestions below, and as Apple's General Counsel Bruce Sewell made clear in his letter to you and I emphasized when we spoke and in my letter to you and in my conversations with the Justice

Department and States on these issues, Apple takes its obligations and responsibilities under the Final Judgment very seriously.  To that end, and among the other things it is doing on this front, Apple has made a reasonable proposal regarding the requested interviews and for working collaboratively and productively with you.  Under the circumstances, your demands and approach are unreasonable, unnecessary and unwarranted, and go well beyond the scope of the Final Judgment and Judge Cote's guidance.


Ted



**Theodore J. Boutrous Jr.**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7804 • Fax +1 213.229.6804
TBoutrous@gibsondunn.com • www.gibsondunn.com



**From:** Michael Bromwich [mailto:michael.bromwich@bromwichgroup.com]
**Sent:** Saturday, November 09, 2013 2:48 PM
**To:** Boutrous Jr., Theodore J.
**Cc:** Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.; Richman, Cynthia; scarroll@robbinsrussell.com
**Subject:** Re: Apple -- Expense Guidelines


Ted,


This is a very disappointing response, and very much at odds with what my understanding was during and after our call last Wednesday.  The company was put on notice on October 22 that we intended to make our initial visit the week of November 18.  Your response suggests that our request was not -- and is not -- taken seriously by the company.   Apple is a can-do company, and I am confident that they can pull this together.  If they maintain that they cannot, that suggests to me that they do not take its obligations and my responsibilities under the Final Judgment very seriously.  The questions below need only be answered if the company maintains that that it unable to comply with our request for a series of interviews and meetings the week of November 18.


Please advise which of the 15 people (Sewell, Moyer, Levoff, Vetter, Andeer, Said, Persamperi, Moerer, McDonald, Cook, Schiller, Cue) identified in your e-mail and my response are unavailable for as little as an hour any day the week of November 18 (Monday through Friday). Be prepared to support any

representations concerning their unavailability with detailed copies of their schedules for that entire week.

Please confirm that contact has been made with the 2-3 Board members identified in my e-mail who appear to work in the vicinity of Apple's headquarters, and that they are also unavailable for a meeting/interview of similar length.

Please advise which of the subjects identified in my recent e-mail cannot be addressed in a presentation/discussion (with almost two weeks notice) and why that is the case.

I remain willing to upend my schedule and make the trip this coming week rather than the week of November 18 if that will mean the company is better able to comply with our quite reasonable requests.  I am not prepared to drag things out any longer than that.

Thanks.

*MRB*

On Sat, Nov 9, 2013 at 4:01 PM, Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com> wrote:

Michael:

      I have now heard back and, unfortunately, that week is very bad in terms of scheduling.  I know you will be out of the country the week of December 2, but we would very much appreciate it if you could work on your scheduling conflicts the week of December 9 and make the trip that week.  Apple will be able to have a full slate of interviewees for you to meet with that week along the lines of my prior email and the new ACO will have had time to get acclimated and up and running.  This will get things off to a strong start and would be much better from the standpoints of efficiency and effectiveness.  It doesn't make sense to have you fly all the way to California only to meet with a few people the week of November 18.  In the meantime, we can start getting you some of the information you have requested.  We are also working on a new confidentiality arrangement based on the protective order.  Can we make this work?

**Theodore J. Boutrous Jr.**

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7804 • Fax +1 213.229.6804
TBoutrous@gibsondunn.com • www.gibsondunn.com

---

**From:** Michael R. Bromwich [mailto:michael.bromwich@bromwichgroup.com]
**Sent:** Saturday, November 09, 2013 11:30 AM
**To:** Boutrous Jr., Theodore J.
**Cc:** Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.; Richman, Cynthia; scarroll@robbinsrussell.com
**Subject:** Re: Apple -- Expense Guidelines


Thanks, Ted. We appreciate it. We will plan to fly in late Sunday and be ready to go first thing Monday morning unless a Tuesday start would be significantly better for the company.


Also, we would be grateful for any of the materials we originally requested October 22.

Best.


MRB


On Nov 9, 2013, at 2:13 PM, "Boutrous Jr., Theodore J." <TBoutrous@gibsondunn.com> wrote:

> Checking to see what can be pulled together for that week  Will report back


**Theodore J. Boutrous Jr.**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7804 • Fax +1 213.229.6804
TBoutrous@gibsondunn.com • www.gibsondunn.com


**From:** Michael Bromwich [mailto:michael.bromwich@bromwichgroup.com]
**Sent:** Thursday, November 07, 2013 12:58 PM
**To:** Boutrous Jr., Theodore J.
**Cc:** Nigro, Barry; Cirincione, Maria; Swanson, Daniel G.
**Subject:** Re: Apple -- Expense Guidelines

Thanks, Ted. Let's keep trying for the week of November 18. The following two weeks are bad for me -- I'm out of the country and otherwise committed the week of December 2 and have some real scheduling difficulties the following week as well. And then we're into the holidays when we can expect people to be traveling everywhere.

We have always understood that we would not be able to grab everyone we would like to meet or interview the week of the 18th, but let's resolve to do the best we can. The list you have generated is an excellent start.

In addition to the people on this list, all of whom we want to meet/interview either the week of the 18th or at some point soon thereafter, we would like to interview/meet Tim Cook, Phil Schiller, and Eddie Cue. If there are other Senior VPs who touch antitrust-related issues in a meaningful way, we would like to add them to the list as well.

In addition, we would be very interested in gathering information while we are out there on the following.

1. A discussion of the overall compliance structure at Apple -- spheres of responsibility, reporting structure, and personnel involved in compliance.

2. Overview of the compliance activities that were commenced after the Final Judgment, as referred to in Bruce Sewell's November 4 letter.

3. Overview of the structure and operation of the Risk Management Committee.

4. Overview of the role of the Audit Committee in compliance

5. Overview of the evaluative tools -- e.g., outside audits and reviews -- currently used to review and monitor the compliance program.

6. Discussion of the tools and methods currently used within the company to promote compliance.

7. Structure for reporting and investigating suspected compliance violations (antitrust and other issues).

8. Existing system for imposing discipline on company personnel who violate compliance policies.

9. Mechanisms for reporting compliance violations and preventing retaliation.

These are just a few ideas about topics that I have found very worthwhile to explore at the outset of monitoring. I will leave to Apple which of these it wants to take up the week of 11/18 and which it would prefer to defer until our next trip -- realistically, probably in early January. I am open to interviewing people who are the most knowledgeable on these subjects, or receiving presentations, which can then be later followed up on with interviews. I want to be as flexible as possible about this, but I have no doubt we will be able to usefully fill 2-3 days the week of 11/18.

We would also very much ask for the company's assistance in arranging interviews with its Board members. In addition to Mr. Cook, I note that Mr. Levenson and Mr.

Campbell, both of whom are members of the Audit Committee, are based in Mountain View (Campbell) and South San Francisco (Levenson). My understanding is that Mr. Gore either lives of frequently visits Northern California. If one or more of these outside directors are available the week of the 18th, we would very much like to meet with them.

Thanks very much for your continued assistance and cooperation on this.

Best.

*MRB*

On Thu, Nov 7, 2013 at 3:16 PM, Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com> wrote:

Thank you Michael. I look forward to reviewing this and very much appreciated our call yesterday. The week of November 18 is looking bad from a scheduling standpoint (including because the new Antitrust Compliance Officer will be officially starting work that week and a number of other folks will be traveling), so we would like to propose the week of December 2. I am still working to confirm, but interviewees could potentially include:

Bruce Sewell, Senior Vice President, General Counsel, and Secretary Member of Management Risk Oversight Committee
Tom Moyer, Chief Compliance Officer and Head of Global Security
Gene Levoff, Senior Director, Associate General Counsel - Corporate Law and Assistant Secretary, Legal Counsel to Audit and Nominating and Corporate Governance Committee, Liaison to Board of Directors, Counsel Risk Management Committee
Doug Vetter, Vice President, Associate General Counsel Product Law and Assistant Secretary. Assumed responsibility in July 2013 for legal groups supporting hardware, software, and iTunes (including App Store and iBooks Store).
Kyle Andeer, Senior Director, Competition Law & Policy
Deena Said, Antitrust Compliance Officer
Annie Persamperi, Legal Counsel, iBooks Store
Keith Moerer, Director, iTunes content
Rob McDonald, Head of iBooks Store for the United States

I hope we can work together to make this a productive first trip for you to Apple and sets us on a joint path to achieving the objectives of this effort.

6

                          Ted
Sent from my iPad


On Nov 7, 2013, at 1:00 PM, "Michael Bromwich" <michael.bromwich@bromwichgroup.com>
wrote:

        Dear Ted,

        As promised during our call yesterday afternoon, attached please find a
        letter that sets forth the items included in Apple's expense policies that we
        feel comfortable signing on to.  As you will see, we have no objection to
        agreeing to follow those polices that don't raise independence concerns or
        otherwise seem inappropriate. Please let us know if you have any
        questions or need to discuss any of the specific items.

        Again, I want to thank you for the very productive discussion we had
        yesterday.  We look forward to receiving the list of people and groups the
        company is proposing we meet and/or interview the week of November 18
        so we can reach closure on the issue as soon as possible and schedule the
        trip.

        Best regards.



        *MRB*

        <Apple -- Letter to Boutrous -- 11-7.PDF>

_____

This message may contain confidential and privileged information. If it has been sent to you in
error, please reply to advise the sender of the error and then immediately delete this message.

_____

# EXHIBIT P

| | |
|---|---|
| **From:** | Michael Bromwich <michael.bromwich@bromwichgroup.com> |
| **Sent:** | Tuesday, November 12, 2013 3:10 PM |
| **To:** | Boutrous Jr., Theodore J. |
| **Cc:** | Nigro, Barry (Barry.Nigro@friedfrank.com); Cirincione, Maria (Maria.Cirincione@friedfrank.com); Richman, Cynthia; Swanson, Daniel G. |
| **Subject:** | Re: Apple |

Ted,

Thanks very much for your timely response and the offer of interviews with Mr. Moyer and Mr. Levoff next Monday, November 18. We accept. We are hopeful that once you advise the company that we will be conducting these interviews on Monday, other people whom we have identified, or whom you have suggested, will become available on Monday, Tuesday, or even Wednesday. I think it is very much in the company's interests for us to meet, if only briefly, those people with whom we will be having the most contact over the next two years.

Please let us know whether we should be prepared to conduct the interviews Monday morning or Monday afternoon. Also, we would very much appreciate obtaining the materials we originally requested on October 22, especially those most relevant to Mr. Moyer's and Mr. Levoff's responsibilities, as soon as possible.

Please let us know if the company has any suggestions on hotels where we should try to make reservations.

Again, thanks very much for your cooperation in this matter.

Best regards.


*MRB*


On Tue, Nov 12, 2013 at 4:55 PM, Boutrous Jr., Theodore J. <TBoutrous@gibsondunn.com> wrote:


Dear Michael:

It was good speaking with you yesterday. I have confirmed that Apple would be able to make available for 1-hour intenrviews on Monday November 18 Tom Moyer, who is Chief Compliance Officer and Head of Global Security, and Gene Levoff, who serves as Senior Director, Associate General Counsel - Corporate Law - and Assistant Secretary, Legal Counsel to Audit and Nominating and Corporate Governance Committee, Liaison to Board of Directors, and Counsel to Risk Management Committee. While

they would be able to cover many of the topics you have expressed interest in discussing at the outset of your work, we strongly encourage you to hold off and make the trip the week of December 2 or December 9, when Apple can make a fuller slate of folks available to you, including  Bruce Sewell, who will be attending the Samsung trial next week, and  Deena Said, the new Antitrust Compliance Officer, who will be starting her job at the company and attending new employee orientation next week, along with other relevant members of the legal and business teams mentioned in my prior correspondence.  Apple respectfully submits that this will be more efficient and effective in getting you the information you seek and in working together to ensure that the company has comprehensive and effective antitrust compliance and training programs.  Regards,


Ted

---

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

---

# EXHIBIT Q

| From: | Swanson, Daniel G. |
|---|---|
| Sent: | Sunday, November 17, 2013 12:11 AM |
| To: | 'Michael Bromwich' |
| Cc: | Richman, Cynthia; 'Nigro, Barry'; 'Cirincione, Maria'; 'Carroll, Sarah'; 'Matthew J. Reilly'; Boutrous Jr., Theodore J. |
| Subject: | RE: Apple -- Trip to CA |
| Attachments: | AppleAgenda.docx; ECM Stipulated Protective Order.docx |

Michael:  Ted is out of pocket today but we wanted to get you a copy of Monday's agenda.  Matt Reilly will be in attendance and Ted will dial in as soon as he gets out of a morning court hearing.  Also attached is a draft protective order reflecting Apple's changes.


**Daniel G. Swanson**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7430 • Fax +1 213.229.6430
Avenue Louise 480, Brussels, 1050
Tel +32 2 554 70 00 • Fax +32 2 554 70 33
DSwanson@gibsondunn.com • www.gibsondunn.com

---

**From:** Michael Bromwich [mailto:michael.bromwich@bromwichgroup.com]
**Sent:** Friday, November 15, 2013 9:51 AM
**To:** Boutrous Jr., Theodore J.
**Cc:** Swanson, Daniel G.; Richman, Cynthia; Nigro, Barry; Cirincione, Maria; Carroll, Sarah; Matthew J. Reilly
**Subject:** Apple -- Trip to CA

Dear Ted,

1.    The hotel you recommended was sold out.  We're staying at the Sheraton in Sunnyvale.

2.  Our return flight is late afternoon Tuesday.  We remain hopeful that you will identify additional people for us to meet Monday or Tuesday.

3.  We think it would be useful for us to meet Deena Said if only briefly during our visit.

4.  You had mentioned that Bruce Sewell will be attending the Apple-Samsung trial next week.  I would be happy to stop by the courthouse and meet him briefly over a cup of coffee at the courthouse on Monday or Tuesday if that's convenient for him.  I think it's important that the two of us meet as soon as possible.

5.  We were not planning to have a court reporter attend next week's interviews, unless that is your preference.

6.  Please advise who, if anyone, will be attending the interviews along with the witnesses.

7.  We still have not received any of the written materials we have been promised since October 22.  We would appreciate receiving these as soon as possible.

Please let me know if you have any questions.

*MRB*

# AGENDA

**9:00-9:40**: Noreen Krall, Apple Vice President Litigation

    Confidentiality and Engagement Agreements

**10:15-11:15:** Tom Moyer, Chief Compliance Officer and Head of Global Security

    Compliance Program Overview

**11:15-12:15:** Gene Levoff , Senior Director, Associate General Counsel - Corporate Law - and Assistant Secretary, Legal Counsel to Audit and Nominating and Corporate Governance Committee, Liaison to Board of Directors, and Counsel to Risk Management Committee.

    Audit Committee Overview

# EXHIBIT R

| **From:** | Michael Bromwich <michael.bromwich@bromwichgroup.com> |
| **Sent:** | Friday, November 15, 2013 9:51 AM |
| **To:** | Boutrous Jr., Theodore J. |
| **Cc:** | Swanson, Daniel G.; Richman, Cynthia; Nigro, Barry; Cirincione, Maria; Carroll, Sarah; Matthew J. Reilly |
| **Subject:** | Apple -- Trip to CA |

Dear Ted,

1.   The hotel you recommended was sold out.  We're staying at the Sheraton in Sunnyvale.

2.  Our return flight is late afternoon Tuesday.  We remain hopeful that you will identify additional people for us to meet Monday or Tuesday.

3.  We think it would be useful for us to meet Deena Said if only briefly during our visit.

4.  You had mentioned that Bruce Sewell will be attending the Apple-Samsung trial next week.  I would be happy to stop by the courthouse and meet him briefly over a cup of coffee at the courthouse on Monday or Tuesday if that's convenient for him.  I think it's important that the two of us meet as soon as possible.

5.  We were not planning to have a court reporter attend next week's interviews, unless that is your preference.

6.  Please advise who, if anyone, will be attending the interviews along with the witnesses.

7.  We still have not received any of the written materials we have been promised since October 22.  We would appreciate receiving these as soon as possible.

Please let me know if you have any questions.


*MRB*

# EXHIBIT S

---

SIMPSON THACHER & BARTLETT LLP

1155 F STREET, N.W.
WASHINGTON, DC 20004
(202) 636-5500

FACSIMILE (202) 636-5502

DIRECT DIAL NUMBER
(202) 636-5566

E-MAIL ADDRESS
mreilly@stblaw.com

BY E-MAIL

November 22, 2013

Re: External Antitrust Compliance Monitoring

Michael R. Bromwich
The Bromwich Group LLC
901 New York Avenue, NW 5th Floor
Washington, D.C. 20001

Dear Michael:

I write in regard to your repeated requests to interview additional Apple

executives, board members, and other employees, and to attempt to agree more generally on

a schedule moving forward. In the past few weeks, you have sent frequent and repetitive

requests to speak with—among many others—at least five different board members and the

entire Apple executive team (including Sir Jonathan Ive, whose sole and exclusive

responsibility at Apple is to perfect elegant product designs), long before the Court

contemplated that your review would begin. As explained below, these requests are

inconsistent with Judge Cote's direction and counter-productive to Apple's extensive efforts

to develop a comprehensive new antitrust training and monitoring program. Furthermore,

cascades of emails and demands for immediate attention are incredibly disruptive.

NEW YORK    BEIJING    HONG KONG    HOUSTON    LONDON    LOS ANGELES    PALO ALTO    SÃO PAULO    SEOUL    TOKYO

First and most fundamentally, and as we explained to you previously, Judge
Cote stated expressly that she expected your review to begin three months after your
appointment, noting from the bench that "I don't think that the [Monitor] should conduct a
review or assessment of the current policies. I would expect that Apple would revise its
current policy substantially . . . and create an effective training program. That will require
some time. So I think this should be revised to have the [Monitor] *doing an assessment in
three months from appointment and beginning to engage Apple in a discussion at that
point*." Transcript of Oral Argument at 20-21, Apple, Inc., No. 1:12-CV-2826 (Sept. 5,
2013) (emphasis added). Similarly, the Court amended the Final Judgment to require you to
"conduct a review . . . [of] Apple's internal antitrust compliance policies and procedures, *as
they exist 90 days after his or her appointment*" and to "also conduct a review to assess
whether Apple's training program, required by Section V.C of this Final Judgment, *as it
exists 90 days after his or her appointment*, is sufficiently comprehensive and effective."
Final Judgment § VI.C (emphasis added). Judge Cote also stated more generally that "I
want this injunction to rest as lightly as possible on the way Apple runs its business."
Transcript of Oral Argument at 8-9, Apple, Inc., No. 1:12-CV-2826 (Sept. 5, 2013).

Thus, Judge Cote clearly prescribed that your review would begin in
substance on or around January 14, 2014, not almost immediately after your appointment.
She also directed that you conduct your review in such a way as to disrupt Apple's business
operations as little as possible. The reason for this three-month window is of course to
provide Apple and its counsel with time to develop new, comprehensive antitrust training
and compliance materials in accordance with the Final Judgment, without hampering
Apple's business. Apple and its counsel have in fact already dedicated substantial internal

Michael R. Bromwich                    -3-                    November 22, 2013

and external resources to developing Apple's new training and compliance program, which
we intend to provide to you in draft form in the near future.

Second, ***despite*** the fact that the Court expected your engagement to begin
substantively after this three-month window, Apple already has gone far beyond what the
Final Judgment and Judge Cote require of it. Apple took the initiative to meet with you and
your team on October 22, 2013, immediately after your appointment. We then agreed to
schedule interviews of two senior Apple attorneys on November 18, 2013, despite the fact
that the Final Judgment does not require Apple to do so. Most recently, we have proposed
making several more Apple employees available to you in the first week of December for
two-and-a-half full days of additional interviews. We have also provided you with a number
of documents pursuant to your requests and will provide additional documents going
forward.

Third, your continual requests for additional interviews and other information
before January 14, 2014, affirmatively hamper Apple's efforts to develop a new antitrust
training and compliance program as efficiently and effectively as possible within the
deadline set by Judge Cote. Even after we have met and conferred with you in good faith
regarding specific requests, you have regularly repackaged the same demands in different
forms, through a variety of emails and telephonic and in-person meet and confers, and on a
nearly daily or weekly basis. This constant stream of repetitive requests distracts the Apple
in-house and outside counsel responsible for developing the new training program, thereby
taking away time that would otherwise be devoted to completing the very antitrust program
that is the centerpiece of Judge Cote's Order.

Michael R. Bromwich                    -4-                    November 22, 2013

    In short, we have gone far above and beyond that required of us by the Final

Judgment in order to demonstrate our commitment to working with you in good faith and to

complying with Judge Cote's instructions. We remain committed to doing so. In the spirit

of cooperation, and to ensure that you obtain the information you need while minimizing

any further disruption to the company, we propose the following schedule for additional

interviews, generally to be conducted every two months or so beginning with the upcoming

interviews in December:

### December 4:

9:00 a.m.: Chris Keller, Vice President, Internal Audit

10:00 a.m.: Noreen Krall, Vice President and Chief Litigation Counsel

11:00 a.m.: Doug Vetter, Vice President and Associate General Counsel

1:00 p.m.: Kyle Andeer, Senior Director, Competition Law & Policy

2:00 p.m.: Annie Persampieri, Corporate Counsel, Internet Services & Software

3:00 p.m.: Deena Said, Antitrust Compliance Officer[1]

### December 5:

11:00 a.m.: Ronald Sugar, Director and Chair of the Audit and Finance Committee

2:00 p.m.: Rob McDonald, Head, U.S. iBookstore

3:00 p.m.: Tom Moyer, Chief Compliance Officer (by phone, as Mr. Moyer will be traveling)

---

[1]    Please let me know what time you plan to begin interviewing each day. If any of the proposed times do not work for you, we will work with you in good faith to move specific interviews later in the afternoon on December 4 or to a mutually convenient time on December 6.

Michael R. Bromwich                    -5-                    November 22, 2013

**December 6**:

9:00 a.m.: Gene Levoff, Associate General Counsel, Corporate Law

11:00 a.m.: Keith Moerer, Director, iBookstore

Please note that Bruce Sewell is unavailable December 4-6 due to prior commitments, but will be available for a telephonic interview the week of December 9. We will follow up with proposed dates and times for that call shortly. We will also provide you with any other logistical information shortly before the interviews.

Furthermore, we propose offering one or a small number of senior executives and content managers in early February. Any meeting between you and an Apple business executive or manager, or between you and Mr. Sugar, will be held in the presence of counsel so that we may appropriately protect Apple's attorney-client privilege.

In advance of the additional interviews set out above, we are happy to continue working with you in good faith to respond to any document requests that are reasonably related to your duties as monitor. To that end, enclosed please find a revised draft confidentiality agreement reflecting our discussions last week. Please let me know if you have any further changes to or comments regarding the agreement.

Feel free to contact me with any questions.

Sincerely,

Matthew J. Reilly /ss

Matthew J. Reilly

Encl.

# EXHIBIT T

# The
# Bromwich
# Group

The Bromwich Group LLC
901 New York Avenue, NW, 5th Floor
Washington, DC 20001

November 22, 2013

Mr. Arthur Levinson
Chairman and former CEO
Genentech, Inc.
One DNA Way
South San Francisco, CA 94080

Mr. William Campbell
Chairman and former CEO
Intuit Inc.
2700 Coast Avenue
Mountain View, CA 94043

Mr. Timothy Cook
CEO
Apple Inc.
One Infinite Loop
Cupertino, CA 95014

Mr. Millard Drexler
Chairman and Chief Executive Officer
J. Crew Group, Inc.
770 Broadway
New York, NY 10003

Mr. Albert Gore, Jr.
The Climate Reality Project
901 E Street, N.W.
Suite 610
Washington, D.C. 20004

Mr. Robert Iger
President and Chief Executive Officer
The Walt Disney Company
500 South Buena Vista Street
Burbank, CA 91521

Ms. Andrea Jung
Senior Advisor to the Board of Directors
Avon Products, Inc.
777 Third Avenue
New York, NY 10017

Mr. Ronald Sugar
Former Chairman and CEO
Northrop Grumman Corporation
2980 Fairview Park Drive
Falls Church, VA 22042

Re:  Relationship between External Compliance Monitor and Apple

Dear Members of the Apple Inc. Board of Directors:

As you know, on September 5, 2013, the Honorable Denise L. Cote, United States District Judge for the Southern District of New York, issued a Final Judgment in *United States of America v. Apple, Inc., et al.*, Civil Action No. 1:12-CV-2826 and Order Entering

Permanent Injunction in *The State of Texas, et al., v. Penguin Group (USA), Inc., et al.,* Civil Action No. 1:12-CV-3394 (collectively, the "Final Judgment").

Section VI of the Final Judgment established the position of External Compliance Monitor ("monitor") with "the power and authority to review and evaluate Apple's existing internal antitrust compliance policies and procedures," as well as the training program required by the Final Judgment. In addition, the monitor has the power and authority to recommend changes to "address any perceived deficiencies in those policies, procedures, and training." Section VI.B.

More specifically, the Final Judgment requires the monitor to "conduct a review to assess whether Apple's internal antitrust compliance policies and procedures, as they exist 90 days after his or her appointment, are reasonably designed to detect and prevent violations of the antitrust laws" and to "conduct a review to assess whether Apple's training program, required by the [Final Judgment], as it exists 90 days after his or her appointment, is sufficiently comprehensive and effective." Section VI.C. The monitor is required to provide an initial written report summarizing his findings, conclusions, and recommendations no later than April 14, 2014, and additional written reports at six-month intervals for a period of two years. The Court may extend the duration of the monitor's appointment beyond two years, and the monitor, at his discretion or at the request of the Department of Justice, State Attorneys General, or the Court, may file additional reports.

Consistent with a selection process set forth in the Final Judgment, I was selected by the Court, on October 16, 2013, to serve as the monitor. I have assembled a small team to work with me, led by Barry Nigro, the chair of the Antitrust Department at Fried, Frank, Harris, Shriver & Jacobson LLP.

I have been doing oversight and monitoring work of various kinds for the past twenty years – first, as the Inspector General for the Department of Justice during the Clinton Administration, and subsequently as a monitor of public agencies and private companies. This is the fourth time in the last eleven years I have been selected to serve as a monitor. I am familiar with the challenges and opportunities presented by serving as a monitor or otherwise engaging in oversight work. I have developed an approach of openness, engagement, and collaboration that has been successful for me and the organizations – both public and private – that I have monitored.

I regret to report that in the month since my appointment, I have experienced a surprising and disappointing lack of cooperation from Apple and its executives that is rare in my oversight experience. Within a week of my appointment, on October 22, Mr. Nigro and I met in New York with a senior lawyer for the company and three of the company's outside lawyers to discuss the monitor's role and my approach to the

Members of the Apple Inc. Board of Directors
November 22, 2013
Page 3

responsibilities created by the Court's Final Judgment. I outlined my expectations for the relationship. As reflected in Judge Cote's observations during the trial, and in the post-trial conferences focused on appropriate remedies, senior executives and the Board have an important role to play in the fulfillment of Apple's obligations. At the October 22 meeting, I explained that, in my experience, the monitor and the company benefit from the monitor's direct and regular access to senior management of the company.

In that connection, I advised the company that I felt it was important to conduct a set of initial meetings and interviews with company executives and members of the Board to introduce myself, lay the foundation for our relationship, and learn some basic facts about the company's compliance framework. At the October 22 meeting, I proposed that my first visit to Cupertino for those initial meetings and interviews take place the week of November 18, a full month after my appointment. I expressed my willingness to advance the meetings by a week if that was more convenient for the company and its executives. I should note that the initial meetings for my other monitoring assignments generally occurred within two weeks of my appointment.

Apparently, my requests were inconsistent with the desires, and perhaps the expectations, of the company. Since the October 22 initial meeting until today, the company has not been responsive to our efforts to discharge the obligations the Court assigned to us. The company consistently opposed our requests to conduct interviews during the week of November 18. It originally took the position that we were not to begin our work until 90 days after my appointment, and later opposed the request on grounds that providing senior executive and Board member interviews was overly burdensome, and that *all* of the individuals with whom we had asked to meet were unavailable during the entire week of November 18.

When we made it clear that we intended to travel to California during the week of November 18 and expected to meet with as many of the fifteen individuals we had requested as possible, the company agreed to schedule interviews with only two individuals. We were told that the others were "unavailable," with a specific reason given only for Bruce Sewell. Despite repeated promises, we received not a single document from the company in advance of our trip to California in response to requests we initially made on October 22, and repeated thereafter.[1] Once we arrived in California, the company provided interviews only with the two individuals who had been identified in advance, but with no one else. The company gave no explanation for failing to be more responsive to our requests for other interviews, other than "unavailability."

---

[1]     After our November 18 trip to California, counsel for the company provided its first set of documents in response to our requests.

Members of the Apple Inc. Board of Directors
November 22, 2013
Page 4

In addition to requests for interviews with relevant executives, we also asked to meet with Board members who work and reside in and around Northern California. We repeated our request upon our arrival on Monday, November 18 but we never received a response. It is unclear to me whether these requests have been communicated to you, although they certainly should have been.

Our requests to meet with key Apple personnel have been largely ignored, and when not ignored the responses have been extremely slow in coming. The company has spent far more time challenging the terms of our compensation and raising other objections related to administrative matters, even though the Court's Order provided no role for Apple in setting the monitor's compensation.[2] Apple has sought for the past month to manage our relationship as though we are its outside counsel or consultant, to whom it can dictate terms and conditions, and whose approval is required before we can undertake our work. Despite Apple's failure to respond adequately to our reasonable requests, we will continue to "proceed with all reasonable diligence" in our duties, as instructed by Judge Cote's November 21, 2013 Order proposing an amendment to her original September 5 Order.

The company's approach to date is antithetical to the type of relationship that is required for the monitor and the company to work together in a constructive and collaborative manner. This approach has the potential to create a relationship fraught with friction and tension rather than the positive, collaborative relationship we can – and should – have.

We understand that Apple is appealing the antitrust verdict the Court rendered against the company. We further understand that the company strongly opposed the appointment of an external antitrust compliance monitor, and that Apple has never had a monitor of any kind. That may explain why, over the past month, Apple has taken an unfortunate and unproductive approach. But understanding the company's perspective does not excuse Apple's continuing failure to cooperate.

We are off to a slow, difficult, and unfortunate start, but I have no doubt that we can get our relationship back on track. It is very early in a long-term relationship. I have several suggestions for you as members of the Board in the exercise of your oversight responsibilities, which I believe could help the Company fulfill its obligations under the Final Judgment:

- Ensure that Apple personnel appointed to serve as liaisons to me and the other members of the monitoring team understand that a relationship

---

[2]     The latest of these challenges was in the form of a letter from Noreen Krall on November 21, 2013, demanding documentation and support for compensation.

Members of the Apple Inc. Board of Directors
November 22, 2013
Page 5

> with a court-appointed monitor is different from a relationship with
> counsel to the company, an adversary in litigation, or an outside counsel
> or consultant.

- Promote a positive, direct relationship between the company liaisons and
  the monitoring team that is unfiltered through outside counsel.

- Encourage senior management of the company to work with us to build a
  constructive relationship with a shared goal of creating a world-class
  antitrust compliance program at Apple. That can happen only if the
  company substitutes a new approach, based on collaboration and
  engagement, for the confrontational and obstructionist approach it has
  adopted in the first month of our relationship.

I very much regret that my first encounter with you has been under these
circumstances. I look forward to meeting with you in the near future and working with
you to ensure that Apple fully complies with the Court's Final Judgment in this matter
and builds an antitrust compliance program that can serve as an industry leader.

Very truly yours,

Michael R. Bromwich

# EXHIBIT U

| | |
|---|---|
| **From:** | Michael Bromwich <michael.bromwich@bromwichgroup.com> |
| **Sent:** | Friday, November 22, 2013 8:02 PM |
| **To:** | Reilly, Matt |
| **Cc:** | Nigro, Barry; Carroll, Sarah; Boutrous Jr., Theodore J.; Cirincione, Maria; Arquit, Kevin; Noreen Krall |
| **Subject:** | Re: Letter and Confidentiality Agreement |

Matt,

Thanks for your letter and the draft confidentiality agreement. We will review the agreement and get back to you promptly.

In response to your letter, we simply disagree with the oft-repeated claim that Judge Cote never meant for us to begin our work before January 14. We have the distinct advantage of having discussed our intentions to get off to a fast start directly with her during the interviewing process. We give that discussion far more weight than snippets of transcript taken out of context.

We appreciate the schedule you have provided. We may have some follow-up, but we appreciate the effort that you have made. I thought we had mentioned that we would not be arriving until the late morning of December 4; I don't arrive back in the US from overseas until late in the day on December 3. I'm hopeful that we can make adjustments to accommodate our later arrival.

Thanks again.


*MRB*


On Fri, Nov 22, 2013 at 10:31 PM, Reilly, Matt <Matt.Reilly@stblaw.com> wrote:
Michael,

Please see the attached letter and confidentiality agreement pursuant to our discussion at Monday's meeting.

Best,
Matt

# EXHIBIT V

# The Bromwich Group

The Bromwich Group LLC
901 New York Avenue, NW, 5th Floor
Washington, DC  20001


November 5, 2013


**BY EMAIL**

D. Bruce Sewell, Esq.
Senior Vice President and General Counsel
Apple, Inc.
One Infinite Loop
Cupertino, CA   95014

Dear Bruce:

Thanks very much for your letter of November 4.  I am pleased to hear about the work that Apple has been doing with respect to antitrust compliance since the Court entered the Final Judgment on September 5, including the selection of the internal Antitrust Compliance Officer ("ACO").  Based on your letter, it appears that we fully share the objective of establishing and maintaining a professional, constructive, and collaborative relationship.

First, let me briefly respond to your suggestion that our interactions with Apple should not begin in any meaningful way until the expiration of the 90 days provided by the Final Judgment.  The Final Judgment makes clear that our initial assessment of the company's antitrust policies, procedures, and training should be as they exist *as of* January 14, 2014, but the Final Judgment in no way precludes us from beginning our work upon appointment.   Indeed, in my interviews during the monitor selection process with the Department of Justice and the Plaintiff States, and separately with Judge Cote, I made clear that one of the keys to a successful monitorship was getting off to a fast start and promptly making contact with top executives at the company, including conducting preliminary interviews.  These early contacts lay the groundwork

D. Bruce Sewell, Esq.
November 5, 2013
Page 2

for the type of relationship that benefits both the company and the monitor. There was no suggestion at any time from anyone that these activities needed to be deferred for 90 days after the appointment of the External Compliance Monitor.

I have no doubt, as you suggest, that your newly selected ACO will be quite busy over the next two months, but I also have no doubt that he or she would be available for a brief meeting within the next 2-3 weeks. I am sure the same is true for many of the senior executives in the company, including you and Mr. Cook. That is why from the outset we have been willing to limit each of these initial sessions to one hour. From our perspective, we would benefit from an early window into the work the company has been doing since the Final Judgment. From your perspective, there is a substantial benefit in allowing us to become aware of those efforts as they are taking place rather than having them summarized for the first time when they are complete. It would allow us to comment about such activities in our semi-annual reports and make clear that our information was based on something other than an after-the-fact report.

As I am sure you are aware, monitors often have specific deadlines, some of which can be very demanding. Even so, the existence of such deadlines has never, to my knowledge, been viewed as a reason for the monitor to defer his work until the deadlines have passed. I have been involved in four monitorships over the past eleven years, three as monitor and one as counsel to the monitored entity. In every case, the monitor has met with the top management within 14 days of appointment. Those introductory meetings and interviews have helped create the foundation for the type of relationships that must exist between the monitor and entity being monitored. In none of these cases was the work of the monitor deferred until any of the deadlines, even those that were most demanding, had passed.

As to your concern about a request for "voluminous historical documents," I am afraid you may have been misinformed. Our requests were limited to the company's compliance policies and training materials, organization charts for three specific business divisions, information that describes the company's compliance reporting structure and the roles played by the Audit and Risk Oversight Committees, and any materials referred to in an August 19 letter sent to the Department of Justice, which was provided to us in New York on October 22, that are not duplicative of our other requests. These are very specific and narrowly drawn requests, and we have heard no previous suggestion that the volume was viewed as significant. My impression is that they were viewed as quite modest and reasonable. If that impression is incorrect, we would welcome further discussion on the issue.

D. Bruce Sewell, Esq.
November 5, 2013
Page 3


       I am scheduled to speak with Mr. Boutrous tomorrow to discuss these issues. Our hope is that you will fully authorize him to resolve these issues so that we can move forward without further delay.   I ask that you support our efforts to begin our work as promptly as possible, including meeting with me at your earliest convenience.

       Please feel free to contact me at any time to discuss these matters directly.  I can be reached at 202-682-4268.

                    Very truly yours,


                    Michael R. Bromwich

cc:    Tim Cook, Chief Executive Officer
       Theodore J. Boutrous Jr., Esq.
       Bernard A. Nigro Jr., Esq.

# EXHIBIT W

# The
# Bromwich
# Group

The Bromwich Group LLC
901 New York Avenue, NW, 5th Floor
Washington, DC  20001

November 1, 2013

**BY FEDERAL EXPRESS AND**
**BY E-MAIL VIA THEODORE J. BOUTROUS, JR.**

Mr. Timothy D. Cook
Chief Executive Officer
Apple Inc.

D. Bruce Sewell, Esq.
Senior Vice President and General Counsel
Apple Inc.
One Infinite Loop
Cupertino, CA  95014

Dear Gentlemen:

 As you know, on October 16, 2013, I was selected by the Honorable Denise L. Cote, United States District Judge for the Southern District of New York, to serve as the external antitrust compliance monitor pursuant to the Final Judgment in *United States v. Apple, Inc. et al.,* Civil Action No. 1:12-CV-2826.[1]  I want to take this opportunity to introduce myself, to share with you some information about my responsibilities, to express my hope for a constructive and collaborative relationship, and to express some concern about our initial interactions with the company.

 I have been conducting oversight in the public and private sectors for twenty years, have served as an independent monitor for two public agencies, have worked with companies of all sizes and types as a private sector lawyer, and am currently serving as the independent monitor for one of the largest companies in the world.  I am well aware that this litigation was hotly contested, that the company is appealing the Court's September 5 Final Judgment ("Final Judgment"), and that the company opposed the creation of the external monitor position.

---

[1] Judge Cote further ordered that Bernard A. Nigro, Jr. of Fried Frank, Harris, Shriver & Jacobson assist me on this matter.

Mr. Timothy D. Cook
D. Bruce Sewell, Esq.
Page 2
November 1, 2013

I view all of this as prologue but as fundamentally irrelevant to my responsibilities as the independent monitor. It presents no bar whatsoever to our developing a constructive and harmonious working relationship. Our monitoring responsibilities are clearly described in the Court's Final Judgment. The principal responsibilities are:

- to review and evaluate Apple's internal antitrust compliance policies and procedures;

- to review Apple's antitrust compliance training program and ensure that it satisfies the specific requirements of the Court's Final Judgment;

- to make recommendations regarding Apple's antitrust policies, procedures, and training;

- to work with Apple's newly-appointed Antitrust Compliance Officer, including in connection with the annual antitrust compliance audit the company is required to conduct; and

- to submit semi-annual reports to Apple, the Department of Justice ("DOJ"), the Plaintiff States in the litigation, and the Court and to submit any additional reports that may be requested or may be necessary or appropriate.

As we advised your counsel last week during an in-person meeting ("October 22 Meeting"), we will adhere to several basic principles in conducting our monitoring activities. First, we will follow the specific contours of the monitor's role as set forth in the Final Judgment. Second, we will be accessible at all times to Apple, the other parties in the litigation, and the Court. Our independence does not require remoteness; in fact, it requires the opposite. Third, Apple and the other parties must respect our independence. We are not counsel to Apple, nor a consultant to Apple, nor are we affiliated with the DOJ or the Plaintiff States. We were selected by the Court and ultimately we report to the Court. Finally, the relationship we have with Apple need not – and should not – be adversarial. In fact, the only sure road to failure, for both Apple and the monitoring team, is if we are treated as an adversary and given anything less than the full and complete cooperation of the company and its top management.

In the October 22 Meeting, we made initial requests to obtain a limited set of documentary materials and to conduct brief preliminary interviews of various members of top management and the Board during the week of November 18. These requests were in line with requests I have made in every matter of this type in which I have previously been involved and are central to our ability to discharge our responsibilities. Your counsel suggested that senior management and the Board would find it disconcerting to be interviewed at this time and repeatedly asked for justifications for our requests. After the October 22 Meeting, your

Mr. Timothy D. Cook
D. Bruce Sewell, Esq.
Page 3
November 1, 2013

counsel, through two emails, attempted to negotiate issues related to our monitorship that, according to the Final Judgment, are not subject to negotiation. Yesterday, we received a letter ("October 31 Letter") from your counsel formally objecting to our request to interview senior Apple personnel prior to January 14, 2014. To date, we have not received any requested documentary materials.

Our obligation and authority to speak with you and Apple's senior leaders come directly from Judge Cote's Final Judgment and findings. At the August 27, 2013 hearing, to which your counsel specifically referred in the October 31 Letter, Judge Cote highlighted the central role played in the matters that were at issue by Apple's "lawyers and highest level executives." Hearing Transcript, *United States v. Apple, et al.,* No. 1:12-CV-2826, at 17 (Aug. 27, 2013). Accordingly, in outlining some of the specific activities the monitor is authorized to undertake, the Final Judgment listed as the first item the authority to "interview, either informally or on the record, any Apple personnel . . . ." Section VI.G.1. In the context of the Final Judgment as a whole, it is clear that the most important interviews will involve senior management and the Board. When your counsel expressed concern about tying up executives and Board members with time-consuming interviews, I assured them that each of these initial interviews would be limited to one hour. Although we will do everything possible to accommodate the busy schedules and other commitments of the people we seek to interview, we do not believe the blanket refusal to consent to any interviews prior to the middle of January is consistent with our mandate, and it contradicts the company's pledges to cooperate fully with us.

The success of our relationship depends in large part on the interest, attention and commitment given to this matter by Apple's top management, including both of you. It cannot be delegated away. To ensure that we establish a proper and productive relationship from the outset, I respectfully request that you take a direct interest in making sure that the people within the company who will be overseeing Apple's compliance with the Final Judgment provide us with full and complete cooperation consistent with its obligations under Paragraph VI.G of the Final Judgment.

I am prepared to meet with you, or to speak with you by telephone, at any time regarding these matters. I look forward to working with you and your colleagues as Apple fulfills its obligations under the Final Judgment and, in the words of your counsel, as it seeks to develop a world-class antitrust compliance program.

Mr. Timothy D. Cook
D. Bruce Sewell, Esq.
Page 4
November 1, 2013


     Please feel free to share this letter with members of your Board and with other members of senior management.

               Very truly yours,

               Michael R. Bromwich

cc: Bernard A. Nigro, Jr.

# EXHIBIT X

**The**
# Bromwich
# Group

The Bromwich Group LLC
901 New York Avenue, NW, 5th Floor
Washington, DC 20001

November 22, 2013

Noreen Krall, Esq.
Apple Inc.
Chief Litigation Counsel
1 Infinite Loop
Cupertino, CA 95014

      Re:    *U.S. v. Apple, Inc., et al.*, Civil Action No. 1:12-CV-2826

Dear Noreen:

      Thank you for your letter of November 21. We too are pleased that we finally made a small amount of progress this week, although the progress has been unacceptably slow. Apple has been slow to produce the materials we initially requested a month ago, grudgingly given us access to only two of the 15 witnesses with whom we had requested interviews during our trip to Silicon Valley this past week, refused to allow us an introduction during that trip to the newly-hired internal Antitrust Compliance Officer, and generally deflected our repeated requests to have initial discussions with senior executives at the company and its Board members.

      Instead, Apple has continued to focus on the issues of fees and expenses in disregard of the Court's September 5, 2013 Order. That Order establishes that the monitor proposes its fees and its policies relating to expenses, and the Department of Justice ("DOJ") and Plaintiff States collectively have the sole power of approval. Apple's role is to pay the invoices submitted by the monitor in connection with his work. The only requirement outlined in the September 5 Order is that the "compensation of the External Compliance Monitor and any

Letter to Noreen Krall, Esq.
November 22, 2013
Page 2 of 4

persons hired to assist the External Compliance Monitor shall be on reasonable and customary terms commensurate with the individuals' experience and responsibilities and consistent with reasonable expense guidelines." September 5, 2013 Order, at p. 14.

Apple has converted this standard into a license to make inappropriate demands. Such demands are perfectly understandable and acceptable in other circumstances (i.e., when the company is deciding among various service providers and is expected to negotiate aggressively in order to decide whether or not to retain the services of a particular firm). That is not the case here. The authority regarding who to select as monitor rested, and continues to rest, with the Court, not Apple. The Court selected me as a candidate recommended by the DOJ and Plaintiff States. And, the fees and expenses to be paid to the monitor and his team are not set by Apple; they are set by the monitor, with approval reserved for the DOJ and the Plaintiff States.

In the interests of putting these issues to rest, let me respond to the claims contained in your November 21 letter.

First, you assert that the fee structure we have proposed is "unreasonable for a matter of this size, scope, and type" based on your comprehensive review of past billing practices for law firms working for Apple. Your statistical analysis might be relevant if this matter was in fact comparable to the other matters in your database, but it is not. We have been told by company representatives that Apple has never before had a monitor of any kind, so your review of past matters in which you retained law firms cannot include matters of "this size, scope, and type" because your database contains no such matters. Further, as we discussed again when we met this past Monday, we are providing you with discounts from our standard rates. Unlike other service providers who discount in the hope that they will obtain further work from Apple, we are quite correctly barred from doing any other work for Apple during the duration of the monitorship and for a year afterwards.

As for your concerns about the 15 percent administrative fee, as we discussed on Monday, the fact is the law firms you deal with charge out their associates at hourly rates that generate profits far in excess of 15 percent; indeed, the markups range from more than 30 percent to well over 100 percent. In that context, a 15 percent administrative and management fee is modest.

Second, your suggestion that our proposed fees bear no relation to fees I have charged in past monitorships is misplaced. You refer to an hourly rate I proposed to monitor the New Orleans Police Department ($495/hour), as though it were a comparable assignment. It is not. For one thing, the difference between

Letter to Noreen Krall, Esq.
November 22, 2013
Page 3 of 4

monitoring a private company and a municipal police department with severe
financial problems is obvious on its face. Your reference to another engagement
in which I charged $750/hour to a municipal entity is based on a
misunderstanding; that matter is not a monitorship at all but instead a different
type of assignment.

Third, your requests for additional support for the administrative fee, and
for the billing rates of Ms. Cirincione and other timekeepers (including a
paralegal) are, again, a thinly-veiled attempt to substitute a fee negotiation and
approval process, in which Apple sets the terms of the relationship, for the
process the Court prescribed in its September 5 Order. Because Apple's
historical experience with law firms is limited to hiring lawyers as counsel, this
effort is not surprising, but it is inconsistent with the Court's September 5 Order.

Furthermore, as you are undoubtedly aware, I discussed Ms. Cirincione's
rate with Messrs. Boutrous and Swanson on November 6. We explained that Ms.
Cirincione's rate would be discounted significantly from the standard rate she
charges to almost all of her clients. Moreover, as I told you at our meeting on
November 18, and as I explained to Messrs. Boutrous and Swanson, I retained
Ms. Carroll after a careful search for a talented and cost-effective associate. Ms.
Cirincione, Ms. Carroll and Mr. Cowdery (a Fried Frank paralegal), are the only
members of the monitoring team apart from Mr. Nigro and myself.

Fourth, you complain about our decision not to provide detail in our
invoices on the tasks undertaken in addition to the amount of time spent by
timekeepers on specific days, but this complaint ignores two basic facts. First, we
have told you we will maintain detailed records and they will be provided to
DOJ and the Plaintiff States for their review, as provided for in the Court's
September 5 Order. Second, our experience to date with Apple on the fee and
expense issues validates that decision. We have no interest in, or obligation to
agree to, sharing with Apple each task we decide to undertake. In fact, such
disclosure is inappropriate and could serve to compromise our independence.
The work we undertake to fulfill our obligations under Judge Cote's September 5
Order is not in Apple's discretion.

Fifth, our experience over the past month clearly demonstrates that our
ability to fulfill our obligations would be compromised at this point if we were to
create a budget for our monitoring activities. We could not have anticipated the
amount of effort it would take to get the small number of documents and the
small number of interviews we have obtained so far. Nor could we have
anticipated the amount of time we have spent responding to the numerous e-
mails and letters received from Apple or the time we have spent drafting letters
to senior executives of the company notifying them of Apple's lack of

cooperation and seeking an early course correction. Until we see more cooperation from the company, and have a longer track record on which to base estimates, we are unable to provide a budget. Moreover, your insistence on a budget at this point is inconsistent with your acceptance of my suggestion at our November 18 meeting to base a budget on our first three months of work on this matter. Your letter does not explain the reason for changing your position between then and November 21.

A minor additional point: you suggest that this initial bill was before any "meaningful travel [was] conducted." However, it does include a trip to New York for the introductory October 22 meeting for which Mr. Nigro, Ms. Cirincione and I traveled round-trip from Washington, DC to New York. We were puzzled at Apple's selection of New York as the meeting site when four of the seven attendees are based in DC and only one was based in New York. Meeting in New York was Apple's choice, and yet this selection caused a non-trivial contribution to the bill.

Finally, contrary to your letter, I never said or even suggested that "Apple's wealth is sufficient reason not to address the billing concerns [contained in your November 21 Letter]." That was said by you. It was a view you attributed to me, without any foundation, that I quickly corrected. Please be careful about imputing views to me that I do not hold and have never articulated.

I have no doubt that we can develop a constructive and productive relationship with you and your colleagues, but we have been unable to do so after a full month of making every effort to communicate our expectations and to work with you. Unfortunately, we have seen little reciprocity and instead a consistent pattern of delay, unresponsiveness, and lack of cooperation. We very much hope that changes with our trip to Cupertino the week of December 2.

Very truly yours,

Michael R. Bromwich

# EXHIBIT Y



November 21, 2013

<u>BY E-MAIL</u>

Michael R. Bromwich
The Bromwich Group LLC
901 New York Avenue, NW 5th Floor
Washington, D.C. 20001

Re: External Antitrust Compliance Monitoring

Dear Michael,

      Thank you for meeting with us this week and for the fruitful discussions that we had on a number of issues, and I am glad that we were able to reach agreement in areas such as confidentiality. However, there is one issue left to be resolved: your proposed fees and expenses in this matter.[1] As we have conveyed to you previously, the billing rates that you have proposed, as well as the 15% administrative fee that you intend to charge on top of those rates, are unreasonable, non-customary, and inconsistent with Judge Cote's direction.[2]

      *First*, the fee structure that you have proposed is unreasonable for a matter of this size, scope, and type. Apple has now conducted an extensive review of past billing practices for comparable matters, law firms, and law firm partners who have done work for Apple. Of the approximately 5000 matters that we reviewed, involving roughly 1750 partners, not a single partner had an effective billing rate as high as or higher than those that you have proposed here, and no firm ever imposed an "administrative fee" similar to the 15% fee that you propose. Whether compared to the most expensive partners who have **ever** worked on Apple matters, or the average of the top 10% of the most expensive partners who have worked on those matters, your fees far exceed customary billing arrangements for engagements of similar size and scope and are certainly not "customary and reasonable."

---

[1]     Your letter dated November 7, 2013 indicates you agree to adhere to some but not all terms of the Apple expense policy and guidelines.

[2]     *See* September 5, 2013 Final Judgment ("Final Judgment") § VI.I (providing that "[t]he compensation of the External Compliance Monitor and any persons hired to assist the External Compliance Monitor shall be on ***reasonable and customary terms*** commensurate with the individuals' experience and responsibilities and consistent with reasonable expense guidelines") (emphasis added); *see also id.* § VI.J. (permitting Apple to challenge actions it "determines" not to be "cost-effective").

November 21, 2013
Page 2



     *Second*, your proposed fees appear to bear no relation to the fees that you have charged in past monitorships. For example, in a proposal to monitor the New Orleans Police Department, you suggested a fee of $495 per hour, with no additional administrative fee, which the Department of Justice referred to as "relatively expensive."[3] You also informed us that, in another monitoring engagement relating to a municipality, you billed at a fee of $750 per hour, while you billed a foreign sovereign state $1250 per hour. Based on this billing history, it is unclear to us how your billing at $1100 per hour is consistent with your own "reasonable and customary" practices either.

     *Third*, despite our previous requests, you still have provided no support for adding the 15% administrative fee on top of all time billed in a matter of this type, in which you have been personally appointed to perform the duties of an attorney. Please explain what support, if any, you have for the contention that a 15% administrative fee is "customary and reasonable" for a monitoring engagement involving legal functions.[4]

     *Fourth*, while you have now provided some support for the billing rate of Mr. Nigro, you still have provided no meaningful support for your own rate or the rates of other members of your team such as Ms. Cirincione, Mr. Chowdery, Mr. Bensing, and Ms. Carroll and no evidence to suggest that those rates are reasonable and customary.[5]

     *Fifth*, your proposal to provide only time billed and the total billed amount does not permit us to determine whether your fees and expenses are reasonable and customary. While you expressed concern regarding confidentiality in providing additional detail, you should at minimum provide a general description of each task performed, so that Apple may make a reasonable assessment of your bills. Apple requires detailed time entries—without block billing—from all law firms before paying bills in any comparable matters. We appreciate your stated willingness at the meeting to consider Apple's request for a description of any work performed, and we look forward to receiving your response.

---

[3]     *See* June 4, 2013 Department of Justice Memorandum at 18.

[4]     A justification that you stated at the meeting for the 15% administrative fee was that your solo practitioner consulting group could not generate a profit by staffing associates to this matter. However, the proposed 15% fee applies to Fried Frank, which already has two associates staffed to the monitoring team, and we request support showing that you will not generate a "profit" without that 15% mark-up.

[5]     Other areas in which we have requested additional detail include the hourly billing rates that the Bromwich Group and Fried Frank traditionally charge their respective clients, including any standard discounts or allowances for matters of this type, size, and scope, and any evidence that applying the 15% fee to the invoices of Fried Frank—a law firm—is reasonable or customary under these circumstances.